IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

...........................................................................
                                                    :
GLAXO GROUP LTD.                                    :
d/b/a/ GLAXOSMITHKLINE                              :
                                                    :
        Plaintiff and                               :
        Counterclaim Defendant,                     :
                                                    :
        v.                                          :       Civil Action No. 05-99-GMS
                                                    :
SPECTRUM PHARMACEUTICALS, INC.,                     :       **REDACTED VERSION**
                                                    :
        Defendant and                               :
        Counterclaim Plaintiff                      :
                                                    :
...........................................................................:


## FINAL PRETRIAL ORDER

### VOLUME 2


Jack B. Blumenfeld (#1014)            Edmond D. Johnson (# 2257)
Julie Heaney (#3052)                  Peter B. Ladig (#3513)
Morris, Nichols, Arsht & Tunnell LLP  The Bayard Firm
1201 N. Market Street                 222 Delaware Avenue, Suite 900
P.O. Box 1347                         P.O. Box 25130
Wilmington, DE 19899                  Wilmington, DE  19899
(302) 658-9200                        (302) 655-5000

*Attorneys for Plaintiff Glaxo Group Ltd*     *Attorneys    for    Defendant    Spectrum*
*d/b/a GlaxoSmithKline*                        *Pharmaceuticals, Inc.*


Original Filing Date:  October 13, 2006

Redacted Filing Date:  October 20, 2006

EXHIBIT 19

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

GLAXO GROUP LTD
d/b/a GLAXOSMITHKLINE,

Plaintiff,

- against -

SPECTRUM PHARMACEUTICALS, INC.,

Defendant.

Civil Action No. 05-99 (GMS)

CONFIDENTIAL – UNDER
PROTECTIVE ORDER

PLAINTIFF GLAXOSMITHKLINE'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

Pursuant to this Court's Order of March 17, 2006, plaintiff Glaxo

Group Ltd d/b/a GlaxoSmithKline ("GSK") respectfully submits the following

proposed findings of fact and conclusions of law:[1]

Findings of Fact

I.    THE PARTIES

A.    GSK

1.    Plaintiff Glaxo Group, Ltd d/b/a GlaxoSmithKline ("GSK) is a
company organized and existing under the laws of England and having an office

_____

[1] GSK reserves the right to modify or supplement its findings and
conclusions based on the evidence adduced at trial.

and place of business at Glaxo Wellcome House, Berkeley Avenue, Greenford, Middlesex, United Kingdom.  GSK is engaged in the business of research, development, manufacture and sale of pharmaceutical products worldwide.

B.    <u>Spectrum</u>

2.    Defendant Spectrum Pharmaceuticals, Inc. is a corporation organized and existing under the laws of the State of Delaware and has its principal place of business at 157 Technology Drive, Irvine, California 92618.

II.    **IMITREX**

A.    <u>Imitrex and sumatriptan succinate</u>

3.    Imitrex® ("Imitrex") is a trade name for medication invented by GSK and used in the treatment of migraine and cluster headache.  Imitrex is available in tablet, injection and nasal spray formulations.

4.    GSK manufactures and sells Imitrex products in the United States.

5.    Imitrex injections contain a chemical compound known as sumatriptan succinate.  Sumatriptan succinate is the active ingredient in Imitrex injections.

6.    Imitrex is chemically very different from all prior anti-migraine drugs and is the first of a new class of anti-migraine medications known as triptans.  Imitrex revolutionized migraine treatment.

7.    Imitrex is an extremely successful drug.  For example, in 2004, Imitrex was on the list of top 50 best-selling drugs in the U.S., ranking 45th on the list.

B.    <u>GSK's NDA and patents covering Imitrex</u>

8.    GSK is the holder of New Drug Application ("NDA") 20080, which covers Imitrex injections.

9.    The Food and Drug Administration ("FDA") has approved Imitrex injections for the treatment of migraine and cluster headache.

10.     A holder of an approved NDA for a drug is required to list all patents covering that drug in the FDA's "Approved Drug Products with Therapeutic Equivalence Evaluations," commonly known as the "Orange Book."

11.     The Orange Book lists two patents for Imitrex injections: U.S. Patent No. 4,816,470 (the "'470 Patent") and U.S. Patent No. 5,037,845 (the "'845 Patent").

12.     The term of the '470 Patent, extended nine months pursuant to 35 U.S.C. § 156, expires on December 28, 2006. Pediatric exclusivity for the '470 Patent expires on June 28, 2007. Spectrum has not challenged the validity or enforceability of the '470 Patent.

13.     The '845 Patent is the patent-in-suit. The '845 Patent expires on August 6, 2008. GSK's pediatric exclusivity for the '845 Patent expires on February 6, 2009. GSK did not apply for an extension of the term of the '845 Patent pursuant to 35 U.S.C. § 156 because, under the provisions of Section 156, the '845 Patent was ineligible for such an extension.

III.     PROCEDURAL HISTORY

A.     Spectrum's ANDA filing

14.     REDACTED            Spectrum filed Abbreviated New Drug Application ("ANDA") REDACTED with the FDA. Spectrum's ANDA seeks approval to sell generic equivalents of 6 mg/0.5 mL sumatriptan succinate injectable products.

15.     In its ANDA, Spectrum certified pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV) that the '845 Patent is invalid and/or will not be infringed by Spectrum's proposed sumatriptan succinate injectable products.

B.     The GSK-Spectrum Action

16.     On January 4, 2005, Spectrum sent GSK the Notice required by 21 U.S.C. § 355(j)(2)(B). In its Notice, Spectrum contended that the '845 Patent was invalid for anticipation and obviousness and that its proposed sumatriptan succinate injection would not infringe Claims 6-9 and 12 of the '845 Patent.

17.     Pursuant to 35 U.S.C. § 271(e)(2), GSK filed suit in this Court on February 18, 2005, against Spectrum for infringement of the '845 Patent.

18.     In its Answer, filed on March 15, 2005, Spectrum asserted affirmative defenses alleging that the '845 Patent was invalid under 35 U.S.C. §§ 101, 102, 103 and 112 and under the doctrine of double patenting.

19.     In its Answer, Spectrum also counterclaimed for a declaratory judgment that the '845 Patent was invalid under 35 U.S.C. §§ 101, 102, 103 and 112 and under the doctrine of double patenting and for a declaratory judgment that its proposed sumatriptan succinate injection would not infringe any claim of the '845 Patent.

20.     Spectrum filed an Amended Answer on February 23, 2006.  In its Amended Answer, Spectrum asserted a counterclaim seeking a declaration that the '845 Patent is unenforceable under three theories of alleged inequitable conduct during its prosecution.

21.     On May 19, 2006, Spectrum stipulated for purposes of this action that its proposed sumatriptan succinate injectable products will infringe Claims 1-5 and 10-11 of the '845 Patent and that Spectrum will not raise the defense of non-infringement at trial.  Spectrum also withdrew its counterclaim for a declaration of non-infringement.

## IV.     CHEMISTRY BACKGROUND

### A.     Atoms, Ions, and Compounds

22.     A chemical compound is a substance composed of atoms or ions of two or more elements in chemical combination.

23.     If an atom, through a chemical reaction or physical process, gains or loses one or more electrons, it becomes an "ion."

24.     Ions can be positively or negatively charged, depending on whether the ion has more or fewer protons than electrons.  A positively charged ion is called a "cation," and a negatively charged ion is called an "anion."

25.     The fundamental component of a compound is a molecule, which is a group of atoms or ions that associate with each other in a set pattern through distinct chemical "bonds."

26.     The bonds between atoms that define the structure of molecules generally come in two varieties: ionic and covalent.  Ionic bonds arise when an

electron has been transferred from one atom (or, sometimes, groups of atoms) to another, such that the resulting difference in charge gives rise to an electrical attraction between the two resulting, oppositely charged ions.  In contrast to ionic bonds, covalent bonds arise as a result of the sharing of electrons between two atoms.

27.     When a covalent bond comes about as the result of the sharing of a single pair of electrons (one electron from each atom) by two different atoms, the resulting bond is called a "single bond."

28.     When two atoms share two or three pairs of electrons, the resulting covalent bonds are referred to as "double" and "triple" bonds, respectively.

29.     Organic chemistry is the field of chemistry that concerns itself with the study of "organic molecules."  Organic molecules are compounds that necessarily contain the element, carbon.  Organic molecules may also contain hydrogen, oxygen and nitrogen, as well as sulfur, phosphorus, or other elements.

30.     Carbon can "share" up to four electrons with other atoms (forming four covalent bonds), and can therefore form bonds with up to four other atoms, including other carbon atoms, depending on the number of electrons it shares with each of those other atoms.

31.     Nitrogen generally forms bonds with up to three other atoms, while oxygen generally forms bonds with up to two other atoms.  Hydrogen, because it possesses only one electron, generally shares only one electron with other atoms. Hydrogen generally forms bonds with only one other atom.

B.     Acids and Bases

32.     All chemical compounds can be described as neutral, acidic, or basic.

33.     A neutral compound neither accepts nor donates protons when dissolved in water.

34.     An acidic compound, or "acid," may be defined as a compound that releases a proton to its surroundings when dissolved in water.

35.     A basic compound, or "base," may be defined as a compound that accepts — ionically binds to — a proton when dissolved in water.  When the base

is depicted in the form in which it has not accepted — *i.e.*, is "free of"— a proton, it may be referred to as a "free base."

36.    Sumatriptan, the compound used to make sumatriptan succinate, is a basic molecule (or free base) because certain of its nitrogen atoms have the ability to accept a proton when dissolved in water.

37.    The strength of an acid is determined by its tendency to give up its proton; a strong acid readily donates its proton, whereas a weak acid less readily donates its proton.

38.    By contrast, a strong base attracts protons very strongly, whereas a weak base has only a slight attraction to protons.

39.    A common measurement of acidity correlates with the concentration of protons in an aqueous solution of an acid or base.  That measurement, the pH, is reported according to a logarithmic scale running from 0 up to 14, under which 0 is the most acidic, 7 is neutral, and 14 is the most basic.

C.    Salts

40.    The term, "salt," refers to a compound that results from the combination of an acid and a base.

41.    A salt molecule is characterized by a positively charged ion (cation), ionically bonded to a negatively charged ion (anion).

42.    Salts are distinct chemical compounds.  The structure of a salt always differs from that of its acidic or basic precursor.  In addition, salts formed from the combination of the same base with different acids have distinct molecular structures from each other.

43.    Salts also have properties that are both distinct from those of other salts, as well as from the particular acids and bases from which they are derived.  Different salts of the same base will differ, for example, in their hygroscopicity (the tendency to absorb water from the atmosphere), instability (the tendency to chemically degrade into a different molecule), melting points, and chargeability (the ability to sustain an electric charge), and crystalline size and shape (which can affect the ease with which a compound is manufactured).

44.    The properties of salts and the properties of the acids and bases from which they are derived are not related in any predictable manner.

45.    Free bases or acids with desirable pharmaceutical properties are often formulated as salts because some salts can form crystalline solids. Crystalline solids are more practically manufactured, marketed, stored, and administered than non-crystalline, non-salt formulations.

46.    When molecules of solvent—usually a liquid—are incorporated into the crystalline form of a salt, the resulting compound is called a solvate. Solvates are generally not useful for formulation as pharmaceuticals because ingestion of organic solvents, even at the low levels at which they may be present in solvates, is not desirable.

47.    Whether a solvate will form instead of a pure crystal cannot be predicted.  Neither is there a way to predict whether, and what kind, of crystal a particular salt will form.

48.    The choice of salt may greatly affect a drug's solubility in water, which may substantially affect the pharmacological properties of the drug.

49.    Variations in the properties of a salt can render an otherwise physiologically acceptable salt unacceptable as a pharmaceutical product.

50.    Whether a drug compound will form a soluble, crystalline salt with a particular free base or acid, and the properties of any particular salt that does form, are unpredictable.

51.     To this day, whether a particular salt will have any desirable property, let alone a combination of properties that renders it suitable for pharmaceutical formulation, can be determined only by making and testing the salt.

52.    Succinic acid is one of at least fifty "physiologically acceptable" acids from which salt formulations of sumatriptan (or other basic drug compounds, for that matter) can be prepared.

D.    Isomerism

53.    Isomerism may be defined generally as the phenomenon whereby different molecules have the same atoms (and therefore the same molecular formula) but the atoms are arranged differently.  There are several varieties of "isomerism."

54.    Structural isomers are molecules that have the same number and kinds of atoms, but their atoms are bound to one another differently, resulting in different structures.  Structural isomers have different physical and chemical properties, *e.g.*, melting points, solubility, boiling points.

55.    Cis-trans isomers are compounds that are identical except with respect to the alignment of two different groups around a reference plane.  Cis-trans isomerism may characterize molecules having a carbon-carbon double bond (C=C).  Cis-trans isomers have identical bonds but the alignment of two different groups on each side of the double bond differs.

56.    Like structural isomers, cis-trans isomers differ from each other in that they have different physical and chemical properties, *e.g.*, melting points, solubility, boiling points.

V.    THE MIGRAINE PROJECT AND THE DISCOVERY OF IMITREX

A.    Migraine

57.    Migraine is medical condition marked by a severe and often disabling headache.  Migraine headache is commonly accompanied by other symptoms, such as severe nausea, vomiting, and sensitivity to light and sound.

58.    If left untreated, a migraine attack can last from four to seventy-two hours.  The pain is often severe enough to leave a migraine sufferer debilitated or incapacitated, preventing him or her from performing many ordinary daily activities for hours or even days.

59.    Migraine affects about 12% of the population, and women are three times more likely to be afflicted with migraine than men.  Approximately 20% of women will get migraine headaches at some point in their lives. Tens of millions of people in the United States suffer from migraine.

B.    Migraine treatments before Imitrex

60.    Prior to the discovery of Imitrex, there was a long-felt need for an anti-migraine drug that was more effective than existing anti-migraine treatments and that produced fewer side effects than those treatments.

61.    Migraine treatments prior to Imitrex included aspirin, other analgesics and a class of drugs called ergots, as well as combinations of the

foregoing drugs with barbiturates or caffeine.  All of those prior treatments suffered from significant shortcomings.

62.     Aspirin and other analgesics are not very effective, particularly at relieving more severe migraines.  In addition, aspirin may damage the gastro-intestinal tract and may increase the risk of internal bleeding.  Other analgesics may also cause stomach upset, and all analgesics (including aspirin) when taken very frequently may cause episodic headaches, such as migraine, to evolve into chronic daily headaches.

63.     Ergots, which include ergotamine, dihydroergotamine and methysergide, constrict blood vessels throughout the body.  Ergots also commonly aggravate the nausea and vomiting that often accompany a migraine attack.  Frequent use of ergots leads to habituation or addiction that is particularly difficult to overcome.  Because of their non-selective constriction of blood vessels, ergots also have the potential of causing heart attacks, strokes or gangrene of the fingers or toes.

64.     In addition to those general shortcomings, the ergot methysergide, which is effective only as a prophylactic agent and does not relieve migraine once an attack has begun, has such dangerous potential side effects that it is no longer available in the U.S.  Dihydroergotamine had the added disadvantage of being available only as an injectable medication until well after the discovery of Imitrex.

65.     Despite their shortcomings, ergots were accepted as the primary agents for the treatment of migraine from the 1930s onwards.  Otherwise, patients managed migraine as best they could with analgesics or analgesic-containing combination remedies.

66.     Before the discovery of Imitrex, a number of research projects attempted to develop and improve migraine treatment, none of which was successful in providing a substantially improved anti-migraine drug.  For example, in the 1940s, an attempt to find new types of migraine drugs led to the discovery of LSD but not to the discovery of anti-migraine drugs.  In the 1950s, researchers at the Montefiore Headache Unit in New York created Fiorinal (aspirin, caffeine and butalbital).  However, like other compounds containing analgesics, Fiorinal usually did not fully abort a typically severe migraine attack and was particularly subject to overuse.

67.     Given the limited number of drug therapeutic options before Imitrex, physicians often suggested behavioral strategies and lifestyle changes to migraine patients, such as learning to avoid migraine triggers or undergoing biofeedback conditioning.  Although such advice was intended to help patients manage their migraine headaches and cope with the pain, it was not an adequate substitute for a drug that could safely and effectively relieve an incapacitating migraine attack and allow patients to lead more normal lives.

68.     Until the discovery of Imitrex, researchers were skeptical that an effective anti-migraine drug could be developed since the precise causes and mechanisms of migraine were so poorly understood.

C.    Overview of the Migraine Project

69.     Scientists at Glaxo, one of GSK's predecessor companies, discovered Imitrex during the course of a large-scale research project known as the "Migraine Project" or the "5-HT Project."

70.     Dr. Patrick Humphrey, a British scientist, began the Migraine Project at Glaxo in 1972.  Dr. Humphrey was the chief pharmacologist and head of the Migraine Project from its inception until the early 1990s.

71.     Dr. Humphrey initiated the Migraine Project on the theory that the pain of migraine was attributable to excessive dilation of certain blood vessels in the head.  The goal of the Migraine Project was to discover a compound that could substantially constrict those blood vessels in the head while only minimally constricting other blood vessels in the body so as to avoid hypertension, loss of blood flow to major organs or other undesirable side effects. Constriction of the blood vessels in the head is known as carotid vasoconstriction.

72.     Dr. Humphrey was aware that serotonin (also known as 5-hydroxytryptamine or 5-HT), a chemical occurring naturally in the human body, provided a potential starting point for migraine drug development because administration of serotonin was known to abort a migraine attack.  However, because of its many side effects, serotonin itself was not suitable as an anti-migraine agent.

73.     Dr. Humphrey postulated that serotonin might abort a migraine by binding to certain receptors found in the blood vessels of the head, causing carotid vasoconstriction.  A receptor is a specific protein molecule located in the

cell membranes of particular types of cells in the body. When a chemical compound binds to a receptor, it initiates biochemical events in those cells that ultimately result in a particular biological response, for example, constriction of a blood vessel.

74.     Dr. Humphrey hypothesized that if the blood vessels in the head contained a unique receptor that caused constriction of those blood vessels, it might be possible to synthesize a compound targeted at that receptor so as to cause selective carotid vasoconstriction, which would reverse the blood vessel dilation thought to be involved in migraine pain and would relieve the pain of migraine without causing side effects such as hypertension or loss of blood flow to major organs.

75.     After Dr. Humphrey and his colleagues at Glaxo discovered that a unique serotonin receptor, which they called $S_2$ and which is currently known as 5-$HT_1$, was found primarily in the blood vessels of the head (*i.e.*, the carotid vasculature), the chemists working on the Migraine Project began synthesizing compounds intended to act on that unique receptor without substantially affecting other receptors found in the human body, including other types of serotonin receptors.

76.     The chemists on the Migraine Project used the serotonin molecule as a starting point for their discovery efforts. Because serotonin is a type of molecule known as a substituted indole (or indole derivative), the chemists focused on synthesizing substituted indoles. A virtually infinite number of substituted indoles can be synthesized.

77.     Because of the extremely large number of potential candidate compounds and the lack of standard tests for determination of anti-migraine activity, the Migraine Project scientists developed novel screening tests designed to predict whether a compound would be suitable as an anti-migraine agent.

78.     The initial screening tests used during the Migraine Project sought to determine whether a candidate compound was both potent and selective in activating the $S_2$ receptor and causing carotid vasoconstriction. A potent compound was one that activated the $S_2$ receptor in relatively small amounts, while a selective compound was one that caused minimal activation of other serotonin receptors.

79.     Compounds that were found to be sufficiently potent and selective in causing carotid vasoconstriction went on to be tested for a series of other

properties required in an anti-migraine compound, for example, intravenous duration of action; intraduodenal efficacy; mutagenicity; oral bioavailability; lack of other toxicological effects; lack of behavioral effects and onset of action. Those tests were generally conducted in a particular order, and a compound that failed a particular test was dropped from further consideration.

80.     The Migraine Project lasted approximately twenty years. It employed numerous scientists, including pharmacologists, chemists, toxicologists and laboratory technicians.

81.     The process of drug discovery during the Migraine Project was costly and time-consuming in part because reliable structure-activity relationships ("SARs") were lacking for most of the key properties sought in an anti-migraine compound.

82.     An SAR is a pattern linking the chemical structures of a set of compounds with the particular biological effects of those compounds. To derive an SAR, a chemical structure is modified, and the biological effects of each structural change are assessed to see whether a pattern emerges. If a reliable SAR can be developed, it speeds drug development because it allows scientists to predict what chemical structures or modifications will produce desired biological effects.

83.     Although the scientists on the Migraine Project were ultimately able to derive somewhat predictive SARs for the potency and selectivity of indole derivatives at the $S_2$ receptor, they were never able to derive reliable SARs for the other properties sought in an anti-migraine agent, including intravenous duration of action, intraduodenal efficacy, oral bioavailability, absence of mutagenicity and other toxicological effects, let alone a desirable combination of those properties.

84.     In general, even a very small change in chemical structure from one compound to another can produce substantial differences between the biological and physiological properties of those compounds. In the absence of predictive SARs, there is no way to know what effects a given modification in chemical structure will have.

85.     Because of the lack of predictive SARs, the Migraine Project operated largely by trial and error, and the search for an anti-migraine drug was not restricted to any particular chemical structures.

86.     The Migraine Project scientists synthesized and tested diverse classes of compounds, including substituted indoles. The screening process involved testing several classes of substituted indoles at once, with no prior understanding that any particular class of compounds would be superior to any other.  In addition, the Migraine Project scientists also synthesized and tested a considerable number of non-indole compounds.

87.     Over 1000 novel compounds, not including different salt compounds synthesized from the same free base compound, were synthesized and tested during the Migraine Project.

88.     Despite the synthesis and testing of such a large number of hitherto unknown compounds, the Migraine Project ultimately produced only two marketed medications, the first of which was Imitrex.

D.     <u>Discovery of the compounds specifically disclosed in the '470 Patent</u>

89.     Migraine Project chemists first began synthesizing potential anti-migraine compounds in 1977.

90.     From late 1979 through 1989, the Chemistry Research Leader in the Migraine Project was Dr. Alexander Oxford.  Dr. Oxford led the chemists responsible for synthesizing potential anti-migraine compounds.  Dr. Oxford had overall responsibility for deciding which compounds should be synthesized, a decision he made based on input from the other chemists on the Migraine Project team.

91.     In addition to his role as Chemistry Research Leader, Dr. Oxford personally led a team of Migraine Project chemists in synthesizing compounds. Another team of Migraine Project chemists was led by Dr. Ian Coates, who reported to Dr. Oxford.

92.     Around 1980, Dr. Coates and another chemist, Dr. Michael Dowle, independently suggested to Dr. Oxford that they synthesize a sulphonamide version of a compound then being studied by the Migraine Project scientists.  A sulphonamide contains an $SO_2$ group bonded to a nitrogen atom.  The sulphonamide compound they suggested had the chemical sequence $-NSO_2-$ on the left-hand side of the molecule.

93.     The suggestions of Dr. Coates and Dr. Dowle led to the synthesis of a number of sulphonamide compounds, the most promising of which proved to be compound generally referred to as GR 32066, first synthesized in April 1982.

94.     On June 7, 1982, Glaxo applied for a patent in the United Kingdom on a genus of sulphonamide compounds that included GR 32066.  In accordance with British patent law, Glaxo first submitted an abstract (the "Dowle Abstract") that disclosed a generic chemical formula containing several variables, along with a list of potential substituents for each variable.

95.     On June 7, 1983, Glaxo submitted a completed patent application in the United Kingdom, which was given the application publication number 2124210A.  On the same date, Glaxo submitted a patent application in the United States that corresponded and was substantively identical to UK application number 2124210A.  The US application eventually led to the '470 Patent.

96.     During the period between submission of the Dowle abstract and submission of the final UK and US applications, chemists on the Migraine Project synthesized a number of additional free base and salt sulphonamide compounds that fell within the scope of the generic formula disclosed in the Dowle Abstract, including a compound generally referred to as GR 34456.  Those additional compounds were all specifically disclosed in the UK and US patent applications.

97.     Because of their poor performance in Glaxo's pharmacological and toxicological tests, all of the individual compounds that fell within the scope of the '470 Patent, and that were synthesized prior to the submission of the US and final UK applications corresponding to that patent, were ultimately rejected as potential anti-migraine drugs.  Many such compounds were determined to have less than optimal levels of potency and selectivity.  GR 34456 was rejected because of its insufficient intravenous duration of action.

98.     The compound that progressed furthest in screening tests was GR 32066, which is the particularly preferred compound of the '470 Patent.  For a time, GR 32066 was considered a potential drug development candidate.  GR 32066 was ultimately rejected because of poor efficacy following intraduodenal administration.  GR 32066 was dropped from further consideration around February 1984.

99.     Most of the compounds specifically disclosed in the application for the '470 Patent, including GR 32066 and GR 34456, were also found to be mutagenic.  Mutagenicity is the tendency of a compound to cause genetic

mutations, which indicates that the compound may cause cancer. During the Migraine Project, Glaxo was especially concerned with mutagenicity because indole compounds were generally known to be potentially mutagenic.

100.    The Migraine Project scientists never considered the compounds specifically disclosed in the '470 Patent to comprise a promising class of compounds. None of the compounds specifically disclosed in the '470 Patent became anti-migraine drugs. Apart from GR 32066, none of the compounds specifically disclosed in the '470 Patent was ever even considered to be a promising drug development candidate.

