# EXHIBIT 20

FINAL PRE-TRIAL ORDER EXHIBIT 20

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **GLAXO GROUP LTD., d/b/a GLAXOSMITHKLINE,**<br><br>Plaintiff and Counterclaim-Defendant<br><br>v.<br><br>**SPECTRUM PHARMACEUTICALS, INC.,**<br><br>Defendant, and Counterclaim Plaintiff. | Civil Action No. 05 CV 99 GMS |

**EXHIBIT 20**

**SPECTRUM'S PROPOSED FINDINGS OF FACT AND CONCLUSION OF LAW**

Spectrum attaches its Proposed Findings of Fact and Conclusions of Law.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

**GLAXO GROUP LTD., d/b/a**
**GLAXOSMITHKLINE,**

Plaintiff and Counterclaim-Defendant,

v.

**SPECTRUM PHARMACEUTICALS, INC.,**

Defendant, and Counterclaim Plaintiff.

Civil Action No. 05 CV 99

## SPECTRUM'S PRETRIAL
## PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW

00403270

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... 1

SUMMARY OF FINDINGS AND CONCLUSIONS ............................................... 1

I.     Anticipation ................................................................................................... 1

II.    Obviousness ................................................................................................... 1

III.   Double Patenting ........................................................................................... 2

IV.    Unenforceability ............................................................................................ 2

FINDINGS OF FACT .............................................................................................. 3

I.     Background .................................................................................................... 3

       A.    The Parties ........................................................................................... 3

       B.    The Technologies at Issue ................................................................... 4

             1.    Organic Chemistry ................................................................... 4

             2.    Pharmacology .......................................................................... 5

             3.    Genetic Toxicology .................................................................. 5

       C.    Key Pre-Litigation Events ................................................................... 6

             1.    1989—The First Sumatriptan Patent (the '470 Patent) ............ 6

             2.    1991—The Second Sumatriptan Patent (the '845 Patent) ........ 6

                   a.    The Filing, Specification, and Claims ............................ 6

                   b.    The Prosecution History ................................................. 7

                         i.     The Patent Office Repeatedly Rejected
                                GSK's '845 Patent Claims as Anticipated
                                and Obvious in View of the First
                                Sumatriptan Patent ............................................... 7

                         ii.    GSK Submits Two Declarations—Allegedly
                                Showing Unexpected Results—to Overcome
                                the Rejections Based on the First
                                Sumatriptan Patent ............................................... 8

iii. GSK Submits a Third Declaration—Originally Filed With a Different Application—to Overcome an Obviousness Type Double Patenting Rejection ...................................... 10

c. Based on GSK's Declarations and Arguments, the Patent Office Issues the Second Sumatriptan Patent.................... 12

3. 1992—GSK's First U.S. Market Approval for Sumatriptan..................... 12

4. 1993—GSK Chooses to Extend the Life of the First Sumatriptan Patent (the '470 Patent)—an Extension that Has No Value Unless the '845 Patent Is Invalid...................... 12

5. 1994—GSK Lists Both The '470 and '845 Patents in the Orange Book as Covering Sumatriptan.................................... 14

6. 1997–2002—Naratriptan (AMERGE®) and the Other Triptans................................................................................ 14

7. Spectrum Files an ANDA Certifying the '845 Patent Is Invalid, Unenforceable, or Not Infringed................................ 15

8. 2005—GSK Brings this Suit Alleging Infringement of the '845 Patent............................................................................ 16

D. Background in the Art of Migraine Treatment Prior to the Filing of the '845 Patent........................................................................ 17

1. Migraine and Migraine Treatments Prior to the Discovery of Triptans ........................................................................ 17

2. The Development of the Triptans........................................... 18

a. The '470 Patent—The First Sumatriptan Patent ........... 19

b. The "Discovery" of Sumatriptan.................................... 19

II. The '845 Patent Claims Are Invalid................................................ 21

A. The '470 Patent Anticipates the '845 Patent Claims........................... 21

1. The '470 Patent Describes to One Having Ordinary Skill in the Art a Group Containing a Mere Nine Compounds—Including Sumatriptan .................................................. 22

a. The Broadest Interpretation of Claim 7 of the '470 Patent Includes 102 Compounds—Including Sumatriptan .................................................. 22

ii

00403270

          i.      The '470 Patent Specification Demonstrates a Pattern of Preferences Narrowing the Claim 7 Group to 33 Compounds ...................................... 31

          ii.     The '470 Patent Specification Demonstrates a Further Pattern of Preferences Limiting the $R_2$ Variable to Either a Hydrogen Atom or a Methyl Group—Limiting the Group to Only 9 Compounds.................................................................. 32

B.     The Claims of the '845 Patent Are Obvious ......................................... 34

    1.     Scope and Content of the Prior Art ........................................... 35

    2.     Level of Ordinary Skill in the Art ............................................ 36

    3.     Differences between the Claimed Invention and the Prior Art............................................................................................. 37

    4.     The Skilled Artisan Would Be Motivated to Make Sumatriptan and Sumatriptan Succinate, with a Reasonable Expectation of Success upon Reviewing the '470 Patent ......................... 38

    5.     The Alleged "Unexpected Results" Do Not Support the Nonobviousness of Sumatriptan................................................. 41

        a.     The Jackson Declaration ............................................. 43

          i.      The Evidence Submitted to the Examiner in Dr. Jackson's Declaration was Not Sufficient to Establish Unexpected Results ...................... 43

          ii.     Evidence GSK Withheld from the Examiner Concerning the Data in the Jackson Declaration Demonstrates Clearly and Convincingly that Sumatriptan Does Not Exhibit Unexpected or Surprising Results ........................ 48

        b.     The Data GSK Put Before the Examiner in the Humphrey Declaration Do Not Establish Unexpected or Surprising Results for Sumatriptan...................... 50

          i.      Efficacy:  The $CD_{50}$ Test.................................................. 50

          ii.     Duration of Action ............................................ 51

          iii.   Oral Administration........................................................ 52

00403270

|  |  |  | iv. | The Humphrey Declaration | 53 |
|  |  |  | v. | The Tarbit Declaration | 62 |
|  |  | c. | | Other Results Not Reported by GSK to the Patent Examiner | 64 |
|  | 6. | | | No Other Secondary Indicia of Obviousness Support Patentability | 65 |
| C. | | | | Double Patenting | 67 |
|  | 1. | | | Double Patenting with Respect to the First Sumatriptan Patent | 67 |
|  | 2. | | | Double Patenting with Respect to the '483 Patent | 67 |
| III. | | | | The Unenforceability of the '845 Patent—Inequitable Conduct | 68 |
| A. | | | | The Jackson Declaration Was False and Misleading | 68 |
|  | 1. | | | Dr. Jackson Falsely Stated that GSK Followed an Official, Recognized, Mutagenicity Test | 71 |
|  | 2. | | | By Withholding the WHO NAP Test Results, Dr. Jackson Skewed the Results in Favor of Sumatriptan—Under the WHO NAP Test Conditions, No Difference Exists Between Sumatriptan and GR32066 | 72 |
|  | 3. | | | Dr. Jackson Falsely Told the Patent Office that He Supervised the NAP Tests | 76 |
|  | 4. | | | The Circumstances Surrounding the GR32066 Tests Leading to the Results Disclosed in Table 1 of Dr. Jackson's Declaration Demonstrate an Intent to Deceive the Patent Office | 77 |
|  |  | a. | | In 1983, GR32066 Showed Only a Single Positive Test Result—Using a Frameshift Strain in GSK's 6% Method—That was Likely Caused by Mutagenic Impurity | 78 |
|  |  | b. | | In 1989 GSK Retested GR32066 | 79 |
|  |  |  | i. | The 1989 Retests were Not Full Tests— Instead, GSK Used Selected Controls, Selected Strains and Selected Acid |  |

iv

Concentrations, and Did Not Test Sumatriptan Under the Same Conditions........................ 80

ii.  The 1989 Tests Did Not Follow GLP and Likely Used a Contaminated Batch of GR32066 ........................................................ 81

iii.  These Tests Were Not Conducted in Accordance with GSK's own SOPs ................................ 85

5.  Dr. Jackson and GSK Withheld Tests Showing Sumatriptan as Positive in the GSK 6% NAP Test ...................................... 86

