106.    Claim 7 requires an "unsubstituted" alkylene chain of two of three carbon atoms.

Accordingly, Alk must be either ethylene or n-propylene.

| Variable | Available Chemical Entities | | | | |
|---|---|---|---|---|---|
| | Specification Col. 1, ll. 11–35 | Claim 1 | Claim 5 | Claim 6 | Claim 7 |
| $R_1$ | H<br>$C_{1-6}$ alkyl group<br>$C_{3-6}$ alkenyl group | H<br>$C_{1-6}$ alkyl group<br>$C_{3-6}$ alkenyl group | H<br>$C_{1-3}$ alkyl group | H<br>$CH_3$ | H<br>$CH_3$ |
| $R_2$ | H<br>$C_{1-3}$ alkyl group<br>$C_{3-6}$ alkenyl group<br>aryl<br>$(C_{1-4})$ alkyl group<br>$C_{5-7}$ cycloalkyl group | H<br>$C_{1-3}$ alkyl group<br>$C_{3-6}$ alkenyl group<br>phenyl group<br>phen$(C_{1-4})$ alkyl group<br>$C_{5-7}$ cycloalkyl group | H<br>$C_{1-3}$ alkyl group<br>$C_{3-4}$ alkenyl group<br>phen$(C_{1-2})$ alkyl group | H<br>$CH_3$, $C_2H_5$, $C_3H_7$, $C_3H_5$<br>benzyl group | H<br>$CH_3$, $C_2H_5$, $C_3H_7$,<br>$C_3H_5$<br>benzyl group |
| $R_3$ | H<br>$C_{1-3}$ alkyl group | H<br>$C_{1-3}$ alkyl group | H | H | H |
| $R_4$ | H<br>$C_{1-3}$ alkyl group<br>propenyl group | H<br>$C_{1-3}$ alkyl group<br>$C_{1-3}$ propenyl group | H<br>$C_{1-3}$ alkyl group | H<br>$CH_3$ | H<br>$CH_3$ |
| $R_5$ | H<br>$C_{1-3}$ alkyl group<br>$C_{1-3}$ propenyl group | H<br>$C_{1-3}$ alkyl group<br>$C_{1-3}$ propenyl group | H<br>$C_{1-3}$ alkyl group | H<br>$CH_3$ | H<br>$CH_3$ |
| $R_4$ & $R_5$ (together) | aralkylidene group | benzylidene group | | | |
| Alk | alkylene chain<br>two or three C<br>unsubstituted<br>substituted<br>< 2 $C_{1-3}$ alkyl groups | alkylene chain<br>two or three C<br>unsubstituted<br>substituted<br>< 2 $C_{1-3}$ alkyl groups | alkylene chain<br>two or three $C_{1-3}$<br>unsubstituted<br>substituted<br>< 2 $C_{1-3}$ alkyl groups | alkylene chain<br>two or three $C_{1-3}$<br>unsubstituted<br>substituted<br>< 2 $C_{1-3}$ alkyl groups | alkylene chain<br>two or three $C_{1-3}$<br>unsubstituted<br>substituted<br>< 2 $C_{1-3}$ alkyl groups<br>ethylene<br>n-propylene |

107.    Claim 7 includes a very narrow group of compounds.  GSK contends that the broadest interpretation of claim 7 would include the four isomers of propenyl ($C_3H_5$).  These isomers would lead to compounds that are largely theoretical as many would be too unstable to be practical.  (Expected Testimony of Dr. Sharpless.)  But even including these hypothetical compounds, however, the total encompassed by the claim is a mere 102 compounds.  It includes only 66 compounds if the theoretical isomerism of the $C_3H_5R_2$ group are excluded.  (Expected Testimony of Dr. Sharpless.)

00403270

i.    **The '470 Patent Specification Demonstrates
a Pattern of Preferences Narrowing the
Claim 7 Group to 33 Compounds**

108.    The specification of the '470 patent still further limits this narrow genus by demonstrating a preference for ethylene as the Alk variable and 2-propenyl as the preferred $C_3H_5$ possibility for the $R_2$ variable.

109.    First, the '470 patent specification expressly lists a few specific compounds that are "preferred." The specification states:

Preferred compounds according to the invention include:

3-(2-(methylamino)ethyl)-N-methyl-1H-indole-5-methanesulphonamide;

3-(2-aminoethyl)-N,N-dimethyl-1H-indole-5-methanesulphonamide;

3-(2-aminoethyl)-N-(2-propenyl)-1H-indole-5-methanesulphonamide.

(DTX 5.)

110.    As the skilled artisan would readily appreciate, each of these three preferred compounds have an ethylene chain as the Alk variable. 2-propenyl is the only $C_3H_5$ possibility that is exemplified for $R_2$.

111.    Second, the '470 patent specification expressly identifies one compound as a "particularly preferred compound." The specification states that "[a] particularly preferred compound according to the invention is: 3-(2-aminoethyl)-N-methyl-1H-indole-5-methanesulphonamide." (*Id.* at col.4 ll.5-8.) This too has an ethylene chain as the Alk variable.

112.    Third, the '470 patent includes numerous examples. In those examples, a total of 18 different compounds are exemplified. Seventeen of the 18 exemplified compounds (or 94%) have an ethylene group in the Alk position.

113.    This pattern of preferences still further limits the number of compounds of claim 7 to a group of just 33 compounds. (Expected Testimony of Dr. Sharpless.)

31

| Variable | Available Chemical Entities | |
|---|---|---|
| | Claim 7 | Preferred Compound, Particularly Preferred Compound, and Examples (Alk Variable) |
| $R_1$ | H<br>$CH_3$ | H<br>$CH_3$ |
| $R_2$ | H<br>$CH_3$, $C_2H_5$, $C_3H_7$, $C_3H_5$<br>benzyl group | H<br>$CH_3$, $C_2H_5$, $C_3H_7$, ~~$C_3H_5$~~ 2-propenyl<br>benzyl group |
| $R_3$ | H | H |
| $R_4$ | H<br>$CH_3$ | H<br>$CH_3$ |
| $R_5$ | H<br>$CH_3$ | H<br>$CH_3$ |
| $R_4$ & $R_5$ (together) | | |
| Alk | ethylene<br>n-propylene | ethylene<br>~~n-propylene~~ |

ii.    The '470 Patent Specification Demonstrates a Further Pattern of Preferences Limiting the $R_2$ Variable to Either a Hydrogen Atom or a Methyl Group—Limiting the Group to Only 9 Compounds

114.    The specification of the '470 patent still further limits this narrow group by demonstrating a preference for either a hydrogen atom or a methyl group at the $R_2$ position.

115.    There are 14 compounds of claim 7 exemplified in the '470 patent. Eleven of those 14 have either a hydrogen atom or a methyl group at the $R_2$ position. Thus, 79% of the exemplified claim 7 compounds demonstrate a preference for either hydrogen or methyl at the $R_2$ position. This pattern of preferences still further limits the size of the group of compounds described above. Indeed, this preference reduces the number to a mere nine compounds.

00403270

| Variable | Available Chemical Entities | | |
|---|---|---|---|
| | Claim 7 | Preferred Compound, Particularly Preferred Compound, and Examples (Alk Variable) | Exemplified Compounds |
| $R_1$ | H<br>$CH_3$ | H<br>$CH_3$ | H<br>$CH_3$ |
| $R_2$ | H<br>$CH_3$, $C_2H_5$, $C_3H_7$, $C_3H_5$<br>benzyl group | H<br>$CH_3$, $C_2H_5$, $C_3H_7$, $C_3H_5$<br>benzyl group | H<br>$CH_3$, ~~$C_2H_5$, $C_3H_7$, $C_3H_5$~~<br>~~benzyl group~~ |
| $R_3$ | H | H | H |
| $R_4$ | H<br>$CH_3$ | H<br>$CH_3$ | H<br>$CH_3$ |
| $R_5$ | H<br>$CH_3$ | H<br>$CH_3$ | H<br>$CH_3$ |
| $R_4$ & $R_5$ (together) | | | |
| Alk | ethylene<br>n-propylene | ethylene | ethylene<br>~~n-propylene~~ |

116.    Sumatriptan is a member of this limited group of nine compounds.  Six of these are exemplified.  (Expected Testimony of Dr. Sharpless.)  Sumatriptan is a "compound of general formula (I)" of the '470 patent wherein $R_1$ is a hydrogen atom, $R_2$ is a methyl group, $R_3$ is a hydrogen atom, $R_4$ is a methyl group, $R_5$ is a methyl group, and "Alk" is an unsubstituted ethylene group.

