

TABLE I

| Compound | Mutagenicity in S. typhimurium | | | |
|---|---|---|---|---|
| | TA 1537 | | TA98 | |
| | $-S_9$-Mix | $+S_9$-Mix | $-S_9$-Mix | $+S_9$-Mix |
| **Compound of the invention :** | | | | |
| sumatriptan (43175) → Result | NEG | NEG | NEG | NEG |
| WHO Classification | (-) | (-) | (-) | (-) |
| **Compound of Formula (I) :** | | | | |
| GR32066 → Result | 6* | 7 | 2.3 | 3.4 |
| WHO Classification | (+) | (+) | (±) | (+) |

\*    Fold increase over control values.

+    indicates that the increase in number of mutants was 3-fold or more when compared to the control data

±    indicates that the increase was between 2- and 3-fold

−    indicates an increase of less than 2-fold

NEG  indicates a negative result.

According to the criteria adopted by the WHO (+) means a significant chance of mutagenic potential, (±) means an elevated chance of mutagenic potential and (-) means no mutagenic potential.

DTX 40, GSK0026811 (notation added)

287.    Based on this table, Dr. Jackson concluded: "The results clearly demonstrate that the compound of the invention shows no mutagenic potential in the NAP test. By contrast the compound of formula I tested shows a significant mutagenic potential in the NAP test." (*Id.* at 4.)

70

### 1.    Dr. Jackson Falsely Stated that GSK Followed an Official, Recognized, Mutagenicity Test

288.    The Jackson Declaration stated that the mutagenic potential of sumatriptan and that of the closest prior-art compound (as determined by Dr. Humphrey)—the results shown in Table 1—were determined "following the nitrosation assay procedure (NAP test) recommended at the World Health Organization Symposium on the Potential Carcinogenicity of Nitrosatable Drugs held in Geneva in June 1978." (DTX 40.)

289.    Dr. Jackson further represented:  "In the present experiments each compound was incubated with excess sodium nitrite in dilute acid (0.06% v/v acetic acid, pH 3.6)."  (DTX 40, Appendix I.)

290.    Both statements were false.  The data Dr. Jackson presented in his declaration were not obtained following the Nitrosation Assay Procedure recommended at the World Health Organization Symposium on the Potential Carcinogenicity of Nitrosatable Drugs held in Geneva in June 1978 ("WHO NAP Test").  That procedure requires that the test compound be incubated with excess sodium nitrite in dilute acetic acid at a concentration of 0.06%, which equates to a pH of 3-4.

291.    Dr. Jackson correctly recited the parameters of the WHO NAP Test in Appendix 1 to his declaration.

292.    Testing that GSK did not disclose to the Patent Office demonstrated that GR32066 was negative in the WHO NAP test, not positive as Dr. Jackson represented.  Unbeknownst to the Patent Office, the results presented in Dr. Jackson's Table 1 were not generated using the WHO NAP Test.  Dr. Jackson and GSK never disclosed to the Patent Office the negative results obtained in the WHO method.  Instead, GSK selectively reported data from

00403270

tests using an acid concentration 100 times greater than the 0.06% concentration prescribed by the WHO method (6%) resulting in a pH of 2-3 ("the GSK 6% method").

293.    The GSK 6% method is substantially different than the WHO NAP Test.  pH is a logarithmic scale measuring acidity.  As such, a down shift in value by one number represents a ten-fold increase in acidity.  The data GSK reported were culled from tests that were substantially different from what Dr. Jackson told the Patent Office.

294.    As an initial matter, the WHO NAP Test had been crafted by a consensus from scientists familiar with the Ames Test and was intended to function for all compounds that might undergo nitrosation under gastric conditions.  (Expected testimony of Dr. Brusick.)  The method has been carefully documented and used successfully in many laboratories throughout the world. This is in contrast to the GSK 6% method which has been apparently used only by GSK.

295.    Even if GSK had adopted a "modified WHO Protocol" having 6% acetic acid or a pH of 2-3 as shown in Table I, the Jackson Declaration should have disclosed (1) the modified procedure, (2) NAP test data at both 0.06% and 6.0% for sumatriptan and GR32066, (3) explained why data obtained at 6.0% was more relevant than that at 0.06% and (4) explained why the negative data obtained at 0.06% should be ignored.  GSK did none of this.  Instead GSK hid the results that were inconsistent with its patentability argument, and falsely represented that the data were from the recognized WHO NAP Test.

> **2.    By Withholding the WHO NAP Test Results, Dr. Jackson Skewed the Results in Favor of Sumatriptan—Under the WHO NAP Test Conditions, No Difference Exists Between Sumatriptan and GR32066**

296.    Even if Dr. Jackson had told the truth about the conditions used to generate the data, GSK's testing skewed the results in favor of GSK's patentability argument.

00403270

297.    GSK has admitted that the results show in Table 1 of the Jackson Declaration stem from four documents, and only four documents: (1) DTX 81, GR43175 tests; (2) DTX 82 GR43175 tests; (3) DTX 85, GR32066 tests; and (4) DTX 86, GR32066.

298.    The actual numerical results from the GSK 6% method experiments appear below:

| GSK 6% Method: Table 1 of Jackson Declaration With Complete Numerical Values | | | | |
|---|---|---|---|---|
| | TA 1537 | | TA 98 | |
| Compound | - S9 | + S9 | - S9 | + S9 |
| Sumatriptan | 1.47 | 0.944 | 0.89 | 1.162 |
| GR32066 | 6.12 | 6.98 | 2.28 | 3.4 |

(DTX 81, 82, 85, and 86.)

299.    But the results from the WHO-NAP test, using the correct acetic acid concentration of 0.06% are reported below:

| WHO-NAP Test Method: Results Not Disclosed to Patent Office | | | | |
|---|---|---|---|---|
| | TA 1537 | | TA 98 | |
| Compound | - S9 | + S9 | - S9 | + S9 |
| Sumatriptan | 1.1 | 1.162 | 0.71 | 0.93 |
| GR32066 | 1.57 | 1.24 | 1.33 | 1.36 |

(DTX 81, 82, and 88.)

300.    The numbers represent fold increases in mutants and, as Dr. Jackson told the Patent Office, a number less than two indicates a negative result. As seen above, based on GSK's own WHO NAP Test results for sumatriptan and GR32066, no difference exists at the 0.06% acetic acid concentration the WHO NAP Test—both are negative. GSK has admitted as

00403270

much.  (D.I. 57, Answer to Amended Counterclaim ¶37, "GSK . . . states . . . that NAP tests on the compound of the closest prior-art performed during 1983 using 0.06% acetic acid were negative.")

301.    GSK's false representation that the data it reported came from the WHO-recommended 0.06 % (pH 3–4) test is particularly egregious given that it is impossible to quantify the difference in mutagenic potential between the two tested compounds based on the information Dr. Jackson reported in Table 1.  Dr. Jackson, using "NEG" for values less than two, chose to hide the numerical value for the sumatriptan results.  An actual "NEG" value could range from 0.001 to 1.999.  Had Dr. Jackson coupled this method of result characterization with the actual WHO NAP Test results, the Table would have looked like this:

| | TA 1537 | | TA 98 | |
|---|---|---|---|---|
| Compound | - S9 | + S9 | - S9 | + S9 |
| Sumatriptan | NEG | NEG | NEG | NEG |
| GR32066 | NEG | NEG | NEG | NEG |

302.    Again, GSK has admitted as much.  (D.I. 57, Answer to Amended Counterclaim ¶37, "GSK. . .states . . . that NAP tests on the compound of the closest prior-art performed during 1983 using 0.06% acetic acid were negative.")

303.    A reasonable examiner would want know that no difference existed between the mutagenic potential of sumatriptan and the mutagenic potential of GR32066 when tested according the nitrosation assay procedure (NAP Test) recommended by the World Health Organization Symposium on the Potential Carcinogenicity of Nitrosatable Drugs held in Geneva in June 1978.

00403270

304.    The data from the WHO NAP Test that GSK and Dr. Jackson concealed from the Patent Office were inconsistent with the positions and arguments GSK asserted in support of patentability to overcome the examiner's rejections.

305.    Dr. Jackson's affirmative misrepresentation and concealment of test results contradicting what he told the examiner were not, as GSK asserts, inadvertent "mistakes" or "typos." The tests GSK actually reported differed in other ways from the WHO NAP Test. But Dr. Jackson was very careful to explain these differences.

