453.   The '470 patent anticipates claims 2-4 because every limitation of these claims is found in the '470 patent.

454.   The '470 patent also teaches each limitation in claims 5-9 of the '845 patent. Claim 5 of the '845 patent is directed to a "pharmaceutical composition comprising as active ingredient an effective amount of" sumatriptan "or a physiologically acceptable salt or solvate" of sumatriptan, "together with one or more pharmaceutically acceptable carrier or excipients for use in the treatment or prevention of pain resulting from dilatation of the cranial vasculature." Claim 6 of the '845 patent depends from claim 5 and limits the pharmaceutical composition to those formulated for oral administration in humans. Claims 7-9 depend from claim 6 and recite pharmaceutical compositions formulated into unit dosage forms comprising 0.1 to 100 mg, 0.5 to 50 mg, and 2 to 40 mg of active ingredient, respectively.

455.   The '470 patent teaches pharmaceutical compositions comprising an effective amount of the claimed compounds, such as sumatriptan, or physiologically acceptable salts or solvates thereof, with pharmaceutically acceptable excipients for the treatment of migraine. (DTX 5, col.1 l.62 to col.2 l.21; Claims 16-18.) The '470 patent also teaches that such pharmaceutical compositions may be formulated for oral administration to human with 0.1 to 100 mg of the active ingredient, which can be administered 1 to 4 times per day. (DTX 5, col.2 l.22 to col.3 l.18.)

456.   The '470 patent further teaches that the pain of migraine results from dilatation of the cranial vasculature. (DTX 5, col.1 l.62-68.) It also teaches that the claimed compounds constrict the carotid arterial bed of anesthetized dogs and thus are useful for the treatment of migraine. (DTX 5, col.1 l.60 to col.2 l. 13.) Claims 15-18 of the '470 patent describe using sumatriptan to treat humans by administering an effective amount of the drug.

00403270

457.    Claim 10 of the '845 patent is directed to a method of treating a human being susceptible to or suffering from migraine by administering an effective amount of sumatriptan or a physiologically acceptable salt or solvate thereof.  Claims 11 and 12 are directed to a method of treating a human being susceptible to or suffering from migraine by administering a pharmaceutical composition recited in claims 5 and 6, respectively.

458.    The '470 patent teaches each limitation in claims 10-12 of the second sumatriptan patent.  Specifically, the '470 patent teaches a method of treating a patient suffering from migraine which comprises administering to the patient an effective amount of a claimed indole derivative compound, such as sumatriptan, or a physiologically acceptable salt or solvate thereof. (DTX 5, Claims 16 and 18.)  As explained above, the '470 patent also teaches pharmaceutical compositions, including those recited in claims 5 and 6, for the treatment of migraine. Accordingly, the '470 patent teaches to a person of ordinary skill in the art a method of treating a patient suffering from migraine with sumatriptan or a pharmaceutical composition comprising sumatriptan.

459.    In sum, the '470 patent discloses each and every limitation of each claim of the '845 patent to a person of ordinary skill in the art at the relevant time.  The '845 patent claims are therefore anticipated by the '470 patent.

### 2.    The '470 Patent Teaches a Sufficiently Small Genus—Containing as Few as Nine or Even Six Compounds—to Anticipate Sumatriptan

460.    In addition, the '845 patent is anticipated under the law set forth in *In re Petering*, 301 F.2d 676 (C.C.P.A. 1962).  A sufficiently limited genus can anticipate a species, even if the species does not explicitly appear in the reference.  *Id.*; *In re Schaumann*, 572 F.2d 312, 316-17 (C.C.P.A. 1978).  The *Petering* and *Schaumann* cases describe the circumstances required for such a case.  As explained in the Findings of Fact Section (II)(A), paragraphs 84-120, *supra*, and

111

00403270

in accordance with the *Petering* and *Shaumann* cases, the '470 patent teaches a limited genus

such that anticipates sumatriptan even though the specific formula for sumatriptan is not

explicitly referenced in the '470 patent examples.

       **a.**    **As in *In re Petering*, the Pattern of Specific Preferences**
                    **Taught by the '470 Patent Yields an Anticipatory Genus**

461.    In *In re Petering*, the Board of Patent Appeals affirmed an examiner's rejection of

a claim to a particular compound—6, 7-demethyl-9-[ß-monohydroxyethyl]-isoalloxazine—and

the applicant appealed. 301 F.2d at 677. The C.C.P.A. affirmed the finding of anticipation.

Specifically, the court affirmed the holding of anticipation based on a single prior-art patent

disclosing a genus that encompassed the claimed compound. The court held that the prior-art

reference—U.S. Patent No. 2,155,555 to Karrer—anticipated the claimed compound even

though it contained neither a picture of the structural formula nor a recitation of the chemical

name.

462.    Karrer disclosed the following genus:



wherein X, Y, Z, P and R' represent either hydrogen or alkyl
radicals, R a side chain containing an OH group . . .

463.    The Petering court noted that, standing alone, this genus "encompasses a vast

number an perhaps even an infinite number of compounds since there is no express limit on the

size of the alkyl group or the structure and size of R." *Id.* at 681. This broad genus disclosure

alone did not anticipate the claimed compound. *Id.* But reading it in connection with "the

pattern of Karrer's specific preferences" revealed a "much more limited class within that broad

00403270

class." *Id.* This pattern of specific preferences emanated from (1) the examples and (2) specifically disclosed preferable R groups:

> Even though appellants' claimed compounds are encompassed by this broad generic disclosure, we do not think this disclosure by itself describes appellants' invention . . . within the meaning of 35 U.S.C. 102(b). However, there is more than this broad generic disclosure in Karrer. . . . Karrer discloses certain specific preferences for X, Y, Z, P, R and R′ **through his series of preferred R groups and his eight specific isoalloxazines**.

*Id.* (emphasis added).

464.    The preferences reduced a potentially infinite genus of compounds to a limited genus of only 20 compounds, "excluding isomerism within certain of the R groups." *Id.* at 681. The court held:

> [W]e wish to point out that it is not the mere number of compounds in this limited class which is significant here but, rather, the total circumstances involved, including such factors as
>
> > [1] the limited number of variations for R,
> >
> > [2] only two alternatives for Y and Z,
> >
> > [3] no alternatives for the other ring positions, and
> >
> > [4] a large unchanging parent structural nucleus.
>
> With these circumstances in mind, it is our opinion that Karrer has described to those with ordinary skill in this art each of the various permutations[sic] here involved as fully as if he had drawn each structural formula or had written each name. . . . we hold that each compound within the limited class in Karrer, as defined supra, has been described in a printed publication within the meaning of 35 U.S.C. § 102(b), and that it is of no moment that each compound is not specifically named or shown by structural formula in that publication.

*Id.* at 682 (paragraphing and numbering added).

465.    The Court excluded isomerism of the R groups when evaluating the size of the class because "one with ordinary skill in this art, with the 20 Karrer compounds before him,

00403270

would also have before him those subspecies which involve standard well-known isomerism within an R group." *Id.* at 682.

466.    In finding that a genus anticipated a species without an explicit recitation of chemical structure or name, the *Petering* court discerned from a genus of millions of compounds a limited genus of only 20 by focusing on the "the pattern of [the prior-art's] specific preferences." *Id.*

467.    As discussed above in Findings of Fact Section (II)(A), paragraphs 84-120, the claims, examples, and preferred compound within the '470 patent direct one skilled in the art to a very limited group of nine or even six compounds. This anticipates the claims of the '845 patent.

468.    Even if the '470 patent genus is considered to be 66 compounds within claim 7 (excluding the standard well-known isomerism of the $C_3H_5$ group included in the $R_2$ definition), this anticipates under *Petering* since 66 compounds is well within the routine number of compounds that one of ordinary skill would envision and make as part of a drug development effort. (Findings of Fact Section (II)(A) paragraphs 84-120.) Indeed, whether the genus were 6, 9, 33, 66 or 102 compounds, sumatriptan is anticipated. The routine practice in the pharmaceutical arts is to make several hundred or more members of a promising class, and the claim 7 group of compounds is well within the routine skill of the art to envision and make.

469.    The *Petering* court held that "it is not the mere number of compounds in this limited class which is significant," but instead focused on four circumstances:

> [1] the limited number of variations for R,
>
> [2] only two alternatives for Y and Z,
>
> [3] no alternatives for the other ring positions, and
>
> [4] a large unchanging parent structural nucleus.

*In re Petering*, 301 F.2d at 681. These circumstances also exist here.

114

00403270

470.    After considering claim 7 in light of the pattern of preferences disclosed in the specification, the variables here are limited. $R_3$ can only be a hydrogen. "Alk" can only be ethylene. $R_1$, $R_2$, $R_4$, and $R_5$ can only be a hydrogen or a methyl. Only four variables exist. And each variable has only two possibilities. (Findings of Fact Section (II)(A), paragraphs 84-120.)

471.    **Limited variations for R.** In *Petering* "R" was one of five variables. *Id.* at 677-78. It was the variable with the most alternatives and after considering the pattern of preferences in the specification, the court limited it to 5 related but complex molecules. *Id.* at 681. Here, after considering the pattern of preferences in the specification, the variables with the most alternatives are $R_1$, $R_2$, $R_4$, and $R_5$ with only two alternatives, hydrogen or methyl. Even under the broadest interpretation of claim 7, the variable with the most options is $R_2$ with five, excluding isomers. This is within what the *Petering* court considered for R in finding anticipation.

472.    **Only two alternatives for Y and Z.** In *Petering* "Y and Z" were two of the other five variables. *Id.* These variables had only two possibilities, hydrogen or methyl. As in *Petering,* here $R_1$, $R_2$, $R_4$, and $R_5$ can only be a hydrogen or a methyl.