101.    During and after the synthesis and testing of the compounds specifically disclosed in the '470 Patent, the Migraine Project chemists synthesized numerous other compounds that differed substantially in chemical structure from, and that did not fall within the scope of, the US and UK applications corresponding to the '470 Patent.

E.    The discovery of Imitrex

102.    By early 1984, Dr. Oxford and his colleagues were frustrated by their lack of success in discovering potential anti-migraine compounds. Despite the discovery and synthesis of approximately 700 novel substituted indole compounds, not including different salt compounds synthesized from the same free base compound, no compound had survived the battery of screening tests.

103.    Dr. Oxford and his colleagues were particularly frustrated by their inability to find compounds that possessed two key properties: adequate efficacy following intraduodenal administration and lack of mutagenicity.

104.    Efficacy following intraduodenal administration was a key property because it predicted whether a compound was suitable for oral administration.

105.    Oral administration—for example, administering the compound in the form of a tablet—is desirable for an anti-migraine drug. Because migraine is a chronic and unpredictable condition, patients need the ability to administer the compound themselves whenever they experience migraine symptoms. Patients generally prefer taking orally administered medications to giving themselves injections. As a result, a compound that can also be administered orally is preferable to one that can only be administered by injection.

106.    The test of efficacy following intraduodenal administration measured the strength and duration of the carotid vasoconstriction produced following injection of the compound into the small intestine of anesthetized test animals.  This method of administration was used as a surrogate for oral administration, which was not feasible because the test animals were anesthetized.

107.    Lack of mutagenicity was also a key property because an anti-migraine medication had to be safe.  During the early 1980s, Glaxo's toxicologists imposed stringent criteria for lack of mutagenicity and insisted that potential anti-migraine compounds could not have even small degree of mutagenic potential.

108.    By 1984, the Migraine Project scientists had not been able to develop reliable SARs for efficacy following intraduodenal administration and mutagenicity.

109.    In thinking about the difficulty in finding compounds with adequate efficacy following intraduodenal administration and lack of mutagenicity, Dr. Oxford recalled that the only previous compound that possessed both properties was a compound generally known as AH 25406.  AH 25406 had been dropped from further development because it caused behavioral effects in conscious animals.  The data concerning AH 25406 that were relied upon by Dr. Oxford were not public knowledge.

110.    Although it is a sulphonamide, AH 25406 did not fall within the scope of the '470 Patent.  The sulphonamides covered by the '470 Patent have the chemical group -NSO$_2$- on the left-hand side of the molecule:



By contrast, AH 24506 has the chemical group -SO$_2$N- on the left-hand side of the molecule:

111.    Dr. Oxford decided that it was worth synthesizing and testing a compound that was otherwise similar to AH 25406 except that the sulphonamide sequence $-SO_2N-$ was reversed to $-NSO_2-$. Dr. Oxford guessed that such a compound might retain the desirable properties of efficacy following intraduodenal administration and lack of mutagenicity of AH 25406 without having the undesirable behavioral effects of AH 25406.

112.    Dr. Oxford's decision to synthesize and test the compound now known as sumatriptan was not influenced by the fact that the compound fell within the scope of what would become the '470 Patent.

113.    When Dr. Oxford shared his idea with other chemists on the Migraine Project, Dr. Coates, the other team leader on the Migraine Project, as well as other chemists all expressed skepticism that Dr. Oxford's proposed compound would be a good anti-migraine agent.

114.    The compound proposed by Dr. Oxford terminates in two methyl groups on the right-hand side of the molecule. Methyl is a chemical group consisting of one carbon atom and three hydrogen atoms ($-CH_3$).

115.    Dr. Coates and other chemists recalled that, in prior testing, a sulphonamide with the sulphonamide sequence $-NSO_2-$ on the left-hand side of the molecule and with two methyl groups on the right-hand side of the molecule did not have good potency.

116.    The sulphonamide compound that Dr. Coates recalled had the internal reference number GR 34633. The reason GR 34633 was rejected was because of its poor potency. GR 34633 is the free base compound used to make the solvate disclosed in Example 21 of the '470 Patent, and Example 21 is the only compound disclosed in the '470 Patent with two methyl groups on the right-hand side of the molecule.

117.    Despite his colleagues' skepticism, Dr. Oxford insisted on the synthesis of his proposed compound. The monthly objectives for March-April

1984 for Dr. Oxford's chemistry team contained the structure of the proposed compound and assigned its synthesis to a chemist working on Dr. Oxford's team.

118.    The compound proposed by Dr. Oxford in 1984 was not part of a systematic attempt to test compounds within the scope of what would eventually become, years later, the '470 Patent. Of the compounds synthesized during the Migraine Project after the filing of the initial application for the '470 Patent in June 1983, only two compounds, including the compound Dr. Oxford proposed around February 1984, fell within the scope of what became the '470 patent.

119.    The compound proposed by Dr. Oxford is now known as sumatriptan, which is the free base compound from which sumatriptan succinate is derived.

120.    Sumatriptan was first synthesized on or about March 12, 1984, and, after an unsuccessful attempt to convert it into a creatinine sulfate salt, it was converted into a hemisuccinate salt. Sumatriptan hemisuccinate differs from sumatriptan succinate in that the ratio of sumatriptan to succinate is 2 to 1, rather than 1 to 1. Sumatriptan succinate was first synthesized on October 16, 1984.

121.    Subsequent testing of sumatriptan compounds revealed that, in comparison with all previous compounds tested, sumatriptan compounds possessed the best combination of properties as a potential anti-migraine agent, including sufficient potency, selectivity, intravenous duration of action, rapid onset of action, efficacy following intraduodenal administration, lack of behavioral effects and oral bioavailability, as well as a lack of mutagenic potential.

122.    On August 1, 1984, Glaxo applied in the United Kingdom for a patent directed to sumatriptan compounds. On August 1, 1985, Glaxo filed a corresponding application in the United States, which began the chain of applications leading to the '845 Patent.

123.    On June 29, 1990, Glaxo filed NDA 20080 with the FDA seeking approval to sell Imitrex injections for the treatment of migraine. In connection with its NDA, GSK submitted voluminous data concerning the safety and effectiveness of Imitrex.

124.    The FDA approved NDA 20080 on December 28, 1992. GSK began marketing Imitrex injections in the U.S. in March 1993. GSK went on to gain FDA approval for and to market tablet and nasal spray formulations of Imitrex.

## VI.     THE MEDICAL AND COMMERCIAL SUCCESS OF IMITREX

### A.     The safety and effectiveness of Imitrex

125.     Clinical trials showed Imitrex to be well tolerated and highly effective for oral, subcutaneous and nasal spray administration.  For example, relief of migraine symptoms in clinical studies was achieved with Imitrex in approximately 85% of patients within 2 hours following a single 6 mg subcutaneous dose, and in approximately 79% of patients after 4 hours following a single 100 mg oral dose.  Significantly, the clinical efficacy of Imitrex is maintained even after long-term usage.

126.     Imitrex produces prompt headache relief.  Imitrex tablets are rapidly absorbed from the gastrointestinal tract.   Even faster effects occur when Imitrex is administered subcutaneously or by nasal spray.

127.     Imitrex leads to relatively few adverse effects, and they are almost always mild and transient.  Those side effects include feelings of pressure or heaviness, warmth and tingling.  The mortality associated with Imitrex is extremely low and is either the result of an idiosyncratic reaction or improper administration to a patient with coronary artery disease or other contraindicating factors.

128.     The development of Imitrex revolutionized the understanding of migraine and of its treatment.  The safety and effectiveness of Imitrex led to the discovery of an entirely new class of anti-migraine drugs, collectively referred to as "triptans."  These include rizatriptan (Maxalt®), naratriptan (Amerge®), zolmitriptan (Zomig®), almotriptan (Axert®), frovatriptan (Frova®) and eletriptan (Relpax®), all of which were discovered after Imitrex.

### B.     The advantages of Imitrex over prior anti-migraine treatments

129.     Imitrex proved to be a significant advance over existing anti-migraine treatments.

130.     Imitrex is more potent than both ergots and the analgesics.  In addition, it is safer and has fewer side effects than the ergots.

131.     Because Imitrex was specifically designed to act primarily on the blood vessels of the head, rather than those found in other parts of the body, it constricts vessels in the heart only to a minimal extent and has little effect on

heart rate and blood pressure in patients without cardio-vascular disease. This stands in marked contrast to ergotamine.

132.    Imitrex does not cause ulcers or gastrointestinal bleeding as do many analgesics, nor does it cause nausea and vomiting as do the ergots. In fact, in contrast to the ergots, Imitrex provides relief from the other migraine symptoms such as nausea, vomiting and light and noise sensitivity.

C.    **The success of Imitrex**

133.    Imitrex (sumatriptan succinate) is an extremely successful medication.

134.    In 2004, approximately 5,500,000 prescriptions for Imitrex were dispensed in the United States, and Imitrex products generated over one billion dollars in sales.

135.    Imitrex sales and widespread use by doctors and patients are driven by the drug's improved efficacy, safety, and tolerability over its competitors.

136.    In addition to Spectrum, at least 13 other generic pharmaceutical companies have applied for FDA approval to sell generic copies of various formulations of Imitrex.

D.    **Imitrex praise and awards**

137.    Following its introduction, there was widespread praise for Imitrex by neurologists and other doctors involved in treating migraine. Words such as "miraculous" were used by migraine patients when their attacks ceased following the administration of Imitrex. The proven success of Imitrex has made it the "gold standard" anti-migraine drug.

138.    In 1994, Glaxo Canada won the Prix Galien Award, an international annual award for pharmaceutical research and innovation, for Imitrex. In 1996, Imigran (the U.K. trade name for Imitrex) won the Queen's Award for Technical Achievement, the highest honor that can be bestowed by the Queen on a British company.

139.    The GSK scientists who discovered sumatriptan have also received a number of scientific awards for their discovery. In 1997, the Royal Society, the U.K.'s national academy of science and preeminent scientific association,

awarded the prestigious Mullard Award to Dr. Humphrey, Dr. Oxford and Dr. Michael Tyers for their development of Imitrex and another medication described as "two effective and novel medicines resulting from research into understanding the role of serotonin in human diseases." The Mullard Award is made annually to an individual with an outstanding academic record "whose work is … making or has the potential to make a contribution to national prosperity in the United Kingdom."

140.    In 1999, Dr. Humphrey was named an Officer of the Order of the British Empire for his services to migraine research. That same year, Dr. Humphrey received the American National Headache Foundation Lifetime Achievement Award for pioneering research that led to the use of triptans for migraine treatment. In 1995, Dr. Humphrey received the U.K. Society for Medicines Research Award for Drug Discovery for the discovery of Imitrex.

## VII.    THE '845 PATENT

### A.    Background

141.    Glaxo Group Limited is the assignee of the '845 Patent, which is entitled "Indole Derivative." The named inventor of the '845 Patent is Alexander W. Oxford.

142.    According to the specification of the '845 Patent, the invention "provides 3-[2-(dimethylamino)ethyl]-N-methyl-1H-indole-5-methanesulphonamide, of formula (I)



and its physiologically acceptable salts and solvates (e.g. hydrates). The compounds according to the invention are useful in treating and/or preventing pain resulting from dilatation of the cranial vasculature, in particular migraine and related disorders such as cluster headache." 845/2:9-27.[2]

---

[2] Citations to patents take the form "[patent number]/[column]:[lines]" or "[patent number]/[column]:[line]-[column]:[line]."

143.    The compound with structure shown in formula (I), with the chemical name 3-[2-(dimethylamino)ethyl]-N-methyl-1H-indole-5-methanesulphonamide, is now commonly known as sumatriptan.  During the Migraine Project, sumatriptan was generally referred to within Glaxo as GR 43175.

144.    The '845 Patent issued from a line of three successive U.S. patent applications.  The first application was U.S. Application Serial No. 06/761,392, filed on August 1, 1985.  A continuing application, U.S. Application Serial No. 07/082,666 was filed on August 7, 1987.  A second continuation and the third application in the series, U.S. Application Serial No. 07/317,682 (hereinafter referred to as the "'845 Patent application") was filed on March 1, 1989.

145.    The '845 Patent issued on August 6, 1991.

146.    The examiner of all three applications leading to the '845 Patent was Mary E. Ceperley.

147.    The attorney who prosecuted all three applications leading to the '845 Patent was Richard E. Fichter of the law firm, Bacon & Thomas.

B.    The claims of the '845 Patent

148.    Claims 1-5 and 10-11 of the '845 Patent are at issue in this action.

149.    For purposes of understanding the disclosures in the '845 Patent, a person of ordinary skill in the art has a graduate degree in a scientific discipline related to the research and development of pharmaceuticals, such as organic chemistry or medicinal chemistry. The person of ordinary skill in the art has a Ph.D. having at least one year of practical experience in academia or industry in drug discovery or a related setting or a M.S. having at least 3 years of practical experience.

150.    Claim 1 of the '845 Patent is directed to "A compound of formula (I):



and its physiologically acceptable salts and solvates."  845/26:38-49.

151.    Claim 1 covers sumatriptan and physiologically acceptable salts and solvates of sumatriptan, including sumatriptan succinate.  A physiologically acceptable salt or solvate is one that is safe to administer to a human being. Claim 1 covers Spectrum's proposed sumatriptan succinate injectable product.

152.    Claim 2 of the '845 Patent is directed to "[a] compound according to claim 1, wherein the physiologically acceptable salt is an acid addition salt formed with an organic or inorganic acid."  845/26:50-52.

153.    Claim 2 covers physiologically acceptable salts formed from the addition of organic or inorganic acids to sumatriptan, including sumatriptan succinate, which is formed from the addition of succinic acid to sumatriptan. Claim 1 covers Spectrum's proposed sumatriptan succinate injectable product.

154.    Claim 3 of the '845 Patent is directed to "[a] compound according to claim 2, wherein the physiologically acceptable salt is a hydrochloride, hydrobromide, sulphate, nitrate, phosphate, formate, mesylate, citrate, benzoate, fumarate, maleate or succinate."  845/26:53-56.

155.    Claim 3 covers twelve categories of physiologically acceptable salts of sumatriptan, including sumatriptan succinate.  Claim 3 covers Spectrum's proposed sumatriptan succinate injectable product.

156.    Claim 4 of the '845 Patent is directed to "[a] compound according to claim 3, wherein the physiologically acceptable salt is the 1:1 succinate." 845/26:57-58.

157.    Claim 4 covers sumatriptan succinate (1:1), *i.e.*, sumatriptan succinate where the ratio of sumatriptan to succinate is 1 to 1.  Claim 4 covers Spectrum's proposed sumatriptan succinate injectable product because it contains sumatriptan succinate (1:1) as the active ingredient.

158.    Claim 5 of the '845 Patent is directed to "[a] pharmaceutical composition comprising as active ingredient an effective amount of the compound of formula (I) as defined in claim 1 or a physiologically acceptable salt or solvate thereof, together with one or more pharmaceutical carriers or excipients for use in the treatment or prevention of pain resulting from dilatation of the cranial vasculature."  845/26:59-65.

159.    Claim 5 covers a pharmaceutical product, used in treating or preventing pain caused by dilation of the blood vessels in the head, consisting of

sumatriptan, physiologically acceptable sumatriptan salts or physiologically acceptable sumatriptan solvates combined with other pharmaceutical ingredients, such as the inert ingredients that go into a injection. Claim 5 covers Spectrum's proposed sumatriptan succinate injectable product.

160.    Claim 10 of the '845 Patent is directed to a "method of treating a human being susceptible or suffering from migraine which comprises administering an effective amount of a compound of formula (I) as defined in claim 1 or a physiologically acceptable salt or solvate thereof." 845/27:10-28:3.

161.    Claim 10 covers any treatment for migraine that involves the administration of sumatriptan, physiologically acceptable sumatriptan salts or physiologically acceptable sumatriptan solvates. Claim 10 covers the use of Spectrum's proposed sumatriptan succinate injectable product to treat migraine, which is the use specified in Spectrum's ANDA.

162.    Claim 11 of the '845 Patent is directed to "A method of treating a human being susceptible or suffering from migraine which comprises administering a pharmaceutical composition according to claim 5." 845/28:4-6.

163.    Claim 11 covers any treatment for migraine that involves the administration of a pharmaceutical product consisting of sumatriptan, physiologically acceptable sumatriptan salts or physiologically acceptable sumatriptan solvates combined with other pharmaceutical ingredients, such as the inert ingredients that go into a tablet or an injection. Claim 11 covers the use of Spectrum's proposed sumatriptan succinate injectable product to treat migraine, which is the use specified in Spectrum's ANDA.

C.    Formula (I) is a limitation in every claim of the '845 Patent

164.    The chemical structure set forth in formula (I) of Claim 1 is a limitation of every claim of the '845 Patent.

165.    In Claims 2-4 of the '845 Patent, the chemical structure set forth in formula (I) of Claim 1 is a component of all physiologically acceptable sumatriptan salts covered by those claims.

166.    In Claims 5-9, the chemical structure set forth in formula (I) of Claim 1 is the structure of sumatriptan and is a component of all physiologically acceptable sumatriptan salts and solvates, which are ingredients in the pharmaceutical compositions covered by those claims.

167.    In Claim 10, the chemical structure set forth in formula (I) of Claim 1 is the structure of sumatriptan and is a component of all physiologically acceptable sumatriptan salts or solvates, whose use to treat migraine is covered by that claim.

168.    In Claim 11, the chemical structure set forth in formula (I) is the structure of sumatriptan and is a component of all physiologically acceptable sumatriptan salts and solvates, which are ingredients in the pharmaceutical compositions whose use to treat migraine is covered by those claims.

D.    The '845 Patent specification

169.    The specification of the '845 Patent discloses that sumatriptan falls within the scope of a group of compounds claimed in the UK patent application corresponding to the '470 Patent, but is not specifically disclosed in that application.  845/1:65-2:8.

170.    The '845 Patent specification indicates that sumatriptan has significant advantages over those compounds since it possesses a highly desirable combination of properties.  Those properties include the ability to cause potent and selective vasoconstrictor action both in vitro and in anesthetized dogs; effective and consistent absorption from the gastro-intestinal tract following intra-duodenal administration; no significant effect on blood pressure, heart rate or lung bronchoconstriction; and the ability to be safely administered (*i.e.*, free from toxic effects) orally as well as intravenously.  The '845 Patent specification characterizes sumatriptan's effective absorption from the gastro-intestinal tract as a particularly advantageous property.  845/1:22-2:55.

171.    The '845 Patent specification discloses the chemical name and formula of sumatriptan, indicates that succinates are preferred salts of sumatriptan and indicates that the 1:1 succinate is the most preferred sumatriptan salt.  845/2:9-23; 845/3:10-11.

172.    The '845 Patent specification discloses eight general processes ((A) through (H)) for the synthesis of sumatriptan.  845/4:66-13:35.  The '845 Patent specification discloses a further 20 examples of specific processes for the synthesis of sumatriptan and various sumatriptan salts, including two examples of processes for making sumatriptan succinate.  845/18:61-26:37.

## VIII.   THE PRIOR ART '470 PATENT

### A.    <u>Background</u>

173.    Glaxo Group Limited is the assignee of the '470 Patent, which is entitled "Heterocyclic Compounds."  The named inventors of the '470 Patent are Michael D. Dowle and Ian H. Coates.

174.    The '470 Patent claims priority from UK patent application No. 8216526 (published as UK patent application 2124210A), which was filed on June 7, 1982.

175.    The '470 Patent issued from a line of three successive U.S. patent applications.  The first application was U.S. Application Serial No. 501,999, filed on June 7, 1983.  A continuing application, U.S. Application Serial No. 680,532 was filed on December 11, 1984.  A second continuation and the third application in the series, U.S. Application Serial No. 789,831 was filed on November 15, 1985.

176.    The '470 Patent issued on March 28, 1989.

177.    The examiner of the application that issued as the '470 Patent was Mary Ceperley, who was also the examiner of all three applications leading to the '845 Patent.

178.    According to the specification, the '470 Patent "relates to heterocyclic compounds, to processes for their preparation, to pharmaceutical compositions containing them and to their medical use."  A heterocyclic compound is an organic compound with a ring structure that contains both carbon atoms and non-carbon atoms, such as nitrogen, as part of the ring. 470/1:8-10.

179.    For purposes of assessing the disclosures in the '470 Patent, a person of ordinary skill in the art has a graduate degree in a scientific discipline related to the research and development of pharmaceuticals, such as organic chemistry or medicinal chemistry. The person of ordinary skill in the art has a Ph.D. having at least one year of practical experience in academia or industry in drug discovery or a related setting or a M.S. having at least 3 years of practical experience.

B.    **'470 Patent genera**

180.    The specification and the claims of the '470 Patent disclose both specific chemical compounds and various genera of chemical compounds.

181.    The genera disclosed in the '470 patent are defined through the use of the following general formula, which the patent refers to as "general formula (I)":



**470/1:13-19; 470/30:6-13.**

182.    In general formula (I), the letter C stands for a carbon atom, O for an oxygen atom, H for a hydrogen atom, N for a nitrogen atom, and S for a sulfur atom.  The hexagonal and pentagonal shapes at the center of general formula (I) represent a particular configuration of hydrogen and carbon atoms.

183.    Every compound defined by general formula (I) must have carbon, hydrogen, oxygen, nitrogen and sulfur atoms in exactly the positions defined by the formula.

184.    General formula (I) contains six variables:  $R_1$, $R_2$, $R_3$, $R_4$, $R_5$ and Alk. Each variable represents an atom or a group of atoms at that location.  General formula (I) does not specify which particular atom or group of atoms can appear at the positions indicated by the six variables.

185.    At various points in the specification and claims, the '470 Patent provides discrete sets of choices for the variables of general formula (I).  Each set of choices references some or all of $R_1$, $R_2$, $R_3$, $R_4$, $R_5$ and Alk and, for each variable, provides a list of the atoms or groups of atoms that can potentially substitute for that variable.  An atom or group of atoms that can substitute for a variable in a general chemical formula is known as a "substituent."

186.    A particular set of choices for the variables in general formula (I) defines a class or "genus" of compounds.  That genus includes any compound whose chemical structure contains carbon, hydrogen, oxygen, nitrogen and

sulfur atoms in exactly the positions defined by general formula (I) as well as any permutation of permissible substituents for each of the variables in the formula.

C.    Genera disclosed in the '470 Patent

187.    Claims 1 through 10 of the '470 Patent each disclose a different genus of compounds defined by specifying potential substituents for the variables appearing in general formula (I).  470/30:5-31:14.

188.    The '470 Patent specification discloses five genera defined by specifying potential substituents for the variables appearing in general formula (I).  Four "preferred" genera are disclosed at column 3, lines 29-53.  A "particularly preferred" genus is disclosed at column 3, lines 54-62.

D.    Individual compounds disclosed in the '470 Patent

189.    In addition to disclosing various genera of chemical compounds, the specification and claims of the '470 Patent disclose a number of individual chemical compounds.

190.    The '470 Patent discloses a free base compound whose chemical name is 3-(2-aminoethyl)-N-methyl-1H-indole-5-methanesulphonamide, hereinafter also referred to as "Compound II."  Compound II is specifically named in Claim 12 of the '470 Patent and is specifically identified as a "particularly preferred compound" in the specification.  Two salts of Compound II are specifically named in Claim 14 of the '470 Patent.  470/31:22-24; 470/32:1-4; 470/4:5-8.

191.    The chemical structure of Compound II is:



192.    During the Migraine Project, Compound II was generally referred to within Glaxo as "GR 32066."

193.    The '470 Patent also discloses a compound whose chemical name is 3-(2-(methylamino)ethyl)-N-methyl-1H-indole-5-methanesulphonamide, hereinafter referred to as "Compound III."  Compound III is specifically named

in Claim 11 of the '470 Patent and is specifically identified as a "preferred compound" in the specification.  470/3:63-66; 470/31:15-17.

194.    The chemical structure of Compound III is:



195.    During the Migraine Project, Compound III was generally referred to within Glaxo as "GR 34456."

196.    In total, the specification of the '470 Patent discloses thirty examples of individual compounds covered by the patent, along with detailed methods for synthesizing each compound.  In some cases, the same compound appears as more than one example since different methods are disclosed for making that compound.  470/9:61-27:42.

E.    Biological information in the '470 Patent

197.    The '470 Patent states that "[i]t is generally believed that the pain of migraine is of vascular origin and caused by excessive dilation of the branches of the common carotid arterial bed…"  470/1:62-64.

198.    The '470 Patent indicates that "the compounds of the invention mimic methysergide in contracting the dog isolated saphenous vein strip." 470/1:68-2:1.  Methysergide is characterized as a compound known to be useful in the treatment of migraine.

199.    The '470 Patent states that "[t]hose compound which we have tested selectively constrict the carotid arterial bed of the anaesthetized dog and the compounds according to the invention are thus potentially useful for the treatment of migraine."  470/2:9-13.

200.    The '470 Patent does not provide any other information concerning the actual or potential biological effects of the compounds claimed in the '470 Patent.  As of 1984, there were no publicly available materials concerning the actual or potential biological effects of the compounds claimed in the '470 Patent.

## IX.    THE '483 PATENT

### A.    Background

201.    Glaxo Group Limited is the assignee of United States Patent No. 4,994,483 (the "'483 Patent"), which is entitled "5-Substituted-3-Aminoalkyl Indole Derivatives for Migraine."  The inventors of the '483 Patent are Alexander W. Oxford; Brian Evans;  Michael D. Dowle and Ian H. Coates.