6.  Dr. Jackson Withheld NAP Test Results of Other '470 Compounds with Negative Results ........................................ 88

7.  Dr. Jackson Misrepresented the Significance of NAP Test Results in the Search for a Marketable Anti-Migraine Drug ................... 89

a.  Dr. Jackson Failed to Disclose that GR32066 Was a Lead Compound at GSK Despite Its NAP Test Results ...................................................................... 89

b.  Dr. Jackson Failed to Disclose that GSK's Own Parameters for an Acceptable NAP Test Result Changed—from a Four-Fold Increase to a Twenty-Fold Increase ...................................................... 90

c.  Dr. Jackson Withheld GSK's NAP Test Result for GR85548—Showing a 17–20 Fold Increase in Revertants—a Compound that GSK Was Developing in 1988 and is Now Sold in the U.S. as Naratriptan...................................................... 91

B.  The Humphrey Declaration Was False and Misleading........................................ 94

1.  GSK Failed to Disclose Subsequent Tests of Compound III (GR34456) Showing Its $RT_{50}$ at Greater than 2 Hours—Tests Completed by GSK before the '845 Patent Issued ........................ 95

2.  The Data in Table 1 of the Humphrey Declaration Do Not Show Statistically Significant Differences and Dr. Humphrey Knew It.................................................. 97

3.  GSK Possessed Data on Other Promising Compounds of the '470 Patent, but Failed to Include Them in the Humphrey Declaration .......................................... 99

00403270

C.      Mr. Fichter's False and Misleading Representations to Examiner ...................... 99

D.      The Cumulative Effect of These Material Omissions and
        Misrepresentation Demonstrates an Intent to Deceive the Patent
        Office ....................................................................................................... 103

CONCLUSIONS OF LAW................................................................................................. 105

I.      Controlling Authority................................................................................................. 105

        A.      Jurisdiction ..................................................................................................... 105

        B.      Federal Circuit Law Applies ......................................................................... 106

        C.      Legal Standard................................................................................................ 107

II.     The Claims of the '845 Patent Are Invalid .................................................................. 108

        A.      The Claims of the '845 Patent Are Anticipated by the '470 Patent.................... 108

                1.      The '470 Patent Anticipates the '845 Patent............................................. 109

                2.      The '470 Patent Teaches a Sufficiently Small Genus—
                        Containing as Few as Nine or Even Six Compounds—to
                        Anticipate Sumatriptan.......................................................................... 111

                        a.      As in *In re Petering*, the Pattern of Specific
                                Preferences Taught by the '470 Patent Yields an
                                Anticipatory Genus ..................................................................... 112

                        b.      As in *In re Schaumann*, Two Facts Make the Case
                                for an Anticipatory Genus Here Even Stronger than
                                in *Petering*—the Express Disclosure of the Claims
                                and the Similarity in Properties Between
                                Sumatriptan and the Prior Art ..................................................... 116

                        c.      *In re Ruschig* Demonstrates That the Application of
                                *Petering* to this Case Is Appropriate ......................................... 118

                3.      *In re Petering* Does Not Require the Skilled Artisan to
                        Immediately and Simultaneously See All the Members of a
                        Disclosed Genus...................................................................................... 119

                4.      The '470 Patent's Recitation of Physiologically Acceptable
                        Salts Does Not Increase the Genus Size................................................... 120

                5.      The '470 Patent Enables Sumatriptan ..................................................... 121

00403270

B.    The Claims of the '845 Patent Are Rendered Obvious by the
      Limited Genus Taught by the '470 Patent ............................................. 122

      1.    The First Three Required *Graham* Factual Findings
            Demonstrate that Sumatriptan Would Have Been Obvious
            to One Having Ordinary Skill in the Art.................................... 122

            a.    Scope and Content of the Prior Art/Differences
                  Between the Prior Art and the Claims............................ 123

            b.    Level of Ordinary Skill in the Art ................................ 123

            c.    Sumatriptan Is an Obvious Species of a Prior Art
                  Genus ........................................................................... 125

            d.    GSK Is Estopped From Asserting That the '470
                  Patent Does Not Provide a Motivation to Make
                  Sumatriptan With a Reasonable Expectation of
                  Succession ................................................................... 127

      2.    The Objective Evidence Does Not Rebut the *Prima Facie*
            Case, But Instead Supports the Obviousness of Sumatriptan ................. 127

            a.    Commercial Success ..................................................... 128

            b.    Long Felt but Unresolved Need ................................... 130

            c.    Failure of Others.......................................................... 131

            d.    Licensing ..................................................................... 131

            e.    Skepticism of Experts.................................................. 131

            f.    Copying ....................................................................... 131

            g.    Unexpected Results ..................................................... 132

      3.    Conclusion—The Claims of the '845 Patent Are Obvious .................... 135

C.    The Claims of the '845 Patent Are Invalid Under the Judicially
      Created Doctrine of Double Patenting ................................................ 136

      1.    The Only Difference Between the Claims Of '845 Patent
            and the '470 Patent Is That the '470 Patent Claims Do Not
            Include a Pictorial Representation of Sumatriptan's
            Structure, But the '845 Patent Claims Do ................................ 137

      2.    The Claims of the '845 Patent is Are Not Patentably
            Distinct from the Claims of the '470 Patent............................. 138

00403270

3.   Secondary Objective Evidence is Not Taken Into Account in Obviousness Type-Double Patenting ................................. 139

III.   GSK's Inequitable Conduct During the Prosecution of the '845 Patent Renders Patent Unenforceable ....................................................... 140

A.   The Jackson Declaration Alone Establishes Inequitable Conduct ...................... 145

1.   Dr. Jackson Withheld and Misrepresented Information that Was Material to Patentability and He Knew It ....................... 145

2.   The Cumulative Effect of the Missing and Distorted Information Presented by Dr. Jackson in His Declaration Demonstrates His Intent to Deceive ........................................ 146

B.   Spectrum Has Established by Clear and Convincing Evidence That GSK and Individuals Under a Duty of Candor to the Patent Office Engaged in Inequitable Conduct ...................................................... 146

C.   The Cumulative Effect of These Material Omissions and Misrepresentation Demonstrates an Intent to Deceive the Patent Office ............................................................................................. 148

IV.   Alternative Defenses Under 35 U.S.C. § 112 ............................................. 149

A.   Test of Enablement ............................................................................ 151

B.   The Claims of the '470 Patent Are Enabled ...................................... 152

C.   The Written Description Requirement ................................................ 152

D.   The '470 Patent Meets the Written Description Requirement ........... 153

E.   The Test for Indefiniteness ................................................................ 153

F.   The Claims of the '470 Patent Meet the Statutory Definiteness Requirement. ...................................................................................... 154

V.   35 U.S.C. § 101 ........................................................................................... 155

VI.   SUMMARY OF CONCLUSIONS .............................................................. 155

00403270

## INTRODUCTION

1.      Spectrum Pharmaceuticals, Inc. ("Spectrum") submits these Proposed Findings of Fact and Conclusions of Law.  To the extent that any issue of law is deemed to be an issue of fact, it should be so considered, and to the extent that any issue of fact is deemed to be an issue of law it should be so considered.  Spectrum reserves its rights to supplement its Proposed Findings of Fact and Conclusions of Law, as necessary.

## SUMMARY OF FINDINGS AND CONCLUSIONS

### I.      Anticipation

2.      U.S. patent law protects only "novel" inventions and expressly bars protection for any invention described in a prior-art patent.  The '845 patent-in-suit claims the pharmaceutical compound sumatriptan.  But GSK had earlier received a prior-art patent, the '470 patent, also claiming the compound sumatriptan among a small group of other compounds.  The prior-art '470 patent did not recite the chemical name for sumatriptan and did not include a picture of the compound's chemical structure.  But a skilled chemist reading the '470 patent, however, would readily recognize the sumatriptan compound as if its chemical name were written out.  The skilled chemist reading the '470 patent claims and examples would readily discern a limited group of nine or fewer preferred compounds; sumatriptan is one of only three members of this group not specifically shown in the examples.  GSK's prior-art patent therefore describes sumatriptan and renders the claims of the patent-in-suit invalid for lack of novelty.