117.    Furthermore, if one were to exclude the possibility of $R_1$ and $R_2$ as both being methyl groups the total number of possible compounds is reduced to six.  (Expected Testimony of Dr. Sharpless.)  Of those six compounds, all are exemplified in the '470 patent except sumatriptan.

00403270

|  | R$_4$, R$_5$ - both H | R$_4$, R$_5$ - one H, one CH$_3$ | R$_4$, R$_5$ - both CH$_3$ |
|---|---|---|---|
| **R$_1$, R$_2$ - both H** | Examples 17, 18, and 24 | Example 19 | Example 21 |
| **R$_1$, R$_2$ - one H, one CH$_3$** | Examples 1-8, 29 | Examples 22, 23, and 25 | sumatriptan |

118.    One of ordinary skill in the art would, upon reading the '470 patent, readily envision sumatriptan.  (Expected Testimony of Dr. Sharpless.)

119.    During the early 1980s, when a promising class of compounds was identified, it was routine practice in the pharmaceutical arts to synthesize and screen large numbers of that class.  It would not have been unusual for several hundred compounds from a promising class of compounds to be synthesized.  (Expected Testimony of Dr. Antonaccio.)

120.    In this context, whether the group of compounds disclosed by claim 7 is 6, 9, 33, 66 or 102, the group is sufficiently small that its members would be immediately envisioned by one skilled in the art.

**B.    The Claims of the '845 Patent Are Obvious**

121.    The '845 patent claims are obvious in view of the '470 patent alone or in combination with a series of public disclosures GSK and others made concerning the treatment of migraine.

00403270

122.    Through the '470 patent, GSK maintained a monopoly that prevented others in the field from making, using and/or selling products claimed by that patent, including sumatriptan.

123.    By obtaining the '470 patent, listing it in FDA's Orange Book, and obtaining a patent term extension for it—based on the length of the FDA approved process for sumatriptan— GSK has successfully asserted that the '470 patent satisfies the requirements for patentability, including those set forth in 35 U.S.C. § 112.  The first two paragraph of 35 U.S.C. § 112 are as follows:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.
>
> The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

124.    These requirements include providing full written description of the subject matter of the claims, enabling those skilled in the art to practice the invention as broadly as it is claimed, and providing claims that particularly point out and distinctly claim the invention.

125.    Accordingly, GSK has conceded that the '470 patent provides written description for and fully enables sumatriptan and its pharmaceutically acceptable salts and solvates.

## 1.    Scope and Content of the Prior Art

126.    GSK does not dispute that the prior-art to the '845 patent includes: (1) the '470 patent and its U.K. equivalent, (2) journal articles by Patrick Humphrey in 1976 and 1980, (3) and GSK's '521 patent.

35

127.    The scope and content of the '470 patent has been described above. (*See* Findings of Fact Section (II)(A), paragraphs 84-120.) As explained above the '470 patent discloses and claims a very narrow group of compounds that includes sumatriptan.

128.    In a 1976 paper in the British Journal of Pharmacology, Patrick Humphrey and his co-workers at GSK suggested that 5-HT and 5-HT receptors played a role in the mechanism of migraines. (DTX 235, Solomon 9, p. 211.) This journal article taught that the ability to mimic the vasoconstrictor activity of 5-HT was an important property of anti-migraine drugs. (*Id.* at 220.)

129.    Later, Humphrey and his co-workers reported in a 1980 paper in the same journal that they had identified two types of 5-HT receptors. (DTX 236, Solomon 10, p. 215.) The authors noted that the different types of receptors could be used to determine selectivity of vasoconstrictive activity. (*Id.*)

130.    These two journal articles permitted scientists to screen potential anti-migraine compounds for potency and selectivity for the 5-HT receptors. (*See* Peroutka Dep., pp. 50-53.)

131.    On August 12, 1980, GSK filed an application in the United Kingdom (UK 8026288) directed to anti-migraine compounds based on the tests described in the aforementioned 1980 paper. (*See* DTX 861.) GSK later filed a U.S. application, claiming priority to that UK application, that matured into US Patent 4,636,521 ("the '521 patent"). (*Id.*)

132.    The '521 patent also claimed a group of anti-migraine compounds. The patent included an independent claim for the compound known within GSK as AH25406.

133.    The '521 patent issued on January 13, 1987. (*Id.*)

### 2.    Level of Ordinary Skill in the Art

134.    One of ordinary skill in the art pertaining to the inventions claimed by the first and second sumatriptan patents (the '470 and '845 patents) would have a bachelor's degree in

00403270

chemistry and an advanced degree in either organic or medicinal chemistry, and approximately two years of industrial and/or academic experience in the field of drug discovery. (Expected Testimony of Dr. Sharpless.)

### 3.    Differences between the Claimed Invention and the Prior Art

135.    With respect to the '470 patent's narrow group of compounds, a group that encompasses sumatriptan, the only difference between claim 1 of the '845 patent and the prior-art '470 patent is the picture of the specific chemical structure with the exact variables selected from the narrow definitions of the '470 patent. The '470 patent does not include a pictorial representation of sumatriptan, but the claims of the '845 patent do.

136.    In comparison with the compounds specifically exemplified in the '470 patent, sumatriptan involves only the trivial selection of one of the claimed compounds. In increasing order of complexity, sumatriptan is the first compound of the series that is not included in the examples:

| $R_4$, $R_5$ - both H | $R_4$, $R_5$ - one H, one $CH_3$ | $R_4$, $R_5$ - both $CH_3$ |
|---|---|---|
|   Examples 17, 18, and 24 |   Example 19 |   Example 21 |
|   Examples 1-8, 29 |   Examples 22, 23, and 25 |   sumatriptan |

37

4.    **The Skilled Artisan Would Be Motivated to Make Sumatriptan and Sumatriptan Succinate, with a Reasonable Expectation of Success upon Reviewing the '470 Patent**

137.    Dr. Sharpless gave the opinion that sumatriptan would be one of the first compounds that one of ordinary skill in the art would envisage and expect to work as an anti-migraine drug upon review of the '470 patent. (Expected Testimony of Dr. Sharpless.)

138.    The '470 patent provides motivation to make sumatriptan because that patent teaches explicitly that the claimed compounds are useful to treat migraine.

139.    The '470 patent claims methods for "treating a patient suffering from migraine" by "administrating to the patient an effective amount" of one of the claimed compounds or a physiologically acceptable salt or solvate. (DTX 5, Claims 16, 18.)

140.    By claiming these methods in the '470 patent, GSK has admitted that one skilled in the art could select and make the claimed compounds, determine an effective amount of the compound, as well as an appropriate salt or solvate, and administer it to a patient to treat the patient's migraine.

141.    Because sumatriptan is one of the claimed compounds that can be used to treat migraine, one of skill in the art would be motivated to make it.

142.    Routine practice in the pharmaceutical arts at the time the application for the '845 patent was filed was to synthesize hundreds of compounds once a promising class of compounds was identified. (Expected testimony of Dr. Antonaccio.) These compounds would then be subjected to screening. (Expected testimony of Dr. Antonaccio.)

143.    GSK's own publications and the '470 patent identify the claimed compounds as effective against migraine and identify the necessary screening tests for the claimed compounds.