306.    The WHO NAP Test recommends a reaction time of 1 hour and 4 hours. (DTX 40 at Appendix 1.) Tests used to generate the data in Table 1 of Dr. Jackson's declaration, however, were run only for 1 hour. In his declaration Dr. Jackson explained that "as indoles are rapidly nitrosatable compounds, however, a reaction time of 1 hour only was chosen in these experiments." (DTX 40.)

307.    Similarly, the WHO NAP Test recommended that resulting N-nitroso compounds be identified by "mass spectrometry or other appropriate methods." (DTX 40 at Appendix 1.) GSK did not identify the N-nitroso compounds. In his declaration Dr. Jackson explained that

> Indoles in general are known readily to form N-nitroso compounds, however, and in these experiments we therefore assumed that any biological effects observed in the mutagenicity assay were due to the formation of N-nitroso compounds.

(DTX 40.)

308.    Clearly, the Jackson Declaration was carefully drafted—recognizing the importance of adhering to the recognized WHO test conditions. Given this attention to detail, and the significant impact that acetic acid concentration had on the results he presented, the evidence shows that the material errors in the declaration were not "mistakes" or "typos." The

00403270

errors and omissions were deliberate.  Dr. Jackson and other GSK witnesses have offered no

credible explanation for falsely representing that he used the standardized WHO NAP Test.

### 3.    Dr. Jackson Falsely Told the Patent Office that He Supervised the NAP Tests

309.    Dr. Jackson was also careful and detailed in presenting his credentials to the

Patent Office to support the credibility of the test results.  On the first page of his declaration, Dr.

Jackson explained his scientific training and his experience in the field of toxicology.  (*Id.* at

GSK00266808.)  Dr. Jackson told the Patent Office that he had held the position of "Head of

Drug Safety Department" at a pharmaceutical company prior to joining GSK and then explained,

precisely, why the examiner should believe what he says:

> I joined Glaxo Group Research Ltd in 1983 as Deputy Director of
> Pathology Division (during this year I gained the Diploma of the
> Royal College of Pathologists on Toxicology) and was appointed
> Director of the Pathology and Toxicology Division in 1987.  As
> such I have world-wide responsibility for all aspects of Glaxo
> preclinical safety testing, both in terms of in-house testing
> programmes and representation of the Company to regulatory
> bodies.    I am the Company's Toxicological Expert for
> documentation to such bodies.

(*Id.*)

310.    Dr. Jackson recited his "other activities" including his position as "an examiner in

Toxicology for the Royal College of Pathologists and the Institute of Biology."  (*Id.* at 2.)

311.    After this, he declared:  "Under my supervision the mutagenic potential of the

compound of the present invention and the prior-art compound of formula (I) was determined..."

*Id.*  This statement was false.

312.    Dr. Jackson did not supervise the tests reported in his declaration.  (Jackson Dep.,

64:3-8.)  He did not even review the underlying data before signing his declaration (Jackson

Dep., 13:14-20.)

00403270

313.    Indeed, Dr. Jackson has never performed a NAP Test in his life.  (Jackson Dep., 63:19–64:4.)  He has never directly supervised any NAP Test.  (*Id.*)  The tests leading to the results shown in Table 1 of his declaration were not performed under his supervision.  (Jackson Dep. 64:3-8.)

314.    Dr. Jackson asserts that he "indirectly" supervised the tests and that he did not need to have direct laboratory involvement for two reasons:  (1) he pushed authority down to his subordinates and (2) the requirements of Good Laboratory Practice ("GLP") would ensure that the work was high quality.  (Jackson Dep., 64:20-65:14.)  Dr. Jackson explained:

> I think you have to see this in perspective of my responsibility of director of the whole division.  At this time I think I had probably about 250 scientists under my responsibility in four major areas of drug safety.  Genetic Toxicology was just one of these.  When you are managing that breadth of responsibility, you actually hand down authority and responsibility to your subordinates to conduct the study effectively and properly.  <u>There is always the back-up then of good laboratory practice</u>, whereby an independent unit of the company would inspect the laboratories to ensure that the quality of the work they undertook was of a high standard, and so from all sources I would get results of experimentation for which I had no direct hands-on involvement. (Jackson Dep., 64:25–65:14.) (Emphasis added.)

315.    Dr. Jackson's reliance on GLP, however, does not help GSK here.  As explained below, the tests used to generate the results shown in Table 1 violated basic GLP procedures.  The tests did not even follow GSK's own internal Standard Operating Procedure ("SOP").  The tests were performed purely for patent purposes and, in material ways, violated GSK's internal procedures and GLP standards.

### 4.    The Circumstances Surrounding the GR32066 Tests Leading to the Results Disclosed in Table 1 of Dr. Jackson's Declaration Demonstrate an Intent to Deceive the Patent Office

316.    In fact, the circumstances surrounding the GR32066 tests used to generate the results shown in Table 1 of Dr. Jackson's declaration—alone—demonstrate a deliberate attempt

00403270

to mischaracterize the actual difference in mutagenic potential results between sumatriptan and GR32066. Additionally, a combination of the timing of these tests, how they were conducted, how the results were presented, and what Dr. Jackson decided to omit from his declaration demonstrates—clearly and convincingly—an intent to deceive the Patent Office.

317. The mutagenicity data shown in Table 1 for GR32066 was generated by two experiments conducted in 1989. Notably, GSK conducted other experiments, much earlier than 1989—experiments not disclosed to the Patent Office.

### a. In 1983, GR32066 Showed Only a Single Positive Test Result—Using a Frameshift Strain in GSK's 6% Method—That was Likely Caused by Mutagenic Impurity

318. In January and February of 1983, GSK conducted mutagenicity experiments on GR32066, including the NAP Test. (DTX 88, GAD 18.) In the report summarizing the results of these tests, known as WPT/83/033, GSK concluded that "GR32066 was nitrosated to a weak frameshift mutagen" based on what GSK considered a single positive result. (DTX 88, GAD18 at GSK-00190776 and 1907817.) This result was likely caused by impurities in the samples.

319. In fact, in summarizing the results of these experiments GSK noted that impurities may have affected the results. (*Id.* at GSK-00190778–779.) Specifically, as the "Table Index" of WPT/83/033 makes clear, GSK used two different batches of GR32066 in obtaining the NAP test results shown in Table 37: (1) batch 538/134 and (2) batch 538/168. (*Id.* at GSK-00190780.) Both batches contained impurities.

320. As page 3 of the report explains in connection with another, related, mutagenicity test, "the mutagenicity observed with Batch 538/168 may be due to a mutagenic impurity." (*Id.* at GSK-00190778.) To purify it, GSK recrystallized the batch. (*Id.*) The purified derivative was labeled 538/184. (*Id.*) GSK then confirmed that batch 538/168 tested positive in strain 1535 (a base pair strain) in the Ames Tests. (*Id.*) Accordingly, GSK concluded "[t]he weak base

substitution activity associated with Batch 538/168 was due to a mutagenic impurity in the sample." (*Id.* at GSK-00190779.)

321.    The same report noted that batch 538/134 contained a "nitrosatable contaminant." (*Id.*) GSK surmised that this contaminant "slowly degraded during storage" based on a previous test. (*Id.*) This contaminant appears to have caused a positive result in the nitrite titration experiments shown in Table 38 for TA 1537—a frameshift strain. (*Id.* at GSK-0190820.)

322.    Spectrum's expert toxicologist, Dr. Brusick, testified that this contaminant could have caused the positive NAP test result seen in Table 37. (Expected Testimony of Dr. Brusick.) GSK's expert, Dr. Gad, agreed. As a result, the 1983 NAP tests of GR32066 show the compound as negative in the NAP test with a single exception—in Strain TA 1537 in the GSK 6% method, without S9, (DTX 88, GSK00190817.) However, that exception was likely a false positive.

323.    Even if it was not a false positive, the conclusions reported by Dr. Jackson for GR32066 are highly questionable because of issues related to impurities found in some of the batches of GR32066 and the effects they may have on the responses GSK found in its tests. Based upon the data, further testing with more pure material was necessary to achieve an accurate assessment of the mutagenicity.