473.    **No alternatives for the other ring positions.** In *Petering*, "X, P, and R" were the remaining variables on the ring. *Id.* at 678. Each could only be hydrogen. As in *Petering,* here $R_3$ can only be a hydrogen and "Alk" can only be ethylene. Even without limiting the claim 7 definitions based on the preferences shown in the examples, "Alk" can be only ethylene or n-propylene.

474.    **A large unchanging parent structural nucleus.** Like the nucleus in *Petering*, the indole nucleus in the '470 patent claim 7 is large and does not include variables or otherwise change.

115

00403270

     **b.**     **As in *In re Schaumann*, Two Facts Make the Case for an Anticipatory Genus Here Even Stronger than in *Petering*—the Express Disclosure of the Claims and the Similarity in Properties Between Sumatriptan and the Prior Art**

475.     In *In re Schaumann*, the Board of Patent Appeals affirmed an examiner's rejection of a claim drawn to a particular compound—DL-1-(3-hydroxyphenyl-2-ethylaminopropane (also known as HEP)—and the applicant appealed. *Schaumann*, 572 F.2d at 312. The C.C.P.A. affirmed the anticipation finding. Specifically, the court affirmed the rejection for anticipation based on a single prior-art patent disclosing a genus that encompassed the claimed compound. Like in *Petering*, the court held that a prior-art patent—U.S. Patent No. 2,344,356 to Hildebrandt—anticipated the claimed compound even though it contained neither a picture of the exact structural formula nor a recitation of the chemical name.

476.     Hildebrandt disclosed the following genus:

$$HO\text{-}C_6H_4\text{-}CH_2\text{-}CH\text{-}CH_3$$
$$R\diagdown N \diagup R$$

     in which R designates hydrogen, an alkyl radical, for example
     methyl, ethyl, propyl, isopropyl, butyl, isobutyl, isoamyl, etc. or a
     cycloalkyl radical, for example cyclohexyl, ortho-, meta- or para-
     methylcyclohexyl, tetrahydronaphthyl, decahydronaphthyl, etc.

*Id.* at 313.

477.     Hildebrandt's claim 1 read:

$$HO\text{-}C_6H_4\text{-}CH_2\text{-}CH\text{-}CH_3$$
$$HN.R$$

     wherein R is a lower alkyl radical.

*Id.* at 314.

00403270

478.    The *Schaumann* court stated:  "[W]e believe the circumstances in the present case provide a far stronger foundation on which to support a finding of anticipation than did the circumstances in *Petering*."  *Id.* at 316.  The *Schaumann* facts were different in two respects.

479.    First, the preference for "lower alkyl secondary amines" was expressly set forth by the prior art in *Schaumann*—namely, by claim 1.  An inference of a preference based on the examples in the specification was not required.

480.    Second:

> [T]he properties possessed by the specific compounds claimed in *Petering* were diametrically opposite to the properties of the compounds disclosed in the prior-art of record, whereas here the blood pressure lowering effect of HEP is also shared by the class of compounds disclosed by Hildebrandt.

*Id.* at 316.

These facts made the case for anticipation stronger in *Shaumann* than in *Petering*.

> When we consider also that claim 1 of the Hildebrandt patent, read in conjunction with the signification given the expression "alkyl radical" in the specification, embraces a very limited number of compounds closely related to one another in structure, we are led inevitably to the conclusion that the reference provides a description of those compounds just as surely as if they were identified in the reference by name.  Since one of the compounds thus described is HEP, we agree with the examiner and the majority of the board that appellants' right to a patent thereon is barred under 35 U.S.C. § 102(b).

*Id.* at 316-317.

481.    As explained above, the facts of *In re Schaumann* provided a stronger case of anticipation for two reasons.  First, the broad genus was limited not by discerning a limited genus from the specification, but by express disclosure of the claims.  Second, the properties of the prior-art compounds were exactly the same at those of the claimed invention.  (Findings of Fact Section (II)(A), paragraphs 84-120.)

117

00403270

482.    The genus disclosed by the '470 patent specification was, in the first instance, substantially narrowed by the claims of the patent—reaching a narrow group of compounds defined in claim 7 (66 excluding isomerism, 102 including all possible isomers).  Moreover, as in *Schaumann*, the compounds claimed by the '845 patent have the same anti-migraine properties as those explicitly described in the '470 patent.

483.    The '470 patent anticipates the '845 patent claims.

### c.    *In re Ruschig* Demonstrates That the Application of *Petering* to this Case Is Appropriate

484.    In *In re Ruschig*, the Board of Patent Appeals affirmed an examiner's rejection of claims drawn to a small set of compounds designed to lower blood sugar.  343 F.2d 965 (C.C.P.A. 1965).  The applicant appealed.  The C.C.P.A. reversed.  Specifically, the court reversed the anticipation rejection because the Board of Patent Appeals improperly applied *Petering*.

485.    The *Ruschig* court explained that finding a smaller disclosed class was appropriate in *Petering* because the members of the disclosed class "were *very* similar to one another in structure and all . . . possessed the *same* properties."  343 F.2d at 974 (emphasis in original).  The *Ruschig* court emphasized that the *Petering* case was based on the total circumstances in the case.  *Id.*

486.    In *Ruschig* the prior-art references did not disclose any utility for the compounds.  The *Ruschig* patent application disclosed a blood-sugar-lowering property but the prior art provided "no disclosure in any reference of any blood sugar lowering action."  *Id.* at 972.  In contrast to *Ruschig*, the '470 patent discloses and claims compounds with the same anti-migraine property as is provided for compounds of the '845 patent claims.  (Findings of Fact Section (II)(B), paragraphs 121-273.)

00403270

487.    The *Ruschig* prior-art reference did not disclose compounds with *similar chemical structures*. The prior-art patent used "widely differing $R_1$ choices [such] as p-acylaminobenzene, diphenyl, β-naphthalene and dimethyl benzene to name a few from the *thirteen* possible choices." *Id.* at 974 (emphasis in original.) The prior-art patent's $R_3$ also had a diverse set of choices including "ethyl, dodecyl, benzyl, and α-naphthyl." *Id.* In contrast, GSK's '470 patent compound discloses compounds with a very similar chemical structure. $R_2$ is the most diverse group in the '470 patent claim 7 and only has choices of hydrogen, methyl, ethyl, isopropyl, propenyl or benzyl. (Findings of Fact Section (II)(A). paragraphs 84-120.) Most of the choices in the '470 patent claim 7 are between hydrogen and methyl. (*Id.*)

488.    The '470 patent discloses compounds with the same anti-migraine property and with very similar chemical structures. (*Id.*) Therefore, it is appropriate to apply *Petering* to find anticipation.

### 3.    *In re Petering* Does Not Require the Skilled Artisan to Immediately and Simultaneously See All the Members of a Disclosed Genus

489.    GSK incorrectly argues that *Petering* provides a test for anticipation requiring a prior-art genus to "disclose such a small class of compounds that a person would immediately and *simultaneously* see in his mind *all* of the members of the class." (D.I. 67, GSK May 19, 2006 Ltr. 2) (emphasis added.)

490.    First, in arguing its point, GSK quoted *Petering* out of context by merely quoting the phrase "at once envisage each member of this limited class." *Petering*, 301 F.2d at 681. The full sentence from *Petering* reads: "It is our opinion that one skilled in this art would, on reading the Karrer patent, at once envisage each member of this limited class, even though this skilled person might not at once define in his mind the formal boundaries of the class as we have done here." *Id.* at 681.

00403270

491.    It is irresponsible to say that *Petering* requires a person of ordinary skill in the art to "immediately and simultaneously see in his mind all members of the class" when the court stated that "this skilled person might not at once define in his mind the formal boundaries of the class." *Id.*

492.    The full context of the quote shows that this is not an articulation of an anticipation *test* but rather the court's description of the strength of the anticipation.

493.    *Petering* uses the "envisage" phrase only once. *Id. Ruschig* quotes the "envisage" phrase only once, but then proceeds to discuss *Petering*'s total circumstances. *In re Ruschig*, 343 F.2d at 974 ("we put great emphasis in [*Petering*] on the total circumstances in the case. . .".) *Schaumann* never quotes or mentions any "envisage" requirement, but instead places emphasis on the total circumstances of the *Petering* case. *Schaumann*, 572 F.2d at 316-17.

494.    Neither *Atofina v. Great Lakes Chem. Corp.*, 441 F.3d 991(Fed. Cir. 2006) or *Schering v. Precision Cosmet Co. Inc.*, 614 F. Supp. 1368 (D. Del. 1985) use the "envisage" phrase but both are cited by GSK as cases applying the *Petering* test.  (D.I. 67, GSK May 19, 2006 Ltr. 3.)

495.    The appropriate application of *Petering* is to examine the inventor's specific preferences and given the total circumstances determine if the specific preferences disclose a genus sufficiently small that it anticipates the species.  Spectrum provided clear and convincing evidence that the specific preferences found in the '470 patent disclose sumatriptan.  (Findings of Fact Section (II)(A). paragraphs 84-120.)

### 4.    The '470 Patent's Recitation of Physiologically Acceptable Salts Does Not Increase the Genus Size

496.    GSK improperly asserts that the use of obvious salts increases the size of the genus.  GSK also misstates the rationale behind *Petering* and its progeny.

00403270

497.    GSK argues that "the number of compounds belonging to a given genus of the '470 Patent is the number of free base compounds multiplied by the number of physiologically acceptable salts." (D.I. 67, GSK May 19, 2006 Ltr. 2.) The litigation-inspired idea that possible salt compounds multiply the number of compounds disclosed to one of skill in the art contradicts GSK's own implicit position in obtaining the '845 patent and the '470 patent. Pharmaceutical patents routinely include "pharmaceutically acceptable salts" because a salt typically has the same pharmaceutical activity as the parent compound—both the '845 and the '470 patent include the identical language. GSK did not provide examples of each and every pharmaceutically acceptable salt of every compound claimed in these patents. Nevertheless, GSK broadly claimed all such salts, implicitly admitting that making salts is routine. Moreover, claim 8 of the '470 patent limits the salts to six. Claim 9 limits the number of salts to one: succinate. GSK's experts concede that creating pharmaceutical salts involves only routine skill, and that once dissolved (e.g., in a patient's bloodstream) the salt form is irrelevant to the activity of the compound. For at least for these reasons, salts are irrelevant.