202.    The '483 patent issued from Application No. 07/443,874 (hereinafter "483 Patent application".)  The examiner of the '483 Patent was Mark L. Berch.

203.    The '483 Patent issued on February 19, 1991, less than six months before the '845 Patent issued.

### B.    Invention of the '483 Patent

204.    The '483 Patent is directed to a single free base compound and physiologically acceptable salts and solvates of that compound, including pharmaceutical compositions containing that free base or those salts or solvates and the treatment of migraine using that free base or those salts or solvates. 483/34:12-20.

205.    During the Migraine Project, the compound with the formula set forth in Claim 1 of the '483 Patent was referred to as GR 40370.  GR 40370 was first synthesized at Glaxo at the end of 1983.

206.    Unlike sumatriptan compounds and the compounds covered by the '470 Patent, GR 40370 contains the chemical sequence $-N-SO_2-CH_2-CH_2-$ on the left-hand side of the molecule, rather than $-N-SO_2-CH_2-$.

207.    GR 40370 was a compound of interest because of its apparent suitability for oral administration, including good efficacy following intraduodenal administration and high oral bioavailability.

208.    However, in contrast to sumatriptan, GR 40370 proved to have toxic side effects, causing testicular atrophy in tests involving rats.  In addition, unlike sumatriptan, GR 40370 tested positive for mutagenic potential and caused behavioral problems in conscious animals.  As a result, Glaxo rejected GR 40370 as a potential anti-migraine drug.

## X.      COMPARISON OF THE '470 PATENT AND THE '845 PATENT

### A.      <u>Invalidity not found by the examiner</u>

209.    Both as originally filed on August 1, 1985 and in its present form, the specification of the '845 Patent states that "[i]n our published UK Patent Application No. 2124210A we describe indoles of the general formula



…"

845/1:36-47.  UK Patent Application No. 2124210A is the foreign priority application for the '470 Patent, and the general formula above corresponds to the general formula (I) of the '470 Patent.

210.    The specification of the '845 Patent also discloses that "We have now found a particular compound which falls within the scope of the group of compounds described and claimed in UK Patent Application No. 2124210A but which is not specifically disclosed therein, which compound has special advantages." 845/1:65-2:1.

211.    The '470 Patent issued shortly after the application leading to the '845 Patent was filed.  The '470 Patent issued on March 28, 1989; the '845 Patent application was filed on March 1, 1989.

212.    In an Office Action dated January 30, 1990, Examiner Ceperley rejected all pending claims of the '845 Patent application for anticipation (35 U.S.C. § 102(b)).  In discussing her anticipation rejection, Examiner Ceperley referenced "formula (I) of U.S. 4,8116,470 [sic]" and the genus of preferred compounds set forth at col. 3, lines 43-53.  Examiner Ceperley stated that "[i]n accordance with the reasoning set forth in <u>In re Schaumann</u> et al., 197 USPQ 5, the claimed compounds are considered to be described by the reference."

213.    *In re Schaumann*, 572 F.2d 312 (C.C.P.A. 1978) reaffirmed the test that was first announced in *In re Petering*, 301 F.2d 676, 681 (C.C.P.A. 1962) and that is the basis for Spectrum's anticipation challenge to the '845 Patent.

214.    Examiner Ceperley subsequently withdrew her anticipation rejection of the '682 application based on the reasoning set forth in *In re Schaumann*.

215.    Examiner Ceperley also initially rejected the '845 Patent for obviousness and obviousness-type double patenting.  Both of those rejections were withdrawn following the submission by Glaxo of declarations concluding that sumatriptan possessed unexpected properties in comparison with the closest prior art compound disclosed in the '470 Patent.

B.    No express disclosure of sumatriptan or sumatriptan succinate in the '470 Patent

216.    The '470 Patent contains no express disclosure of sumatriptan or sumatriptan succinate.

217.    Sumatriptan, sumatriptan succinate or any other sumatriptan salt is not among the individual compounds named in either the claims or the specification of the '470 Patent, including the thirty example compounds found in the specification.

218.    The '470 Patent contains no drawing, chemical name or description of sumatriptan, sumatriptan succinate or any other sumatriptan salt.

C.    Sumatriptan, sumatriptan succinate and '470 Patent genera

219.    Sumatriptan and sumatriptan succinate fall within the scope of '470 Patent genera in which $R_1$ can be substituted by a hydrogen atom, $R_2$ can be substituted by a methyl group, $R_3$ can be substituted by a hydrogen atom, Alk can be substituted by an ethylene chain and $R_4$ and $R_5$ can each be substituted by a methyl group.

220.    Sumatriptan and sumatriptan succinate fall within the scope of generic compound Claims 1-9 of the '470 Patent.

221.    Sumatriptan and sumatriptan succinate do not fall within the genus of particularly preferred compounds disclosed in the '470 Patent specification. 470/3:54-62.

222.    The particularly preferred compounds of the '470 Patent include free base compounds and salt compounds in which the substituent for the $R_4$

variable is a hydrogen atom.  470/3:59.  Sumatriptan and sumatriptan succinate have a methyl group in the position indicated by the $R_4$ variable.

223.    The smallest genus disclosed in the '470 Patent that encompasses sumatriptan and sumatriptan succinate is the genus defined by Claim 7.

**D.    Limitations included in Claim 7**

224.    Claim 7 states:  "A compound according to claim 6, wherein in the formula (I) Alk represents an unsubstituted alkylene chain containing two or three carbon atoms."  470/31:1-3.

225.    Because Claim 7 depends from Claim 6, which itself depends from independent Claim 5, the scope of Claim 7 is determined in part by limitations contained in Claims 5 and 6.  35 U.S.C. § 112, ¶4; 470/30:39-31:3.

226.    Claim 5 covers a genus of compounds defined with reference to formula (I), which is depicted in Claim 5.  Claim 5 contains limitations specifying permissible substituents for the $R_1$, $R_2$, $R_3$, $R_4$, $R_5$ and Alk variables of general formula (I).  Claim 5 also contains a limitation directed to "physiologically acceptable salts and solvates" of all compounds containing permissible substituents for the variables of general formula (I).  470/30:39-60.

227.    Millions of compounds fall within the scope of Claim 5.

228.    Claim 6 states:  "A compound according to claim 5, wherein in the formula (I):
$R_1$ represents a hydrogen atom or a methyl group;
$R_2$ represents a hydrogen atom or a methyl, ethyl, isopropyl, propenyl or benzyl group;
$R_3$ represents a hydrogen atom;
$R_4$ and $R_5$, which may be the same or different, each represents a hydrogen atom or a methyl group."  470/30:61-68.

229.    Because of its dependence on Claim 5, Claim 6 also incorporates the Claim 5 limitation directed to "physiologically acceptable salts and solvates" of all compounds containing permissible substituents for the variables of formula (I).  35 U.S.C. § 112, ¶4; 470/30:59-60.

230.    Because Claim 7 depends from Claim 6, it incorporates all of the limitations of Claim 6 directed to the $R_1$, $R_2$, $R_3$, $R_4$ and $R_5$ variables.  35 U.S.C. § 112, ¶4; 470/30:61-31:3.

231.    Because Claim 7 depends from Claim 6, it incorporates the limitation directed to physiologically acceptable salts present in Claim 6 as a result of the dependence of Claim 6 from Claim 5.  35 U.S.C. § 112, ¶4; 470/30:59-31:3.

E.    Permissible substituents for the $R_1$, $R_3$, $R_4$ and $R_5$ variables in Claim 7

232.    Because Claim 7 depends from Claim 6, the permissible substituents for the $R_1$, $R_3$, $R_4$ and $R_5$ variables of general formula (I) are defined in Claim 6.  35 U.S.C. § 112, ¶4; 470/30:63-68.

233.    Claim 6 states that "$R_1$ represents a hydrogen atom or a methyl group."  470/30:63.

234.    A hydrogen atom has only one structural configuration.

235.    A methyl group contains one carbon atom and three hydrogen atoms and is represented by the formula -$CH_3$.  A methyl group has only one structural configuration.

236.    A person of ordinary skill in the art would understand the genus disclosed in Claim 7 to include two permissible substituents for the $R_1$ variable of general formula (I):  a hydrogen atom or a methyl group.

237.    Claim 6 states that "$R_3$ represents a hydrogen atom."  470/30:66.

238.    A person of ordinary skill in the art would understand the genus disclosed in Claim 7 to include only one permissible substituent for the $R_3$ variable of general formula (I):  a hydrogen atom.

239.    Claim 6 states that "$R_4$ and $R_5$ which may be the same or different, each represents a hydrogen atom or a methyl group."  470/30:67-68.

240.    A person of ordinary skill in the art would understand the genus disclosed in Claim 7 to include two permissible substituents for the $R_4$ variable of general formula (I):  a hydrogen atom or a methyl group.

241.    A person of ordinary skill in the art would understand the genus disclosed in Claim 7 to include two permissible substituents for the $R_5$ variable of general formula (I):  a hydrogen atom or a methyl group.

### F.    Permissible substituents for the $R_2$ variable in Claim 7

242.    Claim 6 states that "$R_2$ represents a hydrogen atom or a methyl, ethyl, isopropyl, propenyl or benzyl group."  470/30:64-65.

243.    An ethyl group consists of two carbon atoms and five hydrogen atoms and can be represented by the formula $-CH_2-CH_3$.  An ethyl group has only one structural configuration.

244.    An isopropyl group is a particular structural configuration ("isomer") of a propyl group.  The general term "propyl" indicates that the group contains three carbon atoms linked only by single bonds, as well as seven hydrogen atoms, but does not specify the particular structural configuration of the atoms in the group.

245.    A propyl group can have one of two structural configurations, isopropyl and n-propyl, which are isomers of each other.  The structural configuration of an isopropyl group may be represented as $CH_3-\overset{Y}{C}H-CH_3$.  The structural configuration of an n-propyl group may be represented as $CH_3-CH_2-CH_2$.

246.    By using the term "isopropyl," Claim 6 of the '470 Patent expressly indicates that only the isopropyl isomer of propyl is a potential substituent for the $R_2$ variable of general formula (I).  An isopropyl group has only one structural configuration.

247.    A benzyl group contains seven carbon atoms and seven hydrogen atoms, which may be represented as $C_6H_5CH_2-$.  A benzyl group has only one structural configuration.

248.    A propenyl group contains three carbon atoms, two of which are linked to each other by a double bond, and five hydrogen atoms.  The term "propenyl" does not specify the particular structural configuration of those atoms.

249.    There are four different structural configurations or isomers of propenyl: 2-propenyl, 1-propenyl (cis), 1-propenyl (trans), and isopropenyl.  The four isomers of propenyl have the structures indicated below:

(2-propenyl)    (1-propenyl) [cis]    (1-propenyl) [trans]    (iso-propenyl)

250.    1-propenyl, 2-propenyl and isopropenyl are structural isomers.  1-propenyl(cis) and 1-propenyl(trans) are cis-trans isomers.

251.    A person of ordinary skill in the art would understand that Claim 7 covers compounds containing any of the four isomers of propenyl at the position indicated by the $R_2$ variable of general formula (I).

252.    The '470 Patent expressly indicates when, in defining classes of compounds, it intends to refer to an individual isomer and when it intends to refer to multiple isomers.  Claim 6 (and therefore Claim 7) uses the specific term "isopropyl," a particular isomer of propyl, in specifying the permissible substituents for the $R_2$ variable.  By contrast, Claim 6 (and therefore Claim 7) uses the general term "propenyl," which refers to four different isomers, in specifying the permissible substituents for that variable.  470/30:64-65.

253.    When discussing a preferred class of compounds, the specification of the '470 Patent uses the specific term "isopropyl," a particular isomer of propyl, in providing examples of permissible substituents for the $R_2$ variable.  By contrast, when discussing that same preferred class of compounds, the specification uses the general term "propenyl," which refers to four different isomers, in providing examples of permissible substituents for the $R_2$ variable.  470/3:43-53.

254.    In defining the particularly preferred class of compounds in the '470 Patent, the specification also uses the general term "propenyl," rather than specify a particular isomer of propenyl.  470/3:47-48; 470/3:58.

255.    The '470 Patent also expressly indicates when it intends to refer only to a specific isomer of propenyl.  Example 14 uses the term "2-propenyl," only one of the four potential propenyl isomers.  In addition, shortly after defining both preferred and particularly preferred classes of compounds by using the general term "propenyl," the '470 Patent specification specifically refers to 2-propenyl in defining a preferred compound of the patent.  470/17:51; 470/17:53; 470/17:65; 470/18:19; 470/18:38; 470/4:1.

256.    A person of ordinary skill in the art would notice the express distinctions drawn in the '470 Patent between terms referring to particular isomers, on the one hand, and terms referring to multiple isomers, on the other, when those terms are used to define classes of compounds. A person of ordinary skill in the art would not ignore that express distinction by divining a preference for only one isomer of propenyl from the thirty example compounds disclosed in the '470 Patent.

257.    A person of ordinary skill in the art would notice the '470 Patent repeatedly uses the general term "propenyl" in referring to classes of compounds and "2-propenyl" only in referring to individual compounds. A person of ordinary skill in the art would not ignore the patent's repeated use of the general term "propenyl" by divining a preference for the 2-propenyl isomer of propenyl from the individual compounds disclosed in the '470 Patent.

258.    By looking to the chemistry literature, one of ordinary skill in the art could make the 4 propenyl groups (1-propenyl (cis), 1-propenyl (trans), isopropenyl and 2-propenyl) attached to a nitrogen as of 1984.

259.    The chemistry literature as of 1984 contained many examples of synthetic reactions for synthesizing amide substituted propenyls. (See, e.g., André J. Hubert et al., *Catalyzed Prototropic Rearrangements. Part 3. Metal-Carbonyl-catalysed Isomerization of N-Allylsulphonamides to N-Prop-2-enyl and N-Propylidene Derivatives*, J.CHEM.SOC. PERKIN TRANS. 2 11 (1977); U.S. Patent No. 4,922,021 (U.S. equivalent of Zubovics et al., *Alkylenediamine Derivatives And as Drug Containing These Compounds*, ALKALOIDA VEGYESZETI GYAR, HUNG. (1981)); W.R. Hertler, *Free-Radical Chain Isomerization of N-Vinylsulfonamides*, 39 J. ORG. CHEM. 3219 (1974); Allan N. Tischler and Maureen H. Tischler, *Dilithiated N-Allylcarboxamides. A Synthesis of Enamides*, 37 TETRAHEDRON. LETT. 3407 (1978); H. Breederveld, *The Chemistry of the N-Alkylaldimines. I. The Reaction of N-Alkylaldimines With Acetic Anhydride*, 79 RECUEIL 401 (1960); M.S. Kharasch and Hill M. Priestley, *The Addition of N-Haloamides to Olefins*, 61 J. AM. CHEM. SOC. 3425 (1939); J.K. Stille and Y. Becker, *Isomerization of N-Allylamides and -imides to Aliphatic Enamides by Iron, Rhodium, and Ruthenium Complexes*, 45 J. ORG. CHEM., 2139 (1980); H. Breederveld, *The Chemistry of the N-Alkylaldimines. II. The Reaction of N-Propylpropanaldimine With Acid Chloride*, 79 RECUEIL 1197 (1960); André J. Hubert et al., *Catalyzed Prototropic Rearrangements. Part 2. Metal-Carbonyl-catalysed Isomerization of N-Allylamides to Prop-2-enyl Derivatives*, J. CHEM. SOC. PERKIN TRANS. 2 1954 (1973); Giovanna Delogu, Giovanni Faedda and Serafino Gladiali, *Hydrocarbononylation of Unsaturated Nitrogen Compounds.*

*Synthesis of N-Protected Aminoacid Derivatives from N-Substituted Phthalimides*, 268 J. ORGANOMET. CHEM. 167 (1984).

260.     A person of ordinary skill in art in 1984 would be able, without undue experimentation, to synthesize compounds with any of the four isomers of propenyl as substituents for the $R_2$ variable in general formula (I).

261.     A person of ordinary skill in the art would understand the genus disclosed in Claim 7 to include nine permissible substituents for the $R_2$ variable of general formula (I):  a hydrogen atom, a methyl group, an ethyl group, an isopropyl group, a 2-propenyl group, a 1-propenyl(cis) group, a 1-propenyl(trans) group, an isopropenyl group or a benzyl group.

G.     The Alk variable of Claim 7

262.     Claim 7 states that the Alk variable can represent "an unsubstituted alkylene chain containing two or three carbon atoms."  470/31:2-3.

263.     In the '470 Patent, Claim 7 defines the narrowest set of potential substituents for the Alk variable in general formula (I).

264.     A person of ordinary skill in the art would understand the phrase "an unsubstituted alkylene chain containing two or three carbon atoms" to refer to two possible substituents:  the chemical group known as ethylene, which, in the context of the '470 Patent, has the chemical formula $-CH_2-CH_2-$, or the chemical group known as n-propylene, which, in the context of the '470 Patent, has the chemical formula $-CH_2-CH_2-CH_2-$.

265.     A person of ordinary skill in the art would understand the genus disclosed in Claim 7 to include two permissible substituents for the Alk variable of general formula (I):  ethylene and n-propylene.

266.     A person of ordinary skill in the art would not modify the genus disclosed in Claim 7 to exclude compounds containing n-propylene in the position indicated by the Alk variable on the basis of any other disclosures in the '470 Patent.

267.     A person of ordinary skill in the art who sought to determine whether the '470 Patent disclosed any patent-wide preferences for the variables of general formula (I) would examine the definitions of the preferred and particularly preferred classes of compounds disclosed in the specification of the '470 Patent.

268.    The preferred and particularly preferred classes of compounds disclosed in the specification of the '470 Patent are defined only on the basis of the $R_1$, $R_2$, $R_3$, $R_4$ and $R_5$ variables contained in general formula (I).  The preferred and particularly preferred classes of compounds contain no restrictions on the potential substituents for the Alk variable of general formula (I).  470/3:29-62.

269.    Because none of the preferred and particularly preferred classes of compounds in the '470 Patent specification is defined with reference to the Alk variable, a person of ordinary skill in the art would conclude that the only restrictions on permissible substituents for the Alk variable are the restrictions expressly defined in the claims of the '470 Patent.

H.    <u>The preferred and particularly preferred compounds of the '470 Patent do not disclose a genus encompassing sumatriptan or sumatriptan succinate</u>

270.    A person of ordinary skill in the art would not derive a genus of compounds encompassing sumatriptan, sumatriptan succinate or any other sumatriptan salt from the preferred or particularly preferred compounds of the '470 Patent.

271.    The '470 Patent discloses various "preferred compounds according to the invention," covered by the patent, including three free base compounds and their physiologically acceptable salts.  The three free base compounds are:  3-(2-(methylamino)ethyl)-N-methyl-1H-indole-5-methanesulphonamide (Compound III); 3-(2-aminoethyl)-N,N-dimethyl-1H-indole-5-methanesulphonamide; and 3-(2-aminoethyl)-N-(2-propenyl)-1H-indole-5-methanesulphonamide.  470/3:63-4:4.

272.    Compound III contains a hydrogen atom and a methyl group, respectively, at the positions indicated by the $R_4$ and $R_5$ variables of general formula (I).

273.    All physiologically acceptable salts and solvates derived from Compound III contain a hydrogen atom and a methyl group, respectively, at the positions indicated by the $R_4$ and $R_5$ variables of general formula (I).

274.    The free base compound, 3-(2-aminoethyl)-N,N-dimethyl-1H-indole-5-methanesulphonamide, contains a hydrogen atom at the position indicated in general formula (I) by the $R_4$ variable and another hydrogen atom at the position indicated by the $R_5$ variable.

275.    All physiologically acceptable salts and solvates derived from 3-(2-aminoethyl)-N,N-dimethyl-1H-indole-5-methanesulphonamide contain a hydrogen atom at the position indicated in general formula (I) by the $R_4$ variable and another hydrogen atom at the position indicated by the $R_5$ variable.

276.    The free base compound, 3-(2-aminoethyl)-N-(2-propenyl)-1H-indole-5-methanesulphonamide, contains a hydrogen atom at the position indicated in general formula (I) by the $R_4$ variable and another hydrogen atom at the position indicated by the $R_5$ variable.

277.    All physiologically acceptable salts and solvates derived from 3-(2-aminoethyl)-N-(2-propenyl)-1H-indole-5-methanesulphonamide contain a hydrogen atom at the position indicated in general formula (I) by the $R_4$ variable and another hydrogen atom at the position indicated by the $R_5$ variable.

278.    The '470 Patent discloses a particularly preferred free base compound, 3-(2-aminoethyl)-N-methyl-1H-indole-5-methanesulphonamide (Compound II), and its physiologically acceptable salts and solvates.  470/4:5-8.

279.    Compound II contains a hydrogen atom at the position indicated in general formula (I) by the $R_4$ variable and another hydrogen atom at the position indicated by the $R_5$ variable.

280.    All physiologically acceptable salts and solvates derived from Compound II contain a hydrogen atom at the position indicated in general formula (I) by the $R_4$ variable and another hydrogen atom at the position indicated by the $R_5$ variable.

281.    None of the "preferred" and "particularly preferred" compounds according to the invention of the '470 Patent contains a methyl group at the position indicated by the $R_4$ variable and another methyl group at the position indicated by the $R_5$ variable.

282.    A person of ordinary skill in the art seeking to derive preferences for the variables of general formula (I) by examining the "preferred" and "particularly preferred" compounds according to the invention of the '470 Patent would conclude that at least one of the $R_4$ and $R_5$ variables must be substituted by a hydrogen atom.  That conclusion would be strengthened by the '470 Patent's disclosure that, in the "particularly preferred class of compounds according to the invention," the $R_4$ variable of general formula (I) must be a hydrogen atom. 470/3:54-55; 470/3:59-60.

283.    A genus based on the "preferred" and "particularly preferred" compounds according to the invention of the '470 Patent would not encompass sumatriptan, sumatriptan succinate or any other sumatriptan salt because none of those sumatriptan compounds contains a hydrogen atom at the position indicated in general formula (I) by either the $R_4$ variable or the $R_5$ variable. Sumatriptan, sumatriptan succinate and all other sumatriptan salts contain a methyl group at the position indicated by the $R_4$ variable and another methyl group at the position indicated by the $R_5$ variable.  845/26:41-47.

I.    <u>The example compounds of the '470 Patent do not disclose a genus encompassing sumatriptan or sumatriptan succinate</u>

284.    A person of ordinary skill in the art would not derive a genus of compounds encompassing sumatriptan, sumatriptan succinate or any other sumatriptan salt from the thirty example compounds disclosed in the '470 Patent.

285.    Twenty-one of the thirty example compounds disclosed in the '470 Patent—Examples 1-18, 24 and 27—contain a hydrogen atom at the position indicated in general formula (I) by the $R_4$ variable and another hydrogen atom at the position indicated by the $R_5$ variable.

286.    An additional seven of the thirty example compounds disclosed in the '470 Patent—Examples 19, 20, 22, 23, 25, 26, and 28—contain a hydrogen atom at one of the positions indicated by the $R_4$ and $R_5$ variables of general formula (I).

287.    Only one of the thirty example compounds disclosed in the '470 Patent contains a methyl group at the position indicated by the $R_4$ variable and another methyl group at the position indicated by the $R_5$ variable.

288.    Because twenty-eight of the thirty example compounds disclosed in the '470 Patent contain at least one hydrogen atom at the positions indicated by the $R_4$ and $R_5$ variables of general formula (I), a person of ordinary skill in the art seeking to derive preferences by examining the thirty example compounds would conclude that at least one of the $R_4$ and $R_5$ variables must have a hydrogen atom as a substituent.  That conclusion would be strengthened by the '470 Patent's disclosures concerning preferred compounds, particularly preferred compounds and particularly preferred classes of compounds, which would also lead a person of ordinary skill in the art to conclude that at least one of the $R_4$ and $R_5$ variables must have a hydrogen atom as a substituent.

289.    A genus based on the thirty example compounds of the '470 Patent would not encompass sumatriptan, sumatriptan succinate or any other sumatriptan salt because none of those sumatriptan compounds contains a hydrogen atom at the position indicated in general formula (I) by either the $R_4$ variable or the $R_5$ variable.  Sumatriptan, sumatriptan succinate and all other sumatriptan salts contain a methyl group at the position indicated by the $R_4$ variable and another methyl group at the position indicated by the $R_5$ variable. 845/26:41-47.

290.    Because neither the preferred and particularly preferred compounds disclosed in the '470 Patent nor the thirty example compounds disclose a genus of compounds encompassing sumatriptan, sumatriptan succinate or any other sumatriptan salts, the genus disclosed in Claim 7 is the smallest genus disclosed in the '470 Patent that encompasses sumatriptan, sumatriptan succinate or any other sumatriptan salts.

J.      The Claim 7 genus includes physiologically acceptable salts

291.    Because of its dependence on Claims 5 and 6, Claim 7 contains a limitation directed to "physiologically acceptable salts."

292.    A person of ordinary skill in the art would understand that the genus disclosed in Claim 7 of the '470 Patent includes any and all "physiologically acceptable salts" derived from any free base compound falling within the scope of Claim 7.

293.    In chemistry, the word "compound" can refer either to a free base compound or to a salt compound.  Because a free base and a salt of that free base have different physical properties, a chemist would consider a free base and a salt of that free base to be distinct chemical compounds.  Because different salts of the same free base have different properties, a chemist would consider different salts of the same free base to be distinct chemical compounds.