### II.     Obviousness

3.      Under U.S. patent law, even if the invention is not identically disclosed or described in a single prior-art reference, a patent will be invalid if the differences between the claimed invention and the prior-art would have been obvious at the time the invention was made.  GSK's prior-art '470 patent disclosed and claimed a narrow group of compounds that includes

1

sumatriptan, and further disclosed and claimed using the compounds to treat migraines.  The

'845 patent-in-suit also describes and claims sumatriptan, and its use to treat migraines.  The

prior-art '470 patent, and related publications concerning the same class of compound, render

obvious the '845 patent claims.

## III.    Double Patenting

4.    The doctrine of nonstatutory double patenting prohibits a second patent with

claims that are not "patentably distinct" from—i.e., are obvious over—claims of a previous

patent.  Because the purpose of this prohibition is to prevent an unjustified extension of the right

to exclude, "motivation to make" and the so called "objective indicia" used in a traditional

obviousness analysis play no role in the analysis.  GSK has two patents—the prior-art '470

patent and the '845 patent-in-suit—granting it the right to exclude others from making, using, or

selling sumatriptan.  The only difference between the claims is that the '470 patent does not

include a specific example reciting the compound by name.  The second sumatriptan patent, the

'845 patent, is barred by the doctrine of nonstatutory double patenting.

## IV.    Unenforceability

5.    An issued patent may be held unenforceable if, during its procurement, the

applicant engaged in "inequitable conduct"—affirmative misrepresentations or failure to disclose

material information to the Patent Office coupled with an intent to deceive.  GSK obtained the

patent-in-suit by submitting two expert declarations purporting to demonstrate that sumatriptan

showed superior toxicological and pharmacological results compared to other compounds from

GSK's prior-art '470 patent.  GSK's expert toxicologist submitted a declaration (1) falsely

claiming to show results from a standardized, recognized mutagenicity test purporting to show

that one of the prior-art compounds was mutagenic, (2) withholding results from that same test

00403270

directly contradicting the results in his declaration and showing the compound to be non-mutagenic in the standardized test, and (3) failing to disclose that GSK had concluded that a positive result in the mutagenicity test in question was so insignificant that GSK was pursuing commercial development of a similar anti-migraine drug having much worse results in the same mutagenicity tests.  Further, GSK also withheld results from testing conducted about two months after GSK submitted the declarations that contradicted the supposedly unexpected pharmacological results asserted in the second declaration.  The circumstances surrounding GSK's preparation of, submission of, and arguments in support of these declarations demonstrate a level of intent to deceive the Patent Office and render the '845 patent-in-suit unenforceable.

## FINDINGS OF FACT

### I.      Background

#### A.      The Parties

6.      The plaintiff, Glaxo Group Ltd. d/b/a GlaxoSmithKline ("GSK"), is engaged in the business of research, development, manufacture, and sale of pharmaceutical products worldwide.  GSK is organized and exists under the laws of England and is located at Glaxo Wellcome House, Berkeley Avenue, Greenford, Middlesex, UB6 0NN, United Kingdom.  (D.I. 1, ¶2.)

7.      The defendant, Spectrum, is a Delaware corporation having its principal place of business at 157 Technology Drive, Irvine, California 92618.  (D.I. 6, ¶3.)

8.      In this action, GSK asserts that Spectrum has infringed U.S. Patent No. 5,037,845 ("the '845 patent") by filing with the United States Food and Drug Administration ("FDA") an abbreviated New Drug Application ("ANDA") seeking approval to sell the drug product sumatriptan in an injectable dosage form before the expiration of the '845 patent.  (D.I. 6, ¶11.)

00403270

**B.     The Technologies at Issue**

9.     Broadly speaking, the heart of this case concerns three scientific disciplines:

(1) organic chemistry; (2) pharmacology; and (3) genetic toxicology.  A brief overview of each

discipline appears below.

### 1.     Organic Chemistry

10.     Organic chemistry is the chemistry of compounds containing carbon.  (DTX 215,

Taylor Report ¶18.)  The term "organic chemistry" comes from the early days of chemistry when

the field was divided into organic and inorganic chemistry.  (*Id.*)  Inorganic chemistry was the

chemistry of minerals, and organic chemistry was the chemistry of compounds derived from

living organisms.  (*Id.*)

11.     Of the millions of known compounds, the vast majority of them are organic

compounds, meaning that they are compounds containing carbon.  (*Id.* at ¶19.)  Living organisms

are made up primarily of organic compounds.  (*Id.*)  Organic chemistry is the chemistry of dyes,

drugs, plastics, paper, and odors—almost everything that we see, touch, feel, smell, wear or eat is

composed of organic compounds.

12.     One of these organic compounds is the compound at issue in this case:

sumatriptan.  The chemical name for sumatriptan is 3-(2-(dimethylamino)ethyl)-N-methyl-1H-

indole-5-methanesulfonamide.  It has the following chemical structure:

00403270

13.    Sumatriptan—sold in the U.S. as IMITREX®—is a prescription medication indicated for the acute treatment of migraine. (*See* DTX 919, 920, 921.)

### 2.    Pharmacology

14.    Pharmacology is the study of how substances, such as pharmaceutical drugs, interact with living organisms and what changes the substances produce. Pharmacologists have known for years that certain bioactive molecules, such as hormones, exert their biological effect by binding to specific protein molecules, called receptors, on the cell membranes of certain tissues in the body. (DTX 160, Peroutka Report ¶22.) Each of the bioactive molecules can be analogized to a "key" that fits into a "lock" in the corresponding receptor. (*Id.*)

15.    The class of "triptan" compounds—including sumatriptan—selectively bind to and activate specific serotonin receptors located in the blood vessels that supply the external carotid (brain) circulation and do not bind to others serotonin receptors. (*Id.* at ¶24.) As a result, the effect of these compounds is selective to certain cranial blood vessels. (*Id.*) The restriction of these blood vessels is the mechanism that causes migraine relief.

### 3.    Genetic Toxicology

16.    Toxicology is the study of adverse effects of chemical agents on biological systems. (DTX 543, Gad Report ¶13.) Genetic toxicology, a sub-discipline of toxicology, seeks to assess a compound's potential for genotoxicity, including mutagenicity or carcinogenicity. (*Id.* at ¶18.) Genotoxicity refers to the ability of compounds to cause a broad range of genetic damage. (*Id.*) Mutagenicity, a specific form of genotoxicity, refers to a compound's potential to cause changes in DNA that manifest themselves as changes in a cell's appearance or function. (*Id.*)

17.    The mutagenic potential of a particular compound can be tested in many different ways. Only two types of *in vitro* mutagenic tests—the Ames Test and the closely related WHO

5

NAP Test—are relevant to this case.  These tests are discussed in Findings of Fact Section

(II)(B)(5)(a)(i)(1),  paragraphs 163-171, *Infra.*

C.     **Key Pre-Litigation Events**

1.     **1989—The First Sumatriptan Patent (the '470 Patent)**

18.     U.S. Patent No. 4,816,470 ("the '470 patent" or "the first sumatriptan patent")

issued on March 28, 1989.  (DTX 5.)  GSK is the assignee of the '470 patent.  (*Id.*)

19.     The '470 patent claims a group of compounds from the "triptan" class, including

sumatriptan.  (*Id.* at claims 1-14.)  The '470 patent also claims methods for treating patients

suffering from migraine with the claimed compounds.  (*Id.* at claims 15-18.)

20.     As a result of a patent term extension, discussed below, the '470 patent will expire

on December 28, 2006 (with an associated regulatory exclusivity period that expires June 28,

2007).  (Pretrial Order, Ex. 1, ¶17.)

21.     GSK does not dispute that the '470 patent is prior-art to the '845 patent.  (Pretrial

Order Ex. 1, ¶17.)

2.     **1991—The Second Sumatriptan Patent (the '845 Patent)**

a.     **The Filing, Specification, and Claims**

22.     On August 6, 1991, the Patent Office issued U.S. Patent No. 5,037,845 ("the '845

patent" or "the second sumatriptan patent").  (DTX 1.)  GSK owns the '845 patent.  (*Id.*)

23.     The '845 patent—like the '470 patent—claims sumatriptan.  (DTX 1, claims 1-9.)

Claim 1 appears below.

00403270

1. A compound of formula (I):



and its physiologically acceptable salts and solvates.