144.    Once a company decided on an area of therapeutic interest for drug development (e.g., migraine), people in various scientific areas would be assigned the types of work that were

38

designed to lead to a successful compound. (Expected testimony of Dr. Antonaccio.) This

would include organic/medicinal chemistry, pharmacology, drug metabolism, toxicology, etc.

(Expected testimony of Dr. Antonaccio.)

145.    During the early 1980s, the routine practice was that, once a promising class of

chemical compounds had been identified as having a desired activity, large numbers of those

compounds would be screened. (Expected testimony of Dr. Antonaccio.) It would not be

unusual for the chemists to synthesize several hundred compounds to be tested as a standard part

of this process. (Expected testimony of Dr. Antonaccio.)

146.    These new chemical compounds would be tested by the biology groups for initial

activity in a primary screen such as receptor binding. (Expected testimony of Dr. Antonaccio.)

Compounds of interest from that testing would go on to secondary and perhaps tertiary screening

in whole animal tests. (Expected testimony of Dr. Antonaccio.) The best compounds derived

from the biology testing would be selected for further development to determine other

characteristics of the compound such as bioavailability, toxicology, etc. (Expected testimony of

Dr. Antonaccio.)

147.    Any compound that met the pre-established criteria for an acceptable clinical

candidate would then move on to appropriate testing to advance it to clinical trials. (Expected

testimony of Dr. Antonaccio.) A substantial body of data would then be developed with the

initial compound of interest thus making it fairly difficult for a different compound to displace it

in the development pathway. (Expected testimony of Dr. Antonaccio.)

148.    GSK alleges that it synthesized about 1300 compounds as part of its migraine

project. This is not an unusually large number of compounds in a development effort. (Peroutka

Dep., 58:21-59:3.)

00403270

149.    Based on the disclosures in the '470 patent, including the disclosure of anti-migraine activity for this class of compounds, one of ordinary skill would be motivated to synthesize and evaluate many compounds, including sumatriptan, as part of a routine drug discovery and development process.  (Expected testimony of Dr. Antonaccio.)  Indeed, the routine practice at this time period would be to carry out empirical testing on the class of compounds to allow selection of an appropriate lead compound, particularly where, as in the case of the '470 patent, the number of compounds within the class is relatively small.  (Expected Testimony of Dr. Antonaccio.)

150.    As noted above, the first sumatriptan patent claims compounds, pharmaceutical compositions and methods used in the treatment of migraine.  Specifically, the '470 patent discloses a group of compounds to be used in such compositions and methods.  Furthermore, given the presumption of validity, the '470 patent is presumptively enabled for each and every species disclosed in the claimed genus.  Sumatriptan is among the species claimed; therefore, one of skill in the art would have a reasonable expectation of success in making and using sumatriptan for the purpose of treating migraines.

151.    Furthermore, the '470 patent discloses and claims as noted, *supra*, the use of compounds, compositions and methods wherein the active ingredient is in the form of a pharmaceutically/physiologically acceptable salt or solvate.  The first sumatriptan patent also discloses that a succinate of any of the claimed compounds could be used in the treatment of migraine.  Given the presumptive validity of the '470 patent and the accompanying presumption that the patent is enabled for succinates of all of the species claimed, one of skill in the art would have a reasonable expectation of success in the use of sumatriptan succinate for the treatment of migraine.

00403270

5.    The Alleged "Unexpected Results" Do Not
Support the Nonobviousness of Sumatriptan

152.    As briefly mentioned above, the examiner of the '845 patent allowed the claims

only after GSK presented two declarations allegedly establishing the unexpected results of

sumatriptan.  Specifically, GSK argued that sumatriptan exhibited unexpected results in

comparison to two specific selected compounds from the '470 patent examples.

153.    The only evidence GSK submitted to the Patent Office in support of its

"unexpected results" argument was the declarations of Drs. Jackson and Humphrey.  As

explained below, however, the Humphrey and Jackson Declarations—alone or together—fail to

establish surprising or unexpected results in comparison to the other compounds of the '470

patent.

154.    Specifically, the evidence before the examiner of the '845 patent did not establish

differences in results between sumatriptan and the prior-art.  That evidence similarly failed to

demonstrate that any differences—even if shown— would have been surprising or unexpected to

one having ordinary skill in the art.

155.    The examiner erred in finding otherwise.

156.    Even if, as GSK contends, the examiner evaluated the evidence correctly,

Spectrum has introduced a substantial body of evidence that was not before the examiner.  This

information demonstrates, clearly and convincingly, that sumatriptan does not exhibit surprising

or unexpected results in comparison to the relevant prior-art.

157.    In this case, GSK has failed to introduce any new evidence—other than shown in

the Jackson and Humphrey Declarations—of alleged unexpected results for sumatriptan.  GSK

presented no new tests or results.  Instead, GSK offered expert opinions from Drs. Peroutka and

41

00403270

Gad. These experts merely purport to show that the evidence in the Humphrey and Jackson Declarations does in fact show unexpected results.

158.    The testimony of Drs. Gad and Peroutka fail to establish that the data in the Humphrey and Jackson Declarations show surprising or unexpected results. First, neither the Humphrey Declaration nor the Jackson Declaration credibly establish that a real difference exists between sumatriptan and the other compounds with respect to any significant property. Second, neither declaration establishes that any differences between the compounds were surprising or unexpected to a skilled artisan. Third, additional evidence that GSK did not disclose to the examiner shows clearly and convincingly that sumatriptan does not exhibit surprising or unexpected results.

159.    The material information that GSK did not disclose to the Patent Office—as well as GSK's pattern of false and misleading statements to the Patent Office—are relevant to two separate defenses Spectrum has raised. First, as detailed in the section immediately below, these material misrepresentations and omissions establish that the '845 patent was procured by inequitable conduct, rendering the patent unenforceable. Second, these material misrepresentations and omissions establish that sumatriptan does not show any real difference in material properties compared to the other compounds of the '470 patent, and that any differences that do exist would not have been surprising or unexpected to a skilled artisan. Spectrum will avoid repetition of facts, and relies on the facts set forth in both sections in support of both its inequitable conduct defense and its showing of lack of unexpected results.

00403270

a.     **The Jackson Declaration**

i.     **The Evidence Submitted to the Examiner in Dr. Jackson's Declaration was Not Sufficient to Establish Unexpected Results**

160.    Even assuming that the information before the examiner was true, accurate, and complete the evidence was not sufficient to rebut the strong *prima facie* obviousness established by the limited group of compounds disclosed in the first sumatriptan patent.

161.    Dr. Jackson's declaration was submitted to establish that sumatriptan had a different mutagenic potential than a compound of the prior-art, namely GR32066. GR32066 is, like sumatriptan, one of the compounds claimed in the first sumatriptan patent. It has the following structure:



162.    GSK used several *in vitro* mutagenicity tests to measure the mutagenic potential of a compound. Two of these tests are discussed briefly below.

(1)     **In Vitro Mutagenicity Tests**

Ames Test

163.    During the late 1950s a quick, *in vitro* method of assessing the mutagenic potential of compounds was developed (DTX 543.) This test, developed by Bruce Ames, a genetic toxicologist, took advantage of certain specially developed strains of *Salmonella typhimurium* bacteria, which, unlike naturally occurring strains, have undergone mutations resulting in the loss of the bacteria's natural ability to synthesize histidine, an amino acid necessary for protein synthesis. (*Id.*) These "*his-*" mutant strains can survive only in growth medium containing histidine unless they "mutate back" over "revert" to "*his*+" strains, strains

43

that can, like naturally occurring bacteria, synthesize histidine on their own. (*Id.*) *His*-strains come in two general varieties: (1) "base change" (or "base pair") strains, which serve to detect the presence of mutations consisting of substitution of one DNA nucleotide for another (e.g., CAT→GAT), and (2) "frameshift" strains, which serve to detect the presence of mutations consisting of insertion or deletion of nucleotides (e.g., CAT→CAAT or →CT). (*Id.*)

164.    The "frameshift strains" relevant to this case are referred to as TA1537 and TA98. The "base pair" strains relevant to this case are referred to as TA1535 and TA100.