**b.    In 1989 GSK Retested GR32066**

324.    GSK retested GR32066 in July of 1989—or at least GSK retested some chemical it says was GR32066 in 1989—but GSK has no scientific evidence of what it actually tested. In July of 1989, the '845 patent was pending at the Patent Office. At that time, the last substantive communication from the Patent Office to GSK was a rejection of the claims to sumatriptan. (See DTX 2, Paper No. 11.) Specifically, the claims had been rejected, for the second time, as obvious in view of the application that became the '470 patent. In March of 1989, the '470

00403270

patent issued. GSK retested GR32066 three months later to generate data to respond to the

Patent Office rejection.

325.    GSK has admitted that it retested GR32066 for the specific purpose of submitting

data to the Patent Office. GSK alleges that the later 1989 tests were as "confirmatory":

> The data which we submitted on 32066 in the declaration was
> produced for the declaration as confirmatory data from original
> data on that compound which was produced about six years
> previously.

(Jackson 30(b)(6) Dep., 184:3-7.)

326.    GSK further admitted that "we saw it as a comparator for sumatriptan and [i]t was

at that point in 1989 that we generated the data as confirmatory data for the 1983 result."

(Jackson 30(b)(6) Dep., 187:10-12.)

327.    GSK also admitted:

> Well, because the whole basis of the test which we carried out in
> '89 was as a confirmation of these results in the NAP test carried
> out in '83. That was a strategy which was devised.

328.    The evidence, however, does not support GSK's explanation. The performance of

the GR32066 tests conducted in 1989 suggests that GSK's goal was not to "confirm" the 1983

tests—the goal was to create positive mutagenicity results for GR32066.

### i.    The 1989 Retests were Not Full Tests—Instead, GSK Used Selected Controls, Selected Strains and Selected Acid Concentrations, and Did Not Test Sumatriptan Under the Same Conditions.

329.    Rather than perform a full set of tests as specified in their SOP (WGT/0028/02),

GSK evaluated the compound in selected strains (TA1537 and TA98) and only under the GSK

6% method for only 1 hour.

330.    The raw data from 1989 studies did not identify which batches of GR32066 were

used and whether or not any of these batches were tested for the presence of impurities. No

80

positive control compounds were listed in the raw data. No nitrite controls were included in the study.

331. There were inconsistencies in the retests. One strain, TA98, did not show positive results in 1983 but appeared positive in 1989. It is unclear why this difference occurred but could be related to changes in SOPs, protocol, changes in evaluation criteria or other non-controlled variables.

332. For an accurate comparison with GR32066, sumatriptan should have been retested in 1989 with the same strains under the same conditions.

**ii.    The 1989 Tests Did Not Follow GLP and Likely Used a Contaminated Batch of GR32066**

333. In addition, these tests did not follow the requirements of GLP. Any company that intends to market a pharmaceutical product in the United States must gain approval from the FDA to market the drug. This requires the company to comply with the FDA's GLP regulations during the preclinical phase of development. These standards were put into effect by FDA in 1979. At that time, it dramatically changed the testing requirements in areas of documentation, audit trail, archival and retention of all raw data, and the development and approval of SOPs. All preclinical studies initiated following June 1979 were required to be conducted under GLP regulations. The purpose of the GLP regulations is to "assure the quality and integrity of the safety data filed" with the FDA.

334. As Dr. Gad made clear, the tests of GR32066 in 1989 were not intended to satisfy a GLP audit. (Gad Dep., 156:9-160:9.) Furthermore, GSK did not intend to submit these results to the FDA. But Dr. Jackson signed his declaration with no personal knowledge as to how the tests resulting in Table 1 were conducted—tests Dr. Jackson told the Patent Office he supervised and results that Dr. Jackson swore were true. Dr. Jackson signed his declaration without ever

81

reviewing the underlying data. Dr. Jackson's excuse is that GLP would ensure quality data. Dr. Jackson's reliance on the GLP excuse, his ignorance about the testing details, the manner the tests actually were performed is strong evidence that GSK submitted the false declaration with intent to deceive the Patent Office.

### (1)    GSK Failed to Identify the Batch

335.    GLP requires, among other things, requires that "[t]he identity, strength, purity, and composition . . . shall be determined for each batch and shall be documented before the initiation of the study." (DTX 550; Fed. Reg. Vol. 43, No. 247.)  In fact, under GLP

> Each storage container for a test or control article shall be labeled by name, chemical abstract number or code number, batch number, expiration date, if any, and, where appropriate, storage conditions necessary to maintain the identity, strength, purity, and composition of the test or control article. (*Id.*)

This is precisely the type of information that is commonly found on a certificate of analysis. The importance of this information is clear—chemical compounds often degrade over time, or undergo a transformation to a totally different chemical. They may also be subject to other contamination.

336.    None of the data sheets proffered by GSK as supporting the GR32066 results shown in Table 1 included a batch number. GSK offered no other evidence demonstrating what batch of GR32066 was used in these 1989 tests.

337.    Without the batch number and a corresponding certificate of analysis, it is not even clear that GSK tested GR32066. Questions abound. How old was it?  GSK had not had the compound in development for years, so it was likely old. How was it stored? What color was it? What did it smell like? What was the expiration date? Without answers to these questions, the results are meaningless. Further, because—as Drs. Brusick and Gad both made clear—

00403270

impurities can give false positives in the NAP test, the failure to follow GLP and GSK's SOP was material.

338.    Had GSK followed its own procedures and GLP standards it would have known whether impurities caused the positive results. Had Dr. Jackson supervised the experiments—as he testified under oath to the Patent Office—he would have known that the experiments violated GSK procedures and GLP in ways that render the results meaningless.

339.    Dr. Jackson signed his declaration under oath, supporting the test results with his credentials as a toxicological expert and world-wide representative of GSK to regulatory bodies. He further supported his conclusions with the representation that he had been associated with the sumatriptan program "since the decision was taken for development of the compound for the treatment of migraine." (DTX 40, GSK 00266809)  Dr. Jackson falsely declared under oath that he supervised the testing.

340.    The false statement that Dr. Jackson supervised the tests is material because Dr. Jackson and GSK plainly intended the Patent Office to rely on Dr. Jackson's credentials and involvement with sumatriptan in relying on Dr. Jackson's conclusions regarding the data.  But the data were not valid and were not suitable for submission to FDA or other regulatory bodies. Dr. Jackson would have known this if he had even a cursory review of the data.  Dr. Jackson and GSK intended the Patent Office to rely on Dr. Jackson's conclusion and intended to mislead the Patent Office as to the conduct and validity of the results.

### (2)    At Least One of the Contaminated Batches from the 1983 GR32066 was Reused in 1990

341.    Moreover, at least one of the contaminated batches of GR32066 from the tests in 1983 was reused in a 1990 test (DTX 205, GSK00183068.)  This makes it even more likely that GSK simply reused one of the contaminated batches from the 1983 tests in the 1989 tests

83

supporting Dr. Jackson's declaration.  If the 1989 tests used any of the contaminated batches

from 1983, the impurities could have caused false positives.  A reasonable examiner would want

to know whether GSK used a batch of GR32066 that was known to contain impurities—

particularly if GSK knew that these impurities had caused false positives.

342.    In addition to GSK's reuse of one of the contaminated batches from the 1983

tests, other evidence of purity problems appears by simply comparing the GR32066 results from

1983 to the GR32066 results from 1989.  As seen below, when the same tests parameters (i.e.,

where the control is drug plus acid and the concentration is 6%) are compared, the 1989 tests

show an increase in the number of mutants.

| | TA 1537 | | TA 98 | |
|---|---|---|---|---|
| Compound (Year) | - S9 | + S9 | - S9 | + S9 |
| GR32066 (1983)* | 6.86 | 1.69 | 1.86 | 1.22 |
| GR32066 (1989)** | 6.12 | 6.98 | 2.28 | 3.36 |

\*      Control = drug plus acetic acid
        Concentration = 6%
        Results shown for 4 hour (1 hour not tested)

\*\*     Control = drug plus acetic acid
        Concentration = 6%
        Results shown for 1 hour (4 hour not tested)[3]

343.    As Dr. Brusick stated—and Dr. Gad admitted—the magnitude of the change from

the 1983 tests to the 1989 tests is significant.  (DTX 539, Expert Report of Dr. Brusick p. 11.)

---

[3] GSK admitted that a four hour test would not be different than a one hour test for these compounds.  (DTX 536, Jackson Dep. 9/3/05, 221:18-222:1.)

00403270

The same compound should not, under normal circumstances show this much variation in the number of revertants. This difference is evidence of a problem with the test.

344.    A reasonable examiner would want to know if the NAP test results for GR32066 in Dr. Jackson's declaration stemmed from an experiment using a contaminated batch—particularly if that batch had led to false positive results before.