### 5.    The '470 Patent Enables Sumatriptan

498.    A "disclosure must be sufficient to enable one with ordinary skill in the art to practice the invention." *Minnesota Mining & Mfg Co. v. Chemque, Inc.*, 303 F.3d 1294, 1306 (Fed. Cir. 2002); *see also PPG Indus. v. Guardian Indus Corp.*, 75 F. 3d 1558, 1566 (Fed. Cir. 1996). ("To anticipate a claim, a reference must disclose every element of the challenged claim and enable one skilled in the art to make the anticipating subject matter.") In order to enable, the prior-art reference must teach one of ordinary skill in the art to make or carry out the claimed invention without undue experimentation. *Nat'l Recovery Techs., Inc. v. Magnetic Symposium Sys., Inc.*, 166 F. 3d 1190, 1196 (Fed. Cir. 1999). It is important to note that "prior art patents

121

are presumed enabled . . ." *Amgen Inc. v. Hoechst Marion Roussell*, 314 F.3d 1313, 1354 (Fed. Cir. 2003).

499.    Spectrum provided clear and convincing evidence that '470 patent enables the '845 patent.  (Findings of Fact Sections (II)(A), paragraphs 84-87.)

**B.    The Claims of the '845 Patent Are Rendered Obvious by the Limited Genus Taught by the '470 Patent**

500.    A claimed invention is unpatentable for obviousness if the differences between it and the prior art "are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art."  35 U.S.C. § 103(a).

**1.    The First Three Required *Graham* Factual Findings Demonstrate that Sumatriptan Would Have Been Obvious to One Having Ordinary Skill in the Art**

501.    To determine obviousness as a legal matter, the Court must make four factual inquiries:  (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed invention and the prior art; and (4) secondary considerations of nonobviousness, which include commercial success, long-felt but unresolved need, failure of others, and unexpected results.  *Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 662 (Fed. Cir. 2000).  These factors stem from *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966) and are often referred to as "the *Graham* factors."

502.    The first three obviousness factors cited above comprise the *prima facie* case. *Winner Int'l Royalty Corp. v. Wang*, 202 F.3d 1340, 1350 (Fed. Cir. 2000).

503.    Balancing of the *Graham* factors in the instant case requires a legal conclusion the the '845 patent claims are obvious.

00403270

   a.    **Scope and Content of the Prior Art/Differences Between the Prior Art and the Claims**

504.    The fact finding set forth in Sections (II)(A)-(II)(B), paragraphs 84-120, 126-127, with respect to anticipation and obviousness establish the scope and content of the prior art and the differences between the prior art and the claims.

   b.    **Level of Ordinary Skill in the Art**

505.    The legal standard for this factual finding requires that the Court evaluate the following factors pertinent to this determination: (1) educational level of the inventor; (2) the type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology, and (6) educational level of workers active in the field. *Envtl. Design, Ltd. v. Union Oil Co. of Calif.*, 713 F.2d 693, 696 (Fed. Cir. 1983).

506.    The level of ordinary skill in the art is "a prism or lens through which a judge or jury views the prior art and the claimed invention." *Al-Site Corp. v. VSI, Int'l, Inc.*, 174 F.3d 1308, 1324 (Fed. Cir. 1999). The level of skill is relevant to the obviousness determination. *See, e.g., Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 1120, 1131 (Fed. Cir. 2000) (finding "overwhelming evidence of obviousness, particularly in light of [1] the relatively small difference between the prior art . . . and the claimed invention, and [2] *the high degree of skill* for the ordinary artisan.") (emphasis added).

507.    The education level of a person of skill in the art is set forth in Findings of Fact Section (II)(B)(4), paragraphs 137-151, *infra*.

508.    In particular, the routine practice at the time of the '845 invention was that once a promising class of chemical compounds had been identified as having a desired activity, large numbers of those compounds—several hundred or more—would be synthesized and screened.

123

509.    The routine practice at that time period was to carry out empirical testing on the

class of compounds to select an appropriate lead compound.

510.    The standard for establishing a *prima facie* obviousness case is set forth in *In re*

*Dillon*, 919 F.2d 688, 690 (Fed. Cir. 1990)(en banc).

511.    In the Federal Circuit's en banc opinion in *In re Dillon*, a patent applicant

appealed an examiner's rejection of claims to a hydrocarbon fuel composition containing a

chemical compound called "tetra-orthoesters." *Id.* at 690.  The PTO Board of Patent Appeals

affirmed the examiner's rejection.  *Id.*  Although the initial three-judge panel reversed, the

Federal Circuit sitting en banc withdrew the decision and affirmed the Board's obviousness

rejection. *Id.*

512.    Later, the court opined on the state of chemical obviousness law.  Indeed, the

court noted that it took the case en banc in order to "restore the law to its state existing before

[the withdrawn] panel opinion." *Id.* at 696.

513.    In this connection, the court summarized a litany of cases regarding chemical

obviousness:

> In brief, the cases establish that if an examiner considers that he
> has found prior art close enough to the claimed invention to give
> one skilled in the relevant chemical art the motivation to make
> close relatives (homologs, analogs, isomers, etc.) of the prior art
> compound(s), then there arises what has been called a presumption
> of obviousness or a prima facie case of obviousness.

*Id.* at 696.  Thus *prima facie* obviousness is established for a chemical compound when the prior

art does two things.  It must disclose a compound of similar chemical structure and it must

provide some reason to make the claimed compound.

514.    But more than just this strikingly similar chemical structure, the prior art '470

patent discloses that the prior art compounds are useful for the treatment of migraine.  These two

00403270

facts alone would motivate one of skill in the art to make sumatriptan. *See In re Payne*, 606 F.2d 303, 314 (C.C.P.A. 1979) (holding that the closeness of structural similarity in claimed and prior-art compounds coupled with knowledge of prior-art pesticidal activity alone would motivate a skilled artisan to make the claimed compound); *In re Hoch*, 428 F.2d 1341, 1343 (C.C.P.A. 1970) (holding that *prima facie* case of obviousness was established by similarity in chemical structure in conjunction with utility disclosures of the prior-art references and was not rebutted because "substantial, actual differences in properties" had not been shown); *In re Wilder*, 563 F.2d 457, 460 (C.C.P.A. 1977) ("[C]onsidering the very close structural similarity of the claimed compound and the reference compounds and the fact that the reference compounds were known in the prior art to be useful . . . we conclude that the lack of skin toxicity exhibited by the claimed compound . . . does not rebut the *prima facie* case of obviousness.").

515.    Sumatriptan is *prima facie* obvious in view of the '470 patent. More than simply having a close structural similarity with the compounds from claim 7 of the '470 patent, it is one of those compounds. And the disclosure that the compounds had anti-migraine activity provided the motivation to make the compound. *See Payne*, 428 F.2d at 1343.

### c.    Sumatriptan Is an Obvious Species of a Prior Art Genus

516.    A genus claim encompassing many molecules may render a particular included molecule—a species—obvious. *See, e.g., Merck & Co. v. Biocraft Labs., Inc.*, 874 F.2d 804, 807 (Fed. Cir. 1989) (holding that a claimed species was obvious as a matter of law based on a broad prior art genus disclosure that encompassed the particular later-claimed species without specifying it).

517.    In *Merck*, a Hatch-Waxman patent case like this one, the patent holder, Merck, sued Biocraft for infringement of its patent drawn to a composition useful in the treatment of cardiovascular and renal diseases. 874 F.2d at 805. Biocraft alleged that the patent claims were

00403270

invalid as an obvious species in view of a prior-art genus. *Id.* at 806. The district court held that Biocraft failed to prove that the patent was invalid. The Federal Circuit reversed. *Id.* at 805. On appeal Merck argued that the claimed species was not obvious because the broad disclosure in the prior-art patent did not highlight the specific combination claimed by the patent in suit. *Id.* at 807.

518.    The prior art patent in *Merck* disclosed over 1200 combinations that would produce the desired medical effect. *Id.* at 807.

519.    The Court found that the prior-art reference taught that each member of the entire genus would produce the desired effect, and the mere fact that the prior art patent "discloses a multitude of effective combinations does not render any particular formulation less obvious." *Id.* The court continued: "This is especially true because the claimed composition is used for the identical purpose taught by the prior art." *Id.* (emphasis added).

520.    Here, as in *Merck*, a prior-art patent—the '470 patent—discloses a genus of chemical compounds. Claim 7, as GSK's Dr. Taylor admitted, includes a genus of only 102 compounds. As in *Merck*, the claimed invention at issue here is encompassed by the prior-art patent genus. As in *Merck*, the prior-art '470 patent discloses that all of the permutations encompassed by the genus disclosure are useful for a particular purpose, namely as "useful for the treatment of migraine." (DTX 5, '470 Patent, col.2 ll.11-13; claims 15-18.) And as in *Merck*, the compound claimed in the patent-in-suit—sumatriptan—is used for the exact same purpose as the previously disclosed genus compounds. Thus, as in *Merck*, the claimed compound here is merely an obvious species of a prior-art genus.

00403270

> **d.**   **GSK Is Estopped From Asserting That the '470 Patent Does Not Provide a Motivation to Make Sumatriptan With a Reasonable Expectation of Succession**

521.   Moreover, the '470 patent provides a motivation to make sumatriptan with a reasonable expectation of success.

522.   Given the presumptive validity of the '470 patent and the accompanying presumption that the patent is enabled for succinates of all of the species claimed, one of skill in the art would have a reasonable expectation of success in the use of sumatriptan succinate for the treatment of migraine.  By successfully prosecuting the '470 patent, extending its term, and listing it in the Orange Book GSK has successfully relied on the validity of that patent as discussed in Findings of Fact Section (I)(C)(5), paragraphs 54-58, *infra*.