294.    A person of ordinary skill in the art would understand the word "compound" as used in Claim 7 and elsewhere in the '470 Patent to have its ordinary meaning and to refer either to free base compounds or to salt compounds.

295.    The specification and the other claims of the '470 Patent confirm that the word "compound" as used in the '470 Patent has its ordinary meaning and refers to either a free base compound or a salt compound.

296.    The beginning of the specification of the '470 Patent provides an overview of the compounds embraced by general formula (I) of the '470 Patent. That portion of the specification indicates that "[s]uitable physiologically acceptable salts of the indoles of general formula (I) include acid addition salts formed with organic or inorganic acids for example hydrochlorides, hydrobromides, sulphates, fumarates, maleates and succinates."  470/1:55-59.

297.    The '470 Patent expressly indicates that "[a] preferred class of compounds falling within the scope of general formula (I)" includes "physiologically acceptable salts."  The '470 Patent expressly indicates that "[a] particularly preferred class of compounds according to the invention" covered by that patent includes "physiologically acceptable salts."  470/3:43-62.

298.    The '470 Patent expressly indicates that "preferred compounds according to the invention" covered by that patent include "physiologically acceptable salts."  470/3:63-4:4.

299.    The individual compounds exemplified in the specification of the '470 Patent include both free base compounds and salt compounds.  For instance, Examples 3-6 describe alternative ways of synthesizing Compound II, while Examples 1-2 describe alternative ways of synthesizing a maleate salt of Compound II.  Example 7 describes a method of synthesizing a hydrochloride salt of Compound II, while Example 8 describes a method of synthesizing a hemisuccinate salt of Compound II.  470/9:61-14:4.

300.    Compound II and the salts of Compound II exemplified in the '470 Patent have different formulas and different properties.  Compound II is disclosed as an oil in Example 4 and Example 5 and has the empirical formula $C_{12}H_{17}N_3O_2S$.  Its maleate salt, disclosed in Example 2, has the empirical formula $C_{12}H_{17}N_3O_2S.C_4H_4O_4$, and is a solid with a melting point of 150-54 degrees Celsius.  Its hydrochloride salt, disclosed in Example 7 of the '470 Patent, has the empirical formula $C_{12}H_{17}N_3O_2S.HCl$ and has a melting point of 229-31 degrees Celsius.  Its hemisuccinate salt, disclosed in Example 8 of the '470 Patent, has the empirical formula $C_{12}H_{17}N_3O_2S.0.5C_4H_6O_4$, with a melting point of 179-81 degrees Celsius.  470/12:22-68; 470/10:46-11:31;470/13:47-58; 470/13:60-14:4.

301.    Each of the 30 example compounds in the '470 Patent is accompanied by the method or methods for synthesizing that compound.  Some methods of synthesis require the preparation of intermediate compounds, that is, compounds that are then further modified either to produce another intermediate compound or the final example compound.  In such cases, the

chemical name of the intermediate compound is prefaced with a lowercase letter in parentheses, for example, (a), (b), (c). The last compound prefaced by a lowercase letter in parenthesis is the final example compound.

302.    Many of the example compounds and the intermediate compounds disclosed in the '470 Patent are salt compounds. The '470 Patent consistently uses the word "compound" to refer to those example salt compounds and intermediate salt compounds. *See* 470/10:7 (referring to the intermediate salt compound whose name appears at 470/9:65-66); 470/10:23 (referring to the intermediate salt compound whose name appears at 470/10:9-10); 470/10:39 (referring to the example salt compound whose name appears at 470/10:26-27); 470/11:26 (referring to the example salt compound whose name appears at 470/11:11-12); 470/13:54 (referring to the example salt compound whose name appears at 470/13:48-50); 470/13:67 (referring to the example salt compound whose name appears at 470/13:61-62); 470/14:50-51 (referring to the intermediate salt compound whose name appears at 470/14:37-38; 470/14:67 (referring to the example salt compound whose name appears at 470/14:53-55); 470/15:25-26 (referring to the intermediate salt compound whose name appears at 470/15:21-22); 470/15:37-38 (referring to the example salt compound whose name appears at 15:28-30); 470/15:65-66 (referring to the intermediate salt compound whose name appears at 470/15:61-62); 470/16:11-12 (referring to the example salt compound whose name appears at 470/16:1-3); 470/16:47-48 (referring to the intermediate salt compound whose name appears at 470/16:33-34); 470/16:61-62 (referring to the example salt compound whose name appears at 470/16:50-51); 470/17:3-4 (referring to the example salt compound whose name appears at 470/16:50-51); 470/17:29 (referring to the intermediate salt compound whose name appears at 470/17:25-26); 470/17:43 (referring to the example salt compound whose name appears at 17:31-32); 470/18:17 (referring to the intermediate salt compound whose name appears at 470/17:65-66); 470/18:36 (referring to the intermediate salt compound whose name appears at 470/18:19-20); 470/18:62-63 (referring to the example salt compound whose name appears at 18:38-39); 470/19:20-22 (referring to the intermediate salt compound whose name appears at 470/19:17-19); 470/19:43 (referring to the example salt compound whose name appears at 19:24-25); 470/20:11-12 (referring to the intermediate salt compound whose name appears at 470/19:67-68); 470/20:34-35 (referring to the example salt compound whose name appears at 20:13-15); 470/21:2-3 (referring to the intermediate salt compound whose name appears at 470/20:56-57); 470/21:46 (referring to the example salt compound whose name appears at 21:27-29); 470/22:17-18(referring to the example salt compound whose name appears at 22:7-8); 470/22:63-64 (referring to the example salt compound whose name appears at 22:49-50);

470/23:19(referring to the example salt compound whose name appears at 470/23:3-5); 470/23:41 (referring to the example salt compound whose name appears at 470/23:27-29); 470/23:66-67 (referring to the example salt compound whose name appears at 470/23:49-51); 470/25:35 (referring to the example salt compound whose name appears at 25:22-23); 470/25:63-64 (referring to the example salt compound whose name appears at 470/25:41-43).

303.     Claim 8 of the '470 Patent states:  "A compound according to claim 5, wherein the physiologically acceptable salt is a hydrochloride, hydrobromide, sulphate, fumarate, maleate or succinate."  Claim 8 confirms that the use of the word "compound" in a claim depending from Claim 5 is meant to include physiologically acceptable salts.  470/31:4-8.

304.     A person of ordinary skill in the art would understand the term "physiologically acceptable salts" to refer to salt compounds that are safe to administer to a human being.

305.     As of the mid-1980s, there were over 50 different salt formulations of basic drugs approved for marketing in the U.S.

306.     A person of ordinary skill in the art would understand that the genus disclosed in Claim 7 includes at least 50 different salt formulations for each free base compound that falls within the scope of Claim 7.

K.     The size of the Claim 7 genus

307.     Claim 7 discloses two possible substituents for the $R_1$ variable, nine possible substituents for the $R_2$ variable, one possible substituent for the $R_1$ variable, two possible substituents for the $R_4$ variable, two possible substituents for the $R_5$ variable and two possible substituents for the Alk variable.  On its face, Claim 7 discloses 144 potential combinations of variables in formula (I) ($2 \times 9 \times 1 \times 2 \times 2 \times 2 = 144$).

308.     All other variables being equal, a person of ordinary skill in the art would understand that, because of the potential for rotation around single bonds, a compound that contains hydrogen at the position indicated by the $R_1$ variable and methyl at the position indicated by the $R_2$ variable is structurally identical to a compound that contains methyl at the position indicated by the $R_1$ variable and hydrogen at the position indicated by the $R_2$ variable.

309. All other variables being equal, a person of ordinary skill in the art would understand that, because of the potential for rotation around single bonds, a compound that contains hydrogen at the position indicated by the $R_4$ variable and methyl at the position indicated by the $R_5$ variable is structurally identical to a compound that contains methyl at the position indicated by the $R_4$ variable and hydrogen at the position indicated by the $R_5$ variable.

310. A person of ordinary skill in the art would not count structurally identical compounds twice in calculating the number of compounds that fall within the scope of the Claim 7 genus.

311. When structurally identical compounds are counted only once, the genus disclosed in Claim 7 contains 102 free base compounds.

312. Because the genus disclosed in Claim 7 contains at least 50 physiologically acceptable salt compounds for every one of the 102 free base compounds, that genus contains at least 5100 salt compounds (102 x 50 = 5100).

313. The genus disclosed in Claim 7 contains at least 5202 distinct compounds (102 free base compounds + 5100 salt compounds = 5202).

L. Envisaging the members of the Claim 7 genus

314. A person of ordinary skill in the art could not at once envisage each member of the genus of at least 5202 compounds defined with reference to formula (I).

315. A person of ordinary skill in the art could not at once envisage each member of a genus of 102 free base compounds defined with reference to formula (I).

M. No motivation to select sumatriptan or sumatriptan salts

316. The ‘470 Patent contains no teaching or motivation to select sumatriptan or sumatriptan salts from among the millions of compounds that fall within the scope of the ‘470 Patent. The ‘470 Patent teaches that compounds falling within its constrict the dog saphenous vein strip. 470/1:68-2:1. The ‘470 Patent further teaches that “[t]hose compounds which we have tested”—which the patent does not identify—”selectively constrict the carotid arterial bed of the anaesthetised dog and the compounds according to the invention are thus ***potentially*** useful for the treatment of migraine.” 470/2:9-13 (emphasis added). However, apart from defining “preferred” and “particularly preferred”

compounds and classes of compounds, the '470 Patent does not teach which compounds would be most suitable as anti-migraine agents, nor does the '470 Patent contain any biological data or disclosures that would allow one of ordinary skill in the art to make such a prediction.

317.    The '470 Patent contains no teaching that would motivate one of ordinary skill in the art to select and make sumatriptan compounds from the multitude of compounds that fall within the scope of the "preferred" and "particularly preferred" classes of compounds.

N.    **The '470 Patent teaches away from sumatriptan**

318.    The '470 Patent explicitly teaches that, in the particularly preferred class of compounds, the $R_4$ variable of general formula (I) "represents a hydrogen atom" while the $R_5$ variable of general formula (I) "represents a hydrogen atom or a $C_{1-3}$ alkyl group e.g. a methyl group."  470/3:59-61.  By contrast, sumatriptan has a methyl group at both the $R_4$ and $R_5$ positions in general formula (I).

319.    All of the preferred and particularly preferred individual compounds disclosed in the '470 Patent have at least one and usually two hydrogen atoms at the $R_4$ and $R_5$ positions in general formula (I).  *See* ¶¶ 270-83, *supra*.  A person of ordinary skill in the art would conclude that it is desirable to have at least one hydrogen atom in the $R_4$ and $R_5$ positions in general formula (I), a conclusion buttressed by the patent's teachings concerning the particularly preferred class of compounds.

XI.    ALLEGED INEQUITABLE CONDUCT IN THE SUBMISSION OF THE HUMPHREY DECLARATION

A.    **Origin of the pharmacological tests used during the Migraine Project**

320.    Because the Migraine Project scientists were attempting to find an anti-migraine drug on the basis of a novel hypothesis concerning the origin and mechanism of migraine, there were no established standard pharmacological criteria or tests that could be used to screen potential anti-migraine compounds. As a result, the pharmacologists on the Migraine Project developed their own set of tests to screen potential anti-migraine compounds.

321.    The pharmacological screening tests, as well as the target values selected for each test, represented the Migraine Project pharmacologists' best judgment concerning the properties required in an anti-migraine drug.  Because

their objective was to find a viable anti-migraine drug from among numerous candidate compounds, the screening tests were designed to be sufficiently stringent to winnow out unpromising compounds while not eliminating promising compounds.

B.     *In vitro* **screening tests**

322.     The initial tests ("primary screens") performed on candidate compounds were *in vitro* tests.  An *in vitro* test is one that is performed outside a living organism.  The pharmacological properties measured in the primary screens were (1) potency at the $S_2$ serotonin receptor and (2) selectivity for the $S_2$ serotonin receptor over certain other serotonin receptors.

323.     In pharmacology, "potency" refers to the amount of a compound required to produce a desired physiological response.  The more potent a compound, the less required to produce that response.  During the Migraine Project, $S_2$ potency was tested by measuring the degree of constriction caused by a candidate compound in a strip of dog saphenous vein.  The dog saphenous vein was chosen because it contained many $S_2$ receptors that caused vasoconstriction.

324.     In the context of the Migraine Project, "selectivity" refers to the potency of the candidate compound at the $S_2$ receptor relative to its potency at other serotonin receptors.  In order to be considered sufficiently selective, a compound had to be potent at the $S_2$ receptor while having little or no potency at other serotonin receptors.  The *in vitro* tests for selectivity were similar to the tests for $S_2$ potency except that they were conducted in animal tissues containing a serotonin receptor other than the $S_2$ receptor.

C.     *In vivo* **potency test (CD$_{50}$ Test)**

325.     Once a candidate compound successfully passed *in vitro* tests, it was tested *in vivo*.  In contrast to an *in vitro* test, an *in vivo* test is one conducted in a live animal.  During the Migraine Project, the *in vivo* tests were designed to see whether a candidate compound would produce selective carotid vasoconstriction.  Anaesthetized dogs were used in the *in vivo* tests because they had sufficiently large blood vessels to permit measurement of carotid vasoconstriction.

326.    The CD$_{50}$ Test was the first *in vivo* test performed on compounds that successfully passed the *in vitro* tests.  The CD$_{50}$ Test measured the potency of a candidate compound in causing carotid vasoconstriction.

327.    The CD$_{50}$ Test was performed by attaching an electromagnetic flow probe to a carotid blood vessel in the test animal.  This flow probe measured the degree of carotid vascular resistance, which, in turn, indicated the degree of vasoconstriction of that blood vessel.

328.    In the CD$_{50}$ Test, doses of the test compound were administered intravenously over time up to a particular cumulative dose.  The electromagnetic flow probe would continually monitor the degree of carotid vascular resistance throughout the test.  Usually, the test animal would receive a cumulative dose of 300 µg/kg of the test compound in the CD$_{50}$ Test ("µg/kg" means micrograms per kilogram and refers to the number of micrograms of test compound per kilogram of animal weight).  The reason 300 µg/kg was chosen as the dosage was that maximum vasoconstriction normally occurred near that cumulative dose.  Doses other than 300 µg/kg were administered depending on the response of a particular test animal.

329.    Following each CD$_{50}$ Test, the cumulative dose of the test compound that caused carotid vascular resistance to reach 50% of the maximum vascular resistance was calculated.  That cumulative dose was referred to as the CD$_{50}$ value (for <u>C</u>umulative <u>D</u>ose required for <u>50</u>% of maximum).  A lower CD$_{50}$ value indicated a more potent compound.  As of 1983, the target CD$_{50}$ value was 50 µg/kg or less.

D.    <u>First duration of action test (CD$_{50}$ Test)</u>

330.    Because a migraine attack is typically long-lasting (*i.e.*, 24 to 72 hours), the Migraine Project pharmacologists attempted to find a compound that produced carotid vasoconstriction for a reasonably long period of time so that patients would not have to repeat doses of medication at frequent intervals.

331.    Duration of action was measured in two different ways during the Migraine Project.  The first test for duration of action was an additional component of the CD$_{50}$ Test.   Although the CD$_{50}$ Test was primarily designed and intended to determine a compound's *in vivo* potency, the CD$_{50}$ Test was also used to get an initial indication of that compound's duration of action.

332.    Following administration of the maximum cumulative dose of the test compound in the $CD_{50}$ Test, carotid vascular resistance was monitored for an additional period of time, usually two hours.  The two-hour limit was dictated by the length of time during which the test animal could generally be kept stable under anesthetic.

333.    On the basis of the data generated during the $CD_{50}$ Test, the scientists determined whether the degree of carotid vascular resistance had fallen below 50% of the maximum resistance during the two-hour monitoring period. The resulting value was referred to as an $RT_{50}$ value (for "$\underline{R}$ecovery $\underline{T}$ime to $\underline{50}$%").  If carotid vascular resistance had not fallen to 50% of the maximum during the two hours, the $RT_{50}$ value was expressed as ">2 hours."  If carotid vascular resistance had fallen to 50% of the maximum during the two hours, the $RT_{50}$ value was expressed either in minutes or as "<2 hours."

334.    Compounds with an $RT_{50}$ value of >2 hours went on to be tested in another, more definitive test of duration of action.  Compounds with an $RT_{50}$ value of <2 hours were generally disqualified from further consideration, particularly if the $RT_{50}$ value was well below 2 hours.  However, because the $RT_{50}$ value was not a definitive measure of a compound's duration of action, an otherwise promising compound with an $RT_{50}$ value approaching two hours might be progressed to the next duration of action test.

E.    Second duration of action test

335.    The $RT_{50}$ value obtained during the $CD_{50}$ Test was only a rough estimate of a candidate compound's duration of action because, for example, it did not factor in the relative *in vivo* potency of the compound being tested.  As a result, the Migraine Project pharmacologists created another test to get a more definitive indication of the candidate compound's duration of action and to permit different compounds to be compared with each other in a standardized way.

336.    To test a compound's intravenous duration of action while taking into account relative potency, the scientists in the Migraine Project employed another test, which may be referred to as the Single Intravenous Dose Test.  The Single Intravenous Dose Test was a separate experiment from the $CD_{50}$ Test and was performed on a different test animal than the $CD_{50}$ Test.

337.    In the Single Intravenous Dose Test, the test animal was given a single intravenous dose of a candidate compound.  That dose was set at 10 times

the $CD_{50}$ value obtained for the compound in the $CD_{50}$ Test (if multiple $CD_{50}$ Tests had been performed, 10 times the average $CD_{50}$ value was used).

338.    As in the $CD_{50}$ Test, the electromagnetic flow probe produced a readout of carotid vascular resistance at given intervals.  Following the conclusion of the Single Intravenous Dose Test, the maximum carotid vascular resistance induced in the test animal was determined, along with the time it took carotid vascular resistance to recover to 50% of the maximum value.  That recovery time was also referred to as an $RT_{50}$ value.  To avoid confusion, the $RT_{50}$ value derived in the Single Intravenous Dose Test will be referred to as the equipotent $RT_{50}$ value because it was obtained by using a dose that attempted to equalize for potency.

339.    The equipotent $RT_{50}$ value produced by the Single Intravenous Dose Test was expressed in minutes.  Because the equipotent $RT_{50}$ value took into account the relative potency of compounds, equipotent $RT_{50}$ values for different compounds could be compared accurately with each other.  In general, compounds with an equipotent $RT_{50}$ value of approximately 1 hour were progressed to further testing to measure efficacy following intraduodenal administration.

F.    Suitability for oral administration:  Intraduodenal Efficacy Test

340.    Because migraine is a chronic and unpredictable condition, the scientists in the Migraine Project were looking for a compound that was suitable for oral administration, as opposed to only injectable administration.  Oral administration is more convenient for patients than injectable administration, and an anti-migraine compound that can also be administered orally is preferable to one that can only be administered by injection.

341.    The primary test used during the Migraine Project to predict whether a compound would be suitable for oral administration measured a compound's efficacy in producing carotid vasoconstriction following intraduodenal administration.  That test may be referred to as the Intraduodenal Efficacy Test.  The Intraduodenal Efficacy Test was performed on compounds that had passed the *in vitro* primary screening tests, the *in vivo* potency test, and both duration of action tests.

342.    The methodology for the Intraduodenal Efficacy Test was determined by the objective of seeing whether an orally administered compound would actually produce carotid vasoconstriction in a live animal.  Like the $CD_{50}$

Test and the Single Intravenous Dose Test, the Intraduodenal Efficacy Test required the use of an electromagnetic flow probe to measure carotid vasoconstriction in a live animal, which, in turn, required the larger blood vessels found in a large animal.  As a result, the Intraduodenal Efficacy Test also was performed in dogs.

343.    To perform the necessary surgery to insert the vascular flow probe required by the Intraduodenal Efficacy Test, the dog used in that test had to be anesthetized.  However, because the dog was anesthetized, it was not possible simply to administer the test compound orally.  Because of the effects of anesthesia, orally administered material might not be digested properly, or could induce vomiting or choking.  Consequently, the candidate compound was injected directly into the duodenum of the anesthetized dog in order to approximate oral administration.  The duodenum is the portion of the small intestine that begins where the stomach ends, and it is where gastrointestinal absorption of potential anti-migraine compounds was believed to occur.

344.    Like the Single Intravenous Dose Test, the Intraduodenal Efficacy Test took into account the relative potency of candidate compounds.  The dosage of the candidate compound was again set at 10 times the compound's $CD_{50}$ value in the $CD_{50}$ Test (if multiple $CD_{50}$ Tests had been performed on the compound, 10 times the average $CD_{50}$ value was used).  Because it factored in relative potency, the Intraduodenal Efficacy Test also permitted comparison of compounds with one another in a standardized way.

345.    Following administration of the candidate compound in the duodenum, the carotid vascular resistance measured by the electromagnetic flow probe was recorded at regular intervals over a period of time, usually three hours.  For a compound to pass the Intraduodenal Efficacy Test, it had to produce substantial and sustained carotid vascular resistance throughout that time period.

G.    Testing of Compound II (GR 32066)

346.    Compound II, the particularly preferred compound of the '470 Patent, was first synthesized by Glaxo chemists in April 1982.  Compound II passed all of the *in vitro* primary screening tests, indicating that it was potent in activating the $S_2$ receptor and causing vasoconstriction in the dog saphenous vein.

347.    After passing the *in vitro* tests, Compound II was tested four times in the $CD_{50}$ Test, once in May 1982 and three times in early 1983.  The results of the $CD_{50}$ Tests indicated that Compound II was sufficiently potent *in vivo*, with an average $CD_{50}$ value of 22.7 µg/kg, less than half the 50 µg/kg cut-off for the $CD_{50}$ Tests.

348.    The $CD_{50}$ Tests also provided an initial indication that Compound II possessed a good intravenous duration of action.  In three of the four $CD_{50}$ Tests, the $RT_{50}$ value obtained from the raw data was clearly >2 hours, with the percentage increase in carotid vascular resistance remaining well above 50% of the maximum at the end of the two hours.  In the fourth $CD_{50}$ Test, the percentage increase in carotid vascular resistance hovered around 50% of the maximum but never went below 50% during the test.  At the end of the test, the percentage increase in carotid vascular resistance stood at above 50% of the maximum.

349.    On the basis of its initial duration of action results, Compound II was progressed to definitive duration of action testing.  Single Intravenous Dose Tests confirmed that Compound II possessed a good intravenous duration of action.  In four tests, the mean equipotent $RT_{50}$ value for Compound II was approximately 80 minutes.  By June 1983, Compound II had been selected as a potential development compound.

350.    Despite its initial promise, Compound II was ultimately dropped from all further consideration in early 1984 because it performed poorly in the Intraduodenal Efficacy Test.  Compound II was never progressed to testing in humans.

H.    Testing of Compound III (GR 34456)

351.    Compound III was first synthesized by the Migraine Project chemists in December 1982.  In the primary screens, Compound III showed sufficient *in vitro* $S_2$ potency and selectivity to be progressed to *in vivo* testing.

352.    In February 1983, Compound III was tested for *in vivo* potency in the $CD_{50}$ Test.  Compound III was highly potent in the $CD_{50}$ Test, with a $CD_{50}$ value of approximately 12.5 µg/kg, much less than the 50 µg/kg target value for the $CD_{50}$ Tests.

353.    However, the 1983 $CD_{50}$ Test suggested that Compound III would not have acceptable duration of action.  The $RT_{50}$ value for Compound III was

approximately 1 hour and 45 minutes, below the normal two-hour threshold for advancing compounds to the Single Intravenous Dose Test. Nevertheless, the Migraine Project scientists decided to conduct a Single Intravenous Dose Test on that compound. Given the high *in vivo* potency of the compound, the non-standardized $RT_{50}$ value for Compound III was apparently close enough to 2 hours to justify further testing in the more conclusive test for duration of action.

354.    The intravenous duration of action of Compound III was further tested in April 1983 in the Single Intravenous Dose Test. The equipotent $RT_{50}$ value obtained in that test was 34.75 minutes, substantially less than the 1 hour threshold for the Single Intravenous Dose Test. On the basis of the 1983 Single Intravenous Dose Test results, Compound III was dropped from further consideration.

355.    In March 1990, Compound III was tested again for *in vivo* potency in the $CD_{50}$ Test. Despite having been rejected in 1983 as a potential development compound, Compound III was retested as part of the preparation for seeking regulatory approval for sumatriptan drugs because Compound III was a potential metabolite (by-product) of sumatriptan in the human body. Two $CD_{50}$ Tests were run on Compound III in 1990, and their results were reported on summary sheets.

356.    In connection with the two 1990 $CD_{50}$ Tests on Compound III, an $RT_{50}$ value was also calculated for each test and reported at the bottom of the summary sheets for those tests. In both cases, the $RT_{50}$ value for Compound III was >2 hours. It is not possible to tell from those summary sheets whether the 1990 $RT_{50}$ values for Compound III were just over two hours or considerably over two hours.

357.    The research and development report generated following the 1990 tests on Compound III indicates that the sole purpose of this testing was to verify the potency and selectivity of Compound III (as well as Compound II) because both compounds were potential metabolites of sumatriptan. The report contains no mention or discussion of any duration of action data or $RT_{50}$ values from any test cited in the report.