24.    The '845 patent also claims a method for treating patients suffering from migraine with sumatriptan. (*Id.* at claims 10-12.)

25.    The '845 patent will expire on August 6, 2008 (with an associated regulatory exclusivity period that expires February 6, 2009). (Pretrial Order, Ex. 1, ¶9.)

26.    The '845 patent stemmed from a series of continuation applications. (*See* DTX 2-4.) The first was filed with the U.S. Patent Office on August 1, 1985, one year after GSK filed a similar—but not identical—application with the U.K. Patent Office. (*See* DTX 4 at Paper No. 1, priority document.) GSK requested, and the U.S. Patent Office granted, foreign priority to the U.K. application.

### b.    The Prosecution History

#### i.    The Patent Office Repeatedly Rejected GSK's '845 Patent Claims as Anticipated and Obvious in View of the First Sumatriptan Patent

27.    Over the next few years, the Patent Office repeatedly rejected GSK's '845 patent claims as anticipated and obvious in view of the patent application that became the '470 patent, as well as an associated published abstract. (*See* DTX 2, 3, and 4.) On September 2, 1988, the Patent Office rejected the pending claims as anticipated and obvious in view of the application that led to the '470 patent. (DTX 3, Paper No. 11.)

00403270

28.    Later, GSK requested, and the Patent Office granted, an interview with the

examiner to discuss, *inter alia*, those rejections.  That interview took place on January 11, 1990.

(DTX 2, Paper No. 6.)

### ii.    GSK Submits Two Declarations—Allegedly Showing Unexpected Results—to Overcome the Rejections Based on the First Sumatriptan Patent

### (1)    The January 11, 1990 Interview

29.    In the January 11, 1990 interview—according to the examiner's interview

summary—the examiner and GSK's attorney, Mr. Fichter, "discussed proposed declarations to

establish unobviousness over Dowle et al.  U.S. 4,816,470." (DTX 2, Paper No. 6, Examiner

Interview Summary Record.)  Mr. Fichter submitted his own summary of the interview on

January 23, 1990.  (DTX 2, Paper No. 6, Interviewer Summary Record).  In it, he made several

important representations on behalf of GSK.

30.    Mr. Fichter alleged in the interview summary—for the first time during the

prosecution history—that the results of sumatriptan were "unexpected." (*Id.* at 4.)  Mr. Fichter

stated:

> Thus, the combination of properties of the presently claimed compound is unexpected and establishes that the compound of the invention is patentable over the teachings of the Dowle references.

(*Id.*)

31.    To support this conclusion, Mr. Fichter first relied on the declaration of Dr.

Jackson ("the Jackson Declaration").  Dr. Jackson compared the mutagenic potential of the

claimed compound (sumatriptan) to that of what he alleged was the "closest prior-art

compound." (DTX 40 at 2.)  Dr. Jackson told the Patent Office that he used a particular

standardized and recognized test for mutagenic potential—the WHO recommended Nitrosation

00403270

Assay Procedure ("WHO NAP test"). (*Id.* at 2-3.) Mr. Fichter echoed Dr. Jackson's representations:

> [T]he mutagenic potential of the claimed compound and the closest prior-art compound was determined following the nitrosation assay procedure (NAP test) recommended at the World Health Organization (WHO) Symposium on the Potential Carcinogenicity of Nitrosatable Drugs.

(DTX 2, Paper No. 6.)

32.    Mr. Fichter further represented to the Patent Office that the results presented in the Jackson Declaration "clearly demonstrate" that sumatriptan "shows no mutagenic potential in the NAP test." (*Id.*) Further, Mr. Fichter compared these results to results that allegedly showed "significant mutagenic potential in the NAP test." (*Id.*)

33.    GSK also relied on the declaration of Dr. Humphrey ("the Humphrey Declaration"). As Mr. Fichter explained to the examiner, Dr. Humphrey's declaration had two purposes. First, Dr. Humphrey went to great lengths to explain why the examiner should treat a particular compound from the '470 patent as the "closest" prior-art compound to sumatriptan. Second, Dr. Humphrey presented data allegedly showing that sumatriptan

> is considerabl[y] more effective than ... the closest prior-art compound following intraduodenal administration of doses directly proportional to their relative intravenous potency.

(*Id.* at 4.)

34.    This result, according to Fichter, when coupled with Dr. Jackson's showing the sumatriptan lacked mutagenic potential in the WHO recommended NAP test, was "unexpected." (*Id.*)

9

**(2)     The January 30, 1990 Rejection
and GSK's Response**

35.     Despite these declarations, purported results, and arguments, on January 30, 1990

the examiner again rejected the pending claims as being anticipated by, or obvious over the '470

patent and an associated published abstract. (DTX 2, Paper No. 7.) The examiner found that the

'470 patent described a small genus of compounds that encompassed the claimed species. (*Id.* at

3.) The examiner further found that the preferred compound, as set forth at Column 3, lines 43-

53 of the '470 patent constituted an even more limited genus of compounds that anticipate, or at

least render obvious, any further claims directed to sumatriptan. (*Id.*)

36.     In response, Fichter reiterated his summary of the Humphrey and Jackson

Declarations and again asserted that the "combination of properties of the presently claimed

compound is unexpected." (DTX 2, Paper No. 10 at 7.)

**iii.     GSK Submits a Third Declaration—Originally
Filed With a Different Application—to Overcome
an Obviousness Type Double Patenting Rejection**

37.     On July 27, 1990, the examiner issued another rejection, this time withdrawing all

the previous rejections save one. (DTX 2, Paper No. 11.) The examiner maintained a

provisional obviousness-type double patenting rejection over another GSK patent application—

an application that later became U.S. Patent No. 4,994,483 ("the '483 patent"). (DTX 2, Paper

No. 11; DTX 63, '483 Patent.) The examiner stated:

> Claims 1–4, 6–9, 11–13 and 15 are directed to an invention not
> patentably distinct from claims 1–9, 13 and 14 of commonly
> assigned S.N. 07/443,874 [which became the '483 patent] for the
> reasons of record.

(DTX 2, Paper No. 11 at 2.)

38.     The "reasons of record" referred to by the examiner amounted to one fact: the

only compound claimed by the '483 patent was, according to the examiner "clearly as close (or

00403270

closer) in structure to" sumatriptan as the compound GSK had alleged was the "closest prior-art." (DTX 2, Paper No. 7 at 2.)  In fact, in the very first rejection, the examiner referred to the compounds disclosed by the '483 patent as "adjacent homologs" of sumatriptan. (DTX 4, Paper No. 11 at 3.)

39.    In the then-copending prosecution of the '483 patent, the examiner—a different examiner—issued an obviousness-type double patenting rejection.  (DTX 67 at Paper No. 14.) There, the '483 patent claims were rejected in view of the '845 patent claims.  (*Id.*)

40.    Mr. Fichter overcame that rejection at least in part by filing several documents including the declaration of Michael Howard Tarbit ("the Tarbit Declaration").  (*See* DTX 67 at Paper No. 18.)  On February 13, 1991, Mr. Fichter had another interview with the examiner of the '845 patent.  (DTX 2, Paper No. 14.)  There, they discussed the application that led to the '483 patent.  At the interview with Mr. Fichter, the examiner of the '845 patent first became aware that the obviousness-type double patenting rejection in the '483 patent prosecution had been overcome.  Apparently, the examiner asked Mr. Fichter to provide the documents that GSK filed in the prosecution of the '483 patent to overcome the claims to sumatriptan.  (*Id.*)  Mr. Fichter agreed.

41.    On January 17, 1991, Mr. Fichter provided those documents and made several arguments.  (DTX 2, Paper No. 15.)  One of those documents was the Tarbit Declaration.  (*Id.*) The Tarbit Declaration compared the oral bioavailability the compound of the '483 patent with a few of the compounds from the '470 patent, including sumatriptan.  (DTX 2, Paper No. 15, Tarbit Declaration at 3.)  The Tarbit Declaration concluded that the compound of the '483 patent had "markedly higher" oral bioavailability than any of the other compounds tested, including sumatriptan.  (*Id.*)

00403270

### c.    Based on GSK's Declarations and Arguments, the Patent Office Issues the Second Sumatriptan Patent

42.    The examiner—with no explanation—issued a Notice of Allowability for the patent application on February 13, 1991.  (DTX 2, Paper No. 17.)  The '845 patent issued on August 6, 1991.  (Pretrial Order, Ex. 1 ¶3.)