165.    An Ames Test consists of four basic steps. First, the bacteria—either a frameshift strain (TA1537 or TA98) or base pair strain (TA1535 or TA100)—are spread on a histidine-free agar plate. Second, the test compound (e.g., GR32066 or sumatriptan) is placed in the middle of the plate. Liver extract, referred to as "S9," may also be added to simulate the effect of metabolism because some compounds are not mutagenic but their metabolic products are. Third, the plates are then incubated for 48 hours. Fourth, the number of colonies or "revertants" is counted by hand. The mutagenic potential of a substance as measured in the Ames Test is reported as proportional to the number of colonies observed.

### WHO NAP Test

166.    A special category of tests in genetic toxicology relate to nitrosatable compounds. Nitrosatable compounds undergo "nitrosation" in the presence of nitrous acid. Nitrosation is the process of converting organic compounds to into nitroso compounds or "N-nitroso" compounds. Such compounds—unlike the parent compounds, which are not "N-nitroso" compounds—may have mutagenic potential in the Ames Test.

167.    During the 1970s, a concern about exposure to N-nitroso compounds arose. The concern was fostered by, among other things, a suspected relationship between the occurrence of gastrointestinal cancers and the ingestion of nitrite, a common food preservative. Nitrite and

00403270

acid combine to form nitrous acid. Since the stomach is acidic, the hypotheses arose that the ingestion of nitrosatable compounds could present enhanced mutagenic and carcinogenic risks.

168.    To address that concern, a group sponsored by the World Health Organization (WHO) modified the Ames Test to permit assessment of the mutagenic potential of nitrosatable compounds. The WHO-recommended NAP Test is performed similarly to the Ames Test, except that the compound of interest is preincubated for either one or four hours with acid and nitrite, and then neutralized.

169.    Specifically, the tests consist of adding sodium nitrite (40 mmol/L) to 0.06% acetic acid. The resulting mixture has a pH range of 3 to 4 and produces nitrous acid. The reaction is allowed in incubate at 37°C for 1 and 4 hours at which times sodium bicarbonate is added to stop the reaction by bringing the pH up to approximately 7.

170.    The neutralized end products for the 1-hour and 4-hour samples are then tested for mutagenic activity in the Ames Test, as described above, both with and without S9.

171.    The WHO-recommended NAP Test was designed by scientists familiar with human physiology and with the Ames Test. The WHO NAP Test was designed as an *in vitro* method that would generate nitrosated compounds at pH conditions that closely replicated those found under normal physiological conditions in the human digestive system.

(2)    **The Jackson Declaration**

172.    Dr. Jackson's declaration was submitted to show an actual difference in results in the WHO NAP Test. The Jackson Declaration included this table:

45



### TABLE I

| Compound | Mutagenicity in S. typhimurium | | | |
|---|---|---|---|---|
| | TA 1537 | | TA98 | |
| | $-S_9-Mix$ | $+S_9-Mix$ | $-S_9-Mix$ | $+S_9-Mix$ |
| **Compound of the invention :** | | | | |
| Result | NEG | NEG | NEG | NEG |
| WHO Classification | (-) | (-) | (-) | (-) |
| **Compound of Formula (I) :** | | | | |
| Result | 6* | 7 | 2.3 | 3.4 |
| WHO Classification | (+) | (+) | (±) | (+) |

sumatriptan (43175) → (arrow pointing to "Compound of the invention")

GR32066 → (arrow pointing to "Compound of Formula (I)")

\*    Fold increase over control values.

+    indicates that the increase in number of mutants was 3-fold or more when compared to the control data

±    indicates that the increase was between 2- and 3-fold

–    indicates an increase of less than 2-fold

NEG    indicates a negative result.

According to the criteria adopted by the WHO (+) means a significant chance of mutagenic potential, (±) means an elevated chance of mutagenic potential and (-) means no mutagenic potential.

DTX 40, GSK0026681, notation added

173.    Based on this table, Dr. Jackson represented to the Patent Office: "The results clearly demonstrate that the compound of the invention shows no mutagenic potential in the NAP test. By contrast the compound of formula I tested shows a significant mutagenic potential in the NAP test." (*Id.* at 4.)

46

The Jackson Declaration Does Not Establish a Difference
in Mutagenic Potential between Sumatriptan and GR32066

174.    As seen above, the "compound of the invention" refers to sumatriptan.  The

"compound of formula (I)" refers to 32066, one of several '470 patent prior-art compounds.

175.    Dr. Jackson's Table 1—on its face—is insufficient to support a finding of

unexpected results and it was error for the examiner to find otherwise.

176.    The chart does not quantify the actual numerical difference in results that GSK

alleged were "unexpected."  The "NEG" entry for the sumatriptan results is not a valid

comparator—it could mean 0.001 or 1.9.  Actual difference in results, if any, are therefore

hidden or distorted.  (DTX 40, GSK 00266811.)

177.    The significance of the mutagenicity test results reported illustrated in the table

above is questionable given that the patentee's other commercial "triptan" product, naratriptan,

tested far more positive in the mutagenicity test and yet was approved by the FDA.  (DTX 179,

Gad 4/Naratriptan FDA Pharmacology Review.)  GSK sells it today.

178.    Finally, Dr. Jackson stated that these results were the "worst results of two

experiments for each compound." (DTX 40, GSK00266810.)  It is improper to submit the "worst

results" and to hide the other results.  GSK should have provided the other undisclosed results.

179.    Faced only with what was shown by Dr. Jackson in his declaration, it was

improper for the examiner to find that sumatriptan has an unexpected difference, when compared

to GR32066, in mutagenic potential in the WHO NAP Test.

The Jackson Declaration Does Not Establish the Alleged Difference in Mutagenic
Potential between Sumatriptan and GR32066 Was Unexpected to the Skilled Artisan

180.    Dr. Jackson does not allege that the purported difference in WHO NAP Test

results were "unexpected" or "surprising."  These terms do not appear in the Jackson

Declaration.  The most Dr. Jackson can say is that "[t]he results clearly demonstrate that the

00403270

compound of the invention shows no mutagenic potential in the NAP test. By contrast the

compound of formula I tested shows a significant mutagenic potential in the NAP test." (*Id.* at

4.) This is not testimony about unexpectedness.

181.    And GSK's attorney did not even allege that these results, by themselves, were

"unexpected." Instead, Mr. Fichter grouped the NAP Test Results together with the alleged

results shown in the Humphrey Declaration to focus on the "combination of properties." Mr.

Fichter asserted:

> Thus, the <u>combination of properties</u> of the presently claimed
> compound <u>is unexpected</u> and establishes that the compound of the
> invention is patentable over the teachings of the Dowle references.

(*Id.*) (emphasis added.)

182.    In sum, the WHO NAP Test results before the examiner fail to establish an actual

difference in results. And even if a difference is shown by the Jackson Declaration standing

alone, it is not one that is surprising or unexpected.

ii.    **Evidence GSK Withheld from the Examiner
            Concerning the Data in the Jackson Declaration
            Demonstrates Clearly and Convincingly that
            Sumatriptan Does Not Exhibit Unexpected or
            Surprising Results**

183.    Even if, as GSK asserts, the mutagenicity results presented to the examiner were

sufficient to establish unexpected results, Spectrum has presented additional evidence that clearly

and convincingly establishes that sumatriptan exhibits no surprising or unexpected results in

comparison with the other '470 patent. This evidence—evidence not before the examiner—

demonstrates that the strong *prima facie* obviousness established by the limited group of

compounds disclosed in the '470 patent cannot be rebutted by alleged unexpected results.

184.    As explained more fully in Findings of Fact Section (III)(A), paragraphs 279-380,

below, the Jackson Declaration was false and misleading.