### iii.    These Tests Were Not Conducted in Accordance with GSK's own SOPs

345.    In addition to being conducted in violation of basic requirements of GLP, the tests GSK conducted in 1989 did not follow GSK's own internal SOP.

346.    SOPs are prepared for the specific purpose of ensuring the processes (tests) are conducted according to best practices and can be reproduced. Not following the SOP reduces the ability of any reviewer to compare the results from the tests conducted in 1989 to similar tests of GR32066 conducted earlier—or the tests of sumatriptan to which the 1984 tests are compared in the Jackson Declaration.

347.    Because GSK did not follow its own SOP, the basic methodology of the NAP Test conducted in 1989 differed from the methods used in tests conducted in 1983. (DTX 88.) The 1989 tests were conducted using only the modification employing 6% acetic acid (pH 2-3) and only at the 1 hour time period and did not include a control for nitrite (nitrite plus acetic acid). Dr. Gad asserts that these conditions were appropriate for determining the mutagenic activity of the frameshift mutant strains TA1537 and TA98.

348.    Sumatriptan, however, was not also retested in 1989 using this altered methodology. If it had been retested using the exact procedures employed for GR32066 in 1989, sumatriptan would have likely produced a positive response in TA1537, as explained below.

00403270

### 5.   Dr. Jackson and GSK Withheld Tests Showing Sumatriptan as Positive in the GSK 6% NAP Test

349.   As explained above, the 1989 tests of GR32066 were not conducted in accordance with GLP and violated GSK's own NAP Test SOP. In 1989, GSK used two frameshift strains (TA98 and TA1537). Further, in determining the fold increase shown in Table 1 of Dr. Jackson's declaration, GSK compared the test solution to the "test compound only" control.

350.   On April 4, 1984, GSK performed a NAP test on sumatriptan. (DTX 186, Gad 14.) There, GSK used two frameshift strains (TA1537 and TA98)—the exact same strains GSK used to test GR32066 in 1989. (*Id.*) And GSK used 6% acetic acid—the exact same concentration that GSK used to test GR32066 in 1989. (*Id.*) In this 1984 test, a comparison of the test solution with the drug only control—the exact same comparison GSK used to generate the GR32066 mutagenicity assertion that Dr. Jackson submitted to the Patent Office—sumatriptan shows a mutant fold-increase of greater than two. (*Id.*)

351.   The results for sumatriptan in Experiment 1540 show a 2.1 fold increase in TA1537 revertants (-S9) between the drug plus 6% acetic acid control (the appropriate control) and the treated group (drug plus nitrite plus 6% acetic acid). This increase meets the GSK criteria for a positive response. (*Id.*) Thus, under similar pH treatment conditions using the same (and only) control conducted in 1989, sumatriptan showed a positive response.

352.   Although this response is not conclusive evidence for the mutagenic activity of sumatriptan, it shows why GSK's failure to use consistent study designs when reporting its data to the Patent Office was material. Dr. Brusick testified that additional testing was required to confirm or reject the possibility that sumatriptan was mutagenic in this test. (DTX 539, p. 8.) Dr. Brusick testified that these data support the conclusion that sumatriptan may be a weak frameshift mutagen. (*Id.*)

00403270

353.    A reasonable examiner would want to know that sumatriptan, using the exact same methodology GSK used for GR32066 in 1989, tested positive, particularly given Dr. Jackson's statement in his declaration that the results in Table 1 "represent the worst results of two experiments for each compound." (DTX 40, GSK 00266810.)  That statement was false.

354.    Dr. Gad disagreed that the TA1537 results for Sumatriptan reported in Gad 14 confirms (GSK00397436-437) showed positive result.  He agreed that the treated group (drug plus nitrite plus 6% acetic acid) was more than two times greater that the drug plus 6% acetic acid control.  But he said this was irrelevant given the results from the untreated control.  His opinion was that the untreated control for TA1537 superseded the drug plus acetic acid control. (Gad Dep., 183:25-184:22.)

355.    Dr. Brusick disagreed.  Dr. Brusick testified that the untreated control is not the appropriate control for the treatment group.

356.    According to Dr. Brusick, it is a control to assure that the TA1537 strain used in the study has a background mutant number in the appropriate range.  (Brusick Dep., 153:17-158:8.)  The nitrosation treatment sample consists of the drug, nitrite and acetic acid.  In order to control for the effect of nitrite (i.e., nitrosation reaction) in that sample, the appropriate control must be different by only one variable, thus, the appropriate control for this study was the drug plus acetic acid control.

357.    Dr. Gad's "untreated control" theory is particularly unpersuasive given GSK's own 1989 test of GR32066.  There, using the TA1537 strain, the fold increases reported in the Jackson Declaration were made using the drug plus acetic acid control and not the untreated control.  Therefore, the TA1537 results in the 6% acetic acid test of sumatriptan shown in DTX 186 appear to indicate mutagenic activity.

00403270

358.    If one wished to conclude that the 1989 repeat studies of GR32066 in strains TA1537 and TA98 are valid and accurate, then one must also be prepared to believe that the TA1537 data for sumatriptan in GSK's Experiment 1540 (DTX 186, GSK0039743637) are also suggestive of weak frameshift activity.  While a second study of TA1537 in 1984 did not show mutagenic activity for sumatriptan, Dr. Jackson and GSK presented the worst of two experiments in the declaration.   Similar variability was also found for GR32066 which was not mutagenic in a test with TA1537 (Experiment 808) as seen in GSK00397382–383.  (DTX 149, GSK00397382-383.)

### 6.    Dr. Jackson Withheld NAP Test Results of Other '470 Compounds with Negative Results

359.    As GSK's toxicology expert admitted, like sumatriptan, another compound claimed in the '470 patent "tested negative in the NAP Test."  (DTX 543, Gad Report ¶ 29.)  The WHO NAP test results for that compound, GR34633, were not compared to the results for sumatriptan.  (DTX 40, DRL 35, Jackson Declaration.)

360.    No differences, on NAP Test results exist between sumatriptan and GR34633.  A reasonable examiner would want to know that sumatriptan showed no difference in results when compared to other '470 patent compounds.

361.    Dr. Jackson's failure to disclose the NAP Test results for GR34633 is particularly egregious considering that this compound showed a 17% bioavailability in the Tarbit Declaration.  Sumatriptan showed 24%.

362.    Dr. Jackson also failed to disclose negative NAP Tests for other, closely related compounds.  One such compound was AH25406.

363.    These undisclosed NAP Test results were material and should have been disclosed.  GSK offered no credible explanation for withholding them.

00403270

### 7. Dr. Jackson Misrepresented the Significance of NAP Test Results in the Search for a Marketable Anti-Migraine Drug

364. Dr. Jackson suggested to the examiner that the NAP Test was a high hurdle, over which all anti-migraine compounds must pass before they could be declared toxicologically sound enough to be sold on the market. Not true. Similarly false was Dr. Jackson's statement that "the compound of formula I tested shows a significant mutagenic potential in the NAP Test" (DTX 40, GSK0026681.) This misrepresentation is evidenced by GSK internal document characterize a much greater fold revertant increase as showing "little activity." (DTX 411.) Moreover, several lead candidate compounds during the history of GSK's Migraine Project tested positive on the NAP test. GSK presently sells one such compound—naratriptan (AMERGE®).

### a. Dr. Jackson Failed to Disclose that GR32066 Was a Lead Compound at GSK Despite Its NAP Test Results

365. In fact, GSK had a history of considering compounds with positive NAP Test results as viable market candidates in its search for marketable anti-migraine drugs. For example, in GSK's "Monthly Report" of March 1983, GSK noted that GR32066 showed a 4 to 5 fold increase in strain TA1537 (frameshift). (DTX 404, at GSK 00284369.) This NAP test result, however, was not considered significant. Indeed, in the same monthly report GSK announced that this compound would be selected as the new lead compound. (*Id.* at GSK00284365.) GSK was much more concerned about patent protection than about mutagenic potential. The 1983 report explains exactly why GSK chose GR32066 as the lead: "32066 will be developed instead of 25086 in view of [the] patent situation." (*Id.* at GSK 00284365.)