> **2.**   **The Objective Evidence Does Not Rebut the *Prima Facie* Case, But Instead Supports the Obviousness of Sumatriptan**

523.   Secondary factors such as commercial success do not control the obviousness conclusion. *Newell Co. v. Kenney Mfg. Co.*, 864 F.2d 757, 768 (Fed. Cir. 1989), *cert. denied*, 110 S. Ct. 62 (1989).  *Id.* at 768; *see also Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714, 719 (Fed. Cir. 1991) (affirming summary judgment when the district court determined that secondary considerations did not carry sufficient weight to override a determination of obviousness based on primary considerations and concluding that such a determination can be made as long as the secondary considerations are contemplated by the district court).  Instead, "secondary considerations, including evidence of unexpected results and commercial success, are but a part of the "totality of the evidence" that is used to reach the ultimate conclusion of obviousness." *Richardson-Vicks*, 122 F.3d at 1476, 1483.

00403270

524.    GSK attempts to rebut the *prima facie* case with so-called objective evidence of nonobviousness.  After considering the evidence—including GSK's alleged secondary considerations—the asserted claims of the '845 patent are obvious in view of the '470 patent.

### a.    Commercial Success

525.    As set forth in Findings of Fact Section (II)(B)(6) , paragraphs 258-262, *infra* commercial success does not support patentability of the '845 patent.

526.    Indeed, GSK's decision to forego the extension of the '845 patent in favor of an extension of the '470 patent causes this factor to weigh in favor of obviousness, rather than against obviousness.  (*See* paragraphs 258-262.)

527.    In *Merck v. Teva,* a Hatch-Waxman patent case like this one, Merck sued Teva for infringement of a patent drawn to a method for treating osteoporosis with the chemical compound alendronate on a once-a-week schedule.  395 F.3d 1364, 1366-67 (Fed. Cir. 2005).  The district court, partially based on the commercial success of the claimed invention, found the claims not invalid for obviousness.  The Federal Circuit reversed, holding that the district court's commercial success analysis was error.  *Id.* at 1366.  The court explained:

> Although commercial success might generally support a conclusion that Merck's claimed invention was non-obvious in relation to what came before in the marketplace, the question at bar is narrower.  It is whether the claimed invention is non-obvious in relation to the ideas set forth in the [closest prior-art].  ***Financial success is not significantly probative of that question in this case because others were legally barred from commercially testing the [closest prior-art]*** . . . In this case *Merck had **a right to exclude others*** from practicing the weekly-dosing of alendronate specified in claims [at issue], ***given . . . another patent*** covering the administration of alendronate sodium to treat osteoporosis. . .

*Id.* at 1377.

528.    Like Merck, GSK had a right to exclude others from making, using, testing, selling, and importing not only the closest prior-art but also the purported invention of

128

00403270

sumatriptan.  Accordingly, as in *Merck v. Teva*, "because market entry by others was precluded the inference of non-obviousness . . . from evidence of commercial success, is weak." *Merck*, 395 F.3d at 1377.  *See also Syntex v. Allergan, Inc.*, 407 F.3d 1371, 1383 (Fed. Cir. 2005) (admonishing the district court to "carefully consider" Merck on remand because "[a]ssuming that the active ingredient in the formulation was previously patented, the commercial success of ACULAR may heavily derive from subject matter that does not on the whole contribute to the patentable distinctiveness of these claims").  But a close look at the *Merck* case reveals that such a pre-patent right to exclude affects *other* secondary considerations as well.

In *Merck*, the Federal Circuit explained why commercial success can evidence nonobviousness:

> [t]he possibility of market success attendant upon the solution of an existing problem may induce innovators to *attempt a solution*. If in fact a product attains a high degree of commercial success, there is a basis for inferring that such *attempts have been made and have failed*.

*Merck*, 395 F.3d at 1376 (quoting Richard L. Robbins, Subtests of "Nonobviousness": A Nontechnical Approach to Patent Validity, 112 U. Pa. L. Rev. 1169, 1175 (1964) (emphasis added).  Thus, at bottom, commercial success does not evidence nonobviousness—it evidences a failure of others to invent.  Commercial success is but a window through which the fact finder can see that others tried and failed to obtain the claimed solution.  It is this failure of others—or a long-felt but unresolved need—that that can demonstrate nonobviousness.  Judge Easterbrook explained:

> The existence of an enduring, unmet need [long felt but unresolved need] is strong evidence that the invention is novel, not obvious, and not anticipated. If people are clamoring for a solution, and the best minds do not find it for years [failure of others to invent], that is practical evidence--the kind that can't be bought from a hired

00403270

expert, the kind that does not depend on fallible memories or
doubtful inferences. . . .

*In re Mahurkar Patent Litigation*, 831 F. Supp. 1354, 1377-78, (N.D. Ill. 1993), *aff'd*, 71 F.3d

1573 (Fed. Cir. 1995).

529.   The upshot is that commercial success does not show nonobviousness unless it

can be linked to a failure of others.  In *Merck*, prior-art patents destroyed any such link.  Because

others were legally prevented from entering the marketplace, any commercial success must have

been due to factors *other than* the failure of others.  *Merck* did not directly address—because the

question was not presented—how prior-art patents affect the probative value of two related

indicators of nonobviousness, namely "failure of others" and "long-felt but unresolved need."

But the answer is clear.  Where, as here, prior-art patents prevented others from practicing not

just the related prior-art but also the actual compound now alleged to be separately patentable—

*no others could have tried and failed to develop sumatriptan because they were "legally barred"*

*from testing it.*  Accordingly, on these facts, "failure of others" and "long felt but unresolved

need," like "commercial success," are simply not probative of the obviousness *vel non* of

sumatriptan.

### b.    Long Felt but Unresolved Need

530.   Moreover, any long felt need was resolved by the first sumatriptan patent—the

'470 patent.  No one could legally have made sumatriptan without infringing the first

sumatriptan patent.  (Findings of Fact, Section (II)(B)(6), paragraph 257.).

531.   As previously discussed, under the Federal Circuit precedent of *Merck v. Teva*

and based on the facts of this case, the prior patent vitiates the link between unresolved need and

obviousness.  (Conclusions of Law (II)(B)(2), paragraphs 527-529.)

130

00403270

### c.    Failure of Others

532.    After the first sumatriptan patent—the '470 patent—everyone but GSK was barred from experimenting with sumatriptan.  GSK provided no persuasive evidence to support to support a finding of non-obviousness through the failure of others.  (Findings of Fact, Section (II)(B)(6), paragraph 263.)

533.    *Teva,* as previously discussed, also vitiates the nexus between failure of others and non-obviousness.  *Id.*

### d.    Licensing

534.    There is no persuasive evidence of licensing.  (Findigs of Fact, Section (II)(B)(6), paragraph 264.)

### e.    Skepticism of Experts

535.    GSK's assertion that there was skepticism in the art was unpersuasive.  (Findings of Fact, Section (II)(B)(6), paragraph 265.)  Solomon's assertion that there was skepticism as to the success of a new anti-migraine medication because the underlying factors were not well understood is not logically sound because once the '470 patent was published then the skepticism should dissipate. *Id.*

### f.    Copying

536.    The ANDA procedures established by the Hatch-Waxman Act require generic drug manufacturer to copy the approved drug.  A demonstration of equivalency or copying is therefore not an indication of nonobviousness in the context of generic drugs.  *See Eli Lilly and Co. v. Teva Pharmaceuticals, Inc.,* No. 02-0512, 2004 WL 1724632, at *38, n.21 (S.D. Ind. July 29, 2004) ( "Because the very nature of a generic drug indicates that it is equivalent to the branded drug in certain significant respects, [the generic drug manufacturer's] demonstration of

00403270

equivalency of [the patented drug] to the extent required by the FDA is not an indication of the non-obviousness of the claimed invention.").

537.   "Evidence of copying tends to be more compelling in arts in which there is more room to design around patents or to improve upon them. When the invention in question is a drug that has won FDA approval as safe and effective, the incentive to copy is strong. In fact, the ANDA procedures established by the Hatch-Waxman Act require generic drug manufacturers to copy the approved drug." *Eli Lilly v. Zenith Goldline Pharm*, No. 99-38, 2001 U.S. Dist. LEXIS 18361, at *41 (S.D. Ind. Oct. 21, 2001).

538.   "Variations undermine the FDA's ability to assume that if the patented drug is safe and effective, the generic competitor will also be safe and effective. The fact that copying is likely to be present in many Hatch-Waxman Act cases does not allow the court to ignore the copying as evidence of non-obviousness, even though it may be entitled to relatively little weight." *Id.* at *42.

539.   In light of the evidence of Hatch-Waxman's fiscal incentives to be the first company to produce a generic version of the branded drug evidence of copying should be given minimal weight of nonobviousness.

### g.     Unexpected Results

540.   Unexpected superior properties from an invention support the conclusion that the invention was not obvious to one of ordinary skill in the art. *In re Baxter Travenol Labs.*, 952 F.2d 388, 392 (Fed. Cir. 1991); *In re De Blauwe*, 736 F.2d 699, 705 (Fed. Cir. 1984). As the Federal Circuit has recognized, the reason behind this principle is "that which would have been surprising to a person of ordinary skill in a particular art would not have been obvious." *In re Mayne*, 104 F.3d 1339, 1343 (Fed. Cir. 1997) (quoting *In re Soni*, 54 F.3d 746, 750 (Fed. Cir. 1995)).

132

541.    One of the secondary indicia that a patentee may use to rebut a *prima facie* showing of obviousness is evidence that "the claimed compositions possess **unexpectedly** improved properties . . . ." *In re Dillon*, 919 F.2d 688 (Fed. Cir. 1990) (emphasis added). Unexpected results, however, must be established by **evidence**—not argument and conjecture. *In re De Blauwe*, 736 F.2d 699, 705 (Fed. Cir. 1984).