358.    The definitive test for intravenous duration of action—the Single Intravenous Dose Test—was not conducted on Compound III in 1990 or at any point after Compound III was dropped from further consideration as an anti-migraine drug in 1983.

359.    The 1990 report concluded that "since the plasma concentration of these possible metabolites of [sumatriptan] would represent less than 10% of the circulating plasma concentration of [sumatriptan] in man and the plasma half life of any metabolites are similar to that of [sumatriptan] in man…, it is unlikely that [Compound II] or [Compound III] would make a significant contribution to the haemodynamic effect of orally administered [sumatriptan]."  In other words, any Compound III that formed as a potential metabolite of sumatriptan would have been in such small quantities that it would have had minimal activity compared with sumatriptan.

360.    The report's conclusion explains why no Single Intravenous Dose Tests were conducted in connection with the 1990 report:  because any effect produced by Compound III was insignificant compared to the effect produced by sumatriptan, there was no reason conclusively to re-test the duration of action of such an insignificant effect.

361.    Apart from the two 1990 $CD_{50}$ tests on Compound III, Compound III was never tested following its rejection in 1983.  Compound III was not revived as a drug development candidate after the two 1990 $CD_{50}$ tests, nor was it ever revived as a drug development candidate following its rejection in 1983. Compound III was never progressed to testing in humans.

I.    **The Humphrey Declaration**

362.    To support Glaxo's application for the '845 Patent, Dr. Patrick Humphrey executed a declaration dated January 19, 1990 (the "Humphrey Declaration"), which was then submitted to the United States Patent and Trademark Office ("PTO").

363.    In his Declaration, Dr. Humphrey compares Compound II (GR 32066) and Compound III (GR 34456), which are both specifically described in the UK patent application corresponding to the '470 Patent, with sumatriptan (which is referred to in the declaration as "Compound (I)").

364.    In his Declaration, Dr. Humphrey concludes that, of the compounds specifically described in the UK patent application corresponding to the '470 Patent, Compound II is the compound of greatest potential as an anti-migraine agent.  Although Dr. Humphrey notes that the chemical structure of Compound III is more similar to that of sumatriptan than the chemical structure of Compound II, he states that the biological properties of Compound III led him to conclude that it was relatively less interesting than Compound II as a potential

anti-migraine agent.  Thus, the Humphrey Declaration indicates that it is limited to a comparison of sumatriptan against the most pertinent compounds from the UK patent application corresponding to the '470 Patent, in terms of both structural similarity and greatest potential as an anti-migraine agent.

365.    Dr. Humphrey observes that "[i]n the absence of standard tests for the determination of anti-migraine activity, we have devised a series of criteria which a potential development compound must satisfy.  Compounds which satisfy all the criteria are considered in preference to those which fail to satisfy the criterion laid down at any stage."

366.    Dr. Humphrey proceeds to compare sumatriptan, Compound II and Compound III.  He states that, while sumatriptan and Compounds II and III each had satisfactory vasoconstrictor activity both *in vitro* and *in vivo*, "[Compound III] was found to have shorter duration of activity than either [sumatriptan] or [Compound II] following intravenous administration to anaesthetized dogs" and that "[o]n the basis of the duration of activity results, [Compound III] was eliminated from further consideration while [sumatriptan] and [Compound II] were further tested to compare their efficacy following intraduodenal administration…."

367.    The duration of activity results for sumatriptan and Compounds II and III are set forth in Table I of the Humphrey Declaration, which shows the relative in vivo potency of all three compounds, the $RT_{50}$ value obtained in the $CD_{50}$ Test and the equipotent $RT_{50}$ value obtained in the Single Intravenous Dose Test.  Table I also indicates that the equipotent $RT_{50}$ values for each compounds were obtained using different numbers of dogs:  four dogs for sumatriptan and Compound II, and one dog for Compound III.

368.    After discussing the importance of and methodology behind the test of efficacy following intraduodenal administration, the Dr. Humphrey reports that "[sumatriptan] is considerably more effective than [Compound II] following intraduodenal administration of doses directly proportional to their relative intravenous potency.  These data infer that the bioavailability of [sumatriptan] from the intestinal tract is much greater than that of [Compound II], hence leading to the much greater biological effect of [sumatriptan] by this route."

369.    The intraduodenal efficacy data for sumatriptan and Compound II are set forth in Table II of the Humphrey Declaration, which shows the degree of

average carotid vasoconstriction produced by each compound over a three-hour time period.

370.    Dr. Humphrey concludes that, given the chemical structures and intravenous duration of actions of sumatriptan and Compound II, he "found the marked difference in the efficacy of the two compounds following [intraduodenal] administration surprising."

## J.    The accuracy of the Humphrey Declaration

371.    The conclusions concerning sumatriptan, Compound II and Compound III that are set forth in the Humphrey Declaration mirror the conclusions that were reached by Glaxo's scientists concerning those compound during the Migraine Project.  The data presented in the Humphrey Declaration in support of its conclusions is the same data used to reach those conclusions during the Migraine Project.

372.    The Humphrey Declaration accurately discloses the absence of standard tests for anti-migraine activity and the fact that the tests and criteria presented in the declaration were devised by Glaxo's scientists.  The Humphrey Declaration also discloses that Glaxo's scientists considered a compound that satisfies all criteria to be preferable to a compound that fails to satisfy a given criterion, which was the basic methodology used during the Migraine Project.  A compound that failed a particular screening test was generally dropped from further consideration regardless of its relative performance in earlier screening tests.

373.    The Humphrey Declaration concluded that Compound III was found to have shorter duration of action than sumatriptan and Compound II and that it was eliminated from further consideration on the basis of its results in duration of action tests.  In fact, during the Migraine Project, Compound III was rejected as a potential anti-migraine drug precisely because of its duration of action, while sumatriptan and Compound II each proceeded to the next stage of testing.  Table I discloses exactly the duration of action data that led Glaxo to eliminate Compound III from further consideration.

374.    Table 1 of the Humphrey Declaration accurately disclosed the number of test animals used to derive the equipotent $RT_{50}$ value for each compound, which appears in column (b) of the table.  Table I discloses that Compound III was only tested in one dog, while sumatriptan and Compound II were tested in four dogs each.  The examiner did not question the validity of this

comparison.  As a result, the fact that Table I does not disclose the number of dogs used to derive the $CD_{50}$ and column (a) $RT_{50}$ values—one dog was also used in testing Compound III, and multiple dogs were used in testing sumatriptan and Compound II—is immaterial.

375.    The Humphrey Declaration concluded that sumatriptan was considerably more effective following intraduodenal administration than Compound II.  In fact, Compound II was dropped from further consideration during the Migraine Project precisely because of its poor efficacy following intraduodenal administration.  Table II of the Humphrey Declaration contains the data that led Glaxo to eliminate Compound II from further consideration.

376.    The Humphrey Declaration was accurate in all material respects at the time it was submitted to the PTO.

K.    The 1990 $CD_{50}$ Tests on Compound III

377.    The 1990 $CD_{50}$ Tests on Compound III were performed several months after the submission of the Humphrey Declaration to the PTO.

378.    Although the 1990 tests resulted in two $RT_{50}$ values of >2 hours, in contrast to the $RT_{50}$ value of <2 hours obtained in the 1983 test, that data does not lead to the conclusion that Compound III necessarily possessed a longer duration of action than previously thought.  Because the 1983 $RT_{50}$ value approached two hours (approximately 1 hour and 45 minutes), it is entirely possible that the 1990 tests were consistent with the 1983 test (*i.e.*, the $RT_{50}$ value in the 1990 tests was just over two hours).

379.    It is impossible to compare the relative durations of actions of sumatriptan, Compound II and Compound III using the $RT_{50}$ values obtained in the $CD_{50}$ Test.  That test does not take into account the relative potency of each compound, nor does the two-hour cutoff for the test permit comparisons when the $RT_{50}$ values are over two hours.  Only the Single Intravenous Dose Test permitted accurate comparisons between compounds, and no such tests were run on Compound III at any point following 1983.  As a result, the 1990 tests on Compound III do not disprove the Humphrey Declaration's conclusions concerning relative duration of action.

380.    There is no evidence that Dr. Humphrey was aware of the 1990 test data on Compound III at any time prior to his deposition in this action.  There is

no evidence that Dr. Humphrey intended to deceive the PTO in connection with that test data.

381. There is no evidence that anyone else at Glaxo connected the $RT_{50}$ values obtained for Compound III in 1990 with the 1983 value set forth in Table I of the Humphrey Declaration. The 1990 tests were performed for the sole purpose of verifying the *in vivo* potency of Compound III, not its duration of action. Consequently, there is no reason to expect that anyone at Glaxo would have compared the 1990 $RT_{50}$ values of Compound III with its 1983 $RT_{50}$ value, and there is no evidence that any such comparison was made.

382. There is no evidence that the 1990 tests on Compound III altered the Migraine Project scientists' conclusions concerning the duration of action of Compound III. Compound III was dropped for insufficient duration of action in 1983. That decision was never revisited, whether after the 1990 tests or at any other time, and Compound III was never revived as a development candidate or even tested further. The conclusion stated in the Humphrey Declaration—that Compound III was eliminated on the basis of its duration of action—remained unaltered following the 1990 tests.

383. In sum, there is no evidence that anyone at Glaxo was aware of any real or apparent contradiction between the 1990 tests on Compound III and the data and conclusions set forth in the Humphrey Declaration. There is no evidence that anyone at Glaxo intended to deceive the PTO in connection with the 1990 test data.

## XII. ALLEGED INEQUITABLE CONDUCT IN THE SUBMISSION OF THE JACKSON DECLARATION

### A. <u>Mutagenicity</u>

384. One of the important goals of the Migraine Project was to develop an anti-migraine drug that lacked genotoxicity.

385. Genotoxicity refers to the property of a compound, when administered, to damage an organism's genetic material.

386. Genotoxicity can express itself in several ways.

387. One of the most significant types of genotoxicity is mutagenicity, the tendency of some compounds to alter individual coding sequences of DNA.

388.    Mutagenic compounds exert their effects by altering, inserting, or deleting nucleotides, the basic units of the genetic code, so as to change the sequence of an organism's DNA.

389.    The alteration, insertion or deletion of nucleotides may have a variety of effects upon an organism's appearance or functions.

390.    Mutagenicity is of particular concern when developing pharmaceutical compounds, because, among other things, there is a correlation between mutagenicity and the formation of cancerous tumors.

391.    By the time of the Migraine Project, the correlation between mutagenicity and carcinogenicity was long and well established.

392.    Mutagenicity is of even greater concern when developing compounds intended for treatment of acute, non-life threatening conditions, such as migraine, because the benefits of such medications are less likely to outweigh the risks associated with the administration of potentially mutagenic drugs.

393.    During the Migraine Project and to this day, the FDA and other drug regulatory bodies have required that drugs be tested extensively to assess their mutagenic potential before they are approved for administration in clinical trials to human beings.

394.    During the 1980s, Glaxo screened all Migraine Project compounds for mutagenicity, and abandoned the development of compounds that tested positive in its mutagenicity screens.

B.    **Mutagenicity Assays:  the Ames Test**

395.    An important screen for mutagenicity is the Ames test.

396.    Developed during the 1970s, the Ames test employs special strains of ***Salmonella typhimurium ("Salmonella")*** bacteria that have undergone mutations that compromise their otherwise natural ability to synthesize histidine, a necessary amino acid.

397.    In contrast to naturally occurring ***Salmonella*** bacteria, which, because they can synthesize histidine naturally, can grow in media that do not contain this essential compound, the strains of ***Salmonella*** that are used in Ames testing ("***his***- strains") cannot grow in histidine-free media.

398.     ***His***- strains, as a general matter can grow in histidine-free media only if they undergo mutations that restore their ability to synthesize histidine.

399.     By exposing ***his***- strains to a compound of interest, incubating the exposed strains on plates containing growth medium lacking histidine, and then, after a few days, counting the number of resulting "revertant" colonies—***i.e.***, the number of spots (each of which represents a group of bacteria that have descended from a single bacterium)—one can assay the potential of a compound to cause mutations.

400.     The Ames test uses two types of ***his***- strains: (1) "base change" strains, which serve to detect the presence of mutations consisting of substitution of one DNA nucleotide for another (***e.g.***, CAT → GAT), and (2) "frame shift" strains, which serve to detect the presence of mutations consisting of insertion or deletion of nucleotides (***e.g.***, CAT → CAAT or → CT).

401.     The greater the ratio of the number of revertant colonies in test plates to the number of revertant colonies in control plates, the greater the compound's mutagenic potential.

402.     Because the basic mechanism of mutagenic damage—changes, insertions or deletions of nucleotides—is similar in bacteria and human beings, the Ames test is believed to have predictive value as a screen for mutagenicity.

403.     Because of its predictive value as well as its speed, ease, scalability, and low cost, the Ames test has been a standard tool of genetic toxicology for decades.

C.     <u>Mutagenicity Assays:  the NAP Test</u>

404.     During the 1970s, there arose within the field of toxicology a concern about the mutagenic potential of n-nitroso compounds, namely, nitrosamines.

405.     Nitrosamines are compounds that form through the reaction of nitrous acid and compounds that contain certain types of amine groups, namely, secondary and tertiary amines.

406.     Secondary amines are compounds containing a nitrogen atom bound to two organic substituents and not more than one hydrogen atom.

407.    Tertiary amines are compounds containing a nitrogen atom bound to three organic substituents.

408.    Primary amines are compounds containing a nitrogen atom bound to one organic substituent and two hydrogen atoms.

409.    In contrast to secondary and tertiary amines, primary amines do not possess the potential to form nitrosamines when exposed to nitrous acid; primary amines react with nitrous acid to form nitrogen gas instead, which is not mutagenic.

410.    Ames tests of nitrosamines have demonstrated that nitrosamines often have mutagenic potential.

411.    The mutagenic potential of nitrosamines was a source of concern during the 1970s and 1980s because nitrous acid may be present in the stomach, particularly after ingestion of foods containing the common preservative, nitrite, which forms nitrous acid upon exposure to acidic conditions, such as those found in the stomach.

412.    Because of the concern about the mutagenic potential of nitrosamines, a group of genetic toxicologists working under the auspices of the World Health Organization during the late 1970s developed a modification of the Ames test designed to assess the mutagenic potential of compounds susceptible to nitrosation upon exposure to nitrous acid ("nitrosatable compounds").

413.    This modified Ames test, referred to as the Nitrosation Assay Procedure Test, or "NAP Test," quickly became accepted within the field of genetic toxicology and the pharmaceutical industry as a means of assaying the mutagenic potential of nitrosatable compounds.

414.    The NAP Test is an Ames test that has been preceded by exposure of the compound of interest to a mixture of acid and nitrite for a period of time, generally one or four hours.

415.    The purpose of exposing the compound of interest to this mixture is to catalyze the formation of potentially mutagenic nitrosamines under aqueous acidic conditions whose strength approximates the acidity of the human stomach.

416.    A compound scored positive in the NAP Test if the number of revertant colonies in the test plates was more than twofold the number of revertant colonies in the appropriate control plates.

417.    The strength of aqueous acidic conditions can be expressed in either of two ways: through specification of the concentration of acid (e.g., 6% acetic acid), or according to the pH scale.

418.    The pH scale ranges from 0 to 14, and by convention, an aqueous solution is characterized as acidic if its pH is below 7.

419.    The lower the pH, the more acidic the aqueous solution.  (Jackson Dep. 114)

420.    Accordingly, an aqueous solution whose pH is 2.6, for example, is more acidic than one whose pH is 3.6.

421.    Indeed, because the pH scale is logarithmic, every single point decrease in the pH scale corresponds to a ten-fold increase in acidity as measured by the absolute concentrations of protons in solution.

422.    In its original 1978 protocol for the NAP Test, the WHO recommended that the NAP Test be conducted at pH 3-4.

423.    Its recommendation was based upon the considerations that "the pH range 3-4 . . . is close to that prevailing in the stomach during digestion, [and] is optimal for most nitrosation reactions."

424.    The WHO advised the scientific community to review data generated according to its recommendations periodically "with a view to developing additional perspectives and insights into the possible hazards associated with N-nitrosatable drugs."

425.    By 1984, for example, it was known that the pH of the stomach ranged between 1 and 5, depending on the stage of digestion and other physiological factors.

426.    In addition, it was known that nitrosation of certain types of compounds proceeded more readily at a pH lower than 3-4.

427.    Specifically, in 1984, an authoritative publication by a major British genetic toxicology society, the United Kingdom Environmental Mutagen Society

(the "UKEMS"), observed that aromatic secondary amines (of which indoles, including sumatriptan and GR 32066, are an example), were optimally nitrosated at higher acidities than pH 3-4.

428.    Because the optimal pH for nitrosation varied among nitrosatable compounds, the UKEMS "recommended the pH be chosen from the range 1-4, and be determined, where possible, by the chemical properties of the substance to be nitrosated."

429.    A 1983 article by Glaxo genetic toxicologists, Dr. David Gatehouse and David Wedd, demonstrated that serotonin and other naturally-occurring indoles, which have structures similar to the compounds covered by the '470 Patent, are nitrosated more readily at pH 2.6 than at pH 3.6.

430.    When acetic acid is used as the acidic reagent in the NAP Test, a pH of 3.6 results from use of a solution of 0.06% acetic acid, whereas a pH of 2.6 results from use of a solution of 6.0% acetic acid.

431.    Glaxo's internal standard operating procedures for the conduct of NAP Tests, which were first promulgated in 1982 and reissued at intervals thereafter, approved the performance of NAP Tests using both 0.06% and 6.0% acetic acid.

432.    Based on the public and internal data available to Glaxo toxicologists during the 1980s, those toxicologists would have expected and did expect indole compounds, including sumatriptan and GR 32066, to be more readily nitrosated in the presence of 6.0% acetic acid, than in the presence of 0.06% acetic acid.

D.    Glaxo's NAP Tests of Migraine Project Compounds

433.    In 1983, Glaxo conducted NAP Tests, as well as other tests for mutagenicity, on GR 32066, a compound it had recently synthesized as a potential anti-migraine compound, and the compound that would later come to be identified as the "particularly preferred compound" of the '470 Patent.

434.    GR 32066 is structurally similar to sumatriptan; the only structural difference between the two compounds is that sumatriptan has a tertiary amine group, which has the potential for nitrosation, whereas GR 32066 has a primary amine group, which lacks the potential for nitrosation.

435.    Both GR 32066 and sumatriptan have aromatic secondary amine groups within their indole rings, which have potential for nitrosation.

436.    NAP Tests of other compounds having indole rings demonstrated with overwhelming frequency that such compounds were mutagenic.

437.    For example, NAP Tests of AH 21467, AH 22602, AH 22800, AH 23551, AH 23595, AH 24359, AH 24956, AH 25086, AH 25482, AH 25657, AH 25958, AH 25978, AH 26160, GR 31531, GR 32066, GR 32124, GR 32707, GR 33166, GR 33305, GR 33731, GR 33886, GR 34027, GR 34087, GR 34274, GR 34306, GR 34317, GR 34450, GR 34456, GR 34512, GR 34633, GR 34656, GR 34669, GR 34759, GR 34877, GR 35258, GR 35241, GR 35242, GR 35458, GR 35503, GR 35673, GR 35813, GR 36445, GR 37128, GR 37419, GR 40370, GR 41524, GR 43022, GR 44310, GR 44666, GR 46611, GR 48374, GR 49464, GR 50330, GR 52851, GR 53396, GR 54007, GR 54263, GR 57987, GR 58763, GR 59141, GR 59630, GR 59727, GR 59881, GR 64027, GR 64029, GR 64987, GR 65463, GR 69036, GR 74297, GR 78580, GR 78893, GR 80178, GR 91346 and GR 96796 demonstrated that these compounds had mutagenic potential.

438.    The mutagenic potential of indoles as revealed by the NAP Test was a major obstacle Glaxo faced in developing migraine drug candidates.   An internal Migraine Project document stated that "the spectre of key compounds failing in Genetic Toxicology continues to haunt the [Migraine Project] as so many promising compounds have had to be abandoned because of mutagenic effects.  This is the principal limiting factor in recommending follow-up candidates to [sumatriptan]."  *See* GSK 189949.

439.    Glaxo was not able to identify a relationship between the structure of Migraine Project compounds and mutagenicity.   "Identifying compounds which are non-mutagenic in the standard tests operated by genetic toxicology, especially the NAP Test, is a continuing problem in the 5-HT project.  We do not yet understand the factors which govern this mutagenicity . . . ."  GSK 00138234; *see also* GSK 00143862.

440.    Glaxo relied on the NAP Test to screen follow-up candidates to sumatriptan up to the issue date of the '845 Patent.  An internal Glaxo report, dated July 8, 1991, observed that Glaxo's primary follow-up candidate, GR 85548 (a/k/a naratriptan), "has weak activity in the nitrosation assay procedure (NAP) and is thus unsuitable for oral administration . . . ."  GSK 00143738.

441.    Glaxo regularly abandoned development of otherwise promising antimigraine drug candidates based on positive results in the NAP Test, including NAP Tests performed using only 6.0% acetic acid as the acid reagent.

442.    Consistent with the frequent finding that indoles were mutagenic in the NAP Test, Glaxo's 1983 tests of GR 32066 demonstrated that that compound had mutagenic potential; when tested in TA 1537, the compound registered a significant mutagenic response when subjected to nitrite in the presence of 6.0% acetic acid.

443.    Glaxo described the conditions under which GR 32066 was mutagenic as the "conditions of the standard W.H.O. Nitrosation assay," notwithstanding the use of 6.0%, rather than 0.06%, acetic acid.

E.    **Glaxo's NAP Tests of Sumatriptan**

444.    In April 1984, shortly after sumatriptan was synthesized, that compound was also subjected to the standard screen for mutagenic potential, including NAP Tests.

445.    Those tests demonstrated that sumatriptan lacked mutagenic potential.

446.    Sumatriptan scored negative for mutagenic potential in all strains and under all conditions in the 1984 NAP Tests.  Glaxo's internal summary of the 1984 NAP test data concluded, "GR 43175 was not nitrosated to a direct or indirect mutagen in the standard NAP test (10mM drug, 40mM nitrite, pH 2-3, 3-4)."  GSK 00190673.

447.    Sumatriptan's lack of mutagenicity was unexpected because indoles frequently tested positive in the NAP Test, and because the structurally similar indole, GR 32066, had tested positive.

448.    Sumatriptan's lack of mutagenicity compared to GR 32066 was particularly unexpected because sumatriptan has more potential sites for nitrosation than GR 32066.

449.    Glaxo referred to its 1984 NAP Tests of sumatriptan as having been conducted "under the conditions of the standard W.H.O. NAP test," notwithstanding the use of 6.0%, as well as 0.06%, acetic acid.

450.    In 1986, sumatriptan was re-tested for mutagenic potential.

451.    In the 1986 tests, sumatriptan again scored negative for mutagenic potential in all strains and under all conditions.

452.    Glaxo characterized its 1986 NAP tests of sumatriptan as "the standard WHO NAP test," notwithstanding the use of 6.0%, as well as 0.06%, acetic acid.

F.    The 1989 NAP Tests of GR 32066

453.    In 1989, Glaxo re-tested GR 32066 for mutagenicity in the TA 1537 strain (in which, at pH 2.6, the compound had previously tested positive) and in the TA 98 strain (in which, at pH 2.6, the compound had previously scored close to a cut-off for mutagenic potential).

454.    Glaxo's internal standard operating procedures for the conduct of the NAP Test provided for the use of two experimental controls: (1) test compound alone in acid ("Compound Alone Control") and (2) sodium nitrite alone in acid ("Nitrite Alone Control").

455.    Sodium nitrite, when combined with acid, acts as a weak base change mutagen.  Hence, to score a NAP Tests using base change strains (e.g., TA 100, TA 1535) accurately, and to correct for the weak base change activity of the sodium nitrite and acid in the test sample, Glaxo used the Nitrite Alone Control when using base change strains.

456.    By contrast, Glaxo used either or both controls when using strains designed to assay for frame shift mutations (TA 98, TA 1537), because neither the Nitrite Alone Control, nor the Compound Alone Control would be expected to contribute to the number of frame shift mutations observed in the test plates (assuming the test compound was not a frame shift mutagen in the basic Ames Test).

457.    Over time, Glaxo was able to streamline its NAP Test procedures in light of unmistakable observed trends in the NAP Test data collected during the Migraine Project.  By 1988, when using frame shift strains (TA 98, TA 1537), Glaxo tested compounds with 6.0% acetic acid (pH 2.6) using the Compound Alone Control as the primary experimental control.  For example, GR 52851, GR 61386, GR 74297, GR 78580, GR 78893, GR 80178, GR 91346, and GR 96796 were tested under these conditions to determine whether to invest additional resources in development of those compounds.

458.    Consistent with Glaxo's streamlined procedures, the 1989 NAP Tests of GR 32066 were conducted at pH 2.6, the pH at which earlier positive results for GR 32066 had been obtained.  In addition, and also consistent with Glaxo's streamlined procedures, the 1989 tests of GR 32066 utilized frame shift strains and the Compound Alone Control as the primary experimental control.

459.    In the 1989 tests, GR 32066 tested positive for mutagenicity in both TA 1537 and TA 98.

460.    Initial Ames tests on GR 32066 performed in 1983 revealed that one of the original batches of GR 32066 contained a mutagenic impurity.  Glaxo scientists later purified the contaminated batch by recrystallization.  Subsequent retests confirmed the absence of the mutagenic impurity in the purified batch.