### 3.    1992—GSK's First U.S. Market Approval for Sumatriptan

43.    Because of these events, by August of 1991, GSK possessed two separate patents granting it the right to exclude others from selling sumatriptan in the United States.

44.    Seventeen months later, in December of 1992, the FDA granted GSK approval to sell sumatriptan in the injectable form.[1]  (DTX 919.)

### 4.    1993—GSK Chooses to Extend the Life of the First Sumatriptan Patent (the '470 Patent)—an Extension that Has No Value Unless the '845 Patent Is Invalid

45.    Under the Hatch-Waxman Act, the term of a patent covering a new drug can be extended—for a period of up to five years—if the time taken by the regulatory approval process deprives a patentee of the full benefit of a patent.  35 U.S.C. § 156; 35 U.S.C. § 156(d)(5)(E)(i). However, patent term extensions under the Hatch-Waxman Act are limited to one extension per patent and one extension per product.  35 U.S.C. § 156 (a)(2) and (c)(4).

46.    Accordingly, in 1993 GSK had a significant decision to make—whether to apply for a patent term extension on the first sumatriptan patent, or the second one.

47.    GSK had the potential to add 275 days to either patent.

---

[1] GSK currently sells three dosage forms of sumatriptan under the trademark IMITREX®.  These dosage forms include:  (1) an injectable dosage form; (2) a tablet dosage form; and (3) a nasal spray dosage form.  GSK first sought approval for the injectable form.  The FDA approved GSK's injectable sumatriptan dosage form on December 28, 1992 based on GSK's New Drug Application ("NDA") No. 020080.  (DTX 919.)  The FDA approved the tablet dosage form of sumatriptan on June 1, 1995 based on NDA No. 020132.  (DTX 920.)  The FDA approved the nasal spray form on August 26, 1997 based on NDA No. 020626.  (DTX 921.)

00403270

48.     Before the patent term extension was granted, the '470 patent was set to expire on March 28, 2006. (DTX 255, Orange Book (17th ed.) listing for sumatriptan.) The '845 patent was not set to expire until more than two years later, on August 6, 2008. (*Id.*) Therefore, extending the term of the '470 patent by 275 days—i.e., to December 29, 2006—would not provide GSK with any exclusivity it did not already have from the '845 patent.

49.     In other words, a 275 day patent extension for the '470 patent would have had no value to GSK unless the '845 patent is invalid or unenforceable.

50.     But had GSK instead extended the '845 patent, GSK would have secured market exclusivity until May 8, 2009—if the '845 patent was valid and enforceable. Based upon the 2006 sales of sumatriptan, an additional 275 days of exclusivity would yield nearly $1 billion in additional sales.

51.     On February 24, 1993, GSK applied for a patent term extension for the '470 patent, not the '845 patent. (DTX 6, Paper No. 22.) On September 20, 1994, GSK was granted a 275 day extension of the '470 patent. (DTX 6, Paper No. 30, Certificate Extending Patent Term.)

52.     GSK's choice is telling. Had GSK believed, in 1993, that the '845 patent was valid and enforceable, GSK would have extended it.

53.     GSK decided to forego nearly $1 billion dollars in potential sales to extend a patent that has no value unless the '845 patent is held invalid or unenforceable. This demonstrates that GSK did not believe the '845 patent was valid and enforceable.

00403270

### 5.  1994—GSK Lists Both The '470 and '845 Patents in the Orange Book as Covering Sumatriptan

54.     NDA applicants are required by statute and by FDA regulations to submit to FDA

the patent number and expiration date of any patent that claims the NDA-approved drug product

or a method of using such drug product.  35 U.S.C. § 355(b)(1).

55.     The FDA—with no substantive review of the patents—lists the patent number(s)

and expiration date(s) of the submitted patents ("listed patents") in its publication "Approved

Drug Products with Therapeutic Equivalence Evaluations" (the "Orange Book").  (*Id.*)

56.     By 1994, GSK had submitted both its sumatriptan patents to the FDA for listing

in the Orange Book.  (DTX 252, Orange Book (14th Ed.) listing for sumatriptan.)

57.     To cause the FDA to list the '470 patent in the Orange Book, GSK certified to the

FDA that the '470 patent "claims sumatriptan succinate generically" and that "U.S. Patent

Application No. 317,682 (filed March 1, 1989) [the '845 patent] covers sumatriptan and its

physiologically acceptable salts, per se . . . ." (DTX 911; GSK–00278899.)

58.     GSK continues to maintain that both the '470 patent and the '845 patent are listed

in the Orange Book for all dosages of sumatriptan/sumatriptan succinate injectable, nasal spray,

and tablet products.  (Pretrial Order, Ex. 1 ¶¶ 11, 17.)

### 6.  1997–2002—Naratriptan (AMERGE®) and the Other Triptans

59.     GSK and a number of other pharmaceutical companies have, since sumatriptan

was first approved, successfully developed a number of additional "triptan" compounds to treat

migraines.  Today, the complete picture looks like this:

00403270

**Table 1 – Currently marketed triptans in use for migraine treatment**

| Triptan | Manufacturer | Approval Date |
|---------|-------------|---------------|
| Almotriptan (AXERT®) | Ortho-McNeil/J&J | May 7, 2001 (tablets) (DRX 922.) |
| Eletriptan (RELPAX®) | Pfizer | December 26, 2002 (tablets) (DRX 923.) |
| Frovatriptan (FROVA®) | Endo Pharms | November 8, 2001 (tablets) (DRX 924.) |
| Naratriptan (AMERGE®) | GSK | February 10, 1998 (tablets) (DRX 925.) |
| Rizatriptan (MAXALT®) | Merck | June 29, 1998 (tablets) (DRX 926.) |
| Sumatriptan (IMITREX®) | GSK | December 28, 1992 (injectable) (DRX 919.) June 1, 1995 (tablets) (DRX 920.) August 26, 1997 (nasal spray) (DRX 921.) |
| Zolmitriptan (ZOMIG®) | AstraZeneca | November 25, 1997 (tablets) (DRX 929.) February 13, 2001 (ODT) (DRX 927.) September 30, 2003 (nasal spray) (DRX 928.) |

60.     Specifically, GSK currently sells Naratriptan (marketed as AMERGE®). Like sumatriptan, naratriptan is indicated for the acute treatment of migraine attacks with or without aura in adults. Naratriptan tested strongly positive in an *in vitro* mutagenicity test. (DTX 916, 2004 Physicians' Desk Reference ("PDR"), p. 1426.)

### 7.    Spectrum Files an ANDA Certifying the '845 Patent Is Invalid, Unenforceable, or Not Infringed

61.     The Federal Food Drug and Cosmetics Act ("FFDCA") as amended by the Drug Price Competition and Patent Term Restoration Act of 1984 ("the Hatch-Waxman Act") authorizes a company seeking approval for a generic version of an approved drug to file an ANDA. The ANDA applicant must show that its proposed product has the same active ingredient as and is bioequivalent to an approved NDA product. 21 U.S.C. § 355(j)(2).

62.     A generic company seeking approval to market an ANDA product prior to the expiration of any listed patents must include in its ANDA a certification that its proposed product will not infringe the listed patents, and/or that the patents are invalid or unenforceable.

15

This is known as a "Paragraph IV Certification". 21 U.S.C. § 355(j)(2)(A)(vii)(IV). The

applicant must then send a notice letter to the NDA-holder and patent owner that includes a

detailed statement of the factual and legal basis of the applicant's opinion that the patent is

invalid, unenforceable, or would not be infringed. 21 U.S.C. § 355(j)(2)(B).

63.    Spectrum included a Paragraph IV Certification in its ANDA certifying that, in

Spectrum's opinion, the '845 patent is invalid, unenforceable and/or will not be infringed. (D.I.

6, ¶12.) Spectrum certified that it was not seeking approval to sell generic injectable sumatriptan

succinate until after the expiration of the '470 patent. (DTX 917.)

64.    Spectrum sent GSK the required Notice of Paragraph IV Certification ("Notice

Letter"). Spectrum's Notice Letter informed GSK that Spectrum had filed an ANDA with a

Paragraph IV Certification, and that in Spectrum's opinion the '845 patent was invalid in view of

prior-art, including the '470 patent.