00403270

185.    The false representations and material omissions, do more, however, than establish inequitable conduct.  Information withheld from the examiner by Dr. Jackson and GSK demonstrates two things:  (1) there is no difference in NAP Test mutagenic potential results between sumatriptan and GR32066 and (2) even if some minute difference could be shown, that difference is neither surprising nor unexpected.

186.    This withheld information is explained in detail in Findings of Fact Section (III)(A), paragraphs 279-380  which is incorporated herein by reference.  In summary, GSK failed to disclose:

- That the data were not derived from the recognized WHO NAP Test.  Both sumatriptan and GR32066 were negative in that test.

- The data in the Jackson Declaration were instead taken from a different internal GSK test, and the test did not even follow GSK's internal procedures or Good Laboratory Practice.  These failures render the data meaningless.

- An internal GSK document unequivocally states that the WHO NAP test, "does not relate to physiological conditions," thus calling the entire table into question.  (DTX 187, GSK 00095689.)

- A 1983 mutagenicity test of GR32066 showing a positive result was tainted by impure batches of test compound that the patentee admitted affected the test results.  (DTX 88, GSK00190779.)  This result was likely a false positive, making GR32066 negative across the board in the NAP.

- Actual, numerical data points for GR32066 and sumatriptan using the WHO NAP Test showed no difference between sumatriptan and GR32066.

- In a 1984 NAP Test—using the exact same methodology that GSK used in its 1989 tests—sumatriptan tested positive.

- The NAP Test was not a significant screening criteria given that when Dr. Jackson signed his declaration, GSK was actively developing a compound for market that Dr. Jackson knew had tested many times worse that GR32066.  GSK currently sells that compound, naratriptan, on the market as AMERGE®.

49

00403270

- Like sumatriptan, other '470 patent compounds—in tests not disclosed to the Patent Office—also showed negative mutagenicity test results.  (DTX 90, GSK00120563-5)

- Lastly, Spectrum's expert, Dr. David Brusick, upon review of all the undisclosed test results, questions whether any toxicological difference exists between GR32066A and sumatriptan.  (DTX 537, Supplemental Brusick Report, Exhibit 3, Section IV.)

187.    These facts, unknown to the examiner, establish that sumatriptan does not display unexpectedly different results in mutagenic potential.

> **b.    The Data GSK Put Before the Examiner in the Humphrey Declaration Do Not Establish Unexpected or Surprising Results for Sumatriptan**

188.    In addition to measuring the mutagenic potential of prospective anti-migraine compounds, GSK tested the compounds for efficacy and duration of action.

### i.    Efficacy: The $CD_{50}$ Test

189.    Efficacy was tested in two ways:  *in vitro* (i.e., in a petri dish) and *in vivo* (i.e., in a live animal).

190.    GSK tested for *in vivo* potency of candidate compounds in a cumulative dose test in dogs.  This will be referred to as "$CD_{50}$ Efficacy Test."  The "CD" stands for "Cumulative Dose" and "50" stands for 50% of the maximum vasoconstriction caused by that dose.   In this test, after being anesthetized to permit surgery to take place, the dog would have an electromagnetic flow probe attached to a carotid blood vessel.  This flow probe measured the degree of carotid vascular resistance, which, in turn, indicated the degree of vasoconstriction of that blood vessel.

191.    Doses of the test compound were then administered intravenously over time to the dog up to a particular cumulative dose.  The goal was to cause the maximum carotid vascular resistance without significantly overdosing the animal.  The electromagnetic flow probe would

00403270

continually monitor the degree of carotid vascular resistance during the test. Usually the anesthetized dog would receive a cumulative dose of 300 $\mu$g/kg of the test compound in the $CD_{50}$ Efficacy Test ("$\mu$g/kg" means micrograms per kilogram and refers to the number of micrograms of test compound per kilogram of animal weight).

192.    Following each $CD_{50}$ Efficacy Test, the cumulative dose of the test compound that had caused carotid vascular resistance to reach 50% of the maximum value was calculated by examining a logarithmic graph on which the data obtained from the flow probe had been manually plotted.

193.    On that graph, dosage was plotted on the x-axis and the percentage increase in carotid vascular resistance was plotted on the y-axis.

194.    The cumulative dose that caused carotid vascular resistance to reach 50% of the maximum value was estimated on the basis of that graph and referred to as the $CD_{50}$ value.

195.    A lower $CD_{50}$ value indicated a more potent compound.

### ii.    Duration of Action

#### (1)    $RT_{50}$ Test (Cumulative Dose)

196.    GSK also performed tests designed to estimate the duration of action or the compounds.

197.    GSK reported supposed duration of action to the Patent Office relying on two different methods. First, GSK added a component to the $CD_{50}$ efficacy test described above. This test will be referred to as the "$RT_{50}$ Test (Cumulative Dose)." Specifically, following administration of the maximum cumulative dose of the test compound in the $CD_{50}$ Test, carotid vascular resistance was monitored for an additional period of time, usually two hours.

00403270

198.    On the basis of data generated during the $CD_{50}$ Test, one could determine whether the degree of carotid vascular resistance had fallen below 50% of the maximum resistance during the two-hour post-cumulative-dose observation period.

199.    The resulting value was referred to as the $RT_{50}$ value (for "Recovery Time to 50%").

### (2)    $RT_{50}$ Test (Single Intravenous Dose)

200.    GSK also reported data in the Humphrey Declaration based on a second test, which also measured an $RT_{50}$ value, but after a single dose intravenously administered. This test will be referred to as "$RT_{50}$ Test (Single Intravenous Dose)." This test was a separate experiment from the $CD_{50}$ Test and was performed on a different anesthetized dog.

201.    In this test, as the name suggests, the anesthetized dog was given a single intravenous dose of the test compound.

202.    That dose was set at 10 times the $CD_{50}$ value obtained for that compound in the $CD_{50}$ Test.

203.    As in the $CD_{50}$ Test, the electromagnetic flow probe produced a readout of carotid vascular resistance at given intervals.

204.    Following the conclusion of the $RT_{50}$ Test (Single Intravenous Dose), the maximum carotid vascular resistance obtained for the dog could be determined, along with the time it took carotid vascular resistance to recover to 50% of the maximum value.

205.    That recovery time was also referred to as $RT_{50}$.

### iii.    Oral Administration

206.    GSK submitted data to the Patent Office using two tests to estimate possible efficacy following oral administration. The first was a test of vasoconstrictive efficacy following intraduodenal administration in an anesthetized dog. The second was an oral bioavailability test

00403270

in a rat model as discussed in Findings of Fact Section (II)(B)(5)(b)(v), paragraphs 239-248 in connection with the Tarbit Declaration.

Intraduodenal Efficacy Test

207.    The "Intraduodenal Efficacy Test," like the *in vitro* tests described above, used an electromagnetic flow probe to measure carotid vasoconstriction in a dog.  In each of these tests, the dog was anesthetized and a flow probe was surgically inserted.  The candidate compound was injected directly into the duodenum of the anesthetized dog.  The duodenum is the portion of the small intestine that begins where the stomach ends.

**iv.     The Humphrey Declaration**

208.    The Humphrey Declaration compared sumatriptan (called Compound I in the declaration) with two compounds exemplified in the '470 patent: Compound II, also known as GR32066 and Compound III, also known as GR34456.

209.    Dr. Humphrey presented results from each of the *in vivo* tests described above. Specifically, Dr. Humphrey presented this Table:

Table 1

| Compound | $CD_{50}$ (µg/kg) i.v. | Recovery time to 50% of the maximum increase in carotid vascular resistance in anaesthetised dogs. (mean from n dogs) | |
|---|---|---|---|
| | | a)  After cumulative dosing i.v. to 300µg/kg | b)  After a single dose i.v. of $10 \times CD_{50}$ |
| (I) | 39 | >2h | 55 min (n=4) |
| (II) | 22.7 | >2h | 79.5 min (n=4) |
| (III) | 13 | <2h | 35 min (n=1) |

DTX 41, GSK00268474

210.    As can be seen, sumatriptan ("Compound I") has the worst efficacy as measured by the $CD_{50}$ Test.  A lower score means better efficacy, because the score represents the amount of drug that should be necessary to obtain the same 50% result.