366. Just a few months later, in November of 1984, Dr. Jackson received an internal GSK document showing a compound related to GR32066, namely GR40370, as having a NAP Test result that was "small (i.e., less than 5-fold)." (DTX 261, GSK00137426.) Later in the

00403270

Migraine Project—but well before Dr. Jackson signed and submitted his declaration—GSK

significantly changed the parameters required to reject a potential compound for positive NAP

test results.  (*Compare* DTX 458 at GSK00160978 *with* DTX 459 at GSK00161015.)

> **b.  Dr. Jackson Failed to Disclose that GSK's Own Parameters for an Acceptable NAP Test Result Changed— from a Four-Fold Increase to a Twenty-Fold Increase**

367.    GSK first used the NAP test in its screening criteria in November of 1983.

(*Compare* DTX 410 *with* DTX 411 at GSK00159431.)  At the time GR32066 was the lead

compound.  GSK decided to search for an improved compound and instituted a new set of six

internal screening criteria.  The fourth criterion required that the new compound show a four-fold

increase in mutagens or less—a clear positive result under GSK's SOP.  GSK characterized a

four-fold increase as showing "little activity in [the] NAP test."  (DTX 411.)

---

The profile of action of GR32066 could be improved upon by a compound with a substantially longer duration of action.  Such a compound would need to fulfil the following criteria in our primary and secondary tests before detailed evaluation of its relative duration of action.

### CRITERIA FOR SELECTION OF AN IMPROVED $S_2$-AGONIST

1.  Potency <u>in vitro</u>.  EPC (5-HT = 1) must be < 10 on dog saphenous vein ($S_2$) and > 100 on rabbit aorta ($S_1$), rat vagus nerve ($S_3$) and cat saphenous vein ($S_4$).  Maximum response in dog saphenous vein must be at least 50% of the maximum response to 5-HT.

2.  $CD_{50}$ in anaesthetised dog < 50 µg/kg i.v. with maximum response of at least 50% increase in carotid vascular resistance and $RT_{50}$ > 2h.

3.  Duration in anaesthetised dog following intravenous administration at 10 x $CD_{50}$ dose must be greater than 1 h.

4.  Little activity in NAP test using TA98 and TA1537 (4 fold increase in mutagens or less) with loss of activity when 30 mM instead of 40 mM nitrite used.

5.  No marked behavioural effects in conscious dog in intravenous doses up to 100 x $CD_{50}$.

6.  Criteria for oral potency and rate of absorption from the alimentary tract have yet to be determined.

NB  As diverse a range of chemical structures as possible will be tested against these criteria.  Lipophilic agonist compounds are probably unsuitable as anti-migraine drugs.

---

(DTX 411, GSK00159431) (emphasis added.)

00403270

368.    This remained GSK's NAP test criteria for the next four years. Then, in April 1988—still before Dr. Jackson signed and submitted his declaration—GSK changed its NAP Test criteria, making it much easier to for a compound to qualify as a potential lead compound:

CRITERIA FOR SELECTION OF AN IMPROVED $5HT_1$-like $(S_2)$-AGONIST

1.  The compound should have an in vitro EPMR (5-HT=1) of <10 on dog saphenous vein ($5HT_1$-like $(S_2)$).

2.  $CD_{50}$ in anaesthetised dog <50μg/kg i.v. with maximum response of at least 50% increase in carotid vascular resistance and $RT_{50}$ > 2h.

3.  Duration in anaesthetised dog following intravenous administration at $10 \times CD_{50}$ dose must be greater than 1h.

4.  Little activity in NAP test using TA98 and TA1537 (up to 20 fold increase in revertants).

5.  No marked behavioural effects in conscious dog in intravenous doses up to $20 \times CD_{50}$.

6.  Criteria for oral potency and bioavailability from the alimentary tract are still being considered. At present, compounds will be administered intraduodenally to anaesthetised dogs at a dose equivalent to $10 \times CD_{50}$. Compounds producing a mean carotid arterial vasoconstrictor response equivalent to ≥50% of the i.v. maximum from 2 dogs with 50% of this response being achieved within 1 hour will be evaluated further. The ratio $\frac{IDmax\%}{IVmax\%}$ should be ≥50 for n=2. Selected compounds will be assessed for bioavailability in the rat.

(DTX 459, GSK00161015) (emphasis added.)

369.    Hence, by April of 1988, GSK considered a twenty-fold increase in the number of revertants—*ten times* the number reported in the Jackson Declaration as required to show a "positive" result—as showing "little activity in [the] NAP test." (*Id.*) A twenty-fold increase in revertants is more than twice the GR32066 number Dr. Jackson presented to the Patent Office. His characterization of this result as showing "significant mutagenic potential" is false and misleading. But there is more.

### c.    Dr. Jackson Withheld GSK's NAP Test Result for GR85548— Showing a 17–20 Fold Increase in Revertants—a Compound that GSK Was Developing in 1988 and is Now Sold in the U.S. as Naratriptan

370.    Just three months later, in July of 1988, two significant events occurred in GSK's migraine project. First, a relatively new compound—then known as GR85548 and now know as naratriptan (and currently sold by GSK under the brand name AMERGE®)—had completed a preliminary NAP Test. The results showed that it had a twelve-fold increase in revertants in the

91

TA98 strain. (DTX 462, GSK00161103.) Second, that compound became one of only two

compounds "recommended to the Research Management Committee." (DTX 462,

GSK00161092.) At that time, the other compound, sumatriptan, had been on this recommended

list for over four years. (*See* DTX 417, GSK00146545.)

371.    By October of 1988 a full NAP Test of naratriptan was complete. According to a

summary report entitled "Nitrosation of GR85548"—a report that Dr. Jackson received—GSK

concluded that "GR85548 is readily nitrosatable." (DTX 645, GSK00127669.) Specifically, this

report concluded that in the naratriptan NAP tests "[a] 17–20 fold increase was obtained using *S.

typhimurium* TA98 after 1 hr and 4 hr reaction at pH 3–4." (*Id.*) Dr. Jackson signed his

declaration just over a year after receiving this report—when naratriptan was being developed

for commercial marketing. (DTX 266, GSK00129436.)

372.    Yet Dr. Jackson fails to mention any of this in his declaration. Instead, he states:

> A compound intended for oral administration and which
> consistently shows no mutagenic potential in the NAP test will
> always be more acceptable from a toxicological viewpoint than a
> compound which shows even some mutagenic potential in this test.
> This is particularly so with a class of compound, such as
> nitrosatable indoles, which is known to have a significant
> mutagenic risk. A compound with no mutagenic risk will always
> be fundamentally more acceptable than a compound which shows
> a possibility of risk. This is particularly so where the compounds
> under consideration are intended for the treatment of a non-life
> threatening condition. (DTX 40, GSK 00266812.)

373.    A reasonable examiner would want to know (1) that GSK's NAP test benchmark

was set at a twenty-fold increase in revertants; (2) that at the time Dr. Jackson signed and

submitted his declaration, GSK was developing a similar anti-migraine compound that showed a

17–20 fold increase in revertants; and (3) that GSK considered this degree of increase "little

activity."

00403270

374.    In sum, Dr. Jackson admits that the information presented in his declaration regarding the testing or GR32066 is false and inaccurate.

375.    If GSK had used the data for GR32066 that followed the WHO Protocol, GSK would not have been able to make the arguments made in the Jackson Declaration.

376.    The examiner relied on the arguments made in the Jackson Declaration in allowing the '845 patent application to issue.

377.    GSK, Mr. Fichter, Dr. Jackson, Dr. Oxford and/or others with a duty of disclosure to the Patent Office knew or should have known that the data presented in the Jackson Declaration was material to the prosecution of the patent application and that the data regarding GR32066 was false and misleading, and that the data withheld from the Patent Office was material to patentability.

378.    The circumstances surrounding the preparation and submission of the Jackson Declaration demonstrate that GSK, Mr. Fichter, Dr. Jackson, Dr. Oxford and/or others with a duty of disclosure to the Patent Office submitted false and misleading information and withheld information from the Patent Office with intent to deceive the Patent Office.

379.    The highly material nature of the misleading statements creates an inference of intent to deceive on the part of the applicant which renders the '845 patent unenforceable for inequitable conduct.

380.    The false and misleading nature of the data in the Jackson Declaration regarding GR32066 combined with the applicant's intent to deceive the Patent Office constitutes inequitable conduct that renders the '845 patent unenforceable.

00403270

**B.    The Humphrey Declaration Was False and Misleading**

381.    GSK's pattern of submitting false and misleading information, and withholding material information from the Patent Office continued with the submission of the Humphrey Declaration.