542.    In order for a showing of unexpected results to be probative of nonobviousness, the evidence must establish: (1) that there actually is a difference between the results obtained and those of the closest prior art and (2) that the difference actually obtained would ***not have been expected*** by one skilled in the art at the time of the invention. *In re Freeman*, 474 F.2d 1318, 1324 (1973) (emphasis added).  No such evidence exists here.

543.    GSK claims unexpected results exist for duration of activity, potency and mutagenicity and that these alleged unexpected results indicate nonobviousness.  Spectrum has provided clear and convincing evidence that GSK's conclusions that there are unexpected results does not follow from the evidence that GSK has presented.

544.    Sumatriptan does not have any ***unexpectedly*** better properties than the prior art for two reasons.

545.    First, as described above, based on evidence unknown to the examiner during the prosecution of the '845 patent, it is now clear that a no actual *difference in properties exists between sumatriptan and the prior art*.  Even if, as GSK asserts, a difference has been shown, it is small and, to say the least, questionable.  (*See* Findings of Fact (II)(B)(5), paragraphs 152-248.)

546.    But even if the data can be said to support a difference—however small and questionable—the data supporting any purported ***unexpected*** results must, of course, have

133

00403270

probative value. *McNeil-PPC, Inc.*, 207 F. Supp.2d 356, 365-72 (E.D. Pa. 2002), *rev'd on other grounds*, 337 F.3d 1362 (Fed. Cir. 2003) (discounting the probative weight of purported unexpected results evidence because the results were (1) inconsistent (2) not readily reproducible (3) statistically and clinically questionable, and (4) based on studies showing comparisons with something other than the closest prior art). Here, GSK's data are highly questionable for the reasons set forth in Findings of Fact (III)(B), paragraphs 152-248.

547.    Finally, no credible evidence  showing that the alleged differences would have been surprising to one of skill in the art.  More than a mere difference in degree between the properties of sumatriptan and the prior art must be shown.

548.    In *In re Merck*, Merck appealed a PTO Board of Patent Appeals rejection of patent claims drawn to a chemical compound useful for treating depression. 800 F.2d 1091, 1092 (Fed. Cir. 1986).  The Federal Circuit affirmed, first holding that given the close structural similarity, the known similar uses, and the knowledge of investigative techniques, the claimed invention "was prima facie obvious over the prior art of record." *Id.* at 1097.  The court further held:

> [W]hile there are *some differences in degree* between the properties of [the claimed invention] and [the closest prior art], the compounds expectedly have the same type of biological activity. In the absence of evidence to show that the properties of the compounds differed in *such an appreciable degree that the difference was really unexpected*, we do not think that the Board erred in its determination that appellant's evidence was insufficient to rebut the prima facie case. . . . *a difference in structure, although slight, would have been expected to produce some difference in activity.*

*Id.* at 1099 (emphasis added).  This analysis applies with equal force in the case at bar.

549.    Even assuming, arguendo, GSK has shown a difference in properties between sumatriptan and the prior art, as in *Merck*, the difference is "a matter of degree rather than kind."

00403270

*Id.* at 1099. As in *Merck*, the claimed invention and the prior art have very similar chemical structure and have known similar uses. When coupled with the knowledge of investigative techniques here, as in *Merck*, the claimed invention is obvious.

550.    The small—even debatable—differences in properties proffered by GSK are *precisely* what the skilled artisan would have expected—especially give the similarity in chemical structure. See *In re Rosselet*, 347 F2d 847, 848 (C.C.P.A. 1965) (rejecting a showing of activity 4.7 and 1.6 times that of the prior art in part because of the close structural similarities).

551.    The evidence did not demonstrate that sumatriptan possesses any "unexpected results" when compared with the prior art. Little, if any, differences in results exist between sumatriptan and the prior art—let alone differences that would be unexpected or surprising to one having ordinary skill in the art. This secondary consideration, like the others, supports the conclusion that the asserted claims are obvious.

### 3.    Conclusion—The Claims of the '845 Patent Are Obvious

552.    An analysis under *Graham*, *supra.*, considering the scope and content of the prior-art, the level of skill in the art, the differences between the prior-art and sumatriptan, and the objective evidence of nonobviousness, leads this court to the conclusion Spectrum has proven by clear and convincing evidence that the subject matter claimed in each and every claims of the '845 patent would have been obvious within the meaning of 35 U.S.C. § 103 to a person of ordinary skill in the art.

00403270

C.    The Claims of the '845 Patent Are Invalid Under
the Judicially Created Doctrine of Double Patenting

553.    The defense of double patenting "precludes one person from obtaining more than

one valid patent for either (a) the 'same invention,' or (b) an 'obvious' modification of the same

invention." *In re Longi*, 759 F.2d 887, 892 (Fed. Cir. 1985).

554.    The double-patenting law "prohibit[s] the issuance of the claims in a second

patent not patentably distinct from the claims of the first patent." *Id.*

555.    Defendants must prove double patenting by clear and convincing evidence.

*Symbol Techs., Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1580 (Fed. Cir. 1991); *Carman Indus., Inc.*

*v. Wahl*, 724 F.2d 932, 940 (Fed. Cir. 1983).

556.    The first type of double patenting, based on the "same invention," arises from 35

U.S.C. § 101, which authorizes "a patent" to issue on an invention. Thus, same invention or

"statutory" double patenting prevents a second patent from issuing on an identical invention. *See*

*Longi*, 759 F.2d at 892.

557.    The second type of double patenting, sometimes referred to as "nonstatutory" or

"obviousness type" double patenting, is based on federal common law rather than statute, and

prevents a patent claim from validly issuing "when the claimed subject matter is not patentably

distinct from the subject matter claimed in a commonly owned patent.'' *In re Berg*, 140 F.3d

1428, 1431 (Fed. Cir. 1998).

558.    A later claim is not patentably distinct if it "is obvious over, or anticipated by, the

earlier claim." *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 968 (Fed. Cir. 2001). Thus, the

court must determine whether "any claim in the application define[s] merely an obvious

variation of an invention claimed in the patent asserted as supporting double patenting." *Gen.*

*Foods Corp. v. Studiengesellschaft Kohle GmbH*, 972 F.2d 1272, 1278 (Fed. Cir. 1992) (citing *In*

00403270

re Vogel, 57 C.C.P.A. 920, 422 F.2d 438, (1970)); accord *Ortho Pharm. Corp. v. Smith*, 959 F.2d

936, 940 (Fed. Cir. 1992) (finding that double patenting precludes a second patent that "would

have been obvious from the subject matter of the claims in the first patent, in light of the prior-

art") (quoting *Longi*, 759 F.2d at 893). "If the rejected claim defines more than an obvious

variation, it is patentably distinct." *Gen. Foods*, 972 F.2d at 1278 (emphasis in original).

559.    "The fundamental reason for the rule [of obvious-type double patenting] is to

prevent unjustified timewise extension of the right to exclude granted by a patent no matter how

the extension is brought about." *Eli Lilly & Co.*, 251 F.3d at 968 (quoting *In re Van Ornum*, 686

F.2d 937, 943–44 (C.C.P.A. 1982)).

560.    The double patenting analysis involves a two-step process. First, the court must

determine the differences between the claims of the patents. Second, the court must determine

whether the differences in the claimed subject matter between the earlier and later patents render

the claims patentably indistinct or obvious. *Eli Lilly & Co. v Barr Labs* 251 F.3d 955, 968 (Fed.

Cir. 2001).

> **1.    The Only Difference Between the Claims Of '845 Patent and the '470
> Patent Is That the '470 Patent Claims Do Not Include a Pictorial
> Representation of Sumatriptan's Structure, But the '845 Patent
> Claims Do**

561.    The '470 patent claims cover the same anti-migraine property claimed in the '845

patent. The '845 patent also discloses the sumatripitan. The only possible difference between

the claims of the '845 patent and the '470 is that the '470 patent discloses a small group of

compounds including sumatriptan and the '845 patent shows the specific structure and chemical

name for sumatriptan.

562.    In *Eli Lilly v. Barr Laboratories Inc.*, Eli Lilly sued Barr for infringement of its

patents covering Prozac. 251 F.3d 955 (Fed. Cir. 2001). The district court granted summary

00403270

judgment for infringement and Barr appealed. *Id.* at 959. The case was heard by a Federal Circuit panel, then by the Federal Circuit en banc, which then reassigned the opinion to the panel. *Id.* at 958. The Federal Circuit held that a claim 7 of the '549 patent was invalid due to obvious-type double patenting, reversed-in part the district court's grant of summary judgment for non-infringement and remanded the case to the District Court. *Id.* at 972.

563.    The Federal Circuit dismissed the idea that the '549 claim 7 to "fluoxetine hydrochloride" was different from the '213 claim 1 to "fluoxetine or norfluoxetine or pharmaceutically acceptable salts thereof." *Id.* at 969.

564.    The Federal Circuit, *inter alia,* held that "[a] person of ordinary skill in the art would have recognized that fluoxetine hydrochloride is a pharmaceutically-acceptable salt of fluoxetine. In fact, hydrochloride salts are the most common pharmaceutically acceptable salts of basic drugs, and hence are obvious compounds." *Id.* at 969.

565.    Similarly, succinate was a common and well-known salt at the time of the invention. (*See* Findings of Fact (II)(B)(4), paragraphs 137-151.) Therefore, the use of succinate is obvious in light of the '470 patent's claim to pharmacologically acceptable salts.

566.    Therefore the only difference it that the '845 patent claims the species of sumatriptan and that the '470 patent claims a small group of compounds that includes sumatriptan.

### 2.    The Claims of the '845 Patent is Are Not Patentably Distinct from the Claims of the '470 Patent

567.    The second step of the obvious type double patenting analysis is to determine if the claims are patentably distinct. This court has previously explained how the '845 patent is anticipated and obvious in light of the '470 patent. *See Generally* Findings of Fact (II)(B)(4), paragraphs 137-151.)