461.    The 1983 Ames tests demonstrated that the impurity was a weak base change mutagen, not a frame shift mutagen.

462.    There is no evidence that Glaxo used in 1989 testing the one batch of GR 32066 prepared in 1983 in which an impurity had been detected prior to purification through recrystallization.

463.    Even if the batch of GR 32066 used in 1989 had been the one in which a mutagenic impurity had been detected in 1983, that impurity could not have caused the positive 1989 NAP Test results of GR 32066 in frame shift strains because Glaxo purified the contaminated batch by recrystallization years earlier and, more importantly, the impurity was not a frame shift mutagen.

G.    The Jackson Declaration

464.    To support Glaxo's application for the '845 Patent, Dr. Michael A. Jackson executed a January 12, 1990 declaration (the "Jackson Declaration"), which was then submitted to the PTO.

465.    In 1990, when he submitted his declaration, Dr. Jackson was the Director of Glaxo's Pathology and Toxicology Division.

466.    As Director of the Pathology and Toxicology, Dr. Jackson was responsible for supervision of the approximately 250 Glaxo scientists, as well as for all aspects of Glaxo preclinical safety testing, including the representation of Glaxo before regulatory bodies.

467.    In his declaration, Dr. Jackson compared the results of the NAP Tests of sumatriptan with the results of the 1989 NAP Tests for GR 32066.

468.    The results of those tests were accurately reported in the Jackson Declaration.

469.    Those results showed, and Dr. Jackson concluded, that sumatriptan "shows no mutagenic potential in the NAP Test.  By contrast, [GR 32066] shows a significant mutagenic potential in the NAP test."

470.    Dr. Jackson also wrote that the tests underlying the declaration were performed "under [his] supervision."

471.    Dr. David Tweats, an experienced, senior genetic toxicologist employed by Glaxo, assisted in the preparation of the Jackson Declaration.

472.    Dr. Tweats, though below Dr. Jackson within the Glaxo hierarchy, was "scientifically . . . [his] peer, if not more."

473.    The Jackson Declaration contained one typographical error:  the appendix to the declaration describing the conditions under which the tests that were the bases for comparison were performed, stated that those tests were performed using 0.06% acetic acid, whereas, in fact, they were performed using 6.0% acetic acid.

474.    But for this single typographical error, the Jackson Declaration was accurate.

H.    The NAP Tests of GR 32066 and GR 43175 Were Performed Under Dr. Jackson's Supervision

475.    Dr. Jackson's declaration correctly stated that the underlying NAP Tests were performed under Dr. Jackson's supervision.

476.    Dr. Gatehouse, Dr. Tweats, and every other individual associated with the data underlying Dr. Jackson's declaration, including the lab technicians that performed the actual experiments, reported to Dr. Jackson as the director of Glaxo's toxicology department.

477.    Dr. Jackson did not misrepresent any information in his declaration or mislead the Patent Office, intentionally or otherwise, with respect to his role at Glaxo or his supervision of the NAP Tests.

### I.     The Misstatement of Acid Concentration Was Immaterial

478.     The misstatement of the acid concentration at which the NAP Tests that were the basis for comparison of sumatriptan's and GR 32066's mutagenic potential did not affect the validity of Dr. Jackson's conclusion that sumatriptan lacked mutagenic potential, or the conclusion that its lack of mutagenic potential was an unexpected property.

479.     Because indoles and aromatic secondary amines are more likely to be nitrosated — and hence, are more likely to be mutagenic — at a pH between 2 and 3 (i.e., 6.0% acetic acid), than at a pH between 3 and 4 (i.e., 0.06% acetic acid), the effect of the typographical error in the Jackson Declaration was to make sumatriptan's lack of mutagenicity appear to be less impressive and less unexpected than it would have been had the declaration accurately stated the pH at which the NAP Tests that were the basis for comparison of sumatriptan's and GR 32066's mutagenic potential were performed.

480.     The characterization within the Jackson Declaration of the NAP Tests that were the basis for comparison of sumatriptan's and GR 32066's mutagenic potential as "following the nitrosation assay procedure (NAP Tests) recommended at the World Health Organization (WHO) Symposium on the Potential Carcinogenicity of Nitrosatable Drugs held in Geneva in June 1978" was neither inaccurate nor misleading.

481.     Although the guidelines for NAP Testing released by the WHO in 1978 recommended use of acid concentrations resulting in a pH between 3 and 4, that recommendation was not intended to preclude use of other physiologically relevant acid concentrations, or to suggest that use of other physiologically relevant acid concentrations would render the results of a NAP Test suspect.

482.     The motivation for the WHO's recommendation was the observation that "a number of commonly-used drugs . . . undergo a detectable degree of nitrosation when exposed to an excess of nitrite in aqueous solution under conditions of temperature and pH within the physiological range."

483.     Accordingly, genetic toxicologists working during the 1980s considered NAP Testing at pH 2-3, which is well within the physiological range, to be fully compliant with WHO guidelines.

484.     In its own testing of compounds, Glaxo regularly performed what it referred to as "WHO NAP Tests" using 6.0% acetic acid, and rejected

compounds (e.g., GR 53396, GR 59630, GR 59881, GR 80178, GR 96796) based on the results of those tests alone.

**J.     The Misstatement of Acid Concentration Was Inadvertent**

485.     Dr. Jackson was not aware of the typographical error in his declaration at the time he executed it.

486.     Because it was a standard operating procedure within Glaxo to test compounds using both 6.0% and 0.06% acetic acid, and because of the similar typographical appearance of 6.0% (i.e., 0.06) and 0.06%, it is not surprising that the mistake in the statement of the acid concentration was made and that it was not caught.

487.     That the Jackson Declaration inadvertently misstated the acid concentration is corroborated by the consideration that it would have been in Glaxo's interest to correct the mistake:  the conclusion that sumatriptan lacked mutagenicity would have been only more impressive and more unexpected if the examiner had known that its lack of mutagenicity had been demonstrated under more stringently acidic conditions under which nitrosation was more likely.

488.     Dr. Jackson did not become aware of the typographical error in his declaration until shortly before his deposition in this case in 2005.

489.     Neither Dr. Jackson nor anyone involved in the prosecution of the '845 Patent intended to deceive the PTO through the submission of the Jackson Declaration.

**K.     The Omission of Additional Data from NAP Tests of GR 32066 Was Not Material**

490.     The Jackson Declaration did not report the negative results of the 1983 NAP Tests of GR 32066 at pH 3.6.

491.     At pH 3.6, both GR 32066 and sumatriptan scored negative for mutagenic potential.

492.     The failure of the Jackson Declaration to report the negative results of NAP Tests of both GR 32066 and sumatriptan at pH 3.6 was not material because the purpose of the Jackson Declaration was to identify a respect in which sumatriptan differed from a structurally similar prior art compound, not the possibly numerous respects in which they were similar.

493.    Had the examiner known that both sumatriptan and GR 32066 were non-mutagenic at pH 3.6, whereas GR 32066 was mutagenic only at pH 2.6, the conclusion that sumatriptan's lack of mutagenicity was unexpected would have been just as well supported, because the presence of mutagenicity in a structurally similar compound at any physiologically relevant pH renders unexpected sumatriptan's lack of mutagenicity at the same pH.

494.    The Jackson Declaration did not report the positive results of the 1983 NAP Tests of GR 32066 at pH 2.6.

495.    The failure of the Jackson Declaration to report the negative results of the 1983 NAP Tests of GR 32066 at pH 2.6 was not material because GR 32066 registered positive in both sets of tests; submission of the 1983 data would have been cumulative.

L.    **Glaxo Did Not Omit Additional Data from NAP Tests of GR 32066 With Intent to Deceive**

496.    Neither Dr. Jackson nor anyone involved in the prosecution of the '845 Patent intended to deceive the PTO through the omission from the Jackson Declaration of data from the 1983 tests of GR 32066.

497.    Because the purpose of the Jackson Declaration was to demonstrate respects in which sumatriptan differed from GR 32066, not those in which it was similar, Dr. Jackson and those involved in the preparation of the Jackson Declaration elected not to include data that demonstrated similarities or that afforded merely cumulative proof of those compounds' unexpected differences.

XIII.    **ALLEGED INEQUITABLE CONDUCT OF GSK'S PATENT ATTORNEY**

A.    **The Obviousness-Type Double Patenting Rejection**

498.    In an Office Action dated January 30, 1990, Examiner Ceperley provisionally rejected pending claims 1-4, 6-9, 11-13 and 15 of the '845 Patent application based on the then-pending application for the '483 Patent, which had the serial number 07/443,874.  Examiner Ceperley's rejection was based on the doctrine of obviousness-type double patenting and was provisional because the '483 patent application had not yet issued as a patent.

499.     Examiner Ceperley's obviousness-type double patenting rejection
was based solely on the similarity in chemical structure between the compounds
of the '845 application and the compounds of the '483 application.  According to
Examiner Ceperley, both sets of compounds were not patentably distinct from
each other because they were adjacent homologs of each other.

500.     Examiner Ceperley was referring to the fact that sumatriptan
compounds contain a methylene (-CH$_2$-) chain between the indole nucleus and
the sulphonamide group (NSO$_2$), while the compounds then included in the '483
application differed only in having additional methylene groups in the chain (for
example, - CH$_2$CH$_2$-, as in the compounds ultimately claimed in the '483 Patent).

501.     Examiner Ceperley concluded her discussion of the obviousness-
type double patenting rejection by quoting a portion of the *Manual of Patent
Examining Procedure* indicating that a terminal disclaimer could overcome an
obviousness-type double patenting rejection, but only if the applicant shows that
the conflicting patents and/or patent applications were commonly owned.

502.     The filing of a terminal disclaimer is a procedure in which the
patent applicant agrees to let a later patent expire at the same time as a
commonly owned earlier patent.

503.     In a Request for Reconsideration dated May 3, 1990, Mr. Richard
Fichter, GSK's patent attorney, addressed Examiner Ceperley's provisional
rejection of the pending claims of the '845 Patent application based on the then-
pending claims of the '483 Patent application.

504.     In his May 3, 1990, Request for Reconsideration, Mr. Fichter
informed Examiner Ceperley that, once the '845 Patent was allowed, Glaxo
would file a terminal disclaimer in the '483 Patent application.  Mr. Fichter wrote,
"The provisional rejection of claims 1-4, 6-9, 11-13 and 15 under the judicially
created doctrine of obviousness-type double patenting as being unpatentable
over claims 1-9, 13 and 14 of copending application serial no. 07/443,874 has been
carefully considered.  However, it is noted that neither application has yet been
allowed.  Although it is believed that the inventions claimed in each application
are patentably distinct, upon allowance of the present application, the necessary
terminal disclaimer will be filed in the '874 application to expedite the
prosecution of the present application by reducing the issues in the present
case."

505.    On July 27, 1990, Examiner Ceperley issued a Final Office Action continuing to reject all of the pending claims of the '845 Patent application in light of Claims 1-9, 13 and 14 of the '483 Patent application for "the reasons of record," *i.e.*, the reasons stated in her January 30, 1990 rejection. Examiner Ceperley noted "Applicant's intent to file a terminal disclaimer in S.N. 07/443,874," *i.e.*, the '483 Patent application, but pointed out that the required showing of common ownership of the '845 and '483 patent applications had not been filed.

506.    On December 26, 1990, Mr. Fichter filed a Request for Reconsideration enclosing a declaration of common ownership for the '845 and '483 patent applications. Mr. Fichter also stated that "[a]s also noted in the Official Action"—referring to Examiner Ceperley's July 26, 1990 Final Office Action—"Applicant will take whatever action is necessary to remove any obviousness double patenting rejection in United States application serial No. 07/443,874," *i.e.*, the '483 Patent application.

507.    On January 17, 1991, Examiner Ceperley called Mr. Fichter. Examiner Ceperley memorialized the conversation in an Interview Summary Record.

508.    In the Interview Summary Record, Examiner Ceperley noted that the file for the '483 Patent application was unavailable. She indicated that she called Mr. Fichter "to see if a terminal disclaimer over [the '845 patent application] had been filed in that case," *i.e.*, with respect to the '483 patent application.

509.    During the call, Examiner Ceperley was advised by Mr. Fichter that the obviousness-type double patenting rejection had been overcome in the '483 patent application. Examiner Ceperley requested that Mr. Fichter provide her with a "copy of final rejection + response thereto of" the '483 Patent application, referring to the relevant portions of the '483 patent prosecution file.

510.    Mr. Fichter's statement that the obviousness-type double patenting rejection had been overcome in the '483 patent application was true. There were no material misstatements or omissions in Mr. Fichter's statement to Examiner Ceperley. There is no evidence that Mr. Fichter intended to deceive Examiner Ceperely, nor would a reasonable examiner have been misled by Mr. Fichter's statement.

**B.**    **Factual statements in the allegedly misleading Supplemental Response and Clarification**

511.    On the same day as his telephone interview with Examiner Ceperley, Mr. Fichter filed a Supplemental Response and Clarification dated January 17, 1990 that addressed the issues discussed during the interview.

512.    In the second paragraph of his Supplemental Response, Mr. Fichter noted that the "Examiner has inquired about the filing of a terminal disclaimer with respect to [the] copending ['483 Patent application].  It was applicants['] intention to file a terminal disclaimer in the ['483 Patent application] if the double patenting rejection therein over the present application could not be overcome.  However, Examiner Berch agreed that the obviousness double patenting rejection in the ['483 Patent application] over the present application was obviated by the response and evidence filed therein and passed the ['483 Patent application] to issue without requiring a terminal disclaimer.  The issue fee has been paid and the ['483 Patent application] will issue as a patent without a terminal disclaimer."  Examiner Berch was the examiner of the '483 Patent application.

513.    In response to the Examiner's inquiries concerning the filing of  a terminal disclaimer in the '483 Patent application, Mr. Fichter accurately indicated that the prior intention to file such a terminal disclaimer had changed.  Mr. Fichter accurately indicated that the examiner of the '483 Patent application had withdrawn his obviousness-type double patenting rejection based on the '845 Patent application.  Mr. Fichter accurately indicated that the examiner of the '483 Patent application had withdrawn his obviousness-type double patenting rejection on the basis of a response and evidence filed during the '483 Patent prosecution.  Mr. Fichter accurately indicated that the examiner of the '483 Patent application allowed the '483 Patent to issue without a terminal disclaimer and that the '483 Patent would issue without a terminal disclaimer.

514.    The second paragraph of Mr. Fichter's Supplemental Response fully disclosed the fact that no terminal disclaimer would be filed in the '483 Patent application and fully explained why.  There are no factual misrepresentations or omissions in the second paragraph of the Supplemental Response.  There is no evidence that Mr. Fichter intended to deceive Examiner Ceperley in this paragraph, nor would a reasonable examiner have been misled by anything contained in this paragraph.

C.     <u>483 Patent application materials submitted to Examiner Ceperley with
the allegedly misleading Supplemental Response and Clarification</u>

515.     In the Supplemental Response and Clarification, Mr. Fichter
proceeded to write, "Applicants submit herewith for the convenience of the
Examiner copies of the final rejection in the ['483 Patent] application and the
response thereto in light of which the examiner withdrew all of the rejections
including obviousness double patenting rejection without requiring the filing of
a terminal disclaimer."

516.     Mr. Fichter's statement is accurate and contains no factual
misrepresentations or omissions.  The Supplemental Response and Clarification
was accompanied by all pertinent material from the prosecution file of the '483
Patent application requested by Examiner Ceperley.

517.     Mr. Fichter submitted to Examiner Ceperley an Office Action dated
January 23, 1990 by Examiner Berch that, among other things, provisionally
rejected the '483 Patent application for obviousness-type double patenting based
on the '845 Patent application.

518.     In the Office Action, Examiner Berch explained that the basis for
the obviousness-type double patenting rejection was the structural similarity of
the compounds of the '483 Patent application to the compounds of the '845
Patent application.  Examiner Berch stated that the claims were not "patentably
distinct from each other because of homology."  Examiner Berch explained that
the '483 Patent claims were to a "chain homologue" of the compounds in the '845
Patent claims, referring to the fact that the difference between the compounds of
the '483 Patent application and the '845 Patent application lay in the addition of a
methylene group ($-CH_2-$) to the chain between the sulphonamide group and the
indole nucleus.

519.     Mr. Fichter also submitted to Examiner Ceperley an Amendment,
Notice of Appeal and Petition for Extension of Time, all dated July 24, that he
had filed in the '483 Patent application in response to Examiner Berch's January
23, 1990 Office Action.  The Amendment enclosed a declaration dated July 18,
1990, and executed by Michael Howard Tarbit ("Tarbit Declaration").

520.     In the July 24, 1990, Amendment to the '483 Patent application, Mr.
Fichter addressed the rejection of the '483 Patent application in light of the '845
Patent application:  "The provisional rejection of Claims 1-9 and 13-14 under the
judicially created doctrine of obviousness type double patenting as being

unpatentable over Claim 1 of [the] co-pending ['845 Patent application] has been carefully considered. It is believed that this provisional rejection has been obviated in view of the data contained in accompanying 132 declaration. As noted at the interview, the data presented in Table 1 of the declaration clearly show that the compound of the present invention has a much higher oral bioavailability than any of the other compounds tested. Accordingly, it is most respectfully requested that the provisional rejection over [the] co-pending ['845 Patent application] be withdrawn."

521.    The declaration referred to by Mr. Fichter in his July 24, 1990, Amendment to the '483 Patent application is the Tarbit Declaration.

522.    The Tarbit Declaration indicates on its face that it was submitted in connection with the '483 Patent application ("In re Application Serial No. 07/443,874").

523.    The Tarbit Declaration states that "[a]n advantageous feature of a good anti-migraine drug is its efficacy following oral administration, and this is dependent on its oral bioavailability." The Tarbit Declaration goes on to detail the methodology used to measure oral bioavailability, which involved tests on laboratory rats.

524.    Table 1 of the Tarbit Declaration compares the oral bioavailability of five compounds: the compound of the '483 Patent application; sumatriptan; and four compounds from the '470 Patent, including Compounds II and III.

525.    Mr. Tarbit concluded in the Tarbit Declaration that "[t]he data presented in Table 1 clearly show that the compound of the present application has a much higher oral bioavailability than any of the other compounds tested." Mr. Tarbit also concludes that "[i]n view of the structural similarity of the test compounds I find the markedly higher oral bioavailability of the compound of the present application surprising." It is apparent from the Tarbit Declaration that the "compound of the present application" refers to the compound of the '483 Patent application.

526.    Mr. Fichter's discussion of the Tarbit Declaration in his July 24, 1990, Amendment to the '483 Patent application also points out that the number of the '845 Patent application is incorrect in Table 1. Mr. Fichter wrote, "Applicants wish to note that there is an error in Table 1 of the 132 declaration with respect to the identification of U.S. Serial No. 317,682 [the '845 Patent application], which is incorrectly referred to in the Table as Serial No. 371,682.

However, it is clear from Item 4 of the declaration that the correct Serial No. is 317, 682, which is consistent with the application cited in the rejection. Accordingly, it is most respectfully requested that this provisional rejection be withdrawn." It is clear that the "rejection" Mr. Fichter refers to is Examiner Berch's January 23, 1990, rejection of the '483 patent application.

527.    Mr. Fichter also submitted to Examiner Ceperley the Notice of Allowability issued by Examiner Berch. The Notice indicates that the reason for allowance of the '483 Patent application was that "testing shows unexpected effects arising from the $n = 2$ homologue." The reference to "$n = 2$" apparently refers to the structural formula found in Table 1 of the Tarbit Declaration, in which only the compound from the '483 Patent application has an $n$ value of 2. The $n$-value of 2 indicates that the compound from the '483 Patent application has $-CH_2CH_2-$ between the sulphonamide and the indole nucleus, while every other compound tested has only $-CH_2-$ between the sulphonamide and the indole nucleus.

528.    It is readily apparent from the materials from the '483 Patent prosecution submitted by Mr. Fichter to Examiner Ceperley at her request: (1) what the purpose, content and context of each document was; (2) that the Tarbit Declaration was submitted by Mr. Fichter during the '483 Patent prosecution to show the unexpectedly higher bioavailability of the '483 Patent compound over sumatriptan; and (3) that Examiner Berch had allowed the '483 Patent application over the '845 Patent application because of the unexpected effects shown in the Tarbit Declaration.

529.    There are no factual misrepresentations or omissions in the '483 Patent prosecution materials submitted by Mr. Fichter is response to Examiner Ceperley's request. Mr. Fichter's statements in those materials were entirely accurate.

530.    There is no evidence that Mr. Fichter submitted the materials from the '483 Patent prosecution to Examiner Ceperley with an intent to deceive or mislead Examiner Ceperley. Mr. Fichter submitted the materials requested by Examiner Ceperley, submitted complete copies of those materials and accurately characterized those materials in his January 17, 1990, Supplemental Response and Clarification.

531.    A reasonable examiner would not have been misled by anything contained in the materials from the '483 Patent prosecution submitted by Mr.

Fichter to Examiner Ceperley or by Mr. Fichter's discussion of those materials in the Supplemental Response and Clarification.

**D.    Mr. Fichter's legal argument in the Supplemental Response and Clarification**

532.    Mr. Fichter concluded his discussion in the January 17, Supplemental Response and Clarification by stating: "[i]t is believed that the present application should also be allowed without a terminal disclaimer. This is particularly true since to do otherwise would result in an inconsistent position being maintained by the PTO Examiners. As noted by the court in E.I. du Pont de Nemours & Co. v. Ladd, Comr. Pats., 140 USPQ 297, 'We are also persuaded somewhat by the history of the Patent Office in granting letters patent for application claims having the same descriptive nature as claim 1 herein.' In other words, the court recognized the value of the PTO being consistent in its determinations."

533.    Mr. Fichter accurately quoted from the *du Pont* case. Mr. Fichter did not represent that the *du Pont* case involved obviousness-type double patenting. Mr. Fichter's legal argument consisted solely of the proposition that because PTO should be consistent in its determinations, Examiner Ceperley should allow the '845 Patent because Examiner Berch had allowed the '483 Patent.

534.    Because of her training as a patent examiner, Examiner Ceperley was qualified to evaluate the merits of Mr. Fichter's legal argument.

535.    Mr. Fichter did not make any factual representations in his discussion of the *du Pont* case. Mr. Fichter did not represent that sumatriptan compounds had superior oral bioavailability or possessed any other property in comparison with the compounds of the '483 Patent.

**E.    Contemporaneous legal authority supports Mr. Fichter's position**

536.    A legal argument consistent with the one made by Mr. Fichter— that because Examiner Berch had found the claims of the '483 Patent to be patentably distinct from the claims of the '845 Patent, Examiner Ceperley should find claims of the '845 Patent patentably distinct from the claims of the '483 Patent—was supported by language in several prior district court decisions. Those decisions stated that obviousness-type double patenting required finding both that the claims of the first patent were not patentably distinct from the

claims of the second patent as well as that the claims of the second patent were not patentably distinct from the first patent.

537.    In *Phillips Petroleum Co. v. United States Steel Corp.*, 604 F. Supp. 555, 563 (D. Del. 1985), the court held that "[o]bvious-type double patenting . . . involves a reciprocal analysis.  Double patenting will be established on the basis of obviousness only if *each* patent is obvious over the other." (emphasis in original) (citation omitted).

538.    In *Rolls-Royce, Ltd. v. GTE Valeron Corp.*, 625 F. Supp. 343, 351 (E.D. Mich. 1985), *aff'd*, 800 F.2d 1101 (Fed. Cir. 1986), the court stated that "the test of this defense is whether the claims of the [patents-at-issue] are obvious from the subject matter of Claim 18 of the [prior art patent], and whether Claim 18 . . . is obvious from the subject matter of the [patents-at-issue]."

539.    In *Ortho Pharm. Corp. v. Smith*, 1990 U.S. Dist. LEXIS 10878, at *50 (E.D. Pa. Aug. 17, 1990), *aff'd*, 959 F.2d 936 (Fed. Cir. 1992), the court stated that "the test [for obvious-type double patenting] is whether the subject matter of the claims of the patent sought to be invalidated would have been obvious from the subject matter of the other patent, and vice versa."

## XIV.   ADDITIONAL MIGRAINE PROJECT TESTING

### A.    Oral Bioavailability Test

540.    In addition to the Intraduodenal Efficacy Test, another test was used to predict a compound's suitability for oral administration during the Migraine Project.  Because that test measured oral bioavailability, it may be referred as the Oral Bioavailability Test.

541.    The Oral Bioavailability Test compared the amount of a candidate compound found in the blood following oral administration with the amount of that compound found in the blood following intravenous administration. Because intravenous administration involves injection of the compound directly into the bloodstream, it is the most efficient method of getting a compound into the blood.  In essence, the Oral Bioavailability Test seeks to measure to what extent, if any, oral administration is less efficient than intravenous administration.

542.    The Oral Bioavailability Test was conducted in rats.  Rats were chosen for tests such as the Oral Bioavailability Test in part because they were

considered more predictive of the relative pharmacokinetic activity of compounds in humans than other animal species, and it is not feasible to test all compounds synthesized during a drug discovery project in humans.

543.    In the Oral Bioavailability Test, one group of rats was given a single oral dose of the candidate compound, while another group of rats was a given a comparable single intravenous dose of that compound.  At fixed intervals following the administration of the compound, a set of rats from each group was sacrificed (usually three rats from each group), and the concentration of the candidate compound in the blood of each rat was measured.  The results for each set of rats were then averaged.