65.    Spectrum's statement of the factual and legal bases for its Paragraph IV

Certification included an explanation of why prior-art, including the '470 patent, rendered the

'845 patent invalid. (*Id.*)

**8.    2005—GSK Brings this Suit Alleging Infringement of the '845 Patent**

66.    Pursuant to the Hatch-Waxman Act, GSK sued Spectrum within 45 days of

receiving the Notice Letter alleging infringement of the '845 patent. 21 U.S.C. §

355(j)(5)(B)(iii).

67.    GSK seeks an order (1) prohibiting FDA approval of Spectrum's generic

sumatriptan succinate injectable product prior to the expiration of the '845 patent and (2)

enjoining Spectrum from the commercial manufacture, use, offer to sell, sale within the United

States, or importation into the United States of generic sumatriptan succinate injectable product

until after the expiration of the '845 patent and its associated pediatric exclusivity.

00403270

**D.    Background in the Art of Migraine
Treatment Prior to the Filing of the '845 Patent**

**1.    Migraine and Migraine Treatments Prior to the Discovery of Triptans**

68.    A migraine is a headache—typically one-sided—of moderate to severe intensity (Solomon Dep., 21:10–16.)  Migraines are usually associated with nausea, with or without vomiting, and sensitivity to external stimuli such as light or noise.  (*Id.*)  Migraine is believed to affect 12% of the population.  (Solomon Dep., 23:13–14.)

69.    Prior to the development of the triptan class of compounds, there were three significant improvements in the treatment of migraines.  The first improvement occurred in the late 19th Century with the discovery of aspirin.  (Solomon Dep., 231:3–4.)

70.    The second significant improvement in the treatment of migraine was the development of ergotamine tartrate.  (Solomon Dep., 233:7–18.)  Ergotamine tartrate was discovered in 1920 and first used successfully to treat migraine by 1925.  (DTX 242, Silberstein and McCrory, "Ergotamine and Dihydroergotaimine: History, Pharmacology, and Efficacy" Headache 43:144-166 (2003).)  With an effectiveness in the range of 60 percent, ergotamine tartrate was a significant improvement over aspirin.  (DTX 231, Solomon Report, ¶26; Solomon Dep., 54:2-55:12; 133:11-25.)

71.    The third significant improvement in the treatment of migraines occurred in 1943 with the development of dihydroergotamine tartrate ("DHE").  (*See* DTX 242, Silberstein and McCrory, p. 144.)  DHE, has a potency of "[s]eventy to 75 percent" when "given intravenously for a patient who has moderate or severe headache, migraine." (Solomon Dep., 62:19-20; 63:1-64:11.)

00403270

### 2.    The Development of the Triptans

72.    By 1959, scientists had discovered that serotonin—a neurotransmitter found in the brain—was involved in causing migraines. (DTX 160, Peroutka Report, ¶14.) Serotonin is also known as 5-HT. Scientists had determined that serotonin itself could be administrated to treat migraine. (DTX 160, Peroutka Report ¶14.) In addition, scientists had concluded that several compounds structurally similar to serotonin relieved migraine. Scientists concluded that these compounds acted by "attach[ing] themselves to the same receptor sites." (*Id.* at pg. 109.) As briefly explained above, receptors, such as 5-HT receptors, are molecular sites on cell surfaces that bind with substances to potentially result in a biological response. (DTX 215, Taylor Report ¶46.)

73.    In the 1970s, scientists made two important discoveries. First, it was discovered that several types of 5-HT receptors existed, and that not all of these 5-HT receptors were responsible for the anti-migraine effect of serotonin and related compounds. (DTX 236.) This discovery was reported in scientific journals. (*See*, *e.g.*, DTX 236.) Second, scientists developed and published specific tests for the anti-migraine action of compounds, including tests for potency and selectivity for different 5-HT receptors. (*Id.*) Using these tests, called screening methods, GSK began to synthesize analogues of serotonin and screen them for anti-migraine activity using the published tests. (*Id.*)

74.    The results from the tests led GSK to file a series of patents, first in the U.K. and then in the U.S., drawn to tryptamine derivatives useful in the treatment of migraine. On June 7, 1982, GSK filed a patent application in the U.K. that eventually issued as the '470 patent. (*See* DTX 5.)

00403270

### a.    The '470 Patent—The First Sumatriptan Patent

75.    The application that became the '470 patent disclosed and claimed a narrow group of anti-migraine compounds. (DTX 5, '470 patent, col.2 ll.2-13.) The claimed compounds were identified as useful for treatment of migraine based on the screening methods published in late 1970s and early 1980s. (DTX 5, '470 patent, col.3 1.62 — col.4 1.13.) The patent includes method claims to using the compounds to treat migraine.

76.    Sumatriptan is included in this narrow group of anti-migraine compounds.

77.    GSK laboratory notebook entries show that GSK synthesized sumatriptan in April, 1983 as part of the development of the '470 patent and before GSK filed the U.S. patent application that led to the '470 patent. (DTX 197 at 182.)

78.    Though the laboratory notebook entries clearly document the synthesis of sumatriptan, GSK argues that it did not in fact synthesize sumatriptan at that time and that it did not "invent" that compound until 1984.

### b.    The "Discovery" of Sumatriptan

79.    Dr. Oxford testified that in February 1984, he proposed that GSK make and study sumatriptan. (Oxford Dep. 75:21–76:5.) Sumatriptan was closely related in chemical structure to another compound that was known to be "non-mutagenic" and have "good oral bioavailability"—a compound GSK called AH25406. (Oxford Dep., 76:6–77:15.)

80.    AH25406 is disclosed and claimed in GSK's U.S. Patent No. 4,636,521 ("the '521 patent") which, like the '470 patent, is prior-art to the '845 patent.

81.    In addition to sumatriptan, a series of other compounds were also suggested for development in February, 1984. However, Dr. Oxford's testimony shows that GSK chose sumatriptan for development because it was in the application that led to the '470 patent and therefore would have patent protection:

00403270

Q. Was it [sumatriptan] also an analogue of 32066?

A. It could be viewed as that as well, but the thinking was that this compound resembled 25406 and should have similarly properties, physicochemical properties that should give rise to the good oral absorption and non-mutagenic activity <u>and it was different</u> from any of the other proposals being made at the time by our chemists.

Q. How was it different?

A. Because it was related to a compound that had already been patented whereas all these other compounds were designed to be less basic and were <u>not covered by previous patents</u>.

Q. So you are saying that sumatriptan was related to a compound that had already been patented?

A. I was aware that it was in a patent that we had already filed.  It was covered.

Q. Okay.

A. It was encompassed in the definitions.

Q. And that was what we are talking about, the '470 patent?

A. Yes.

(Oxford Dep. 79:2–22, emphasis added.)

    82.    The next month, a technician in Dr. Oxford's laboratory, Mr. Owen, synthesized sumatriptan with "little difficulty." (DTX 93 GSK-00397143; Oxford Dep., 80:13.)  Dr. Oxford explained that making sumatriptan "was a one-step synthesis" from an available intermediate. (Oxford Dep., 81:21.)  Mr. Owen agreed, noting that "[f]rom that common intermediate to sumatriptan was relatively straightforward." (Owen Dep., 35:21–22.)

    83.    GSK submitted sumatriptan for testing on March 28, 1984 and by April it was shown to be a highly potent, selective, well absorbed anti-migraine compound, just as Dr. Oxford expected. (DTX 93 GSK-00397143–44.)  In addition, by June 25, 1984, GSK had concluded that

00403270

sumatriptan was "negative in the Ames, fluctuation, gene conversion and nitrosation assays"—just like AH25406 and just as Dr. Oxford expected.  (DTX 84; GSK-00190673.)

II.     **The '845 Patent Claims Are Invalid**

   A.     **The '470 Patent Anticipates the '845 Patent Claims**

   84.     The '845 patent claims are invalid because they are anticipated by the '470 patent.

   85.     Claim 1 of the '845 patent is directed to sumatriptan and its physiologically acceptable salts and solvates.  Claims 2-4 are directed to specific salt forms of the compound sumatriptan.  Claims 5-9 are drawn to "pharmaceutical compositions" of sumatriptan.  Claims 10-12 claim methods of using sumatriptan.