00403270

211.    Based on this data, Dr. Humphrey stated that he "eliminated" Compound III (GR34456) because it supposedly did not have sufficient duration of activity. With compound III gone, Dr. Humphrey then presented this chart:

| Table 2 | | |
|---|---|---|
| Time (min) following intraduodenal dosing with test compound | % increase carotid arterial vascular resistance (values are mean ± s.e.m. from n dogs) | |
| | Compound (I) (n=4) | Compound (II) (n=6) |
| 15 | 26    ±7 | 32    ±8 |
| 30 | 50    ±8 | 40    ±9 |
| 45 | 64    ±12 | 38    ±10 |
| 60 | 71    ±13 | 37    ±10 |
| 75 | 80    ±16 | 36    ±10 |
| 90 | 79    ±17 | 37    ±13 |
| 105 | 87    ±25 | 31    ±12 |
| 120 | 104    ±36 | 30    ±12 |
| 135 | 105    ±38 | 36    ±12 |
| 150 | 105    ±41 | 36    ±13 |
| 165 | 117    ±57 | 37    ±18 |
| 180 | 126    ±52 | 33    ±16 |

DTX 41, GSK00268476

212.    Based on this chart, Dr. Humphrey asserted that sumatriptan "is considerabl[y] more effective" than Compound II (GR32066) in the Intraduodenal Efficacy Test. He stated:

54

00403270

On the basis of their structures and the comparability of their duration of action following intravenous administration I did not anticipate a significant difference between compounds (I) and (II) following intraduodenal administration.  I therefore found the marked difference in efficacy of the two compounds following such administration surprising.

<strong>The Humphrey Declaration Does Not Establish Any Surprising<br>or Unexpected Differences between Sumatriptan and the Prior Art</strong>

213.    The duration of action data provided in the Humphrey Declaration do not provide evidence that sumatriptan is surprisingly or unexpectedly superior to either Compound II (GR32066) or Compound III (GR34456).

214.    Dr. Humphrey's conclusions do not follow from the data presented and are misleading.  (Expected testimony of Dr. Antonaccio.)

215.    Dr. Humphrey conceded that sumatriptan, Compound II (GR32066), and Compound III (GR34456), all showed satisfactory vasoconstrictor activity.  This does not provide a basis to distinguish sumatriptan from the other compounds.  (DTX 41, Humphrey Declaration; Expected testimony of Dr. Antonaccio.)

Table I

216.    For convenience, the data from Table I of the Humphrey Declaration is reproduced below:

| Table I | | | |
|---|---|---|---|
| Compound | $CD_{50}$ Efficacy Test | $RT_{50}$ (Cumulative Dose) | $RT_{50}$ (Single Intravenous Dose) |
| Sumatriptan (I) | 39 | >2h | 55 min (n=4) |
| GR32066 (II) | 22.7 | >2h | 79.5 min (n=4) |
| GR34456 (III) | 13 | <2h | 35 min (n=1) |

217.    Dr. Humphrey concluded that the duration of activity of sumatriptan and Compound II (GR32066) were comparable following intravenous administration, but discounted

55

00403270

the duration of activity of Compound III (GR34456), even though it was not very much different than the duration of activity of sumatriptan (Compound I). The data presented for Compound III (GR34456) were obtained from a single experiment from a single dose. Without any statistical data to support the selection of one compound over the other, the decision to discount Compound III (GR34456) over Compound II (GR32066) was arbitrary and unsupported.

218.    Because Dr. Humphrey elected not to further evaluate or present data for Compound III (GR34456) based on the single measurement of one animal, no data was reported for the duration of activity of this compound after intraduodenal administration. In fact, as demonstrated below, further intravenous testing from two additional dogs demonstrated that, indeed, the duration of action of Compound III (GR34456) was greater than obtained from the single experiment shown in Table 1, thus demonstrating how misleading GSK's representations based on a single experiment were.

219.    There is very little actual data in Table 1. There is no description of the total number of animals used to determine the amount of each compound necessary to reach $CD_{50}$ (in the second column of Table I). It is entirely possible that the $CD_{50}$ could have been different if more animals had been tested. This is important because a higher number (i.e., lower efficacy) for Compound III (GR34456) would have meant that a higher dose would have been used in the duration calculations which would have resulted in a higher duration of action. (Expected testimony of Dr. Antonaccio.)

220.    Dr. Humphrey reported that Compound III (GR34456) showed the highest intravenous potency of the three compounds, requiring only 13 $\mu g/kg$[2] to achieve 50% of the maximum obtainable increase in the carotid vascular resistance ($CD_{50}$). By contrast, sumatriptan

---

[2] The Declaration does not report how many dogs were tested to determine the $CD_{50}$ nor the dose response curve, both of which are important factors to validating the accuracy of the results reported.

00403270

required 300% of that amount, 39 µg/kg, to reach 50% of the maximum obtainable increase in

carotid vascular resistance. Compound II (GR32066) required nearly 75% more (22.7 µg/kg) of

that compound to be administered to reach the same point. These results suggest that

sumatriptan, contrary to what was claimed in the Humphrey Declaration and represented to the

Patent Office, does not have unexpectedly superior properties when compared to the prior-art

compounds, i.e., Compounds II (GR32066) and III (GR34456).

### (1)    $RT_{50}$ Test (Cumulative Dose)

221.    Furthermore, there is no information describing the number of animals tested to

support the results of column (a) in Table I of the Humphrey Declaration. This is critically

important because Table I fails to disclose how much longer than 2 hours either sumatriptan or

Compound II (GR32066) were required to eventually attain 50% recovery of the maximum

increase in vascular resistance. The amount of time less than 2 hours is also not indicated in the

Humphrey Declaration. GSK's internal data that was not disclosed to the Patent Office show

that the actual score for Compound III (GR34456) was 1 hour, 48 minutes—only 12 minutes less

than 2 hours, a statistically insignificant amount of time.

222.    Based upon the data provided in column (a) of Table I of the Humphrey

Declaration, one would not be able to determine how much longer than 2 hours sumatriptan or

Compound II (GR32066) lasted. Based upon the information GSK provided, it is equally likely

that Compound II (GR32066) lasted longer than sumatriptan. In fact, the data show that after a

single dose of 10 times $CD_{50}$, Compound II (GR32066) was 44.5% longer acting than

sumatriptan. Therefore, the information provided decidedly does not indicate that sumatriptan is

longer lasting than the prior-art compounds.

223.    The information necessary to determine whether the data reported in Table I is

statistically accurate or predictable is absent. Thus, it is impossible to analyze whether the

00403270

results in column (a) of Table I are statistically significant because there is no information in Dr. Humphrey's declaration that identifies how many dogs were tested to generate the results reported in that column.

### (2)    RT $_{50}$ Test (Single Dose)

224.    In the RT $_{50}$ Test (Single Dose), sumatriptan showed an average recovery time duration (RT$_{50}$) of 55 minutes based on four dogs. Compound II (GR32066) showed an average recovery time duration (RT$_{50}$) of 79.5 minutes, also based on four dogs. Compound III (GR34456) showed an "average" recovent time duration of 35 minutes, based on single dog.

225.    Similarly, it is impossible to determine if there were real differences among the compounds given that the result reported for Compound III (GR34456) in column (b) was obtained from a single test in one animal. There was no sound scientific reason to limit the study to a single animal. On the contrary, given the closeness of the results, scientific rigor demanded that more dogs be tested before GSK represented to the Patent Office that Compound III (GR34456) was inferior to sumatriptan and Compound II (GR32066).

226.    Column (b) would suggest that Compound II (GR32066) is longer acting than sumatriptan, since column (b) shows a longer duration of action for Compound II (GR32066) vis-à-vis sumatriptan, indicating no advantage of sumatriptan over Compound II (GR32066) with respect to duration.