382.    Mr. Fichter presented the Humphrey Declaration in the interview with the examiner on January 11, 1990.  (DTX 2, Paper No. 6, Interview Summary Record.)

383.    The Humphrey Declaration was made of record by the examiner.  (DTX 2, Paper No. 6, Examiner - Interview Summary Record.)

384.    The examiner later withdrew the rejection of the '845 patent claims and allowed the patent to issue based, at least in part, on the data presented in the Humphrey Declaration and Dr. Humphrey's representations.

385.    The Humphrey Declaration was material to the prosecution of the application that matured into the '845 patent.

386.    Although Dr. Humphrey stated in his declaration that he was responsible for the biological testing of sumatriptan, Compound II (GR32066), and Compound III (GR34456), he never reviewed the underlying data before signing his declaration.

387.    GSK, Mr. Fichter, Dr. Humphrey, Dr. Oxford and/or others with a duty of disclosure to the Patent Office knew or should have known that the data presented in the Humphrey Declaration was material to the prosecution of the patent application.

388.    The highly material nature of the omitted information and misleading statements creates an inference that GSK intended to deceive the Patent Office, which renders the '845 patent unenforceable for inequitable conduct.

00403270

389.    The failure to disclose material information relating to the Humphrey Declaration combined with GSK's intent to deceive the Patent Office constitutes inequitable conduct that renders the '845 patent unenforceable.

390.    Mr. Fichter argued to the examiner that the claims were allowable because, *inter alia*, the Humphrey Declaration clearly demonstrated that sumatriptan shows longer duration of activity than Compound III (GR34456).

### 1.    GSK Failed to Disclose Subsequent Tests of Compound III (GR34456) Showing Its $RT_{50}$ at Greater than 2 Hours—Tests Completed by GSK before the '845 Patent Issued

391.    The mean $RT_{50}$ value for Compound III (GR34456) provided in the Humphrey Declaration was based on a single test carried out under the specified condition.

392.    The single test carried out under the specified condition provided a $RT_{50}$ value of 1 h 48.5 min for Compound III (GR34456).

393.    The Humphrey Declaration reported that the mean $RT_{50}$ value for Compound III (GR34456) under the specified condition was < 2 h.

394.    Dr. Humphrey asserted that Compound III (GR34456) was eliminated from the side-by-side comparisons recited in the Humphrey Declaration, in part, because its $RT_{50}$ (cumulative dosing) was less than two (2) hours based on results GSK had generated in February of 1983.

395.    Less than two months after Humphrey signed his declaration, and during the prosecution of the application that resulted in the '845 patent, GSK performed and recorded two additional duration of activity tests of Compound III (GR34456).

396.    The two experiments were conducted on March 20 and 23, 1990, during the prosecution of the '845 patent.  (GSK 00096445-00096447.)  In both experiments, the cumulative dosing $RT_{50}$ of GR34456 was determined to be greater than two (2) hours.

95

397.    Dr. Humphrey admitted just how material these 1990 results were. Dr. Humphrey testified that were he to have come across the data summarized in GSK00096445-00096447, he would have not only wanted to put it before the examiner but that the "balance of the evidence would have changed if that data was real." (Humphrey Dep., 195:24-196:8.) This information, as Dr. Humphrey himself acknowledged, is highly material. It undercuts a conclusion that Compound III has inferior duration of action compared to sumatriptan.

398.    GSK never disclosed the $RT_{50}$ values of > 2h for Compound III (GR34456) in the two additional tests.

399.    The omitted data is contradictory to and inconsistent with the data for Compound III (GR34456) in the Humphrey Declaration.

400.    If GSK had disclosed the omitted data from the two additional tests of Compound III under the specified condition, GSK would not have been able to eliminate Compound III from consideration.

401.    The materiality of the missing data is heightened by results of individual tests for Compound II (GR32066) that failed to meet GSK's criteria.

402.    The mean $RT_{50}$ value for Compound II (GR32066) provided in the Humphrey Declaration was obtained based on four tests carried out with cumulative intravenous dosing of Compound II (GR32066) in anaesthetized dogs.

403.    One of the four tests was carried out with cumulative intravenous dosing to 106 μg of Compound II per kg of weight of the anaesthetized dog.

404.    One of the four tests was carried out with cumulative intravenous dosing to 1000 μg of Compound II per kg of weight of the anaesthetized dog.

00403270

405.    Two of the four tests were carried out under the specified condition, i.e., with cumulative intravenous dosing to $300\,\mu g$ of Compound II per kg of weight of the anaesthetized dog.

406.    The two tests carried out under the specified condition provided $RT_{50} > 2h$ and $RT_{50} > 90$ min for Compound II.

407.    The Humphrey Declaration concluded the mean RT50 value for Compound II under the specified condition was $> 2h$.

408.    The Humphrey Declaration omitted any reference to the $RT_{50}$ value of 90 min for Compound II in one of the only two tests carried out under the specified condition.

409.    If it were proper not to eliminate Compound II based on the omitted $RT_{50}$ value of 90 min in one test, GSK should not have eliminated Compound III based on the $RT_{50}$ value of 1 h 48.5 min in one test according to the GSK criteria.

410.    Because the additional tests were carried out at least five years after GSK states that it had rejected Compound III from consideration, a strong inference arises that those substantively involved with the prosecution of the '845 patent knew or should have known this information.

411.    If GSK were consistent in its reliance on the test data for Compound II and Compound III, GSK would not have been able to make the arguments made in the Humphrey Declaration which were relied upon by the examiner in allowing the '845 patent application to issue.

### 2.    The Data in Table 1 of the Humphrey Declaration Do Not Show Statistically Significant Differences and Dr. Humphrey Knew It

412.    Table 1 in the Humphrey Declaration was included ostensibly to illustrate the differences between the three aforementioned compounds based on their potency ($CD_{50}$), and

00403270

duration of action ($RT_{50}$, cumulative and single dosing). However, it should be noted that column (a) of Table 1, under the heading, "Recovery time to 50% of the maximum increase in carotid vascular resistance in anesthetized dogs (mean from n dogs)" provides no indication as to the number of dogs used to determine the "mean."

413.   Dr. Humphrey testified to the fact that the numbers in parentheses at the end of each row below the Table 1 headings pertain only to the data in the second column (column b) and not to the data in column (a). (Humphrey Deposition, 91:7-17.) Dr. Humphrey also testified to the fact that the examiner would have no way of knowing the number of dogs used to determine the column (a) mean and that that information could only be gleaned from "screen data." There is no evidence within the prosecution history of the '845 patent that such "screen data" was ever before the examiner. Such information is material. In its absence, the examiner had no true basis to assess the integrity of GSK's data since, for instance, a mean derived from a single animal is not statistically meaningful. GSK provides no reasonable explanation for this failure and an intent to deceive the Patent Office can be fairly inferred.

414.   Furthermore, it is evident from Table 1 of the Humphrey Declaration that Compound III was tested for duration of action ($RT_{50}$, single dose) on a single dog. Dr. Humphrey testified that, were he sitting on the board of a peer-review journal and confronted with the data shown in Table 1, he would have potentially wanted to see more data, although he claimed that GSK did not have more data at the time. (Humphrey Dep., 173:10-18.) Dr. Humphrey further elaborated in his testimony that he would, were he on the board of the hypothetical journal, like to see "more N values." (Humphrey Dep., 174:6-16.) Therefore, in his testimony, Dr. Humphrey acknowledges that one of skill in the art, in this case the practicing pharmacologist, would have demanded more data in order to be convinced that an actual

00403270

difference existed between the duration of action of GR34456 and sumatriptan. It is evident

from his testimony that Dr. Humphrey knew that the data submitted to the Patent Office was not

statistically significant and made no effort to provide data to the examiner that would

demonstrate that an actual difference between the compounds tested existed. The Humphrey

Declaration was highly material because it went to the foundation of GSK's case for non-

obviousness. GSK had knowledge of the insufficiency of the data, and also knew during

prosecution that it was in possession of more data points that would have enhanced the statistical

significance of the information presented in the Humphrey Declaration. However, GSK has, to

date, provided no credible explanation as to why it failed to provide this information to the

examiner during prosecution of the '845 patent.