00403270

### 3. Secondary Objective Evidence is Not Taken Into Account in Obviousness Type-Double Patenting

568.     The Federal Circuit's recent decision in *Geneva Pharm., Inc. v. GlaxoSmithKline*

*P.L.C.*, 349 F.3d 1373, 1377–78 n1 (Fed. Cir. 2003) differentiated the obviousness type double

patenting analysis.

> The distinctions between obviousness under 35 U.S.C. § 103 and nonstatutory double patenting include:
>
> 1.     The objects of comparison are very different: Obviousness compares claimed subject matter to the prior-art; nonstatutory double patenting compares claims in an earlier patent to claims in a later patent or application;
>
> 2.     Obviousness requires inquiry into a motivation to modify the prior-art; nonstatutory double patenting does not;
>
> 3.     Obviousness requires inquiry into objective criteria suggesting non-obviousness; nonstatutory double patenting does not.

*Id.* at 1377 n.1.

569.     Therefore the previous obviousness analysis applies without reference to

secondary indicia of obviousness.

570.     The anticipation analysis applies with equal force.  The similarity of the analysis,

as well as the findings and conclusions relating to the novelty and nonobviousness of the '845

patent claims in light of the '470 patent, are equally relevant to the issue of non-statutory double

patenting.

571.     Spectrum has proven that the '845 patent is invalid for double patenting over the

'845 patent.

00403270

III.    **GSK's Inequitable Conduct During the Prosecution of the '845 Patent Renders Patent Unenforceable**

572.    Patent applicants are required to prosecute patent applications with candor, good faith, and honesty. *Semiconductor Energy Lab. Co. v. Samsung Electronics Co.*, 204 F.3d 1368, 1373 (Fed. Cir. 2000).

573.    Attorneys, agents, and applicants who have applications pending before the Patent Office have an uncompromising duty to report all facts concerning possible fraud or inequitable conduct underlying the application. *See Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.*, 324 U.S. 806, 818, 65 S.Ct. 993, 89 L.Ed. 1381 (1945).

574.    If a patent applicant violates these duties, the patent may be held unenforceable due to inequitable conduct. *See Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.*, 326 F.3d 1226, 1233 (Fed. Cir. 2003).

575.    "[I]nequitable conduct includes affirmative misrepresentation of a material fact, · failure to disclose material information, or submission of false material information, coupled with an intent to deceive." *Semiconductor Energy Lab.*, 204 F.3d at 1373.

576.    "The duty of candor extends throughout the patent's entire prosecution history." *Fox Indus. v. Structural Preservation Sys., Inc.*, 922 F.2d 801, 803 (Fed. Cir. 1990).

577.    Inequitable conduct requires Defendants to prove the elements by "clear and convincing evidence." *Manville Sales Corp. v. Paramount Sys., Inc.,* 917 F.2d 544, 551 (Fed. Cir. 1990).

578.    "Inequitable conduct entails a two-step analysis: first, a determination of whether the [conduct] meets a threshold level of materiality and intent to mislead, and second, a weighing of the materiality and intent in light of all the circumstances to determine whether the applicant's conduct is so culpable that the patent should be unenforceable." *GFI, Inc. v. Franklin Corp.*, 265

00403270

F.3d 1268, 1273 (Fed. Cir. 2001); *see also Hoffmann–LaRoche, Inc. v. Promega Corp.*, 323 F.3d 1354, 1359 (Fed. Cir. 2003).

579.    Thus, to prevail on its inequitable conduct allegations, Spectrum must prove that the information that was allegedly withheld or misrepresented was material to patentability. They must then demonstrate knowledge, chargeable to those responsible for prosecuting the application, of that information and of its materiality.  Finally, they must prove that an individual having a duty of disclosure to the Patent Office intentionally withheld or misrepresented the information with an intent to mislead the PTO.  *FMC Corp. v. Manitowoc Co.*, 835 F.2d 1411, 1415 (Fed. Cir. 1987).

580.    "If the trial court still finds that a threshold level of intent to deceive has been established, the court should reweigh its materiality and intent findings to determine whether the sanction of unenforceability due to inequitable conduct is warranted."  *Purdue Pharma L.P. v. Endo Pharm., Inc.*, 438 F.3d 1123, 1135 (Fed. Cir. 2006).

581.    "Materiality of the non-disclosed information, and culpable intent to deceive must be established by clear and convincing evidence."  *ATD Corp v. Lydall Inc.*, 159 F.3d 534, 546 (Fed. Cir. 1998).

582.    The duty of disclosure is codified in the regulations governing patent application proceedings before the PTO. 37 C.F.R. § 1.56 (1992) ("Rule 56"). Regulations consistent with statutes have the force and effect of law. *Wyden v. Comm'r of Patents & Trademarks*, 807 F.2d 934, 935–36 (Fed. Cir. 1986) (en banc ) ("[T]he Commissioner's promulgation of regulations, which are found in 37 C.F.R., … if not inconsistent with law, … have the force and effect of law."); *Norton v. Curtiss*, 57 C.C.P.A. 1384, 433 F.2d 779, 791(1970) ("[Title] 35 U.S.C. § 6 [now § 2(b)(2)(A) ] gives the Commissioner authority to establish regulations governing the

00403270

conduct of proceedings in the Patent Office. We have long held that such regulations, when not inconsistent with the statutes, have the force and effect of law").

583.    Prior to 1992, Rule 56 defined information as being material "where there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent." 37 C.F.R. § 1.56 (1990).

584.    "Direct evidence of intent to deceive or mislead the Patent Office is 'rarely available but may be inferred from clear and convincing evidence of the surrounding circumstances.'" *Purdue Pharma Pharma v. Endo Pharmaceuticals Inc.,* 438 F.3d 1123, 1133-1134 (Fed. Cir. 2006)(quoting *Baxter Int'l, Inc. v. McGaw, Inc.*, 149 F.3d 1321, 1329 (Fed. Cir. 1998) quoting *LaBounty Mfg., Inc. v. USITC*, 958 F.2d 1066, 1076 (Fed. Cir. 1992)).

585.    "When determining whether intent has been shown, a court must weigh all evidence, including evidence of good faith." *Id.* at 1134 (citing *Baxter*, 149 F.3d 1321 at 1330).

586.    The Federal Circuit has held that "a patentee facing a high level of materiality and clear proof that it knew or should have known of that materiality, can expect to find it difficult to establish subjective good faith sufficient to prevent the drawing of an inference of intent to mislead." *Id.* at 1134. (citations and internal quotation omitted)

587.    The Federal Circuit "has inferred the requisite intent to deceive when a patentee has withheld highly material information such as a key prior-art reference and knew or should have known of its materiality." *Id.* at 1134 (citing *Bruno*, 394 F.3d 1348, 1354 (Fed. Cir. 2005); *Critikon*, 120 F.3d 1253, 1256-57 (Fed. Cir. 1997).

588.    "The more material the conduct, the less evidence of intent will be required in order to find that inequitable conduct has occurred." *PerSeptive Biosystems, Inc. v. Pharmacia Biotech, Inc.*, 225 F.3d 1315, 1319 (Fed. Cir. 2000).

00403270

589.   "Intent [to deceive] need not be proven by direct evidence; it is most often proven by a showing of acts, the natural consequences of which are presumably intended by the actor." *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1180 (Fed. Cir. 1995).  "Generally, intent must be inferred from the facts and circumstances surrounding the applicant's conduct." *Id.* at 1180–81.

590.   In ascertaining an applicant's intent, the court must consider the totality of the circumstances. *Baxter Int'l*, 149 F.3d at 1330 ("It is the totality of the applicant's conduct that creates the inference upon which the applicant's intent can be ascertained.").

591.   "'[S]moking gun' evidence is not required in order to establish an intent to deceive. Rather, this element of inequitable conduct, must generally be inferred from the facts and circumstances surrounding the applicant's overall conduct." *Paragon Podiatry Lab, Inc., v. KLM Labs, Inc.*, 984 F.2d 1182, 1189 (Fed. Cir. 1993) (internal quotations and citations omitted).

592.   A mere denial of intent to mislead (which would defeat every effort to establish inequitable conduct) will not suffice in such circumstances. *Id.*

593.   As is often the case, the examiner may initially reject a claim in an application on the basis of a *prima facie* case of obviousness or anticipation.  One method by which the applicant may overcome these rejections is by submitting data representing "unexpected" properties, superior properties or advantages not found in the prior art.  This is frequently presented in the form of comparative testing data.  Since the patent office must rely on the applicant's accurate presentation of data, this area "breeds more problems with fraud and inequitable conduct than any other." 6 Chisum on Patents, § 19.03[2] (Mathew Bender).  In particular, "data furnished to the patent office to compare performance of the invention with prior art must be fairly and accurately presented since the patent office has no means of verifying

143

the data." *Lam, Inc. v. Johns-Manville Corp.*, 668 F.2d 462, 471 (10th Cir. 1982.). This problem is compounded by the fact the PTO is "limited in the time permitted to ascertain the facts necessary to adjudge the patentable merits of each application." *Norton v. Curtiss*, 433 F.2d 779, 793-94 (C.C.P.A. 1970).

594.    To guard against the possibility of fraud or inequitable conduct, applicants who submit test data to show unexpected results are charged with the "highest standards of honesty and candor." (*Id.* at 794.) It is not surprising, therefore, that courts have attached a "higher standard than mere avoidance of intentional fraud" to test results and similar data submitted to the Patent Office. *True Tempur Corporation v. CF&I Steel Corporation*, 601 F.2d 495, 502 (10th Cir. 1979). In submitting evidence of comparative tests, an applicant must be "held to be representing that his showing includes a "fair and accurate demonstration of the closed prior art of which he is aware." *See Norton*, 433 F.2d at 794.