544.    At the conclusion of the Oral Bioavailability Test, the concentrations over time for both groups of rats—the ones that had received the compound orally and the ones that had received the compound intravenously— were plotted on separate graphs, with the time on the x-axis and the plasma concentration on the y-axis.  The area under the curve ("AUC"), a measure of the aggregate amount of drug in the blood plasma of each group of rats for the duration of the test, was calculated for each graph.  Following adjustments for any differences in oral dosage versus intravenous dosage, the AUC for oral administration was divided by the AUC for intravenous administration to provide a measure of the relative efficiency of oral administration in rats.

545.    For example, if a compound had a result of 5% in the Oral Bioavailability Test, only 5% of the blood level of the compound following intravenous administration was found in the blood following oral administration.  To put it another way, oral administration was only 5% as effective at getting the candidate compound into the blood as intravenous administration.  Hence, higher percentages in the Oral Bioavailability Test were better than lower percentages.

546.    In addition, the data generated during the Oral Bioavailability Test allow for the comparison of relative concentrations of compounds in the bloodstream over time, whether following oral administration or intravenous administration.

B.    Other toxicological testing

547.    In addition to tests for mutagenicity, Glaxo performed long-term toxicity studies to assess the safety of its compounds.  One such long-term study was the Five Week Oral Toxicity Test in Rats.

548.    The Five Week Oral Toxicity Test helped Glaxo determine whether a compound was safe for oral administration in man.  The test compound was administered orally to rats each day.  The rats were randomly allocated to low, intermediate, and high dose treatment groups, as well as a control group.  The rats were observed at least once daily for signs of ill health and reactions to treatment.  In addition, each rat underwent a full clinical examination at the beginning and near the end of treatment.

549.    During the course of the study, observations were recorded with respect to body weight, food and water consumption, absorption studies, blood and urine analysis, and ophthalmoscopy.  Organs (e.g., brain, heart, testes, etc.) were weighed at the end of the study and certain preserved tissues underwent microscopic examination.

550.    Numerical data collected during the study were subjected to statistical analysis.  All data were analyzed for abnormalities that could preclude oral administration of the test compound in man.

C.    Tests involving Compound II

551.    The Tarbit Declaration, which was prepared in connection with the prosecution of the '483 Patent and submitted to the '845 Patent examiner at her request, incorporated the results of the Oral Bioavailability Test on sumatriptan and Compound II, among other compounds.  Those tests found that the oral bioavailability of GR 32066 was <5%.  By contrast, the oral bioavailability of sumatriptan (24%) was almost five times as great.

552.    The Oral Bioavailability Test results for Compound II and sumatriptan are consistent with their results in the Intraduodenal Efficacy Test.  This suggests that the likely reason why Compound II had poor efficacy following intraduodenal administration was its poor oral bioavailability.  As a result, the Oral Bioavailability Test further confirms the conclusions reached by Dr. Humphrey in his Declaration.

D.    Tests involving Compound III

553.    Like sumatriptan and Compound II, Compound III was tested in the Oral Bioavailability Test, and the results were reported in the Tarbit Declaration.  The Oral Bioavailability Tests revealed that Compound III, like Compound II, had extremely poor oral bioavailability (6%); by contrast, sumatriptan had an oral bioavailability that was four times greater (24%).

554.    In addition, there is a statistically significant difference in the relative blood concentrations of sumatriptan versus Compound III at every point following either intravenous or oral administration of each compound.  Basically, those data indicate that sumatriptan remains in the bloodstream longer than Compound III, which in turn would correlate with a longer duration of action for sumatriptan versus Compound III.

555.    Compound III was also tested in the NAP Test.  Unlike sumatriptan, which consistently tested negative in the NAP Test, Compound III produced 4 – 6 fold increases in revertant colonies when tested with frame shift strains at pH 2-3.

E.      **Tests involving the compound of the '483 Patent (GR 40370)**

556.    Glaxo terminated the development of GR 40370 because the compound caused testicular effects in long-term toxicity studies.  The testicular effects were first observed in the Five Week Oral Toxicity Study in rats.  The effects included an increase in testis weight and histological changes, accompanied by testicular atrophy after chronic dosing.  By contrast, sumatriptan did not cause any testicular effects in the same long-term toxicity study.

557.    GR 40370 was also tested in the NAP Test.  Unlike sumatriptan, which consistently tested negative in the NAP Test, GR 40370 produced 3 – 5 fold increases in revertant colonies when tested with frame shift strains at pH 2-3.

## Conclusions of Law

### I.     EVIDENTIARY STANDARD

#### A.     Presumption of validity

1.     A patent is presumed valid.  35 U.S.C. § 282.  "Each claim of a patent… shall be presumed valid independently of the validity of other claims…."  *Id.*

2.     "Patents, like claims within them, are independently presumed valid."  *Enzo Biochem, Inc. v. Calgene, Inc.*, 188 F.3d 1362, 1379 (Fed Cir. 1999).  A validity analysis must be performed on a claim-by-claim basis.  *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001).

#### B.     Clear and convincing evidence standard

3.     The presumption of patent validity can only be overcome by clear and convincing evidence.  *See, e.g., Carella v. Starlight Archery and Pro Line Co.*, 804 F.2d 135, 138 (Fed. Cir. 1986) ("Facts establishing anticipation or underlying a determination of obviousness must be proven by clear and convincing evidence"); *Symbol Techs., Inc. v. Opticon, Inc.*  935 F.2d 1569, 1580 (Fed. Cir. 1991) (party asserting a double-patenting defense is "required to prove double patenting by clear and convincing evidence, a heavy and unshifting burden"); *United States v. Telectronics, Inc.*, 857 F.2d 778, 785 (Fed. Cir. 1988) ("A patent is presumed valid, and the burden of proving invalidity, whether under section 112 or otherwise, rests with the challenger. Invalidity must be proven by facts supported by clear and convincing evidence.").

4.     The burden of proving invalidity always remains with the party asserting invalidity and never shifts to the patentee.  *Harrington Mfg. Co., Inc. v. Powell Mfg. Co.*, 815 F.2d 1478, 1482 (Fed. Cir. 1986).

#### C.     Defendants' burden especially difficult

5.     The burden of proving invalidity is especially difficult to meet when a party relies exclusively on material that was already considered by the PTO.  *See, e.g., American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1359 (Fed. Cir. 1984) ("When no prior art other than that which was considered by the PTO examiner is relied on by the attacker, he has the added burden of overcoming the deference that is due to a qualified government agency

presumed to have properly done its job…."); *Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1368 (Fed. Cir. 2004), *cert. dismissed*, 126 S.Ct. 2921 (2006) ("Where, as here, the PTO previously considered the prior art reference, [defendant] bears an even heavier burden to prove invalidity. 'This burden is especially difficult when the prior art was before the PTO examiner during prosecution of the application'.") (*quoting Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1467 (Fed. Cir. 1990)).

6.      All of defendants' invalidity challenges to the '845 Patent rest on the '470 Patent. Because the '470 Patent was considered by the PTO during the prosecution of the '845 Patent, the defendants' burden of proving invalidity by clear and convincing evidence is especially difficult to meet.

D.      **The '470 Patent term extension is not evidence of invalidity or unenforceability**

7.      Spectrum has alleged that GSK's application for a patent term extension on the '470 Patent, rather than on the '845 Patent, reflects GSK's belief that the '845 Patent is invalid and unenforceable. Spectrum's allegations are unfounded and without merit.

8.      Pursuant to 35 U.S.C. § 156(c)(3), a patent term may not be extended for a period greater than 14 years from the date the product covered by the patent receives regulatory approval. Imitrex first received regulatory approval on December 28, 1992, when NDA 20080 was approved by the FDA. Because the '845 Patent was set to expire on August 6, 2008—approximately 15 and a half years later—it was ineligible for a patent term extension. By contrast, the '470 Patent was set to expire on March 28, 2006, which rendered it eligible for a nine-month patent term extension until December 28, 2006.

II.     **ANTICIPATION**

A.      **General test for anticipation**

9.      A patent claim is anticipated if each and every limitation is found either expressly or inherently in a single prior art reference. *Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1339 (Fed. Cir. 2003).

10.     The absence of even a single limitation from the prior art reference precludes a finding of anticipation. *See Kloster Speedsteel AB v. Crucible Inc.*, 793

F.2d 1565, 1571 (Fed. Cir. 1986), *overruled on other grounds, Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.,* 383 F.3d 1337 (Fed. Cir. 2004).

**B.    No express disclosure of sumatriptan**

11.    Because the limitation directed to "A compound of formula (I):



(sumatriptan) is effectively a limitation in every claim of the '845 Patent, a single prior art reference must disclose sumatriptan, either expressly or inherently, in order for the claims of the '845 Patent to be anticipated.

12.    The '470 Patent contains no express disclosure of sumatriptan (or any sumatriptan compound) because neither the chemical name nor the chemical structure of sumatriptan appears in the '470 Patent.  Consequently, for the '470 Patent to anticipate sumatriptan, the '470 Patent must inherently disclose sumatriptan.

**C.    Genus-species anticipation**

13.    A prior art reference that discloses a genus does not inherently disclose all species within that genus.  *See, e.g., Metabolite Labs.,* 370 F.3d at 1367; *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1262 (Fed. Cir. 1989); *Atofina v. Great Lakes Chem. Corp.*, 441 F.3d 991, 999 (Fed. Cir. 2006).

14.    However, "a very small genus can be a disclosure of each species within the genus."  *Atofina,* 441 F.3d  at 999; *see also Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1380 (Fed. Cir. 2001) ("[T]he disclosure of a small genus may anticipate the species of that genus even if the species are not themselves recited.").

15.    Genus patents do not generally anticipate species that fall within them "because picking and choosing from among the possible options is required to arrive at each species in the genus."  *Eli Lilly & Co. v. Zenith Goldline Pharmaceuticals, Inc.*, 364 F. Supp. 2d 820, 899 (S.D. Ind. 2005).

16.    In order for a small genus of chemical compounds inherently to disclose each compound of that genus for purposes of anticipation, a person of

ordinary skill in the art must be able to "at once envisage *each member*" of the genus. *In re Petering*, 301 F.2d 676, 681 (C.C.P.A. 1962) (emphasis in original).

17.    Although *Petering* states that a person of ordinary skill in the art need not at once define the boundaries of the genus in his mind, once the genus has been defined, the *Petering* test for genus-species anticipation expressly requires that person immediately and simultaneously see all compounds belonging to that genus. To meet the *Petering* test, it is not sufficient for that person simply to be able serially to write out all of the compounds belonging to the genus. The latter interpretation of the *Petering* rule would effectively vitiate that rule, because any genus with a finite number of members would then necessarily anticipate all of the members of that genus.

18.    In determining whether the individual example compounds disclosed in a prior art patent create "preferences" that narrow the scope of genera in that patent, the Federal Circuit's predecessor court has strongly cautioned against using hindsight to tailor genera to encompass the later-discovered compound. *In re Kalm*, 378 F.2d 959, 963 (C.C.P.A. 1967) ("We had occasion to comment upon some limitations of that decision [*Petering*] in *In re Ruschig*, [343 F.2d 965, 974 (C.C.P.A. 1965)], where we stated: 'We did not intend our *Petering* opinion or decision to become a precedent for the mechanistic dissection and recombination of the components of the specific illustrative compounds in every chemical reference containing them, to create hindsight anticipations with the guidance of an applicant's disclosures, on the theory that such reconstructed disclosures describe specific compounds within the meaning of section 102'.").

19.    In the more than forty years since its formulation, the *Petering* test has been applied to find anticipation of claims to chemical compounds very infrequently, and the largest genus ever held to meet the *Petering* test contained twenty compounds. *See Petering*, 301 F.2d at 681 (twenty compounds); *In re Schaumann*, 572 F.2d 312, 314 (C.C.P.A 1978) (seven compounds); *In re Donohue*, 632 F.2d 123, 126, 127-28 (C.C.P.A. 1980) (twelve compounds); *In re Sivaramakrishnan*, 673 F.2d 1383, 1384-85 (C.C.P.A. 1982) (prior art patent contained a list of 20 salt compounds in addition to the generic formula); *Revlon, Inc. v. Carson Products Co.*, 602 F. Supp. 1071, 1084-85 (S.D.N.Y. 1985) (fifteen compounds).

20.    With the exception of *Revlon*, all cases in which the *Petering* test was applied to find anticipation of claims to chemical compounds were appeals from

PTO determinations and were therefore decided under an evidentiary standard that afforded deference to the PTO's factual findings. *See Dickinson v. Zurko*, 527 U.S. 150, 160-61 (1999) (reviewing Court of Customs and Patent Appeals precedent showing deference to PTO factfinding).

21.     *Revlon* is the only case that invalidated an issued patent on the basis of the Petering test. *Revlon* involved a genus of only fifteen compounds, and the court in that case also noted the fact that the prior art in question had not been submitted to the PTO during prosecution of the patent, which weakened the patent's presumption of validity, a fact absent from this case. *Revlon*, 602 F. Supp. at 1071, 1083-84.

D.     <u>None of the '845 Patent claims is anticipated by the '470 Patent</u>

22.     Spectrum cannot prove by clear and convincing evidence that the '845 Patent is anticipated by the '470 Patent. The smallest genus disclosed in the '470 Patent is found in Claim 7. Claim 7 discloses a genus of over 5,000 compounds, including 102 free base compounds and at least 5,100 salt compounds. Because a person of ordinary skill in the art could not at once envisage each member of a genus that large, Claim 7 does not inherently disclose sumatriptan.

23.     Because the other genera that are disclosed in the '470 Patent and that encompass sumatriptan are even larger than the Claim 7 genus, a person of ordinary skill in the art could not at once envisage each member of any of those genera. Consequently, none of those other genera inherently discloses sumatriptan.

24.     Because there is no express or inherent disclosure of sumatriptan in the '470 Patent, none of the claims of the '845 Patent is anticipated by the '470 Patent.

III.     OBVIOUSNESS

A.     <u>Legal and evidentiary standard</u>

25.     "A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the

invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103.

26.    Whether or not a claim is obvious is a legal determination based on underlying factual inquiries: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the prior art and the claims at issue; and (4) objective indicia of nonobviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966); *Metabolite Labs.*, 370 F.3d at 1368.

27.    "A patent is presumed valid, and the burden of establishing invalidity as to any claim of a patent rests upon the party asserting such invalidity. The presumption of validity is a procedural device that mandates that the party asserting invalidity bears the initial burden of establishing a *prima facie* case of obviousness under 35 U.S.C. § 103. Once a *prima facie* case has been established, the burden shifts to the patentee to go forward with rebuttal evidence showing facts supporting nonobviousness. The party asserting invalidity, however, always retains the burden of persuasion on the issue of obviousness until a final judgment is rendered. Each fact forming the factual foundation upon which the court bases its ultimate conclusion regarding the obviousness of the claimed subject matter as a whole must be established by clear and convincing evidence." *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 291-292 (Fed. Cir. 1985) (citations omitted).

28.    Because the PTO previously considered whether the '470 Patent rendered the '845 Patent obvious and decided otherwise, Spectrum faces a heavy burden in attempting to invalidate the '845 Patent for obviousness. *Metabolite Labs.*, 370 F.3d at 1368.

B.    Obviousness in the genus-species context

29.    "The fact that a claimed compound may be encompassed by a disclosed generic formula does not by itself render that compound obvious." *In re Baird*, 16 F.3d 380, 382 (Fed. Cir. 1994); *see In re Jones*, 958 F.2d 347, 350 (Fed. Cir. 1992) (rejecting the argument that disclosure of a genus always renders the species encompassed by that genus obvious).

30.    In determining whether a chemical compound that falls within the scope of a generic chemical formula disclosed in a prior art reference is obvious, a court examines whether there is anything in the prior art reference that teaches the selection of the specific variables necessary to arrive at that compound. The

court also examines whether the reference teaches away from the selection of those specific variables.  *See Baird*, 16 F.3d at 382 (Fed. Cir. 1994).

### C.    The '470 Patent teaches away from sumatriptan compounds

31.    The '470 Patent does not contain any teachings that would lead one of ordinary skill in the art to select the specific variables in general formula (I) that result in sumatriptan.  To the contrary, the '470 Patent expressly teaches that, in the most preferred class of compounds disclosed by the patent, at least one of the $R_4$ or $R_5$ variables in that formula should be hydrogen.  However, sumatriptan contains a methyl group at each of the positions represented by the $R_4$ or $R_5$ variables.

32.    To the extent that the individual preferred, particularly preferred and example compounds of the '470 Patent implicitly teach the selection of particular atoms or groups of atoms for the variables in general formula (I), they also teach away from the selection of sumatriptan.

33.    The particularly preferred compound of the patent contains a hydrogen atom at each of the positions represented by the $R_4$ or $R_5$ variables. Most of the preferred compounds and the example compounds of the patent contain a hydrogen atom at each of those positions.  None of the preferred or particularly preferred compounds contain a methyl group at each of those positions, and only two out of thirty example compounds contain a methyl group at each of those positions.

34.    A person of ordinary skill in the art would therefore conclude that individual compounds disclosed in the '470 Patent teach the desirability of having at least one and preferably two hydrogen atoms at the positions represented by the $R_4$ or $R_5$ variables.  That person would also conclude that it is undesirable to have a methyl group at each of the positions represented by the $R_4$ or $R_5$ variables.  Both conclusions teach away from the selection of sumatriptan.

### D.    Secondary considerations of non-obviousness

35.    Secondary considerations of non-obviousness (also referred to as objective indicia of non-obviousness) were developed by the courts as an attempt to counteract the influence of hindsight in considering whether a challenged patent's claims are obvious.  *See Graham v. John Deere Co.*, 383 U.S. 1, 17-18, 35-36 (1966); *Ecolochem, Inc. v. S. Cal. Edison Co.*, 227 F.3d 1361, 1376 (Fed. Cir. 2000).

36.     Secondary considerations of non-obviousness include commercial success of the allegedly obvious invention, a long felt but unresolved need in the art for the allegedly obvious invention, and the failure of others to develop the allegedly obvious invention.  *Graham*, 383 U.S. at 17-18.

37.     Other secondary considerations of non-obviousness include skepticism of skilled artisans concerning the allegedly obvious invention before it was invented, industry praise or acclaim for the allegedly obvious invention, as well as unexpected properties or results of the allegedly obvious invention.  *See, e.g., In re Rouffet*, 149 F.3d 1350, 1355 (Fed. Cir. 1998) and cases cited therein; *Ecolochem*, 227 F.3d at 1379-80.

38.     "[E]vidence rising out of the so-called 'secondary considerations' must always when present be considered en route to a determination of obviousness.  Indeed, evidence of secondary considerations may often be the most probative and cogent evidence in the record."  *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538 (Fed. Cir. 1983) (citations omitted).

E.     Nexus

39.     The term "nexus" designates a factually and legally sufficient connection between the objective evidence of nonobviousness, such as commercial success, and the claimed invention so that the evidence is of probative value in the determination of nonobviousness.  *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988).

40.     For example, "[a] prima facie case of nexus is generally made out when the patentee shows both that there is commercial success, and that the thing (product or method) that is commercially successful is the invention disclosed and claimed in the patent."  *Demaco*, 851 F.2d at 1392.

41.     Secondary considerations are probative of whether a claimed invention is non-obvious in relation to the closest prior art when there is no legal bar preventing others from discovering or practicing the invention before the patentee's date of invention.  At the time sumatriptan compounds were invented in 1984, others were not legally barred from commercially testing or using the closest prior art.  GSK did not obtain the right to exclude others from testing or using the closest prior art until the '470 patent issued in 1989—five years after GSK invented sumatriptan compounds.  Without any legal bar, others were not prevented from testing or using the closest prior art at the time GSK invented sumatriptan compounds.  Accordingly, because there was no legal bar as of the

date of invention in 1984, such secondary considerations as failure of others, long felt but unresolved need and commercial success are highly probative of the non-obviousness of sumatriptan compounds. *Compare Merck & Co. v. Teva Pharms. USA Inc.*, 395 F.3d 1364, 1366, 1377 (Fed. Cir. 2005) (probative value of commercial success weak because patentee obtained a prior art patent that legally barred others from commercially testing the invention for at least ten years before patentee's invention date).

## F.    Particular secondary considerations

42.    GSK has established that Imitrex has been extremely commercially successful.

43.    GSK has established that Imitrex met a long-felt but unresolved need for a new, safe and effective treatment for migraine.

44.    GSK has established that others tried and failed to discover a new, safe and effective treatment for migraine prior to the discovery of Imitrex.

45.    GSK has established that scientists in the field of migraine research were skeptical concerning the discovery a new, safe and effective treatment for migraine prior to the discovery of Imitrex.

46.    GSK has established that various pharmaceutical companies, including Spectrum, wish to sell exact copies of Imitrex.

47.    There is a nexus between the secondary considerations of non-obviousness applicable to Imitrex and the '845 Patent since the '845 Patent specifically claims sumatriptan succinate, the active ingredient in Imitrex.

## G.    Unexpected properties

48.    Although a prima facie case of obviousness may rest on the structural similarity of a patented compound to the compounds in the prior art "where the prior art gives reason or motivation to make the claimed compositions," *see, e.g.*, *In re Dillon*, 919 F.2d 688, 692 (Fed. Cir. 1990) (en banc), such a prima facie case may be rebutted with evidence of unexpected properties. *Id*.

49.    "'From the standpoint of patent law, a compound and all of its properties are inseparable; they are one and the same thing.' Under the *Papesch* doctrine, evidence of unobvious or unexpected advantageous properties may

rebut a prima facie case of obviousness based on structural similarities. Such evidence may include data showing that a compound is unexpectedly superior in a property it shares with prior art compounds." *In re Chupp*, 816 F.2d 643, 645-646 (Fed. Cir. 1987) (quoting *In re Papesch*, 315 F.2d 381, 391 (C.C.P.A. 1963) (citations omitted).

50. "[W]hen unexpected results are used as evidence of nonobviousness, the results must be shown to be unexpected compared with the closest prior art." *In re Baxter Travenol Labs.*, 952 F.2d 388, 392 (Fed. Cir. 1991).

51. "[W]hen an applicant [for a patent] demonstrates *substantially* improved results, as [the applicant] did here, and *states* that the results were *unexpected,* this should suffice to establish unexpected results *in the absence of* evidence to the contrary." *In re Soni*, 54 F.3d 746, 751 (Fed. Cir. 1995) (emphasis in original).

52. "The [unexpected properties] principle applies most often to the less predictable fields, such as chemistry, where minor changes in a product or process may yield substantially different results." *In re Soni*, 54 F.3d at 750.

53. In defending a patent against a validity challenge, a patent holder may rely on unexpected properties not specifically cited to the PTO during prosecution of the patent. *See Knoll Pharm. Co. v. Teva Pharms. USA, Inc.*, 367 F.3d 1381, 1384-85 (Fed. Cir. 2004) (holding that evidence developed after the patent grant is not excluded from consideration and that the patent application need not contain all the work done in studying the invention).

54. Compound II is the closest prior art compound in the '470 Patent to sumatriptan. Compound II is specifically identified in the '470 Patent as the particularly preferred compound of the patent, 470/4:5-9, which would lead a person of ordinary skill in the art to conclude that it was the compound most "potentially useful for the treatment of migraine." 470/2:12-13.

55. Sumatriptan possesses unexpected and superior properties in comparison to Compound II. In addition to the greater intraduodenal efficacy and lack of mutagenicity cited during prosecution of the '845 Patent, sumatriptan possesses superior oral bioavailability in comparison with Compound II. There is no evidence that any of those superior properties could have been predicted prior to the discovery and testing of sumatriptan.

56.     To the extent Compound III may be considered the closest prior art to sumatriptan, sumatriptan also possesses unexpectedly superior properties with respect to Compound III.  In addition to the longer duration of action cited during patent prosecution, sumatriptan possesses a complete lack of mutagenicity and superior oral bioavailability in comparison with Compound III.  There is no evidence that any of those superior properties could have been predicted prior to the discovery and testing of sumatriptan.

H.     The '845 Patent is not obvious

57.     Spectrum has failed to demonstrate by clear and convincing evidence that any of the claims of the '845 Patent is obvious in comparison with the '470 Patent.

58.     The unexpected properties alone of sumatriptan establish that it was not obvious in comparison with the closest prior art compound of the '470 Patent.  Because sumatriptan is effectively a limitation in every claim of the '845 Patent, the non-obviousness of sumatriptan means that none of the claims of the '845 Patent is obvious.

59.     In addition, all of the additional evidence of secondary considerations produced by GSK supports the conclusion that none of the claims of the '845 Patent is obvious.


IV.     OBVIOUSNESS-TYPE DOUBLE PATENTING

A.     Obviousness-type double patenting generally

60.     A patent claim is invalid for obviousness-type double patenting when it discloses an "obvious variation" of an invention disclosed and claimed in an earlier, commonly owned patent.  *Georgia-Pacific Corp. v. U.S. Gypsum Co.*, 195 F.3d 1322, 1326 (Fed. Cir. 1999).

61.     "[Obviousness-type double patenting] is a judge-made criterion adopted out of necessity where the courts were faced with a situation in which claims in two applications or patents were not drawn precisely to the *same* invention, but were drawn to inventions so very much alike as to render one obvious in view of the other and to effectively extend the life of the patent that would have the earlier of the two issue dates."  *Gerber Garment Tech., Inc. v. Lectra Sys., Inc.*, 916 F.2d 683, 686 (Fed. Cir. 1990) (emphasis in original).