   86.     Claim 1 of the '470 patent uses a chemical formula with defined variables as a short-hand means of describing the compounds that fall within its ambit.  Therefore, all of these compounds are described and enabled as if they had been expressly written out.  (Expected Testimony of Dr. Sharpless.)

   87.     The '470 patent claims and describes a limited group of compounds, coupled with examples and other disclosure that identifies a pattern of preferences.  (Expected Testimony of Dr. Sharpless.)  Through these teachings, the patent describes sumatriptan—just as if its structure had been drawn or its name had been written out.  (Expected Testimony of Dr. Sharpless.)  In addition, the '470 patent teaches suitable physiologically acceptable salts and solvates of the claimed compounds, including sumatriptan.  (DTX 5, '470 patent.)  Moreover, the '470 patent teaches multiple operable methods of making sumatriptan.  (Expected Testimony of Dr. Sharpless.)  The '845 patent claims are therefore described, enabled, and thus anticipated by GSK's first sumatriptan patent, the '470 patent.

00403270

1.    **The '470 Patent Describes to One Having Ordinary Skill in the Art a Group Containing a Mere Nine Compounds— Including Sumatriptan**

a.    **The Broadest Interpretation of Claim 7 of the '470 Patent Includes 102 Compounds—Including Sumatriptan**

88.    The '470 patent discloses a series of "indole derivative" compounds of a certain formula. The specification and several of the claims of the '470 patent expressly disclose and claim a small group of compounds. (Expected Testimony of Dr. Sharpless.) Specifically, column 1 of the '470 patent, as well as claims 1, 5, 6, and 7 disclose progressively narrower groupings—each containing sumatriptan. (Expected Testimony of Dr. Sharpless.) This progressive narrowing demonstrates a pattern of specific preferences for each of the variables of the basic structure. (Expected Testimony of Dr. Sharpless.) In view of these preferences, claim 7 teaches—even when interpreted as broadly as possible—a narrow group of a mere 102 compounds, including sumatriptan. (Expected Testimony of Dr. Sharpless.) (DTX 5, col. 1 ll.11–35.)

89.    The broadest group defined in the '470 patent occurs at column 1, lines 11–35:

The present invention provides an indole of the general formula (I):



wherein

$R_1$ represents hydrogen atom or a $C_{1-6}$ alkyl or $C_{3-6}$ alkenyl group;

$R_2$ represents hydrogen atom, or a $C_{1-3}$ alkyl, $C_{3-6}$ alkenyl, aryl, a ($C_{1-4}$) alkyl or $C_{5-7}$ cycloalkyl group;

00403270

$R_3$ represents hydrogen atom or a $C_{1-3}$ alkyl group;

$R_4$ and $R_5$, which may be the same or different, each represents a hydrogen atom or a $C_{1-3}$ alkyl or propenyl group or $R_4$ and $R_5$ together form an aralkylidene group, and

Alk represents an alkylene chain containing two or three carbon atoms which may be unsubstituted or substituted by not more than two $C_{1-3}$ alkyl groups,

and physiologically acceptable salts and solvates thereof.

90.    Each definition of $R_1$, $R_2$, $R_3$, $R_4$, $R_5$, and "Alk" provides a limited number of possible chemical entities that can take the position represented by the variable in the drawing. (Expected Testimony of Dr. Sharpless.)  The method used in Formula I (and throughout the '470 patent) to simultaneously describe a group of compounds—depicting a structural drawing with variable components, and defining each variable to represent one or more possible chemical entities—is a common method of identifying chemical compounds long used by chemists. (Expected Testimony of Dr. Sharpless.)

91.    This method conveys at least the same amount of information to the ordinarily skilled reader as if each compound included within the group was drawn out separately. (Expected Testimony of Dr. Sharpless.)  It is often the preferred way to describe multiple compounds simultaneously because it is efficient in terms of time, energy, and space. (Expected Testimony of Dr. Sharpless.)  One of ordinary skill in the art (and even a person having substantially less training in organic chemistry than one of ordinary skill) would immediately understand from reading this disclosure that each and every compound that results from substitution of the limited number of combinations of the chemical entities that are denoted by variables $R_1$, $R_2$, $R_3$, $R_4$, $R_5$, and "Alk" is described.  (Expected Testimony of Dr. Sharpless.)

00403270

92.    Although column 1, lines 11–35 of the '470 patent disclose a group containing considerable number of compounds, claim 1 narrows this group of compounds and shows a pattern of specific preferences for each variable.

93.    Claim 1, the broadest claim of the '470 patent, states:

A compound of the formula (I):



$$R_1R_2NSO_2CHR_3 \qquad\qquad AlkNR_4R_5 \qquad (I)$$

wherein

$R_1$ represents hydrogen atom or a $C_{1-6}$ alkyl or $C_{3-6}$ alkenyl group;

$R_2$ represents hydrogen atom, or a $C_{1-3}$ alkyl, $C_{3-6}$ alkenyl, phenyl, phen($C_{1-4}$) alkyl or $C_{5-7}$ cycloalkyl group;

$R_3$ represents hydrogen atom or a $C_{1-3}$ alkyl group;

$R_4$ and $R_5$, which may be the same or different, each represents a hydrogen atom or a $C_{1-3}$ alkyl or propenyl group or $R_4$ and $R_5$ together form a benzylindene group; and

Alk represents an alkylene chain containing two or three carbon atoms which may be unsubstituted or substituted by not more than two $C_{1-3}$ alkyl groups,

and physiologically acceptable salts and solvates thereof.

94.    Claim 1 of the '470 patent narrows the genus disclosed in column 1 of the specification. As seen in the chart below, a pattern of preferences for each variable emerges.

24

| Variable | Available Chemical Entities | |
| --- | --- | --- |
| | Specification Col. 1, ll. 11–35 | Claim 1 |
| $R_1$ | H<br>$C_{1-6}$ alkyl group<br>$C_{3-6}$ alkenyl group | H<br>$C_{1-6}$ alkyl group<br>$C_{3-6}$ alkenyl group |
| $R_2$ | H<br>$C_{1-3}$ alkyl group<br>$C_{3-6}$ alkenyl group<br>aryl<br>$(C_{1-4})$ alkyl group<br>$C_{5-7}$ cycloalkyl group | H<br>$C_{1-3}$ alkyl group<br>$C_{3-6}$ alkenyl group<br>~~aryl~~ phenyl group<br>$(C_{1-4})$ alkyl group<br>$C_{5-7}$ cycloalkyl group |
| $R_3$ | H<br>$C_{1-3}$ alkyl group | H<br>$C_{1-3}$ alkyl group |
| $R_4$ | H<br>$C_{1-3}$ alkyl group<br>propenyl group | H<br>$C_{1-3}$ alkyl group<br>$\underline{C_{1-3}}$ propenyl group |
| $R_5$ | H<br>$C_{1-3}$ alkyl group<br>$C_{1-3}$ propenyl group | H<br>$C_{1-3}$ alkyl group<br>$C_{1-3}$ propenyl group |
| $R_4$ & $R_5$ (together) | aralkylidene group | ~~aralkylidene group~~<br><u>benzylidene group</u> |
| Alk | alkylene chain<br>two or three C<br>unsubstituted<br>substituted<br>< 2 $C_{1-3}$ alkyl groups, | alkylene chain<br>two or three C<br>unsubstituted<br>substituted<br>< 2 $C_{1-3}$ alkyl groups, |

95.    Strikethrough and grey highlight indicates chemical entities that have been deleted, or narrowed.  Double underline indicates the addition of a new chemical entity.  Each new chemical entity is narrower than the one it replaces.  As can be seen, the aryl group has been replaced by a narrower phenyl group.  The propenyl group is narrowed to a $C_{1-3}$ propenyl group. And the aralkylidene is replaced with the narrower benzylidene group.  Claim 1 thus shows preferences for the $R_2$, $R_4$ and "$R_4$ & $R_5$ together" variables.