227.    If Compound III (GR34456) had been selected for further testing, it is entirely possible that the duration of action of Compound III (GR34456) after intraduodenal administration may have been as long lasting as, or longer lasting than sumatriptan.

228.    The data in Table I is insufficient to quantitatively demonstrate that the duration of activity of Compound III (GR34456) is statistically different or lower than either sumatriptan or Compound II (GR32066). Based on the scant data and lack of any substantial statistics to

00403270

support the results shown in Table I, the conclusion regarding Compound III (GR34456) in the

Humphrey declaration was unwarranted, and Table I does not demonstrate that sumatriptan

exhibits distinguishably different or superior properties compared to Compounds II (GR32066)

and III (GR34456).

229.    The data from the two additional tests that GSK performed that were not reported

in the Humphrey Declaration would lead to a different conclusion than is reported in the

Humphrey Declaration.  Those data would lead to the conclusion that Compound III (GR34456)

appeared to be as long-lasting as sumatriptan.

230.    The data reported in the Humphrey declaration were "screening data" that do not

provide the necessary information to make a substantive conclusion that sumatriptan is superior

to Compound II (GR32066) or Compound III (GR34456).

00403270

Table II of the Humphrey Declaration

231.    For convenience, Table II of the Humphrey Declaration is reproduced below.

Table 2

| Time (min) following intraduodenal dosing with test compound | % increase carotid arterial vascular resistance (values are mean ± s.e.m. from n dogs) | | | |
|---|---|---|---|---|
| | Compound (I) (n=4) | | Compound (II) (n=6) | |
| 15 | 26 | +7 | 32 | +8 |
| 30 | 50 | +8 | 40 | +9 |
| 45 | 64 | +12 | 38 | +10 |
| 60 | 71 | +13 | 37 | +10 |
| 75 | 80 | ±16 | 36 | ±10 |
| 90 | 79 | ±17 | 37 | ±13 |
| 105 | 87 | ±25 | 31 | ±12 |
| 120 | 104 | ±36 | 30 | ±12 |
| 135 | 105 | ±38 | 36 | ±12 |
| 150 | 105 | ±41 | 36 | ±13 |
| 165 | 117 | ±57 | 37 | ±18 |
| 180 | 126 | ±52 | 33 | ±16 |

(DTX 41.)

232.    The data shown in Table II of the Humphrey Declaration, which allegedly shows

that sumatriptan has a greater *in vivo* potency than Compound II (GR32066) is insufficient to

support GSK's assertions.  Spectrum's expert Dr. Antonaccio gave his expert opinion after

reviewing the GSK internal data that was used to create Table II.  Dr. Antonaccio opined that the

data show that the percent increase in carotid arterial vascular resistance following intraduodenal

administration of sumatriptan starts at 26 ± 7% at 15 minutes and rises to 126 ± 52% at 180

minutes.  (Expected testimony of Dr. Antonaccio.)  Dr. Antonaccio noted that the data show that

the percent increase caused by administering Compound II (GR32066) starts at 32 ± 8% and

holds steady around 30 to 40%, up to 180 minutes, at which point the tested animals showed a 33 ± 16% increase in carotid vascular resistance.  (Expected testimony of Dr. Antonaccio.)

233.    The failure to present any data showing the decline in the carotid vascular resistance for more than two hours limits the conclusions that can be drawn from the data. Without such data, GSK and Dr. Humphrey could not have concluded with any certainty whether sumatriptan had a "much greater" biological effect than Compound II (GR32066).  Compound II, for instance, may have a substantially longer sustained action on the carotid artery that continues long after sumatriptan has ceased working.  Under such a scenario, Dr. Antonaccio opined that he would consider Compound II to have a "much greater" biological effect than sumatriptan.  The experiments GSK conducted, however, were terminated before the true duration of the compounds was determined.  Without any data showing the complete decay in the effect of each compound over time, it was improper for GSK and Dr. Humphrey to conclude scientifically that one compound has a greater biological effect than another, and to make such a representation to the Patent Office.

### The Humphrey Declaration Does Not Establish that the Alleged Differences Between Sumatriptan and the Prior Art Were Unexpected

234.    The results shown in Table 2 of the Humphrey Declaration are neither surprising nor unexpected.

235.    The intraduodenal efficacy test is only a surrogate for true bioavailability. (Expected testimony of Dr. Antonaccio; Humphrey Dep., 226.)

236.    The intraduodenal efficacy test reported in the Humphrey Declaration is relevant only to oral dosage forms of the tested compounds, and has no relevance to the merits of other dosage forms such as the intravenous dosage form Spectrum seeks FDA approval to sell. (Peroutka Dep., 80.)

00403270

237.    The Humphrey Declaration does not establish that sumatriptan shows unexpected results compared with the other compounds of the '470 patent.

238.    The Humphrey Declaration does not compare sumatriptan with any compounds other than Compound II (GR32066) and (GR 34456), and thus makes no effort to establish superiority of sumatriptan to the class as a whole.

### v.    The Tarbit Declaration

239.    GSK presented other oral bioavailability tests to the Patent Office in the Tarbit Declaration, which GSK submitted only after it had convinced the Patent Office to withdraw the anticipation and obviousness rejections by submitting the Humphrey and Jackson Declarations. The Tarbit Declaration reported oral bioavailability data for five compounds from the '470 patent, including sumatriptan, GR32066 and GR34456.  GSK's pharmacology expert, Dr. Peroutka, admitted that these results show that sumatriptan was not exceptional in comparison to the other '470 patent compounds.  (Peroutka Dep., 121.)

240.    This declaration, the Tarbit Declaration, was originally submitted to a different examiner in the prosecution of claims to a different, but closely related compound.

00403270

241.    The data reported in the Tarbit declaration for oral bioavailability were as follows:

| GSK Internal Compound | Disclosed in | Bioavailability |
|---|---|---|
| GR40370 | '483 Patent | 89% |
| GR32066 | '470 Patent Examples 1-8, 29 | < 5% |
| GR34633 | '470 Patent Example 21 | 17% |
| GR34456 | '470 Patent Examples 22, 23, 25 | 6% |
| GR35673 | '470 Patent | 10% |
| Sumatriptan | '470 Patent '845 Patent | 24% |

242.    GSK submitted the Tarbit Declaration to support the patentability of a different patent (the '483 patent) by showing that in the pigmented rat model the compound claimed in the '483 patent has surprisingly superior bioavailability to the '470 patent compounds, including sumatriptan.  (DTX 206.)

243.    Dr. Tarbit states in his declaration that the '483 patent compound has much higher bioavailability than any of the other compounds tested, and that he found this high bioavailability surprising.  (DTX 2, Paper No. 15.)

244.    Dr. Tarbit did not state that he found the bioavailability of sumatriptan surprisingly superior to any of the other '470 patent compounds.  No witness has provided testimony that these data show a surprising or unexpected result for sumatriptan compared to the other '470 patent compounds.

00403270

**The Tarbit Declaration Establishes Sumatriptan Cannot Possess**
**"Unexpected" Bioavailability Results when Compared to the Prior Art**

245.    Sumatriptan does not show surprising or unexpectedly superior bioavailability in comparison to the other compounds of the '470 patent.

246.    According to GSK's regulatory documents, sumatriptan's oral bioavailability is about 14% in humans.  GSK has not produced direct bioavailability data for the other '470 patent compounds.  (DTX 207.)

247.    GSK's NDA states that sumatriptan's absolute oral bioavailability is low, approximately 14%.  (*Id.*)

248.    Sumatriptan's bioavailability in the pigmented rat test is not surprising, exceptional, or unexpected.  Nor was it predictive of bioavailability in humans since sumatriptan has only 14% bioavailability in humans, rather than 24% as shown in the pigmented rat data in the Tarbit Declaration.