### 3. GSK Possessed Data on Other Promising Compounds of the '470 Patent, but Failed to Include Them in the Humphrey Declaration

415.   GSK performed testing on a number of compounds from the '470 patent. The

overall effect of the data from this testing shows that sumatriptan is in no way exceptional. The

Humphrey Declaration omitted this additional data, and relied only on misleading data for two of

the compounds. GSK consistently reported this data in its monthly reports, and could have

easily disclosed it to the Patent Office. The data is material because it shows that the overall

profile of sumatriptan is comparable to that of the other '470 patent compounds. Because this

information was material and was readily available to GSK but was not disclosed, the Court

should infer an intent to deceive.

### C. Mr. Fichter's False and Misleading Representations to Examiner

416.   On July 27, 1990, the examiner in the '845 patent prosecution mailed a Final

Office Action stating that the sole issue remaining in the '845 patent prosecution was whether

claims 1 to 4, 6 to 9, 11 to 13 and 15 are directed to an invention not patentably distinct from

00403270

claims 1 to 9, 13 and 14 of the commonly assigned application bearing serial number 07144,874, which matured into United States Patent No. 4,994,483 ("the '874 Application"). On December 26, 1990, GSK's attorney submitted a Request for Reconsideration stating that GSK would "take whatever action is necessary to remove any obviousness double patenting rejection [in the '874 Application.]"

417.    On January 17, 1991, GSK's attorney conducted an interview with the examiner.

418.    During the interview, the examiner asked whether a terminal disclaimer was filed in the '874 Application over the '845 patent application. GSK's attorney advised the examiner that the obviousness double-patenting rejection had been overcome in the '874 Application without the need to file a terminal disclaimer in that prosecution and that he would provide a copy of the papers to her.

419.    On January 17, 1991, GSK's attorney filed a Supplemental Response and Clarification to clarify and supplement the Request for Reconsideration filed on December 26, 1990.  In this filing, GSK's attorney argued that since the examiner in the '874 Application withdrew the obviousness double-patenting rejection over the '845 patent prosecution without the need to file a terminal disclaimer, the examiner in this case should also withdraw the obviousness double patenting rejection in view of the '874 Application.  GSK's attorney further argued that the double patenting rejection in the '845 patent application should be withdrawn otherwise the result would be inconsistent positions being maintained by two different patent examiners, citing *E.I. du Pont de Nemours & Co. v. Ladd*, Comr Pats 328 F.2d 547, 140 U.S.PQ. 297 (Ct. of App., D.D.C., 1964).

420.    GSK's attorney also submitted to the examiner the papers filed in the '874 Application which included the declaration of Michael Howard Tarbit ("the Tarbit Declaration").

00403270

The Tarbit Declaration compared the oral bioavailability of the compound of the '874 Application with the compounds of the '470 patent, including sumatriptan. The Tarbit Declaration concluded that the compound of the '874 Application had "markedly higher" oral bioavailability than any of the other compounds tested.

421.    In view of the Supplemental Response and Clarification, the examiner withdrew her obviousness double-patenting rejection and allowed the claims to issue.

422.    GSK's Supplemental Response and Clarification was intentionally misleading and not in accordance with Applicant's duty of candor to the Patent Office. In particular, the examiner stated that the sole issue remaining was whether sumatriptan had any superior or surprising quality relative to the compound of the '874 Application. GSK's attorney knew or should have known that the Tarbit Declaration did not show or even suggest that sumatriptan had any surprising or superior quality to the compound of the '874 Application. To the contrary, the Tarbit Declaration showed unexpected results of the compound of the '874 Application over sumatriptan, directly opposite of what would be required to overcome the obviousness double-patenting rejection.

423.    GSK misled the Patent Office into thinking that the Tarbit Declaration presented data that showed that sumatriptan was surprisingly superior to the '483 patent compound. Dr. Tarbit signed this declaration, to his knowledge, solely for the purpose of demonstrating the "markedly higher oral bioavailability" of the '483 compound over compounds claimed in the '470 patent (including sumatriptan) and that this quality was "surprising" given the structural similarity between the '483 compound and those compounds claimed in the '470 patent. Dr. Tarbit played no further role in the prosecution of the '483 patent beyond signing his declaration, and to his knowledge, had played no role in the prosecution of the '845 patent whatsoever.

00403270

Indeed, Dr. Tarbit never knew that GSK had submitted his declaration, and relied upon it, in the '845 patent prosecution. The Tarbit Declaration provides no data that shows, nor even suggests, that sumatriptan has any surprising or superior qualities with respect to the '483 patent compound.

424.    The argument offered by GSK's patent attorney, Mr. Fichter, with the submission of the Tarbit Declaration was misleading. Mr. Fichter's January 17, 1991 Supplemental Response and Clarification presented an erroneous argument that Mr. Fichter knew to be wrong, or should have known to be wrong. Mr. Fichter directly argued to the Patent Office that because another examiner in the prosecution of another application (Examiner Berch in the '483 patent prosecution) found that the Tarbit Declaration presented evidence sufficient to have the '483 patent application overcome provisional obviousness-type double-patenting rejections with respect to the '845 patent application, the examiner in the '845 patent should withdraw her provisional obviousness-type double patenting rejection of the '845 patent over the '483 patent application because "to do otherwise would result in an inconsistent position being maintained by the Patent Office examiners." Mr. Fichter relied on *E.I. du Pont de Nemours & Co. v. Ladd*, Comr. Pats., 140 USPQ 297 for support of his position.

425.    The "consistency" argument asserted to the Patent Office by Mr. Fichter was wrong, and either was known to be wrong by Mr. Fichter or should have been known to be wrong by Fichter. There is no authority for the principle that mutual, contemporaneous provisional obviousness-type double patenting rejections are necessarily "bilateral," (i.e., if overcome in one direction, must be overcome in the opposite direction). Moreover, evidence that a first invention is surprisingly or unexpectedly superior in some way to a second invention does not also demonstrate that the second invention was surprisingly or unexpectedly superior to

00403270

the first. Nevertheless, GSK submitted the Tarbit Declaration (without Dr. Tarbit's knowledge) to assert exactly this position. That is, GSK argued that because the Tarbit Declaration demonstrated that the '483 compound was surprisingly superior (in oral bioavailability) to, *inter alia*, sumatriptan, then the Tarbit Declaration must also demonstrate that sumatriptan was surprisingly superior to the '483 compound, and therefore that the Patent Office should withdraw the '845 patent obviousness-type double patenting rejection without requiring GSK to submit the promised terminal disclaimer.

426.   The authority Mr. Fichter cited to the Patent Office to support this argument does not support this argument and therefore further misled the PTO. *E.I. du Pont de Nemours & Co. v. Ladd*, Comr. Pats., 328 F.2d 547, 140 U.S.P.Q. 297 (Ct. of App., D.D.C., 1964) has nothing to do with double-patenting. This case concerns the Commissioner's rejection of a particular patent application for anticipation and failure to comply with the written description requirement (35 U.S.C. §§ 102, 112, respectively).

427.   GSK submitted no evidence to the examiner that there was a patentable distinction with respect to sumatriptan, i.e., between sumatriptan and the compound of the '874 Application.

428.   GSK's attorney's submissions were material to the prosecution of the '845 patent. GSK's failure to advise the examiner of the true nature of the non-responsive submissions was done with an intent to deceive the Patent Office rendering the '845 Patent unenforceable.

### D.   The Cumulative Effect of These Material Omissions and Misrepresentation Demonstrates an Intent to Deceive the Patent Office

429.   The cumulative effect of these material omissions and misrepresentation demonstrates an intent to deceive the Patent Office. GSK's repeated assertion of inadvertence, typos or honest mistake lacks credibility—particularly given the fact that GSK is a

00403270

pharmaceutical company used to operating in a heavily regulated environment. GSK does not make these types of "mistakes" in its FDA submissions—it knows how to submit quality, reliable, and complete data when it wants to. Its repeated failure to do so now was intentional.

00403270

## CONCLUSIONS OF LAW

I.  **Controlling Authority**

  A.  **Jurisdiction**

430.    The court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1338(a).

## REGULATORY FRAMEWORK

431.    In 1984, Congress enacted legislation amending the federal Food, Drug and Cosmetic Act, 21 U.S.C. §§ 301-392 (hereinafter referred to as "Hatch-Waxman Amendments") with the primary purpose of facilitating and expediting the marketing of generic drugs. Congress recognized that bringing generic drugs to the market provides significant benefits to consumers, including lower prices and increased choice.