595.    The very act of submitting comparative data is itself a "representation." *Id.* at 794.

596.    Concealment and nondisclosure are also considered to be "evidence of and equivalent to a false representation, because concealment or suppression is, in effect, a representation that what is disclosed is the whole truth." *Monsanto Co. v. Rohm & Haas Co.*, 456 F.2d 592, 599 (3rd Cir. 1972) (*citing Stewart v. Wyoming Cattle Ranche Co.*, 128 U.S. 388, 388-89 (1888)).

597.    The Federal Circuit has plainly noted that "there is no room to argue that submission of false affidavits is not material." *Rohm & Haas Co. v. Crystal Chemical Co.*, 722 F.2d 1556, 1571 (Fed. Cir. 1983).

00403270

598.    The intent requirement of inequitable conduct is established when the applicant has withheld material information and "(1) the applicant knew of the information; (2) the applicant knew or should have known of the materiality of the information; and (3) the applicant has not provided a credible explanation for the withholding." *Ferring B.V. v. Barr Labs., Inc.*, 437 F.3d 1181, 1191 (Fed. Cir. 2006).  The Federal Circuit has held:

> No single factor or combination of factors can be said always to *require* an inference of intent to mislead; yet a patentee facing a high level of materiality and clear proof that it knew or should have known of that materiality, can expect to find it difficult to establish "subjective good faith" sufficient to prevent the drawing of an inference of intent to mislead. A mere denial of intent to mislead (which would defeat every effort to establish inequitable conduct) will not suffice in such circumstances.

*LaBounty Mfg., Inc. v. U.S. Int'l Trade Com.*, 958 F.2d 1066, 1076 (Fed. Cir. 1992) (emphasis in original).

**A.    The Jackson Declaration Alone Establishes Inequitable Conduct**

**1.    Dr. Jackson Withheld and Misrepresented Information that Was Material to Patentability and He Knew It**

599.    There is clear and convincing that GSK committed inequitable conduct through the use of the false and misleading Jackson Declaration.  (*See* Findings of Fact Sections (III)(A), paragraphs 274-380.)

600.    First, Spectrum has established, with clear and convincing evidence, the threshold requirement of materiality.  *Id.*

601.    The Jackson Declaration was used to overcome a double patenting rejection by the Patent Office.  *Id.*

602.    The Jackson Declaration's many material false statements, GSK's material omissions and GSK failures to make related subsequent material disclosures include:

(1)    Jackson falsely claims he supervised the testing

145

(2)     Jackson falsely reports that WHO NAP testing conditions were followed but more favorable data from a different test was presented

(3)     Actual WHO NAP testing conducted by GSK disproved the Jackson Declaration's assertion that the closest prior-art was mutagenic

(4)     GSK never submitted the real WHO NAP test data to the Patent Office that contradicted the Jackson Declaration. (*See* Findings of Fact (III)(A)(2), paragraphs 296-308.)

**2.     The Cumulative Effect of the Missing and Distorted Information Presented by Dr. Jackson in His Declaration Demonstrates His Intent to Deceive**

603.    Second, Spectrum has presented clearing and convincing to meet the established threshold of intent to deceive. While Spectrum has not provided a smoking gun, the highly material and false declarations provides an inference of intent to deceive. Furthermore the presentation of false WHO NAP test data combined with the withholding of the unfavorable WHO NAP test demonstrates clear and convincing evidence of intent to deceive. GSK's mere denial of intent to mislead will not suffice to overcome the evidence presented by Spectrum.

**B.     Spectrum Has Established by Clear and Convincing Evidence That GSK and Individuals Under a Duty of Candor to the Patent Office Engaged in Inequitable Conduct**

604.    The Jackson Declaration contained false and misleading information and made material misstatements as set forth in Section (III)(A), paragraphs 274-380.

605.    GSK and individuals with a duty of candor to the Patent office, including Dr. Jackson, withheld material information from the Patent Office, relating to and inconsistent with the information and representations made in the Jackson Declaration, as set forth in Sections (III)(A), paragraphs 274-380.

606.    The false and misleading information, material misstatements and withheld or omitted information relating to the Jackson Declaration were material to patentability. *Id.*

146

00403270

607.    The facts and circumstances surrounding the preparation, signing and filing of the Jackson Declaration demonstrate that GSK, Dr. Jackson and others associated with the prosecution of the '845 patent acted with intent to deceive the Patent Office.  (*See Findings of Fact* Section (III)(A)(4), paragraphs 316-358, *infra.*

608.    The highly material nature of the false and misleading information, material misstatements and the withheld or omitted information gives rise to an inference that GSK, Dr. Jackson and others associated with the prosecution of the '845 patent acted with intent to deceive.

609.    The continuous and persistent pattern of false and misleading material misstatements and withheld or omitted information gives rise to an inference that GSK, Dr. Jackson and others associated with the prosecution of the '845 patent acted with intent to deceive.

610.    The Humphrey Declaration contained misleading and unsupported statements as set forth in Findings of Fact Section (III)(B), 381- 415.

611.    GSK and individuals with a duty of candor to the Patent Office withheld material information from the Patent Office relating to and inconsistent with the information and representations made in the Humphrey Declaration, as set forth in Findings of Fact Section (III)(B), paragraphs 381-415.

612.    The misleading information, unsupported statements, and withheld or omitted information relating to the Humphrey Declaration were material to patentability.  (*Id.*)

613.    The facts and circumstances surround the misleading and unsupported statements, and the withheld or omitted information relating to the Humphrey Declaration demonstrate that

00403270

GSK, Dr. Humphrey and others associated with the prosecution of the '845 patent acted with intent to deceive the Patent Office.

614.    The highly material nature of the misleading information, unsupported statements and withheld information gives rise to an inference that GSK, Dr. Humphrey and others associated with the prosecution of the '845 patent acted with intent to deceive.

615.    The continuous and persistent pattern of false and misleading information, material misstatements and withheld information associated with the preparation, signing and submission of the Jackson and Humphrey Declarations gives rise to an inference that GSK, Drs. Jackson and Humphrey, and others associated with the prosecution of the '845 patent acted with an intent to deceive.

616.    Finally a weighing of the materiality and intent finding leads to the conclusion that the '845 patent is unenforceable due to inequitable conduct.

617.    The actions of Mr. Fichter described in Findings of Fact Section (III)(C), paragraphs 416-428 establish that Mr. Fichter, GSK and others involved in the prosecution of the '845 patent engaged in inequitable conduct before the Patent Office.

**C.    The Cumulative Effect of These Material Omissions and Misrepresentation Demonstrates an Intent to Deceive the Patent Office**

618.    While GSK's inequitable conduct involving the Jackson Declaration, the Humphrey Declaration and the Mr. Fichter actions were individually proven with clear and convincing evidence, the totality of GSK's actions present another, even stronger, case for unenforceability.

619.    The court finds based on previous discussion of the inequitable conduct that GSK's and the magnitude and scope of the combined acts that they were highly material.  (*See Generally* Findings of Fact Sections (III)(A) - (III)(D), paragraphs 274-429.)

148

620.    As a result GSK needs a lesser showing of deceptive intent.  When the acts are viewed as whole, however, there is even stronger evidence of deceptive intent.  The Jackson Declaration, Humphrey Declaration and Mr. Fichter's misstatements all occurred within one year of each other—and reflect a concerted, directed effort to obtain the '845 patent through inequitable conduct.  The combined material acts and their timing are clear and convincing evidence of a pattern of activity designed to deceive the Patent Office.

621.    A balancing of the materiality of the totality of GSK's conduct with the totality of the evidence of intent to deceive shows that Spectrum has provided clear and convincing evidence of inequitable conduct and therefore the '845 patent is unenforceable.

## IV.    Alternative Defenses Under 35 U.S.C. § 112

622.    Spectrum asserts in this action that both the '470 patent and the '845 patent fully enable and describe sumatriptan and its salts, including the succinate.  This renders the '845 patent invalid under 35 U.S.C. §§ 102 and 103.

623.    GSK's contentions in paragraphs 41-50, 215, 218, 260, 263, 265 and 279-301 of its proposed findings of fact and conclusions of law that the patent is not anticipated by, nor obvious in view of the '470 patent are inconsistent with its present assertions that the '845 patent fully supports claims to sumatriptan and its salts and solvates, compositions containing sumatriptan and its salts and solvates, and methods of treatment using sumatriptan and its salts and solvates.

624.    In particular, GSK now asserts that preparing salts from a parent compound that has been identified involves more than routine skill in the pharmaceutical arts, and that "the properties of salts and the properties of the acids and bases from which they are derived are not related in any predictable manner" and further that "[t]o this day, whether a particular salt will

149

have any desirable property, let alone a combination of properties that renders it suitable for pharmaceutical formulation can be determined only by making and testing the salt."

625.    The '845 patent, like the '470 patent, provides examples of only a handful of the salts that GSK now contends are covered by the term "physiologically acceptable salts and solvates."

626.    Nonetheless, GSK in both patents drafted and obtained claims to "physiological salts and solvates."

627.    Further, throughout the prosecution history of the '845 patent, GSK submitted data to the Patent Office alleging unexpected results for the claims of the '845 patent. While the claims recited sumatriptan and its physiological salts and solvates, GSK made no differentiation of or reference to the effects of the various salts of the compound or the comparative compounds in any of the data it submitted.

628.    GSK's position regarding salts in this case is a reversal of the position it maintained throughout the prosecution of both the '470 and '845 patents, and is effectively an assertion that the claims of the '845 patent are not enabled, are inadequately described, and are indefinite.