## B.    Test for obviousness-type double patenting

62.    "Generally, an obviousness-type double patenting analysis entails two steps.  First, as a matter of law, a court construes the claim in the earlier patent and the claim in the later patent and determines the differences.  Second, the court determines whether the differences in subject matter between the two claims render the claims patentably distinct."  *Eli Lilly and Co. v. Barr Labs., Inc.*, 251 F.3d 955, 968 (Fed. Cir. 2001).

## C.    Obviousness-type double patenting analysis parallels obviousness analysis

63.    In determining whether a patent claim is "patentably distinct," an obviousness-type double patenting analysis differs from an obviousness analysis in terms of what the challenged patent claim is being compared to.  In an obviousness analysis, the challenged patent claim is compared with the entirety of one or more prior art references, i.e., materials meeting the definitions set forth in 35 U.S.C. § 102.  In an obviousness-type double patenting analysis, the challenged patent claim is compared only to individual patent claims found in prior, commonly owned patents, and those prior patents need not meet the definitions for prior art set forth in 35 U.S.C. § 102.  *See Metabolite Labs.,* 370 F.3d at 1368 (discussing factual inquiries to be made in determining obviousness); *Georgia-Pacific*, 195 F.3d at 1326 ("Under obviousness-type double patenting, a patent is invalid when it is merely an obvious variation of an invention disclosed and claimed in an earlier patent by the same inventor."); *Symbol Techs., Inc. v. Opticon, Inc.*  935 F.2d at 1580 (noting that the relevant inquiry in obviousness-type double patenting is in the comparison of the claims).

64.    However, the Federal Circuit has confirmed that the substantive question is the same for both obviousness and obviousness-type double patenting:  "[T]he determining factor in deciding whether or not there is double patenting is the existence vel non of *patentable difference* between two sets of claims.  The phrases actually used ... include 'patentably distinguishable,' 'patentable distinctions,' and 'whether such differences would have been obvious to one of ordinary skill in the art.'  They are all equivalent."  *Gen. Foods Corp. v. Studiengesellschaft Kohle mbH*, 972 F.2d 1272, 1278-79 (Fed. Cir. 1992) (emphasis in original).

65.    As a result, an obviousness-type double patenting analysis parallels an obviousness analysis.  *See In re Jezl*, 396 F.2d 1009, 1013 (C.C.P.A. 1968) ("[A] rejection—one of 'double patenting of the obvious type'—presents the same basic

question as the § 103 [obviousness] rejection, but in narrower aspect.") (citing *In re Land*, 368 F.2d 866 (C.C.P.A. 1966) (holding that the obviousness-type double patenting inquiry is narrower because only the claims of the prior patent, and not the whole patent, are used as the basis for comparison)); *In re Longi*, 759 F.2d 887, 892 n.4 (Fed. Cir. 1985) ("[A] double patenting of the obviousness type rejection is 'analogous to [a failure to meet] the non-obviousness requirement of 35 U.S.C. § 103,' except that the patent principally underlying the double patenting rejection is not considered prior art. Therefore, our analysis concerning the correctness of the Board's decision in the instant case parallels our previous guidelines for a § 103 rejection." (alteration in original, quoting *In re Braithwaite*, 379 F.2d 594, 600 n.4 (C.C.P.A. 1967))); *In re Braat*, 937 F.2d 589, 592-93 (Fed. Cir. 1991).

66.    Secondary considerations of non-obviousness are relevant to obviousness-type double patenting as well. As the courts that have considered the issue have found, a footnote in *Geneva Pharm., Inc. v. GlaxoSmithKline P.L.C.*, 349 F.3d 1373, 1378 n.1 (Fed. Cir. 2003) does not alter the applicability of secondary considerations of non-obviousness to an obviousness-type double patenting analysis. *See Eli Lilly and Co. v. Zenith Goldline Pharms, Inc.*, 364 F. Supp. 2d 820, 910-11 (S.D. Ind. 2005); *In re Glaxo '845 Patent Litigation*, No. 03 Civ. 10260, 2006 WL 2796788 (S.D.N.Y. Sept. 28, 2006); *Pfizer Inc. v. Synthon Holdings BV*, No. 1:05CV39, 2006 WL 2553370, at *21 (M.D.N.C. Aug. 31, 2006).

D.    **Application of the obviousness-type double patenting test**

67.    The relevant differences between the claims of the '845 Patent and the claims of the '470 Patent are not in dispute.

68.    The claims of the '845 Patent all effectively contain sumatriptan as a limitation. The claims of the '470 Patent are based on broad genera of chemical compounds or to individual compounds other than sumatriptan.

69.    Regardless of any other differences between the claims of the respective patents, the test for obviousness-type double patenting can be reduced to the question of whether sumatriptan is patentably distinct from the genera and individual compounds claimed in the '470 Patent.

70.    Sumatriptan is patentably distinct from the genus claims of the '470 Patent because it is not disclosed, either expressly or inherently, in any of those claims. Furthermore, as discussed in connection with obviousness, sumatriptan is not obvious and is therefore patentably distinct from the closest prior art

compounds falling within the scope of those claims. Accordingly, the claims of the '845 Patent, which each effectively contain a limitation directed to the chemical structure of sumatriptan, are patentably distinct from the genus claims of the '470 Patent.

71. Sumatriptan is patentably distinct from the claims of the '470 Patent directed to individual compounds (Claims 11, 12 and 14). Claim 11 is directed to three free base compounds and their physiologically acceptable salts and solvates, one of which is Compound III. Sumatriptan is patentably distinct from Compound III because it possesses unexpected properties—longer duration of action, lack of mutagenicity and superior oral bioavailability—in comparison with Compound III. As a result, the claims of the '845 Patent, which each effectively contain a limitation directed to the chemical structure of sumatriptan, are patentably distinct from Claim 11 of the '470 Patent.

72. Claim 12 of the '470 Patent is directed to Compound II and its physiologically acceptable salts and solvates, while Claim 14 of the '470 Patent is directed to two particular salts of Compound II. Sumatriptan is patentably distinct from Compound II because it possesses unexpected properties—greater intraduodenal efficacy, lack of mutagenicity and superior oral bioavailability—in comparison with Compound II. As a result, the claims of the '845 Patent, which each effectively contain a limitation directed to the chemical structure of sumatriptan, are patentably distinct from Claims 12 and 14 of the '470 Patent.

73. To the extent defendant contends that the claims of the '845 Patent are invalid for obviousness-type double patenting over the claims of the '483 Patent, the scope of the respective claims of both patents is in not in dispute, and the obviousness-type patenting inquiry reduces to the question of whether sumatriptan, which is effectively a limitation in every claim of the '845 Patent, is patentably distinct from the compound claimed in Claim 1 of the '483 Patent (GR 40370), which is effectively a limitation in every claim of the '483 Patent.

74. Sumatriptan possesses unexpected properties in comparison with GR 40370. Unlike GR 40370, sumatriptan did not cause testicular atrophy in laboratory rats. Furthermore, unlike GR 40370, sumatriptan is not mutagenic. Because of the unexpected properties of sumatriptan in comparison with the compound of the '483 Patent, the claims of the '845 Patent are patentably distinct from the claims of the '483 Patent.

## V.    35 U.S.C. § 112 (ENABLEMENT)

### A.    Test of enablement

75.    "The test of enablement is whether one reasonably skilled in the art could make or use the invention from the disclosures in the patent coupled with information known in the art without undue experimentation." *United States v. Telectronics, Inc.*, 857 F.2d 778, 785 (Fed. Cir. 1988).

76.    "A claim will not be invalidated on section 112 grounds simply because the embodiments of the specification do not contain examples explicitly covering the full scope of the claim language. That is because the patent specification is written for a person of skill in the art, and such a person comes to the patent with the knowledge of what has come before. Placed in that context, it is unnecessary to spell out every detail of the invention in the specification; only enough must be included to convince a person of skill in the art that the inventor possessed the invention and to enable such a person to make and use the invention without undue experimentation." *LizardTech, Inc. v. Earth Resource Mapping, Inc.*, 424 F.3d 1336, 1345 (Fed. Cir. 2005) (citations omitted).

### B.    The claims of the '845 Patent are enabled

77.    Each of the claims of the '845 Patent is enabled, and Spectrum has not clearly and convincingly demonstrated otherwise.

78.    Claims 1-4 of the '845 Patent are directed to sumatriptan and/or physiologically acceptable sumatriptan salts.  The '845 Patent specification provides numerous examples of both general and specific methods for making sumatriptan or physiologically acceptable salts of sumatriptan.

79.    Claim 5 of the '845 Patent is directed to a pharmaceutical composition consisting of sumatriptan or a sumatriptan salt in combination with one or more pharmaceutically acceptable carriers or excipients to treat pain resulting from dilatation of cranial blood vessels.  The '845 Patent specification describes numerous pharmaceutical compositions containing sumatriptan succinate and pharmaceutically acceptable carriers or excipients (for example, magnesium stearate, starch, lactose water and salt).  Such pharmaceutical compositions include orally administered tablets and capsules, syrup, suspension, sub-lingual tablets, rectal suppositories, intravenous injections and inhalation cartridges.

80.　　Claims 10-11 are directed to methods of treating migraine in human beings by administering sumatriptan, sumatriptan salts or pharmaceutical compositions containing sumatriptan or sumatriptan salts.　The '845 Patent provides dosage and frequency information for various forms of administration to human beings suffering from migraine.

## VI.　　35 U.S.C. § 112 (WRITTEN DESCRIPTION)

### A.　　The written description requirement

81.　　To meet the written description requirement of 35 U.S.C. § 112, ¶ 1, a patent specification "must describe the invention sufficiently to convey to a person of skill in the art that the patentee had possession of the claimed invention at the time of the application, i.e., that the patentee invented what is claimed." *LizardTech*, 424 F.3d at 1345.

82.　　"[The written description and enablement] requirements usually rise and fall together. That is, a recitation of how to make and use the invention across the full breadth of the claim is ordinarily sufficient to demonstrate that the inventor possesses the full scope of the invention, and vice versa." *Id*.

### B.　　The '845 Patent meets the written description requirement

83.　　Spectrum has not shown by clear and convincing evidence that the '845 Patent fails to meet the written description requirement.

84.　　The portions of the '845 Patent specification that recite both general and specific methods for making sumatriptan and sumatriptan salts adequately support Claims 1-4, which are directed to sumatriptan and sumatriptan salts.　*See* 845/4:66-13:54; 845/17:1-26:37.　A person of ordinary skill in the art would understand that the patentee invented sumatriptan and sumatriptan salts.

85.　　The portions of the '845 Patent specification that recite numerous examples of pharmaceutical compositions containing a sumatriptan salt and pharmaceutical carriers or excipients adequately support Claim 5, which is directed at such compositions.　*See* 845/3:20-4:61; 845/13:55-16:68.　A person of ordinary skill in the art would understand that the patentee invented pharmaceutical compositions containing sumatriptan and/or sumatriptan salts combined with pharmaceutically acceptable carriers or excipients.

86.    The portions of the '845 Patent that describe treatment of human beings suffering from migraine, read in conjunction with the examples and methods for making either sumatriptan compounds or pharmaceutical compositions containing sumatriptan compounds, adequately support Claims 10-11 of the '845 Patent.  *See* 845/3:12-19; 3:62-4:6.  A person of ordinary skill in the art would understand that the patentee invented methods of migraine treatment that utilize sumatriptan, sumatriptan salts or pharmaceutical compositions containing those compounds.

## VII.    35 U.S.C. § 112 (INDEFINITENESS)

### A.    The test for indefiniteness

87.    "Section 112 paragraph 2 of the Patent Act requires that a patent specification conclude with one or more claims 'particularly pointing out and distinctly claiming subject matter which the applicant regards as his invention.' 35 U.S.C. § 112, ¶ 2. We have stated the standard for assessing whether a patent claim is sufficiently definite to satisfy the statutory requirement as follows: If one skilled in the art would understand the bounds of the claim when read in light of the specification, then the claim satisfies section 112 paragraph 2." *Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001) (citation omitted).

88.    "A determination of claim indefiniteness is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims.  The perspective of a person of ordinary skill in the art at the time of the patent application governs the definiteness analysis.  The definiteness of a patent claim depends on whether one skilled in the art would understand the bounds of the claim when read in light of the specification.  A claim is indefinite if its legal scope is not clear enough that a person of ordinary skill in the art could determine whether a particular [product or method] infringes or not." *Howmedica Osteonics Corp. v. Tranquil Prospects, Ltd.*, 401 F.3d 1367, 1371 (Fed. Cir. 2005) (citations and internal quotations omitted, alterations in original).

### B.    The claims of the '845 Patent are not indefinite

89.    Spectrum has not proven by clear and convincing evidence that any of the claims of the '845 Patent are indefinite.

90.    Claims 1-4 of the '845 Patent use a chemical formula and chemical terms whose scope is readily comprehensible to one of ordinary skill in the art. A person of ordinary skill in the art would understand the term "physiologically acceptable salts and solvates" to refer to salt compounds or solvates that are safe to administer to a human being, including the over 50 different salt formulations of basic drugs approved for marketing in the U.S. in the 1980s.

91.    Claim 5 also uses terms whose scope is understandable by one of ordinary skill in the art.  "Pharmaceutically acceptable carriers or excipients" refers to ingredients that go into pharmaceutical compositions, including the many such carriers and excipients disclosed in the '845 Patent specification.

92.    The phrase "an effective amount" refers to an amount sufficient to achieve the purpose of treating conditions such as migraine, and specific dosage information is provided in the '845 Patent specification.  "'[E]ffective amount' is a common and generally acceptable term for pharmaceutical claims and is not ambiguous or indefinite, provided that a person of ordinary skill in the art could determine the specific amounts without undue experimentation."  *Geneva Pharms., Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373, 1383-84 (Fed. Cir. 2003) (citation omitted).

93.    Claims 10 and 11 do not use any terms whose scope would not be understood by one of ordinary skill in the art.


VIII.   35 U.S.C. § 101

94.    Spectrum apparently contends that the '845 Patent is invalid pursuant to 35 U.S.C. § 101 because Section 101 incorporates the substantive requirements for patentability found in other sections of the patent statute, including anticipation (Section 102); obviousness (Section 103); enablement (Section 112, ¶1); written description (Section 112, ¶1) and indefiniteness (Section 112, ¶2).  Spectrum has not articulated any independent basis for invalidity pursuant to Section 101.

95.    To the extent Spectrum's interpretation of Section 101 is correct, Spectrum has not proven invalidity under Section 101 because Spectrum has not proven the invalidity of the '845 Patent under any other section of the patent statute.

## IX.    INEQUITABLE CONDUCT

### A.    Evidentiary standard

96.    "A party asserting that a patent is unenforceable due to inequitable conduct must prove materiality and intent by clear and convincing evidence." *Purdue Pharma L.P. v. Endo Pharms. Inc.*, 438 F.3d 1123, 1128 (Fed. Cir. 2006).

### B.    Legal standard

97.    A party making a charge of inequitable conduct bears the burden of proving by clear and convincing evidence that the patent applicant (i) failed to disclose material information, or submitted false material information, and (ii) did so with the intent of deceiving the patent examiner.  *Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 872 (Fed. Cir. 1988).

98.    "[O]ne who alleges a 'failure to disclose' form of inequitable conduct must offer clear and convincing proof of: (1) prior art or information that is material; (2) knowledge chargeable to applicant of that prior art or information and of its materiality; and (3) failure of the applicant to disclose the art or information resulting from an intent to mislead the PTO."  *FMC Corp. v. Manitowoc Co.*, 835 F.2d 1411, 1415 (Fed. Cir. 1987) (footnote omitted).

99.    For patents prosecuted before 1992, the standard for determining materiality is whether there was a "substantial likelihood that a reasonable examiner would consider [information] important in deciding whether to allow the application to issue as a patent." 37 C.F.R. § 1.56(a) (1989) (quoted in *Halliburton Co. v. Schlumberger Tech. Corp.*, 925 F.2d 1435, 1440 (Fed. Cir. 1991)); *see Dayco Prod., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1365 (Fed. Cir. 2003).

100.    Information that is less pertinent than or merely cumulative of information that was before the patent examiner is not material. *FMC Corp.*, 835 F.2d at 1415; *see also Halliburton*, 925 F.2d at 1440.

101.    "It is not inequitable conduct to omit telling the patent examiner information that the applicant in good faith believes is not material to patentability." *Allied Colloids Inc. v. Am. Cyanamid Co.*, 64 F.3d 1570, 1578 (Fed. Cir. 1995).

102.    "[M]ateriality does not presume intent, which is a separate and essential component of inequitable conduct."  *Atofina v. Great Lakes Chem. Corp.*,

441 F.3d 991, 1001 (Fed. Cir. 2006) (quoting *GFI, Inc. v. Franklin Corp.*, 265 F.3d 1268, 1274 (Fed. Cir. 2001)).

103.     "Intent to deceive 'cannot be inferred solely from the fact that information was not disclosed; there must be a factual basis for a finding of deceptive intent.'" *Kao Corp. v. Unilever United States, Inc.*, 441 F.3d 963, 972 (Fed. Cir. 2006) (quoting *Purdue Pharma*, 438 F.3d at 1134).

104.     "Once threshold findings of materiality and intent are established, the trial court must weigh them to determine whether the equities warrant a conclusion that inequitable conduct occurred." *Purdue Pharma*, 438 F.3d at 1128.

## C.     Declaration of Michael Jackson

105.     Spectrum has not proven inequitable conduct by clear and convincing evidence with respect to Glaxo's submission of the Jackson Declaration.

106.     Appendix I of the Jackson Declaration reports that the underlying experiments used 0.06% acetic acid at pH 3.6.  In fact, the experiments reported in the declaration used 6.0 % acetic acid at pH 2.6.

107.     A reasonable examiner would not have considered the typographical error in the Jackson Declaration important in deciding whether to issue the '845 patent.  Nitrosation of the relevant compounds occurred more readily at the lower pH, *i.e.*, using 6.0% acetic acid.   Had the declaration reported the correct acid concentration, sumatriptan's lack of mutagenicity would have seemed more impressive.

108.     Dr. Jackson testified that the misstatement of the acid concentration in his declaration was unintentional.  Defendant has not produced any evidence to the contrary and has not referenced any surrounding circumstances upon which intent can be inferred.  *See Glaxo, Inc. v. Novopharm Ltd.*, 830 F. Supp. 871, 879 (E.D.N.C. 1993), *aff'd* 52 F.3d 1043 (Fed. Cir. 1995) (declining to infer an intent to deceive, in part, because neither the applicant nor the declarant had anything to gain by submitting a declaration with the material misstatements contained therein).

109.     Nor would a reasonable examiner have considered any undisclosed information or NAP Test data important to the prosecution of the '845 Patent. The Jackson Declaration did not represent that GR 32066, or any other '470

compound, tested positive in the NAP Test under all conceivable test conditions. The purpose of the declaration was to highlight differences, not similarities, between sumatriptan and its closest prior art compound, GR 32066. That GR 32066 did not test positive in the NAP Test under all conceivable test conditions is immaterial. The ultimate conclusion of the declaration remains unchanged— the closest prior art compound, GR 32066, had "significant mutagenic activity" in the NAP test and sumatriptan did not. *See Syntex (U.S.A.) LLC v. Apotex, Inc.*, 407 F.3d 1371, 1384 (Fed. Cir. 2005) (affirming district court's finding of no inequitable conduct in spite of test results withheld from a declaration submitted to the PTO).

110.     No evidence exists to show that anyone at Glaxo intended to deceive or mislead the Patent Office by withholding information or raw data related to GR 32066, sumatriptan, or any other '470 compound.

111.     Defendant's additional attacks on the raw data underlying the Jackson Declaration are spurious. Data submitted to the Patent Office need not comply with Good Laboratory Practices ("GLP") or other requirements of regulatory submissions made to the FDA. *See Purdue Pharma L.P. v. Endo Pharms., Inc.*, 438 F.3d at 1134 ("[T]he quantum of proof necessary for FDA approval is significantly higher than that required by the PTO.").

D.     <u>Declaration of Dr. Patrick Humphrey</u>

112.     Spectrum has not proven inequitable conduct by clear and convincing evidence with respect to Glaxo's submission of the Humphrey Declaration.

113.     The fact that the Humphrey Declaration was not supplemented to disclose the two $RT_{50}$ values for Compound III that were obtained in March 1990, after the submission of the declaration, does not constitute inequitable conduct.

114.     The 1990 $RT_{50}$ values are not material because they do not demonstrate that the conclusions reached in the Humphrey Declaration concerning the duration of action of Compound III were incorrect.

115.     Even if the new $RT_{50}$ values could be considered material, Spectrum has produced no evidence to suggest anyone at GSK, let alone anyone involved in the submission of the Humphrey Declaration to the PTO, had knowledge of the potential materiality of 1990 test results.

116.    Dr. Humphrey testified that he had not seen the 1990 results prior to the current litigation.  Moreover, other GSK scientists testified that the March 1990 tests were performed for regulatory purposes to confirm the compound's potency, not its duration of action.  There is no evidence that anyone at GSK was aware of the potential relevance of the 1990 tests to Dr. Humphrey's declaration or to the prosecution of the '845 Patent.

117.    There is no evidence that anyone at Glaxo intended to deceive the PTO by not supplementing the Humphrey Declaration to disclose the 1990 test results.

118.    Spectrum has produced no evidence of any other material misstatements or omissions in the Humphrey Declaration.  The conclusions stated in the Humphrey Declaration concerning Compounds II and III were the conclusions Glaxo had reached in the course of rejecting both compounds as potential anti-migraine drugs—conclusions that were never altered before or after submission of the Humphrey Declaration.  The test results used to reach those conclusions were the test results contained in the Humphrey Declaration.

119.    The fact that the conclusions presented in the Humphrey Declaration mirrored Glaxo's internal judgments concerning Compounds II and III negates any allegation of intent to deceive the PTO.

120.    The scientists on the Migraine Project spent years in a difficult search for a potential migraine drug.  They had no incentive to reject compounds that they actually believed to be viable anti-migraine drugs.  The evidence clearly indicates that Compounds II and III were rejected because the scientists believed them to have poor intraduodenal efficacy and intravenous duration of action, respectively.  By contrast, the evidence shows that the scientists believed that sumatriptan possessed good intraduodenal efficacy and intravenous duration of action.  In short, Glaxo told the PTO exactly what it itself believed to be true concerning the relative properties of sumatriptan, Compounds II and Compound III.

E.    <u>Submission of '483 Patent application materials by Glaxo's patent attorney</u>

121.    There is no evidence that Glaxo's patent attorney, Mr. Richard Fichter, misled or intended to mislead the Patent Office during the prosecution of the '845 Patent by submitting certain materials from the prosecution history of the co-pending '483 application.

122.     The Examiner requested the materials in question.  Mr. Fichter complied with the Examiner's request and, in doing so, provided a complete and accurate factual summary of the circumstances under which the co-pending '483 application was allowed.  There are no inaccuracies or misstatements either in the materials themselves or in Mr. Fichter's statements concerning those materials.

123.     In making a legal argument concerning the patentability of the '845 Patent application, Mr. Fichter accurately cited to and quoted from the case in question.  The Examiner was fully qualified to judge Mr. Fichter's legal argument on the merits, and there was no reason for Mr. Fichter to think otherwise.

124.     In fact, Mr. Fichter's argument was consistent with a two-way test for obviousness-type double patenting, whereby the test for obviousness-type double patenting is whether the claimed subject matter was obvious from the subject matter of another patent, and vice versa.  *See Carman Indus., Inc. v. Wahl*, 724 F.2d 932, 940-41 (Fed. Cir. 1983).  As of 1991, various courts had held that the two-way test was generally applicable to obviousness-type double patenting.  *See, e.g., Phillips Petroleum Co. v. United States Steel Corp.*, 604 F. Supp. 555, 563 (D. Del. 1985) ("Obvious-type double patenting . . . involves a reciprocal analysis.  Double patenting will be established on the basis of obviousness only if *each* patent is obvious from the other." (emphasis in original, citation omitted)); *Rolls-Royce Ltd. v. GTE Valeron Corp.*, 625 F. Supp. 343, 351 (E.D. Mich. 1985), *aff'd*, 800 F.2d 1101 (Fed. Cir. 1986) ("[T]he test of this defense is whether the claims of the [patents-at-issue] are obvious from the subject matter of Claim 18 of the [prior art patent], and whether Claim 18 . . . is obvious from the subject matter of the [patents-at-issue]."); *Ortho Pharm. Corp. v. Smith*, Civ. A. No. 90-0242, 1990 WL 121353, at *18 (E.D. Pa. Aug. 17, 1990), *aff'd*, 959 F.2d 936 (Fed. Cir. 1992) ("[T]he test [for obviousness-type double patenting] is whether the subject matter of the claims of the patent sought to be invalidated would have been obvious from the subject matter of the other patent, and vice versa."); 3A Donald S. Chisum, *Chisum on Patents*  § 9.03[3][d] (2005) ("Some decisions appear to assume that [the two-way] test is equally applicable to utility/utility patent situations.").

125.     Because Spectrum has not produced any evidence of materiality or intent, Spectrum has not met its burden of proving inequitable conduct regarding the disclosures related to the '483 application by clear and convincing evidence.