96.    Claim 5 further narrows the group of compounds.

00403270

97.    Claim 5 states:

A compound of the formula (I):

$$R_1R_2NSO_2CHR_3 \quad\quad AlkNR_4R_5 \quad\quad (I)$$

wherein

$R_1$ represents hydrogen atom or a $C_{1-3}$ alkyl group;

$R_2$ represents hydrogen atom, or a $C_{1-3}$ alkyl group, a $C_{3-4}$ alkenyl group or a phen($C_{1-2}$)alkyl group;

$R_3$ represents hydrogen atom;

$R_4$ and $R_5$, which are the same or different, each represents a hydrogen atom or a $C_{1-3}$ alkyl group; and

Alk represents an alkylene chain containing two or three carbon atoms which is unsubstituted or substituted by not more than two $C_{1-3}$ alkyl groups,

and physiologically acceptable salts and solvates thereof.

98.    Claim 5 substantially narrows the definitions of claim 1. The pattern of specific preferences continues to emerge.

26

| Variable | Available Chemical Entities | | |
|---|---|---|---|
| | Specification Col. 1, ll. 11–35 | Claim 1 | Claim 5 |
| $R_1$ | H<br>$C_{1-6}$ alkyl group<br>$C_{3-6}$ alkenyl group | H<br>$C_{1-6}$ alkyl group<br>$C_{3-6}$ alkenyl group | H<br>~~$C_{1-6}$ alkyl group~~<br>~~$C_{3-6}$ alkenyl group~~<br>$C_{1-3}$ alkyl group |
| $R_2$ | H<br>$C_{1-3}$ alkyl group<br>$C_{3-6}$ alkenyl group<br>aryl<br>$(C_{1-4})$ alkyl group<br>$C_{5-7}$ cycloalkyl group | H<br>$C_{1-3}$ alkyl group<br>$C_{3-6}$ alkenyl group<br>phenyl group<br>phen$(C_{1-4})$ alkyl group<br>$C_{5-7}$ cycloalkyl group | H<br>$C_{1-3}$ alkyl group<br>~~$C_{3-6}$ alkenyl group~~<br>~~phenyl group~~<br>~~phen$(C_{1-4})$ alkyl group~~<br>~~$C_{5-7}$ cycloalkyl group~~<br>$C_{3-4}$ alkenyl group<br>phen$(C_{1-2})$ alkyl group |
| $R_3$ | H<br>$C_{1-3}$ alkyl group | H<br>$C_{1-3}$ alkyl group | H<br>~~$C_{1-3}$ alkyl group~~ |
| $R_4$ | H<br>$C_{1-3}$ alkyl group<br>propenyl group | H<br>$C_{1-3}$ alkyl group<br>$C_{1-3}$ propenyl group | H<br>$C_{1-3}$ alkyl group<br>~~$C_{1-3}$ propenyl group~~ |
| $R_5$ | H<br>$C_{1-3}$ alkyl group<br>$C_{1-3}$ propenyl group | H<br>$C_{1-3}$ alkyl group<br>$C_{1-3}$ propenyl group | H<br>$C_{1-3}$ alkyl group<br>~~$C_{1-3}$ propenyl group~~ |
| $R_4$ & $R_5$ (together) | aralkylidene group | benzylidene group | ~~benzylidene group~~ |
| Alk | alkylene chain<br>two or three C<br>unsubstituted<br>substituted<br>< 2 $C_{1-3}$ alkyl groups, | alkylene chain<br>two or three C<br>unsubstituted<br>substituted<br>< 2 $C_{1-3}$ alkyl groups, | alkylene chain<br>two or three C $C_{1-3}$<br>unsubstituted<br>substituted<br>< 2 $C_{1-3}$ alkyl groups, |

99.    Here, the column for claim 5 includes only the chemical entities existing in claim 1, with narrower additions. Again, strikethrough and grey highlight indicates chemical entities that have been deleted, or narrowed substantially, when compared to claim 1. Double underline indicates the addition of a new chemical entity. Again, each new chemical entity is narrower than the one it replaces.

100.    Claim 5 narrows claim 1 substantially. Claim 5 limits $R_1$ to either a hydrogen atom or a $C_{1-3}$ alkyl group. $R_2$ is limited to a choice among (1) a hydrogen atom, (2) a $C_{1-3}$ alkyl

27

group, (3) a $C_{3-4}$ alkenyl group, or (4) a phen($C_{1-2}$) alkyl group. $R_3$ can be only a hydrogen atom.

$R_4$, like $R_5$, can be only a hydrogen atom or a $C_{1-3}$ alkyl group. The "$R_4$ & $R_5$ together" possibility has been eliminated.

101.    The pattern of specific narrowing preferences continues in claim 6.

102.    Claim 6 states:

A compound according to claim 5, wherein in the formula (I):

$R_1$ represents hydrogen atom or a methyl group;

$R_2$ represents hydrogen atom, or a methyl, ethyl, isopropyl, propenyl or benzyl group;

$R_3$ represents hydrogen atom; and

$R_4$ and $R_5$, which may be the same or different, each represents a hydrogen atom or a methyl group.

103.    The chart below illustrates just how specific the preferences have become.

00403270

| Variable | Available Chemical Entities | | | |
|---|---|---|---|---|
| | Specification Col. 1, ll. 11–35 | Claim 1 | Claim 5 | Claim 6 |
| $R_1$ | H<br>$C_{1-6}$ alkyl group<br>$C_{3-6}$ alkenyl group | H<br>$C_{1-6}$ alkyl group<br>$C_{3-6}$ alkenyl group | H<br>$C_{1-3}$ alkyl group | H<br>~~$C_{1-3}$ alkyl group~~<br>$CH_3$ |
| $R_2$ | H<br>$C_{1-3}$ alkyl group<br>$C_{3-6}$ alkenyl group<br>aryl<br>$(C_{1-4})$ alkyl group<br>$C_{5-7}$ cycloalkyl group | H<br>$C_{1-3}$ alkyl group<br>$C_{3-6}$ alkenyl group<br>phenyl group<br>phen$(C_{1-4})$ alkyl group<br>$C_{5-7}$ cycloalkyl group | H<br>$C_{1-3}$ alkyl group<br>$C_{3-4}$ alkenyl group<br>phen$(C_{1-2})$ alkyl group | H<br>~~$C_{1-3}$ alkyl group~~<br>~~$C_{2-4}$ alkenyl group~~<br>~~phen$(C_{1-2})$ alkyl group~~<br>$CH_3$, $C_2H_5$, $C_3H_7$, $C_3H_5$, benzyl group |
| $R_3$ | H<br>$C_{1-3}$ alkyl group | H<br>$C_{1-3}$ alkyl group | H | H |
| $R_4$ | H<br>$C_{1-3}$ alkyl group<br>propenyl group | H<br>$C_{1-3}$ alkyl group<br>$C_{1-3}$ propenyl group | H<br>$C_{1-3}$ alkyl group | H<br>~~$C_{1-3}$ alkyl group~~<br>$CH_3$ |
| $R_5$ | H<br>$C_{1-3}$ alkyl group<br>$C_{1-3}$ propenyl group | H<br>$C_{1-3}$ alkyl group<br>$C_{1-3}$ propenyl group | H<br>$C_{1-3}$ alkyl group | H<br>~~$C_{1-3}$ alkyl group~~<br>$CH_3$ |
| $R_4$ & $R_5$ (together) | aralkylidene group | benzylidene group | | |
| Alk | alkylene chain<br>two or three C<br>unsubstituted<br>substituted<br>< 2 $C_{1-3}$ alkyl groups | alkylene chain<br>two or three C<br>unsubstituted<br>substituted<br>< 2 $C_{1-3}$ alkyl groups | alkylene chain<br>two or three $C_{1-3}$<br>unsubstituted<br>substituted<br>< 2 $C_{1-3}$ alkyl groups | alkylene chain<br>two or three $C_{1-3}$<br>unsubstituted<br>substituted<br>< 2 $C_{1-3}$ alkyl groups |

104.    This defines a narrow group of compounds. Up to claim 6, the '470 patent has demonstrated a pattern of specific preference for each of variable. $R_3$ must now be a hydrogen. $R_1$, $R_4$, and $R_5$ must either be a hydrogen atom or a methyl group. $R_2$ must be either a hydrogen atom or one of five common substituents.

### Claim 7

105.    Claim 7 states:

A compound according to claim 6, wherein in the formula (I) Alk represents an unsubstituted alkylene chain containing two or three carbon atoms.

00403270