**c.      Other Results Not Reported by GSK to the Patent Examiner**

249.    During the prosecution of the '845 patent, GSK had literally mountains of data on compounds that were very close in chemical structure to sumatriptan, including other '470 patent compounds.  Many of these tests demonstrate that sumatriptan has properties that are basically the same as most members of its class.  The following results—results left out of the Jackson Declaration and the Humphrey Declaration—provide still further evidence that sumatriptan does not possess any unexpected properties when compared to the prior art.  GSK's internal documents and its pharmacology expert identified the following properties as important to the development of the anti-migraine compound; sumatriptan failed to show surprising or unexpected superiority with respect to any of these properties.

00403270

250. **Behavioral effects.** Sumatriptan showed no surprising or unexpectedly superior effects on the behavior of conscious animals in GSK's tests. (Peroutka Dep. 113:9-21; DTX 204; DTX 680, GSK 226055.)

251. **Selectivity.** Sumatriptan did not show surprising or unexpected differences from the other '470 patent compounds in selectivity for the 5HT-1 receptor. (Peroutka Dep. 101-10; DTX 204.)

252. **Rapid Onset of Action.** Sumatriptan does not exhibit surprising or unexpected results with respect to time to onset of action when compared to other compounds of the '420 patent. (Peroutka Dep. 114-118; DTX 204.)

253. ***In Vivo* Potency.** Sumatriptan does not exhibit surprising or unexpected *in vivo* potency compared to the other prior art '470 patent compounds. (Peroutka Dep., 108-109; DTX 204.)

254. **Effects on Blood Pressure.** Sumatriptan exhibit no surprising or unexpected results with respect to its effects on blood pressure. (Peroutka Dep., 110-111; DTX 205.)

### 6. No Other Secondary Indicia of Obviousness Support Patentability

255. No secondary indicia of nonobviousness supports the patentability of the '845 patent claims.

256. Since sumatriptan is claimed by both the '845 patent and the prior-art '470 patent any secondary considerations that exist are attributable to the '470 patent claims and do not support the patentability of the '845 patent claims.

257. **Long Felt But Unresolved Need.** There is no evidence that there was a long felt need for sumatriptan after the invention of the '470 patent before sumatriptan. Indeed, sumatriptan was invented as part of the invention of the '470 patent.

00403270

258.    **Commercial Success.**  Any commercial success of Imitrex® is due to the features disclosed and claimed in the '470 patent including the ability of the compounds in that patent including sumatriptan to treat migraine.

259.    In fact, Spectrum has presented powerful evidence that the '845 patent is commercially unsuccessful in comparison with the '470 patent.  GSK's own actions in electing to use its one and only statutory patent term extension for sumatriptan to extend the '470 patent rather than the '845 patent speaks volumes.

260.    In short, GSK chose to forego nearly $1 billion in sales that it would have made if it extended the '845 patent, and if that patent were held valid and enforceable.

261.    GSK instead chose to extend the '470 patent—an extension that has no value whatsoever unless the '845 patent is invalid or unenforceable.

262.    If GSK itself was unwilling to rely on the '845 patent to protect its market, the concession of the weakness of the '845 patent is a strong objective indicator that the '845 patent is obvious.

263.    **Failure of Others.**  There is no evidence that others relied on the '470 patent or other prior art to the '845 patent but failed to arrive at sumatriptan.  To the contrary, numerous drug companies (e.g., Ortho-McNeil/J&J, Pfizer, Endo Pharms, Merck and AstraZeneca) developed successful "triptan" anti-migraine drugs based on the prior-art to the '845 patent.

264.    **Licensing.**  There is no evidence of licensing of the invention.

265.    **Skepticism of Experts.**  Dr. Solomon, GSK's expert, practiced neurology at the time sumatriptan was invented.  He testified about his, and other experts', reaction to sumatriptan when studies of it were first made public.  Virtually none of his peers were skeptical about the results.  He did know, however, two people that expressed skepticism upon first hearing about

00403270

sumatriptan. He estimated that of all the experts in his field "a fraction of 1 percent" were skeptical about sumatriptan's results at first. These two people—also experts—finally came around. Dr. Solomon testified that he would be shocked if these physicians later did not prescribe sumatriptan. That so few experts initially expressed skepticism and then recanted demonstrates the obviousness of sumatriptan.

266. **Copying.** There is no relevant evidence of copying of the '845 invention. Spectrum properly seeks to use the invention of the '470 patent upon its expiration, through the congressionally approved mechanism of the Hatch-Waxman Act.

*          *          *

267. The above findings of fact demonstrate that the '845 patent claims are obvious as demonstrated in Spectrum's proposed conclusions of law.

## C.    Double Patenting

### 1.    Double Patenting with Respect to the First Sumatriptan Patent

268. Double patenting exists to bar an extension of an existing patent monopoly when the patents are commonly owned. A patent may only be invalid for double patenting when the claims are identical (statutory double patenting) or when the claims are not "patentably distinct" (obviousness-type double patenting).

269. In light of the Findings of Fact in Section (II)(B), paragraphs 121-267, *supra*, the claims of the '845 patent are not patentably distinct from the claims of the '470 patent.

### 2.    Double Patenting with Respect to the '483 Patent

270. During prosecution of the '845 patent, the examiner rejected the '845 claims for non-statutory obviousness type double patenting over the application that became the '483 patent.

67

271.     During prosecution of the '483 patent, a different examiner rejected the '483 claims for non-statutory obviousness type double patenting over the application that became the '845 patent.

272.     Mr. Fichter prosecuted the '845 patent and the '483 patent for GSK.

273.     While GSK overcame the obviousness type double patenting rejection made in the prosecution of the '483 patent, GSK never made any showing that would establish patentability or obviate the obviousness-type double patenting rejection made in the prosecution of the '845 patent.

## III.     The Unenforceability of the '845 Patent—Inequitable Conduct

274.     As noted above, the '845 patent issued over the '470 patent based on two declarations (the Jackson Declaration and the Humphrey Declaration) coupled with GSK arguments made on its behalf by the prosecuting attorney, Mr. Fichter.

275.     The '845 patent would not have issued without the submission of these declarations. Also critical to the examiner's decision to issue the '845 patent were the representations GSK made through its attorney, Mr. Fichter.

276.     The declarations were false and misleading.

277.     Many of Mr. Fichter's representations were false and misleading.

278.     Taken together, the pattern of material omissions, false representations, misstatements, and improper characterizations by GSK demonstrate, clearly and convincingly, that GSK intended to deceive the Patent Office.

### A.     The Jackson Declaration Was False and Misleading

279.     The Jackson Declaration was made of record by the examiner.

00403270

280.    The examiner later withdrew the obviousness rejection and allowed the claims of
the '845 patent to issue based, at least in part, on the data presented in the Jackson Declaration
and his representations.

281.    The Jackson Declaration was material to the prosecution of the application that
matured into the '845 patent.

282.    Dr. Jackson's declaration purports to show differences in mutagenic potential
between sumatriptan and a related prior-art compound (GR32066).  (DTX 40.)  Dr. Jackson does
not allege in his declaration that the purported difference between the two compounds is
unexpected.  (*Id.*)

283.    Dr. Jackson signed his declaration on January 12, 1990.  (*Id.* at 5.)  In it, above his
signature, he testifies to the truth of the statements:

> I further declare that all statements made herein of my own
> knowledge are true and that all statements made on information
> and belief are believed to be true; and further that those statements
> were made with the knowledge that willful false statements and the
> like are punishable by fine or imprisonment, or both, under Section
> 1001 of Title 18 of the United States Code and that such willful
> false statements may jeopardize the validity of the application or
> any patent issuing thereon.  (*Id.*)

284.    In Dr. Jackson's declaration, he never indicated or suggested that any statement
was made "on information and belief."

285.    Many of Dr. Jackson statements were not true.  Many others, even if literally true,
omitted material information rendering them misleading and deceptive.

286.    Dr. Jackson's declaration was submitted to show an actual difference in results in
the WHO NAP Test between sumatriptan and GR32066.  The Jackson Declaration included this
table:

00403270