432.    The Hatch-Waxman Amendments provide, *inter alia*, two ways to obtain FDA approval to market new drugs: a new drug application ("NDA") and an ANDA. The major difference between the two applications is that NDAs contain full clinical data establishing the drug's safety and effectiveness, while ANDAs rely on the safety and effectiveness data in the referenced NDA rather than submitting otherwise duplicative clinical data. 21 U.S.C. § 355(b), (j).

433.    An NDA holder is required to submit certain patent information to FDA for listing in the Orange Book. 21 U.S.C. § 355(b)(1). The Orange Book is an FDA publication that provides patent information concerning approved drugs and identifies which drugs qualify under the Hatch-Waxman Amendments for period of exclusivity.

434.    The patent information that the NDA applicant must submit to FDA for listing in the Orange Book includes a declaration certifying that (1) the patent claims the drug for which the NDA was submitted (or an FDA-approved method of using such drug) and a (2) a claim of

00403270

infringement could reasonably be asserted if a person not licensed by the patent holder engaged in the manufacture, use, or sale of the drug. 21 U.S.C. § 355(b)(1). The same information must be submitted to FDA for new patents that are issued after NDA approval if they meet these criteria. *Id.*; 21 U.S.C. § 355(c)(2).

435.    A generic drug manufacturer filing an ANDA for a drug with an unexpired patent listed in the Orange Book may, among other things, either (1) certify that the patent for the NDA drug will expire on a particular date and that the ANDA applicant does not seek to market its generic product before that date (a "Paragraph III certification"), or (2) certify that the patent for the NDA drug is invalid, unenforceable, or will not be infringed by the proposed generic company's product (a "Paragraph IV certification"). 21 U.S.C. §§ 355(j)(2)(A)(vii)(III), (IV).

436.    If an ANDA applicant files a Paragraph IV certification, it then sends a notice letter to the NDA holder and patent owner that includes a detailed statement of the factual and legal bases of the ANDA applicant's opinion that the patent is invalid, unenforceable, or would not be infringed. 21 U.S.C. § 355(j)(2)(B).

437.    Filing an ANDA with a Paragraph IV certification confers subject matter jurisdiction for a patent infringement suit under 35 U.S.C. § 271(e)(2).

**B.    Federal Circuit Law Applies**

438.    Federal Circuit precedent governs matters of substantive patent law in this court. The Federal Circuit has adopted decisions of the Court of Customs and Patent Appeals ("C.C.P.A.") as its own precedent, making those decisions binding on this court. *South Corp. v. United States*, 690 F.2d 1368, 1370 (Fed. Cir. 1982) (en banc).

00403270

C.    **Legal Standard**

439.    Patents are presumed valid.  Although historically about half of litigated patents are held invalid,[4] a patent is presumed valid. 35 U.S.C. § 282.  Anticipation of an invention occurs when a single prior-art reference discloses each and every element of a claimed invention. *Richardson v. Suzuki Motor Co.*, 868 F.2d 1226, 1236 (Fed. Cir. 1989).

440.    Evaluation of prior art for anticipation requires that the entire disclosure be considered for everything that it would have reasonably taught one of ordinary skill in the art. *Ex parte Ellis*, Appeal No. 1999-0512, 2002 WL 1801397, at *6 n.2 (B.P.A.I. 2002); *In re Bode*, 550 F.2d 656, 661 (C.C.P.A. 1977).  Moreover, it is necessary to go beyond the specific teachings of the reference and consider inferences that one of ordinary skill in the art would have been reasonably expected to draw from the disclosure. *Ellis*, 2002 WL 1801397, at *6 n.2; *In re Preda*, 401 F.2d 825, 826 (C.C.P.A. 1968).  A prior-art reference **is not limited to its specific examples**. *In re Snow*, 471 F.2d 1400, 1403 (C.C.P.A. 1973) (emphasis added); *Preputnick v. Provencher*, Pat. Int. No. 104,693, 2002 WL 1009878, at *14 (B.P.A.I. 2002). The alleged infringer must prove anticipation by clear and convincing evidence. *Finnigan Corp. v. Int'l Trade Com'n*, 180 F.3d 1354, 1365 (Fed. Cir. 1999).  Spectrum has met its burden.

441.    The determination of obviousness is a question of law. *See Richardson-Vicks Inc. v. Upjohn Co.*, 122 F.3d 1476, 1479 (Fed. Cir. 1997); *Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714, 719 (Fed. Cir. 1991); *Newell Co. v. Kenney Mfg. Co.*, 864 F.2d 757, 767-69 (Fed. Cir. 1988), *cert. denied*, 493 U.S. 814 (Fed. Cir.1989).  Four basic factual inquiries set forth in *Graham v. John Deere*, 383 U.S. 1, 17, (1966), underlie the ultimate legal determination.  The four *Graham* factors are (1) the scope and content of the prior art; (2) the level of ordinary skill

---

[4] *See* FTC, *To Promote Innovation: A Proper Balance of Competition and Patent Law Policy*, Ch. 5, at 25, n.179 (2003) *available at* http://www.ftc.gov/os/2003/10/innovationrpt.pdf (noting that only "54% of final, published district court and appellate decisions during the 1989-96 period found patents valid . . .").

00403270

in the art; (3) differences between the prior art and the claims and (4) secondary considerations such as commercial success, long felt but unresolved needs, and failure of others. *John Deere*, 383 U.S. at 17.

442.    It is Spectrum's burden to prove by clear and convincing evidence that the inventions claimed in the '845 patent would have been obvious. *Ashland Oil, Inc. v. Delta Resins & Refactories, Inc.*, 776 F.2d 281, 291–92 (Fed. Cir. 1985). Spectrum has met its burden.

## II.    The Claims of the '845 Patent Are Invalid

### A.    The Claims of the '845 Patent Are Anticipated by the '470 Patent

443.    A claim not satisfying the novelty condition of patentability, as defined in § 102, is said to be "anticipated." *E.g., Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1339 (Fed. Cir. 2003).

444.    "A claim is anticipated only if each and every element as set forth in the claim is found, either expressly or inherently described, in a single prior-art reference." *Verdegaal Bros., Inc. v. Union Oil Co. of Cal.*, 814 F.2d 628, 631 (Fed. Cir. 1987); *See Moba, B.V. v. Diamond Automation Inc.*, 325 F.3d 1306, 1321 (Fed. Cir. 2003).

445.    However, there is no requirement that the reference and the claim have the exact same words, i.e., there is no 'ipsissimis verbis' test. *See In re Bond*, 910 F.2d 831, 832 (Fed. Cir. 1990).

446.    Spectrum has shown by clear and convincing evidence that '470 patent anticipates the '845 patent claims. Spectrum has shown by clear and convincing evidence that the '470 patent teaches each and every limitation of the claims of the '845 patent.

108

00403270

### 1.    The '470 Patent Anticipates the '845 Patent

447.    Sumatriptan is described and enabled by the '470 patent in at least claims 1-7. Sumatriptan is the compound of any of those claims in which $R_1$ is a hydrogen, $R_2$ is a methyl group, $R_3$ is a hydrogen atom, $R_4$ and $R_5$ are methyl groups, and "alk" is an unsubstituted ethylene group.

448.    The formulas shown in the '470 patent claims 1-7 merely represent a shorthand means to describe the compounds falling within its ambit. All of these compounds are described and enabled as if they had been expressly written out.

449.    Sumatriptan and sumatriptan succinate are described in this manner in the '470 patent. This meets the requirement for anticipation that a single reference teach every limitation with respect to each claim asserted in this case. *See Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1378-79 (Fed. Cir. 2001).

450.    Claim 1 of the '845 patent is directed to sumatriptan and its physiologically acceptable salts and solvates. The '470 patent anticipates this claim because every limitation of this claim is found in the '470 patent.

451.    Claims 2-4 of the '845 patent are directed to an acid addition salt, a physiologically acceptable salt, and the 1:1 succinate of sumatriptan, respectively.

452.    The '470 patent teaches that the claimed compounds, including sumatriptan, may be formed into physiologically acceptable salts, which "include acid addition salts formed with organic or inorganic acids, for example hydrochlorides, hydrobromides, sulphates, fumarates, maleates and succinates." (DTX 5, col.1 l.55-61.) The '470 patent further teaches that an indole derivative compound, such as sumatriptan, may be formed into a physiologically acceptable salt preferably with an equivalent amount of succinic acid, i.e., 1:1 succinates. (DTX 5, col.8 l.66 to col.9 l, 4.) (*See also* DTX 5, col.31 ll.4-8.)

00403270