629.    In *Abbott Labs. v. Andrx Pharms., Inc.*, 452 F.3d 1331, 1341 (Fed. Cir. 2006), the patentee attempted to argue that there was no motivation to substitute clarithromycin for azithromycin because the compounds were "different." *Id.* at 1341. The U.S. Court of Appeals for the Federal Circuit rejected that argument and reversed. Abbott's own prior art patent (U.S. Patent No. 5,705,190) claimed compositions including azithromycin or clarithromycin — claims that satisfied the written description and enablement requirements of 35 U.S.C. § 112. *Id.* Consequently, "Abbott has represented to the Patent Office that the differences between

150

clarithromycin and azithromycin were such that azithromycin could be substituted into a controlled release clarithromycin composition." *Id.* Similarly, by drafting and obtaining claims in the '470 patent and '845 patent covering physiologically acceptable salts and solvates, based on the exemplification of and data relating only to the parent compound and/or a small number of salts, GSK has represented to the Patent Office that salts are a matter of routine skill in the art.

630.    Accordingly, if GSK were correct in its assertion that the '470 patent did not render the '845 patent anticipated and obvious, then Spectrum asserts, as a purely alternative argument, that the '845 patent is invalid under 35 U.S.C. § 112 for enablement, lack of written description and indefiniteness.

631.    GSK's assertions with respect to the '845 patent in paragraphs 63-81 of its proposed findings of fact and conclusions of law constitute admissions with respect to the parallel claims of the '470 patent, as set forth in the following paragraphs.

**A.    Test of Enablement**

632.    "The test of enablement is whether one reasonably skilled in the art could make or use the invention from the disclosures in the patent coupled with information known in the art without undue experimentation." *United States v. Teletronics, Inc.*, 857 F.2d 778,785 (Fed. Cir. 1988).

633.    "A claim will not be invalidated on section 112 grounds simply because the embodiments of the specification do not contain examples explicitly covering the full scope of the claim language. That is because the patent specification is written for a person of skill in the art, and such a person comes to the patent with the knowledge of what has come before. Placed in that context, it is unnecessary to spell out every detail of the invention in the specification; only enough must be included to convince a person of skill in the art that the inventor possessed the invention and to enable such a person to make and use the invention without undue

00403270

experimentation." *LizardTech, Inc. v. Earth Resource Mapping, Inc.*, 424 F.3d 1336, 1345 (Fed. Cir. 2005) (citations omitted).

**B.    The Claims of the '470 Patent Are Enabled**

634.    Each of the claims of the '470 Patent is enabled.

635.    Claims 1-14 of the '470 Patent are directed to compounds represented by formula or chemical name and/or physiologically acceptable salts of those compounds. The '470 Patent provides numerous examples of both general and specific methods for making the claimed compounds or physiologically acceptable salts of the claimed compounds.

636.    Claims 15 and 17 of the '470 Patent are directed to a pharmaceutical composition comprising one of the claimed compounds or a physiologically acceptable salt or solvate thereof together with one or more physiologically acceptable carriers or excipients. The '470 Patent specification describes numerous pharmaceutical compositions containing the claimed compounds, salts of the claimed compounds (including the succinate salt) and pharmaceutically acceptable carriers or excipients (for example, magnesium stearate, starch, lactose, water and salt). Such pharmaceutical compositions include orally administered tablets and capsules, syrup, tablets for buccal administration, suppositories, intravenous injections, inhalation cartridges, and metered-dose pressurized aerosol.

637.    Claims 16 and 18 of the '470 Patent are directed to methods of treating patients suffering from migraines by administering an effective amount of the claimed compounds or salts of the claimed compounds. The '470 Patent provides dosage and frequency information for various forms of administration to humans suffering from migraine.

**C.    The Written Description Requirement**

638.    To meet the written description requirement of 35 U.S.C. § 112, ¶ 1, a patent specification "must describe the invention sufficiently to convey to a person of skill in the art

00403270

that the patentee had possession of the claimed invention at the time of the application, i.e., that the patentee invented what is claimed." *LizardTech*, 424 F.3d at 1345.

**D.    The '470 Patent Meets the Written Description Requirement**

639.    The '470 Patent meets the written description requirement.

640.    The portions of the '470 Patent specification that recite both general and specific methods for making the claimed compounds and salts of the claimed compounds adequately support claims 1-14 of the '470 Patent, which are directed to the claimed compounds and their salts. A person of ordinary skill would understand that the patentee had invented all the claimed compounds and their salts.

641.    The portions of the '470 Patent specification that recite numerous examples of pharmaceutical composition containing a salt of a claimed compound and pharmaceutical carriers or excipients adequately support claims 15 and 17, which is directed to such compositions. A person of ordinary skill would understand that the patentee invented pharmaceutical compositions containing any of the claimed compounds and/or salts combined with pharmaceutically acceptable carriers or excipients.

642.    The portions of the '470 Patent that describe treatment of patients suffering from migraine, read in conjunction with the examples and methods for making the claimed compounds and compositions containing the claimed compounds adequately supports claims 16 and 18 of the '470 Patent. A person of ordinary skill in the art would understand that the patentee invented methods of migraine treatment that utilize any of the claimed compounds, salts of the claimed compounds or pharmaceutical compositions containing those compounds.

**E.    The Test for Indefiniteness**

643.    "Section 112 paragraph 2 of the Patent Act requires that a patent specification conclude with one or more claims 'particularly pointing out and distinctly claiming subject

00403270

matter which the applicant regards as his invention.'  35 U.S.C. § 112, ¶ 2.  We have stated that

the standard for assessing whether a patent claim is sufficiently definite to satisfy the statutory

requirement as follows:  If one skilled in the art would understand the bounds of the claim when

read in light of the specification, then the claim satisfies section 112 paragraph 2." *Exxon*

*Research and Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001) (citation

omitted).

644.    "A determination of claim indefiniteness is a legal conclusion that is drawn from

the court's performance of its duty as the construer of patent claims.  The perspective of a person

of ordinary skill in the art at the time of the patent application governs the definiteness analysis.

The definiteness of a patent claim depends on whether one skilled in the art would understand

the bounds of the claim when read in light of the specification.  A claim is indefinite if its legal

scope is not clear enough that a person of ordinary skill in the art could determine whether a

particular [product or method] infringes or not." *Howmedica Osteonics Corp. v. Tranquil*

*Prospects, Ltd.*, 401 F.3d 1367, 1371 (Fed. Cir. 2005) (citations and internal quotations omitted,

alternations in original).

**F.    The Claims of the '470 Patent Meet the Statutory Definiteness Requirement.**

645.    The claims of the '470 Patent and '845 Patent meet the statutory definiteness

requirement.

646.    Claims 1-14 of the '470 Patent use or incorporate a chemical formula and

chemical terms whose scope is readily comprehensible to one of ordinary skill in the art.  A

person of ordinary skill in the art would understand the term "physiologically acceptable salts

and solvates" to refer to salt compounds or solvates that are safe to administer to a patient.

647.    Claims 15 and 17 of the '470 Patent also uses terms whose scope is

understandable by one of ordinary skill in the art.  "Pharmaceutically acceptable carriers or

00403270

excipients" refer to ingredients that go into pharmaceutical compositions, including that many such carriers and excipients disclosed in the '470 Patent specification.

648.    The phrase "an effective amount" refers to an amount sufficient to achieve the purpose of treating conditions such as migraine, and specific dosage information is provided in the '470 Patent specification. " '[E]ffective amount' is a common and generally acceptable term for pharmaceutical claims and is not ambiguous or indefinite, provided that a person of ordinary skill in the art could determine the specific amounts without undue experimentation." *Geneva Pharms. Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373, 1383-84 (Fed. Cir. 2003) (citation omitted).

649.    Claims 16 and 18 of the '470 Patent do not use any terms whose scope would not be understood by one of ordinary skill in the art.

## V.    35 U.S.C. § 101

650.    Spectrum contends that the '845 Patent is invalid pursuant to 35 U.S.C. § 101 because Section 101 incorporates the substantive requirements for patentability found in other sections of the patent statute, including anticipation (Section 102); obviousness (Section 103); enablement (Section 112, ¶ 1); written description (Section 112, ¶ 1); and indefiniteness (Section 112, ¶ 2).

## VI.    SUMMARY OF CONCLUSIONS

651.    Spectrum has provided clear and convincing evidence that each and every limitation of each and every claim of the '845 is anticipated by the '470 patent. Therefore, each claim of the '845 patent is invalid. (Findings of Fact Section (II)(A), paragraphs 84-120.)

00403270

652.    Based on the precedent of *Graham v. John Deere* and the clear and convincing evidence provided by Spectrum, the '845 is obvious in light of the '470 patent. Therefore the '845 patent is invalid. (Findings of Fact Section (II)(B), 121- 267.)

653.    There is clear and convincing evidence that the '845 patent is invalid for double patenting. (Findings of Fact Section (II)(C), paragraphs 268-273.)

654.    Spectrum has provided clear and convincing evidence of GSK's material omissions, material false statements and material misleading statements. Spectrum has also provided clear and convincing evidence of GSK's intent to deceive the Patent Office during the prosecution of the '845 patent. Based on the high materiality of GSK's misstatements and the strong evidence of deception the '845 patent is unenforceable under the doctrine of inequitable conduct. (Findings of Fact Section Sections (III), paragraphs 274-429.)

655.    Whereas the '845 patent is invalid for anticipation, obviousness, and double patenting and unenforceable due to inequitable conduct, Spectrum has not infringed the '845 patent.

00403270

## <u>CERTIFICATE OF SERVICE</u>

I, Julia Heaney, hereby certify that on October 20, 2005 I electronically filed the foregoing with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

Edmond D. Johnson
The Bayard Fim

I also certify that copies were caused to be served on October 20, 2005 upon the following in the manner indicated:

### <u>BY HAND</u>

Edmond D. Johnson
Peter B. Ladig
The Bayard Firm
222 Delaware Avenue
Suite 900
Wilmington, DE  19801

### <u>BY FEDERAL EXPRESS</u>

Daniel G. Brown
Frommer, Lawrence & Haug LLP
745 Fifth Avenue
New York, NY  10151

*/s/ Julia Heaney*
Julia Heaney (#3052)